IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KYLE ALEXANDER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-2159-KHV-JPO |
| | ) | |
| BF LABS INC., | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT BF LABS INC.'S MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION TO COMPEL

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................................... iii

I.      STATEMENT OF FACTS AND CHRONOLOGY LEADING TO MOTION TO
        COMPEL ........................................................................................................................... 2

        A.      Historical Background of Bitcoin and BF Labs ..................................................... 2

        B.      Litigation Background .......................................................................................... 4

        C.      The FTC Litigation Begins Without Any Notice to BF Labs ................................ 7

        D.      Defendant Responds to Plaintiffs' Discovery ...................................................... 11

        E.      Plaintiffs Initiate a Discovery Dispute ................................................................ 12

        F.      BF Labs Supplements its Interrogatory Answers ................................................. 13

        G.      BF Labs Supplements its Interrogatory Answers for the Second Time ................ 14

        H.      BF Labs Responds to Plaintiffs' Second Document Requests ............................. 15

        I.      BF Labs and Plaintiffs Continue to Discuss Discovery Issues ............................ 15

II.     ARGUMENTS AND AUTHORITIES .............................................................................. 16

        A.      Legal Standards for Discovery ............................................................................ 16

        B.      Discovery Ostensibly at Issue ............................................................................. 18

                1.      Interrogatory No. 5 ................................................................................. 19

                2.      Interrogatory No. 6 ................................................................................. 21

                3.      Interrogatory No. 7 ................................................................................. 22

                4.      Interrogatory No. 8 ................................................................................. 23

                5.      Interrogatory No. 9 ................................................................................. 23

                6.      Interrogatories 12 and 13 ........................................................................ 24

                7.      Interrogatories 14 and 15 ........................................................................ 24

                8.      Interrogatory No. 18 ............................................................................... 26

                9.      Interrogatory No. 19 ............................................................................... 27

10.    Interrogatory No. 20.................................................................................... 27

11.    Interrogatory No. 23.................................................................................... 28

12.    Requests for Production of Documents in General.................................... 29

13.    RFPD No. 11............................................................................................... 30

14.    RFPD No. 14............................................................................................... 30

15.    RFPD No. 20............................................................................................... 30

III.    CONCLUSION........................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allianz Ins. Co. v. Surface Specialities, Inc.*,
    Case No. 03-2470, 2005 WL 44534 (D. Kan. Jan. 7, 2005)....................................................17

*Apsley v. Boeing Co.*,
    2007 WL 3120712 (D. Kan. 2007) ...........................................................................................16

*Didier v. Abbott Laboratories, et al.*,
    2014 WL 219851 (D. Kan. Jan. 21, 2014)...............................................................18, 19, 20

*Firestone v. Hawker Beechcraft Intern. Service Co.*,
    2012 WL 899270 (D. Kan. March 16, 2012)...........................................................................19

*Hilt v. SFC Inc.*,
    170 F.R.D. 182 (D. Kan. 1997)................................................................................................18

*ICE Corp. v. Hamilton Sundstrand Corp.*,
    05-4135-JAR, 2007 WL 4239454 (D. Kan. Nov. 30, 2007) ...................................................18

*Koch v. Koch Industries, Inc.*,
    203 F.3d 1202 (10th Cir. 2000) ...............................................................................................17

*Lawrence v. First Kan. Bank & Trust Co.*,
    169 F.R.D. 657 (D. Kan. 1996)................................................................................................18

*Majdalani v. Legacy Bank*,
    Case No. 06-1317-MLB, 2007 WL 2694043 (D. Kan. Sept. 11, 2007) ..................................17

*Munoz v. S . Mary-Corwin Hosp.*,
    221 F.3d 1160 (10th Cir. 2000) ...............................................................................................17

*Payless Shoesource Worldwide, Inc., v. Target Corp.*,
    Case No. 05-4023-JAR, 2007 WL 1959194 (D. Kan. June 29, 2007) ...................................18

*Sonnino v. University Kansas Hosp. Authority*,
    220 F.R.D. 633 (D. Kan. 2004)................................................................................................16

**Other Authorities**

D. Kan. Rule 37.1(b).........................................................................................................................18

Rule 26(b)(2)(i), (ii)..........................................................................................................................17

Rule 26(b)(2)(iii)...............................................................................................................................17

Rule 26(b)(2)(C) ......................................................................................................................17

Rule 26(g)(1)......................................................................................................................12, 14

The Court should deny the Plaintiffs' Motion. Not only were BF Labs' responses to Plaintiffs' First Interrogatories and First Requests for Production of Documents and Electronically Stored Information[1] sufficient when BF Labs initially answered, but BF Labs has gone above and beyond the Plaintiffs' specific questions in an effort to provide responsive information. BF Labs has also provided its entire hard drive of Electronically Stored Information ("ESI") to the Plaintiffs resulting in the production of thousands of electronic records responsive to Plaintiffs' requests.[2]

BF Labs has twice supplemented its answers to Plaintiffs' First Interrogatories. Following service of the initial discovery responses, and after meeting and conferring with Plaintiffs' counsel, BF Labs supplemented its answers to the Plaintiffs' First Interrogatories before the Plaintiffs even filed their Motion on March 20, 2015. *See* Supplemental Answers and Objections to Plaintiffs' First Interrogatories, attached as Exhibit C. Then, after the Plaintiffs filed their Motion, the parties again conferred to discuss what issues may remain following Plaintiffs' receipt of the supplemental answers. These discussions clarifying the nature and scope of the discovery caused BF Labs to further supplement its interrogatory answers (even though it believed its initial answers were sufficient) and it served those second supplemental answers to Plaintiffs' counsel on April 1, 2015. *See* Second Supplemental Answers and Objections to Plaintiffs' First Interrogatories, attached as Exhibit D. Thereafter, on April 9, 2015, and at

---

[1] BF Labs Inc.'s Responses to Plaintiffs' First Requests for Production of Documents and Electronically Stored Information are attached as Exhibit A, and BF Labs Inc.'s Answers and Objections to Plaintiffs' First Interrogatories are attached as Exhibit B.

[2] Because of the extraordinary expense that BF Labs, a start-up company that was controlled by a temporary receiver for over three months, was going to have to incur to review and label tens (or even hundreds) of thousands of documents, BF Labs agreed to produce to the Plaintiffs the entire hard drive of all ESI that BF Labs collected [subject to reviewing for privilege and supplying a privilege log]. In that the Plaintiffs agreed to this, BF Labs believes that this moots Plaintiffs' complaints about the Requests for Production, other than a few minor issues discussed below, including a disagreement as to how the search was done to locate attorney-client privileged e-mails.

Defendant's request, the parties' counsel discussed again whether there were any remaining unresolved issues. Unfortunately, Plaintiffs' counsel continues to assert that BF Labs' answers are deficient.

To the contrary, it is evident that BF Labs can do nothing to slake Plaintiffs' thirst for a judicial resolution despite providing lengthy, complete responses to written discovery and producing thousands of paper and electronic records. For the reasons discussed herein, Plaintiffs' Motion to Compel should be denied.

## I.   STATEMENT OF FACTS AND CHRONOLOGY LEADING TO MOTION TO COMPEL

BF Labs believes the Court would benefit from additional background and presents the following facts to support this Memorandum in Opposition:

### A.   Historical Background of Bitcoin and BF Labs

1. Bitcoin came into existence in about 2009. *See* David McClain Declaration, ¶ 2, attached Exhibit E.

2. Bitcoin was initially mined with the central processing unit (CPU) in laptop or desktop computers, and subsequently with the more powerful graphics cards (GPU) in these types of computers. *See* Ex. E, ¶ 3.

3. In 2011, BF Labs was incorporated to manufacture a line of high speed encryption processors for use in Bitcoin mining, research, telecommunication, and security applications. *See* Ex. E, ¶ 4.

4. In 2012, BF Labs introduced FPGA technology that was approximately two times faster than graphics cards, which were in turn hundreds of times faster than the original CPUs. *See* Ex. E, ¶ 5.

5. In 2013, BF Labs introduced ASIC 65nm technology that was approximately 80 times faster than its FPGA technology. *See* Ex. E, ¶ 6.

6. The ASIC 28nm technology (the "Monarch") that BF Labs began shipping in August 2014 is approximately 10 times faster than the ASIC 65nm technology. At this point, speeds are 1600 times faster than the GPUs and many thousands of times faster than the original CPUs. *See* Ex. E, ¶ 7.

7. While the majority of bitcoin miners accepted the development of new technology, they had to be willing to invest money in specialized

2

equipment in order to compete with thousands of new entrants into "their" industry, or they risked not being able to keep pace. *See* Ex. E, ¶ 8.\

8. Bitcoin miners desired faster, more powerful, more energy-efficient devices as soon as they could get them in order to get a perceived "jump on the other guy." As soon as a new product was announced, some miners insisted on queuing up to be as near the front of the line as possible, and these miners were and are willing to place deposits of up to 100% to secure a delivery slot. *See* Ex. E, ¶ 9.

9. A fully prepaid preorder process has been standard industry practice as the market price of bitcoin fluctuates up and down, causing miners to want either to join the race or to drop out of it. Some miners try to arbitrage the market fluctuation by placing, canceling, and reinstating orders as the price of bitcoin rises, falls, and rises again. This practice creates havoc for the manufacturer, who is trying to forecast product demand, buy parts with long lead times in order to meet the demand, and hire staff to assemble the orders. The financial risk thus shifts to the manufacturer, who runs the risk of getting stuck with obsolete inventory if a competitor announces a product seemingly more attractive that is promised for future delivery, and customers in the queue shift their orders to the competitor. *See* Ex. E, ¶ 10.

10. The above factors, which reflect industry standard practices and are consistent with significant competing manufacturers of similar equipment, led BF Labs to initially use a fully prepaid preorder process whereby the funds paid by a customer are applied to pay for the purchase of parts and labor used in the manufacturing process, making it impractical to reverse an order. *See* Ex. E, ¶ 11.

11. BF Labs' preorder sales model, including the fact that preorder funds may be used to complete the development and manufacture of the products, was fully disclosed to its customers. *See* Ex. E, ¶ 12.

12. When consumers placed preorders for products other than the FPGA generation with BF Labs, consumers accepted terms of purchase including that the shipping range for the ordered product was "two months or longer." *See* Ex. E, ¶ 13.

13. At times, BF Labs' website instructed customers who could not tolerate a two-month or longer waiting period for the ordered product that they should "NOT preorder this product." *See* Ex. E, ¶ 14.

14. BF Labs updated its shipping projections, provided detailed production updates, and gave day-by-day shipping updates. BF Labs never promised specific shipping dates for its products, but rather estimated and projected shipping dates determined in good faith. *See* Ex. E, ¶ 15.

15. Despite clear and unequivocal warnings that consumers were entering into a preorder arrangement for undeveloped products and that a delivery timeframe could not be assured, consumers voluntarily chose to complete their orders. *See* Ex. E, ¶ 16.

16. Like other bitcoin mining manufacturers, BF Labs experienced growing pains—particularly speed-to-market issues—in this developing market. *See* Ex. E, ¶ 17.

**B.    Litigation Background**

17. On December 2, 2013, Martin Meissner, a dual German-Polish national, filed a lawsuit in the United States District Court for the District of Kansas against BF Labs based on delays in shipping bitcoin mining equipment. *See* Case No. 13-2617-RDR-KGS (Dock. 2).

18. On April 4, 2014, Plaintiffs Kyle Alexander and Dylan Symington filed this putative class action on behalf of anyone who ever prepaid BF Labs for bitcoin mining equipment. (Dock. 1.)

19. On the day this lawsuit was filed, the price of one bitcoin was $448.88. *See* Ex. E, ¶ 18.

20. On April 4, 2014, the Wood Law Firm sent a letter and notice to preserve documents to Polsinelli PC, informing BF Labs that it was under a duty not to destroy, conceal, or alter potential relevant evidence. *See* Michael Foster Declaration, ¶ 2, attached Exhibit F.

21. Thereafter, Polsinelli provided BF Labs an attorney-client privileged preservation notice which was signed by ten different custodians. *See* Ex. F, ¶ 3.

22. From June to August 2014, Polsinelli conducted numerous and extensive attorney-client privileged custodian interviews. *See* Ex. F, ¶ 4.

23. On June 25, 2014, this Court entered a Scheduling Order. (Dock. 8.)

24. During that scheduling conference, the Court inquired about BF Labs' net worth. Attorney Michael Foster recollects that attorney James Humphrey told the Court that BF Labs was worth $10 million to $20 million dollars. *See* Ex. F, ¶ 5.

25. On June 25, 2015, on the day of the scheduling conference, the price of bitcoin had risen to $562.13. Most of BF Labs' assets on that day were bitcoin. Ex. E, ¶ 19.

26. On July 10, 2014 an Agreed Order was entered Establishing Protocol for ESI and Paper Documents. The Order stated: "[a]s part of the parties'

4

agreement, the parties may embark on a collaborative effort to identify appropriate Search Terms and Searching Syntax, scoped to key player custodians and date range filtering corresponding to the subject matter of this lawsuit." (Dock. 12.)

27.     On July 17, 2014, BF Labs voluntarily ended its preorder sales model for bitcoin mining equipment. *See* Ex. E, ¶ 20.

28.     On August 18, 2014, Plaintiffs served their first interrogatories and first requests for production to BF Labs. (Dock. 28.)

29.     Thereafter, BF Labs' counsel sent Plaintiffs' discovery requests to BF Labs. *See* Ex. F, ¶ 6.

30.     BF Labs does not employ in-house counsel. *See* Ex. E, ¶ 21.

31.     On August 20, 2014, BF Labs' produced its Bates-labeled insurance policy to Plaintiffs' counsel. *See* Ex. F, ¶ 7.

32.     On August 20, 2014, Bruce Bourne, a consultant and acting Chief Financial Officer to BF Labs, in a privileged communication to Polsinelli discussed the difficulties in answering the discovery requests and discussed pulling an employee off of work to begin working on the responses as a full time project manager. *See* Ex. F, ¶ 8.

33.     BF Labs' Monarch line began to ship on August 20, 2014. *See* Ex. E, ¶ 22.

34.     On August 26, 2014, BF Labs' counsel participated in an attorney-client privileged and work-product phone call with Modus, a provider of eDiscovery services, about collecting BF Labs' data for the two lawsuits filed against the company. *See* Ex. F, ¶ 9.

35.     On August 28, 2014, BF Labs signed a non-disclosure agreement (NDA) with Modus. The next day, Modus signed the NDA. *See* Ex. F, ¶ 10.

36.     On or around August 29, 2014, BF Labs and Modus both signed the letter of engagement. *See* Ex. F, ¶ 11.

37.     On September 2 and 3, 2014, BF Labs' counsel and a Modus employee spent two full days at BF Labs' headquarters, imaging key custodians' hard drives, capturing e-mails, etc. The entire size of Modus' data collection was 1.6 TB. *See* Ex. F, ¶ 12.

38.     On September 4, 2014, Plaintiffs filed a notice of intent to subpoena documents to Michael Marquardt d/b/a bitcointalk.org for BF Labs' employees' internet postings made in the forum. BF Labs did not object. *See* Ex. F, ¶ 13.

39.     On September 8, 2014, based on and following numerous discussions concerning BF Labs, documents, systems, policies, procedures, etc., Polsinelli sent an attorney-client privileged communication to BF Labs concerning discovery responses to Plaintiffs' requests. Dave McClain, account manager at BF Labs, was appointed as point person for responding to Plaintiffs' discovery requests. Ex. E, ¶ 23.

40.     Also on September 8 and 9, 2014, multiple attorney-client privileged e-mail correspondence took place between BF Labs' counsel and Modus about continuing to collect data. *See* Ex. F, ¶ 14.

41.     From September 9–20, 2014, McClain traveled to Slovenia and London for work. Counsel for BF Labs and McClain discussed meeting in person to go over responses when McClain returned from the European business trip. *See* Ex. E, ¶ 24.

42.     On September 12, 2014, McClain sent an attorney-client privileged e-mail to Polsinelli noting the difficulty of responding to all of Plaintiffs' requests. That same day, McClain sent another attorney-client privileged e-mail to counsel indicating that BF Labs would likely need an extension due to the breadth and scope of discovery and that he would get back from the European business trip on September 22, 2014 to discuss these questions with counsel in person first thing on September 22, 2014 to go over the discovery responses and finalize. *See* Ex. E, ¶ 25.

43.     On September 12, 2014, multiple attorney-client privileged e-mails between BF Labs and its counsel were sent discussing the burden and scope of these interrogatories and what BF Labs was required to do. Bruce Bourne assigned additional people to work on each request. *See* Ex. E, ¶ 26.

44.     On September 15, 2014, internal attorney-client privileged Polsinelli e-mails were exchanged about potentially using Counsel on Call to review and mark documents. Polsinelli determined it needed to see the amount of data that Modus collected before making a decision. *See* Ex. F, ¶ 15.

45.     On September 18, 2014, BF Labs sent its counsel multiple attorney-client privileged e-mails asking questions on specific discovery requests. *See* Ex. E, ¶ 27.

46.     On September 18, 2014, Polsinelli sent The Wood Law Firm an e-mail confirming the due date is September 22, 2014 because the discovery requests stated the answers were due on September 19, 2014. *See* Ex. F, ¶ 16.

**C.    The FTC Litigation Begins Without Any Notice to BF Labs**

47.    On September 18, 2014, without BF Labs' knowledge of a FTC investigation, the Western District of Missouri entered an *ex parte* order freezing BF Labs' assets, appointing a temporary receiver, and staying any and all actions against BF Labs. *See* Ex. E, ¶ 28; Case No. 14-815-BCW (Dock. 9).

48.    On the date of the *ex parte* order, the price of one bitcoin was $421.46. *See* Ex. E, ¶ 29.

49.    On September 19, 2014, counsel for BF Labs spent the entire morning working on discovery responses. Counsel planned to continue to work with clients that day, determine where they were on the responses, and then potentially ask for an extension of two to three weeks to respond to discovery if it could not be finalized on Monday. *See* Ex. F, ¶ 17.

50.    On September 19, 2014, the FTC, along with its investigator, attorneys, federal marshals, and the court-appointed Temporary Receiver and his counsel raided BF Labs' building and the employees were forced to leave. Completed Monarch devices were on loading docks ready to be shipped (as they had been during the previous month). Polsinelli learned of this development around 11:00 a.m. and later counsel drove to BF Labs' headquarters and met with the Temporary Receiver, his counsel, and the FTC. BF Labs employees were told to leave and cease all activity. *See* Ex. F, ¶ 18; Ex. E, ¶ 30.

51.    At the time the FTC, without notice, raided BF Labs' headquarters, BF Labs was in process of refunding customers who wanted a refund rather than delivering a product. That is, when a Monarch unit passed quality-control tests and became ready for shipment, the next customer in the preorder queue was sent an e-mail that offered the customer the choice of either a refund or product delivery. Whichever selection the customer made, BF Labs timely fulfilled it. *See* Ex. E, ¶ 31.

52.    On September 22, 2014, BF Labs' answers and responses to Plaintiffs' interrogatories and requests were originally due to Plaintiffs. *See* Ex. F, ¶ 19.

53.    On September 28, 2014, ten days after the *ex parte* temporary restraining order was entered, Plaintiffs filed an emergency motion to intervene in the FTC case. Case No. 14-815-BCW (Dock. 43).

54.    On September 29, 2014, the Preliminary Injunction Hearing was scheduled to occur in the *FTC v. BF Labs Inc., et al*., matter. The parties thereafter agreed to a stipulated interim order delaying preliminary injunction hearing until November 2015. *See* Ex. F, ¶ 20.

55.    On October 3, 2014, the Western District of Missouri denied the Plaintiffs' emergency motion to intervene. Case No. 14-815-BCW (Dock. 59).

56.    On October 21, 2014, BF Labs received a bill for $80,256.29 from Modus for its collection efforts in September 2014. The Temporary Receiver never paid this bill. *See* Ex. E, ¶ 32.

57.    On November 21, 2014, the Temporary Receiver and his consultants and attorneys submitted their First Application for Allowance of Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses for the Period September 18, 2014 through October 31, 2014 seeking $662,799.18 in fees and $12,900.32 in expenses. Case No. 14-815-BCW (Dock. 173).

58.    On November 24 and 25, 2014, a two-day preliminary injunction hearing was held in the Western District of Missouri. Case No. 14-815-BCW (Dock. 178, 179).

59.    On December 3, 2014, the FTC and BF Labs submitted proposed findings of fact and conclusions of law to the Western District of Missouri. Case No. 14-815-BCW (Dock. 188, 193).

60.    On December 12, 2014, the Western District of Missouri entered an order denying the FTC's motion for preliminary injunction and continuation of asset freeze and receivership. The Order required BF Labs to submit monthly written reports under seal that address assessment of remaining preorder refund liability, including status of refund requests and the progress toward generating assets to pay out all requested refunds in a timely manner. Case No. 14-815-BCW (Dock. 201).

61.    On December 18, 2014, the Temporary Receiver and his consultants and attorneys submitted their Second Application for Allowance of Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses for the Period November 1, 2014 through November 30, 2014 seeking $275,026.94 in fees and $4,259.08 in expenses. Case No. 14-815-BCW (Dock. 212).

62.    On December 23, 2014, the Court lifted the stay in *FTC v. BF Labs Inc., et al*. Protocols were entered establishing transfer of BF Labs' property (including bitcoin wallets) back from the Temporary Receiver to BF Labs. Case No. 14-815-BCW (Dock. 218).

63.    On December 23, 2014, the price of one bitcoin had dropped further to $334.05. *See* Ex. E, ¶ 33.

64.    No BF Labs products were shipped to consumers and no refunds were made to consumers during the interim period (September 19, 2014 through

December 23, 2014). By halting BF Labs' operations for more than three months, the FTC caused BF Labs' refund liability to its customers to increase significantly. As a result of the injunctive measures entered, BF Labs suffered losses of key employees, losses of vendors due to perceived stigma of working with a company being shut down by a governmental agency's action, and the economic waste of unique technology sitting idle while competitive windows narrow. When the company was returned, BF Labs immediately began trying to remedy some of the harm caused. *See* Ex. E, ¶ 34.

65.     BF Labs incurred literally millions of dollars in additional costs to pay for attorneys to defend itself, accountants to examine it, and a Temporary Receiver and his legal team to oversee it. *See* Ex. E, ¶ 35.

66.     In terms of product value, with the passage of time from the delay, competitors were able to take pre-orders for newer products. BF Labs was prevented from competing to be the first to develop and release new mining equipment. BF Labs was left with the reality that once a competitor's new product was out, customers would want refunds instead of the "older" BF Labs products. Other competitors dramatically lowered their prices during the three-month delay, resulting in customers electing refunds instead of taking delivery of the equipment. *See* Ex. E, ¶ 36.

67.     With respect to vendor relations, BF Labs' payment accounts were frozen and the temporary receiver made disbursements as and when he deemed it appropriate. Vendors went weeks without any payments or communication. Many issued late notices, and some even issued disconnect notices. More than one supplier refused to do business with BF Labs until all past due invoices were paid and future goods or services were paid in advance. One contract software engineer refused any further work with the company due to the perceived stigma of working with a company being sued for fraud by the government. *See* Ex. E, ¶ 37.

68.     On December 29, 2014, Plaintiffs and BF Labs attended a telephonic scheduling conference with this Court regarding amending the scheduling order. The next day, the Court entered an amended scheduling order. (Dock. 60.)

69.     On December 30, 2014, pursuant to the Western District of Missouri's Order, BF Labs began making refunds to customers in the refund queue. *See* Ex. E, ¶ 38.

70.     On January 12, 2015, the Temporary Receiver filed his sealed motion to approve final accounting. Case No. 14-815-BCW (Dock. 233).

71.     On January 12, 2015, the price of bitcoin dropped to $267.09. *See* Ex. E, ¶ 39.

72.     On January 14, 2015, Polsinelli communicated with Modus to discuss the outstanding invoices for September to December 2014 and processing, collection, and fees moving forward. *See* Ex. F, ¶ 21.

73.     Following over four months of disruption, BF Labs began to work again on responses to Plaintiffs' discovery requests in January 2015. *See* Ex. E, ¶ 40.

74.     On February 6, 2015, McClain sent Polsinelli attorney-client privileged communications concerning answers to Plaintiffs' interrogatories. *See* Ex. E, ¶ 41.

75.     On February 6, 2015, Polsinelli discovered that Modus, by mistake, failed to collect a few e-mail addresses from its ESI collection. Modus then collected the data from those missing e-mail addresses from BF Labs. *See* Ex. F, ¶ 22.

76.     On February 9, 2015, McClain sent attorney-client privileged spreadsheets and documents relevant to Plaintiffs' interrogatories to Polsinelli. *See* Ex. E, ¶ 42.

77.     On February 10, 2015, counsel for BF Labs sent Plaintiffs' counsel an e-mail letting him know that BF Labs and its counsel were "working on getting you discovery responses to your interrogatories now. Some are complex and require a lot of work from the client. Still working hard and even over the weekend with Modus to get everything that was collected processed. I should have responses to you soon. I will be back in touch (and be on the phone here in 20 minutes) very soon." *See* Ex. F, ¶ 23.

78.     On February 12, 2015, additional multiple attorney-client privileged e-mails were exchanged between Polsinelli and BF Labs regarding finalizing Plaintiffs' discovery requests. *See* Ex. E, ¶ 43.

79.     On February 17, 2015, multiple attorney-client privileged e-mails were exchanged between Polsinelli and BF Labs regarding finalizing Plaintiffs' discovery requests. *See* Ex. E, ¶ 44.

80.     On February 17, 2015, Plaintiffs' counsel sent a golden rule letter to BF Labs requesting BF Labs to provide discovery responses no later than February 20, 2015. *See* Ex. F, ¶ 24.

81.     On February 19, 2015, multiple attorney-client privileged e-mails were sent between Polsinelli and BF Labs regarding finalizing Plaintiffs' discovery requests. *See* Ex. E, ¶ 45.

82.     On February 20, 2015, Tammy Reed with Wood Law Firm sent an e-mail to this Court without cc'ing BF Labs' counsel or even asking whether BF Labs was providing discovery responses that day, stating that "[w]e are

having a discovery issue and would like to know if Judge O'Hara might be available this afternoon for a brief phone conference with the parties. You can reach me by phone at (816) 651-2400. Thanks. Tammy." Based on a response back from Megan J. Miller, who cc'ed all counsel of record, BF Labs' counsel immediately called Plaintiffs' counsel asking what the dispute was about and informing him that BF Labs was currently finalizing discovery responses that day pursuant to the Plaintiffs' February 17, 2015 letter. *See* Ex. F, ¶ 25.

83.   Plaintiffs' counsel informed this Court that "[t]he dispute is between Plaintiffs and BFL regarding BFL's discovery responses. Since the stay in the FTC action was lifted, the parties have been discussing a date by which BFL would provide discovery responses, but an agreement couldn't be reached in January or February thus far. Plaintiffs demanded BFL to provide responses by 2/20 and planned to file a motion to compel on 2/21 if necessary. The parties again discussed the issue today prior to providing a joint summary of the dispute to the court. BFL advised they will provide discovery responses today. As it stands, a teleconference is no longer necessary at this time."

**D.    Defendant Responds to Plaintiffs' Discovery**

84.   At 10:32 p.m. on February 20, 2015, BF Labs' served discovery responses by e-mail to Plaintiffs' counsel. Counsel for BF Labs noted that if Plaintiffs had any questions or needed any information before the mediation February 26 to let them know. BF Labs' responses to Plaintiffs' requests for production included an answer respecting electronically stored information that states: "in accordance with the ESI protocol, including an agreement on search terms and custodians, BF Labs will conduct a reasonable search for and produce responsive non-privileged documents." *See* Ex. F, ¶ 26.

85.   On February 23, 2015, BF Labs' counsel sent to Plaintiffs' counsel the exhibits identified in BF Labs' Answers to Plaintiffs' First Interrogatories. Those exhibits included order dates (including consideration paid) and order status for BF Labs' products, refund requests, and a list of customers who notified BF Labs the equipment they received was defective, not working properly, or not working according to specification. *See* Ex. F, ¶ 27.

86.   On February 26, 2015, a mediation between the parties took place at The McLeod Law Firm. The mediation lasted nine hours and the case did not settle. *See* Ex. F, ¶ 28.

E.    **Plaintiffs Initiate a Discovery Dispute**

87.    On March 3, 2015, just days after a very long, though unsuccessful mediation, Plaintiffs' counsel sent a golden rule letter stating that "we believe the responses provided are insufficient, incomplete, and do not comply with Rule 26(g)(1)." Plaintiffs served their Second Requests for Production the same day. (Dock. 67.) *See* Ex. F, ¶ 29.

88.    On March 6, 2015, BF Labs paid Modus $78,264.45 after multiple attorney-client privileged negotiations to lower the amount of the September bill and Modus continued to work on processing data. *See* Ex. E, ¶ 46.

89.    On March 4, 2015, Plaintiffs filed a notice of intent to subpoena documents to Michael Marquardt d/b/a bitcointalk.org for BF Labs' employees' internet postings made in the forum. BF Labs did not object. *See* Ex. F, ¶ 30.

90.    On March 12, 2015, Modus sent its February 2015 invoice for $9,389.36 to BF Labs. *See* Ex. E, ¶ 47.

91.    On March 13, 2015, Plaintiffs' counsel and BF Labs' counsel met and conferred for three and a half hours over the telephone about Plaintiffs' golden rule letter and specific issues with BF Labs' discovery responses. It is attorney Michael Foster's belief that no party had reached out to the other about agreed-upon search terms or ESI production until this date. *See* Ex. F, ¶ 31.

92.    On March 16, 2015, Plaintiffs filed an Affidavit of Service serving Michael Marquardt d/b/a bitcointalk.org for BF Labs' employees' internet postings made in the forum on March 7, 2015. (Dock. 70.)

93.    On March 17, 2015, BF Labs' counsel sent a letter to Plaintiffs' counsel with the proposed ESI search terms and production protocols based on the requests for production. Included as exhibits were the names included in the electronic privileged terms search, the ten custodians, and the search terms proposed as a reasonable and proportional approach to respond to Plaintiffs' requests for production. Based on the data collection set of e-mails for the ten custodians identified, the set contained approximately 218,000 documents. Using the search terms and excluding the privileged terms resulted in "79,251 hits." BF Labs' counsel noted that a review of that amount of documents is not realistic, proportional, or reasonable and BF Labs was "therefore looking for practical alternatives to reduce the size of the review and production set." *See* Ex. F, ¶ 32.

94.    On March 18, 2015, based on negotiated fee reductions, Modus revised its February invoice to $7,606.18. *See* Ex. E, ¶ 48.

### F. BF Labs Supplements its Interrogatory Answers

95. On March 20, 2015, at 12:26 p.m., BF Labs' counsel sent a letter to Plaintiffs' counsel addressing the issues that Plaintiffs had with each of BF Labs' Interrogatory Answers and explaining BF Labs' position. At 12:31 p.m. BF Labs sent Plaintiffs' counsel the native files that Plaintiffs requested. At 1:28 p.m., BF Labs sent Plaintiffs' counsel supplemental interrogatory answers with three additional exhibits based on Plaintiffs' concerns with BF Labs' initial answers. At 6:30 p.m., Plaintiffs file their Motion to Compel while noting that they "have not had sufficient time to review these supplemental answers but will notify the court and agree to withdraw any issues . . . ." *See* Ex. F, ¶ 33.

96. On March 23, 2015, two companies submitted bids to review approximately 90,000 documents. One company submitted a bid for $79,415, the other company submitted a bid for $135,000 to $165,000. *See* Ex. F, ¶ 34.

97. On March 26, 2015, BF Labs' counsel sent Plaintiffs' counsel an e-mail asking whether, before BF Labs drafted a response to Plaintiffs' Motion to Compel, the parties could discuss what had been mooted by BF Labs' supplemental answers and ESI Agreement. The parties later discussed ESI and discovery issues on the telephone. At 5:08 p.m., BF Labs' counsel sent Plaintiffs' counsel an e-mail in preparation for a phone call set for the next day about what BF Labs had collected for ESI purposes. *See* Ex. F, ¶ 35.

98. On March 27, 2015, BF Labs paid Modus an additional $7,606.18 for its electronic discovery efforts. The parties had a conference call, finalizing processing and production options with the associated costs. *See* Ex. F, ¶ 36; Ex. E, ¶ 49.

99. On March 27, 2015, counsel for BF Labs and counsel for Plaintiffs conferred for a few hours about remaining discovery issues and what the Plaintiffs believed still was lacking from the interrogatory responses; the parties came to an informal agreement that BF Labs would produce its entire hard drive of data to Plaintiffs in lieu of the agreed-upon ESI protocol so that BF Labs would not have to incur the substantial expense of hiring external reviewers (as well as its belief that reviewing 218,000 documents was not reasonable or proportional) for reviewing and marking documents. *See* Ex. F, ¶ 37.

100. On Saturday, March 28, 2015, at 8:50 p.m., BF Labs' counsel sent an e-mail to Plaintiffs' counsel about the remaining ESI issues and BF Labs' proposal to produce a hard drive to Plaintiffs so they may internally review BF Labs' ESI. *See* e-mail chain, attached as Exhibit G.

101. On March 30, 2015, Plaintiffs' counsel sent an e-mail to BF Labs' counsel confirming they had reached an agreement about ESI but clarifying a few small issues. Plaintiffs' counsel also acknowledged that BF Labs would be supplementing its interrogatory answers a second time. *Id*.

102. From December 2014 through April 2015, BF Labs was also served with and responded to discovery requests in the *Meissner* and *FTC* cases. Because of the significant costs involved in reviewing and marking ESI, BF Labs and the FTC reached a similar agreement to the agreement reached with the Plaintiffs that BF Labs produce its entire hard drive in lieu of running search terms and marking documents as confidential. *See* Ex. F, ¶ 38.

### G.   BF Labs Supplements its Interrogatory Answers for the Second Time

103. On April 1, 2015, BF Labs served its second supplemental answers and objections to Plaintiffs' First Interrogatories. BF Labs hand delivered two exhibits to these interrogatories to the Wood Law Firm and also delivered to Plaintiffs additional documents that BF Labs was producing. These documents were Bates labeled BFLABS-KA 00002731 to 00003289. *See* Ex. F, ¶ 39.

104. By this time, McClain had worked on the interrogatory responses at least 50% of the time for 22 days (and on some days 100% of the time) from January 21 to April 1, 2015. Other BF Labs employees and consultants spent significant time (including entire days) on discovery responses as well. *See* Ex. E, ¶ 50.

105. McClain estimated that he had spent approximately 140 hours working on the discovery responses at issue. Five other BF Labs employees or consultants estimated that they spent anywhere from three to 15 hours working on discovery responses to Plaintiffs' requests. *See* Ex. E, ¶ 51.

106. On April 1, 2015, BF Labs' counsel requested a telephone call with Plaintiffs' counsel to discuss the second supplemental responses and whether it mooted all or nearly all complaints in the motion to compel. BF Labs' counsel also asked for an additional week to respond to the motion to compel to try to work through any remaining issues. Plaintiffs' counsel did not oppose giving BF Labs another week to work out their differences before BF Labs responded to the motion to compel. *See* Ex. F, ¶ 40.

107. On April 1, 2015, BF Labs filed an unopposed motion for an extension of time to respond to Plaintiffs' Motion to Compel. This Court entered an Order granting that Motion. (Dock. 76, 77.)

108. On April 2, 2015, BF Labs' counsel reached out to Plaintiffs' counsel again to discuss the supplemental discovery and see what remaining issues

14

existed. Plaintiffs' counsel responded by stating he was available after April 6, 2015. *See* Ex. F, ¶ 41.

**H.    BF Labs Responds to Plaintiffs' Second Document Requests**

109.    On April 6, 2015, BF Labs served its responses to Plaintiffs' second requests for production the day they were due as well as produced via hand delivery another production, Bates labeled BFLABS-KA 00003290 to 00025988. *See* Ex. F, ¶ 42.

110.    On April 6, 2015, James Humphrey withdrew as counsel for BF Labs and Mark Olthoff entered his appearance as substituting counsel of record for BF Labs. (Dock. 78.)

**I.    BF Labs and Plaintiffs Continue to Discuss Discovery Issues**

111.    On April 9, 2015, counsel for both parties met and conferred about the remaining discovery issues. It was determined that BF Labs would have to brief the response to the motion to compel because the parties could not reach an agreement. Plaintiffs' counsel gave BF Labs until April 17, 2015 to file a response to the Motion to Compel. BF Labs then filed an unopposed motion for extension of time to respond to the Motion to Compel to April 17, 2015. This Court later granted that motion. *See* Ex. F, ¶ 43. (Dock. 80, 82.)

112.    On April 9, 2015, BF Labs served its First Interrogatories and First Request for Production of Documents and ESI to Plaintiffs. (Dock. 81.)

113.    On April 10, 2015, Modus sent a hard drive to Polsinelli with a tracking number. *See* Ex. F, ¶ 44.

114.    On April 13, 2015, BF Labs hand delivered the hard drive of ESI to Plaintiffs. *See* Ex. F, ¶ 45.

115.    After producing the hard drive to Plaintiffs, Plaintiffs' counsel sent an e-mail to BF Labs' counsel asking for the search criteria that Modus used to remove privileged documents from the data before the data was copied to the hard drive. *See* Ex. G.

116.    After Plaintiffs' counsel's e-mail, BF Labs' counsel immediately inquired about the search criteria that Modus used to remove privileged documents, only to find out that it ran searches using the names of BF Labs' attorneys and law firms not only in the to:, from:, cc:, and bcc: fields but also in the body. Modus explained that text searches would catch e-mail chains from counsel that would be privileged that may not have been picked up using only the above fields. BF Labs' counsel informed Plaintiffs' counsel of this and informed him that BF Labs was in the process of creating a

privilege log and would produce all non-privileged documents once that review was finalized. *Id.*; Ex. F, ¶ 46.

117.   While BF Labs' counsel believed Modus was employing privilege filters the way Plaintiffs' counsel suggested, BF Labs' counsel saw no harm in the way the privilege filter was done by Modus because a clawback agreement was in place, BF Labs was creating a privilege log, and BF Labs was going to produce non-privileged documents after reviewing the documents picked up by the privileged term search. *See* Ex. F, ¶ 47.

118.   Plaintiffs' counsel demanded that Modus filter for privilege as set forth in his March 30 e-mail and a separate hard drive be made. *See* e-mail chain, Ex. G.

119.   On April 14, 2015, BF Labs' counsel then inquired as to Plaintiffs' counsel's position as BF Labs was producing all requested documents except those subject to attorney-client privilege and would be supplying a privilege log along with non-privileged documents that were picked up by the search terms. *Id.*

120.   Thereafter, Plaintiffs' counsel stated his position that Plaintiffs never agreed to receive (or pay for) a hard drive that had been filtered using BF Labs' proposed filters and claiming that BF Labs' counsel knew this but used BF Labs' proposed filters anyway and without letting him know before having the hard drive made and delivered. *Id.*

121.   On April 14, 2015, Michael Marquardt, d/b/a bitcointalk.org, responded to Plaintiffs' March 4, 2015 subpoena in this action and produced BF Labs' employees' internet postings made in the forum, including private messages made from those employees. BF Labs did not object. *See* Ex. F, ¶ 48.

122.   As of April 17, 2015, the price of one bitcoin was $222.99. *See* Ex. E, ¶ 52.

## II.   ARGUMENTS AND AUTHORITIES

### A.   Legal Standards for Discovery

"The touchstone of the relevancy of documents and information requested is . . . whether the discovery is 'reasonably calculated to lead to the discovery of admissible evidence.'" *Sonnino v. University Kansas Hosp. Authority*, 220 F.R.D. 633, 646 (D. Kan. 2004) (citing Fed. R. Civ. P. 26(b)(1)). When the relevancy of discovery sought is not readily apparent, "the party seeking discovery has the burden to show the relevancy of the request." *Apsley v. Boeing*

*Co.*, 2007 WL 3120712, *2 (D. Kan. 2007) (citing *Hammond v. Lowe's Home Centers*, 216 F.R.D. 666, 670 (D. Kan. 2003)). If the threshold question of relevance has been satisfied, the analysis proceeds to the question of whether the requested information is privileged or otherwise limited by the considerations set out in Rule 26(b)(2)(i), (ii), or (iii), though the court may deny a motion to compel where the discovery request is overly broad or unduly burdensome on its face. *Id*. (citing *Aikens v. Deluxe Financial Services, Inc*., 217 F.R.D. 533, 538 (D. Kan. 2003)).

Further, when a plaintiff brings an action "without any factual basis evincing specific misconduct by the defendants and then bases extensive discovery requests upon conclusory allegations in the hope of finding the necessary evidence of misconduct, that plaintiff abuses the judicial process." *Munoz v. S . Mary-Corwin Hosp*., 221 F.3d 1160, 1169 (10th Cir. 2000). The limits which Rule 26(b)(2)(iii) place upon discovery are aimed at just such a tactic. *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1238 (10th Cir. 2000). Under these standards, the principles of proportionality set out in Rule 26(b)(2)(C) apply.

Where a party has agreed to provide the requested material, a motion to compel is inappropriate. *Majdalani v. Legacy Bank*, Case No. 06-1317-MLB, 2007 WL 2694043 at *5 (D. Kan. Sept. 11, 2007) ("plaintiff's motion to compel and her related certification violate Fed. R. Civ. P. 37(a)(2) and D. Kan. Rule 37.2. Inherent in both rules is the principle that a motion to compel is inappropriate when, during the meet and confer process, the party opposing discovery agrees to supplement its discovery responses."). Had BF Labs refused to provide ESI after agreeing on search terms that it promised to Plaintiffs, then Plaintiffs may have had "good cause" for a motion to compel after the 30-day period. *See*, *e.g.*, *Allianz Ins. Co. v. Surface Specialities, Inc.*, Case No. 03-2470, 2005 WL 44534, at *1 (D. Kan. Jan. 7, 2005).

In any event, if Plaintiffs were truly worried that they would be waiving all of their interrogatories and document requests by waiting past March 20, there was a remedy short of an "inappropriate" motion to compel: Plaintiffs could simply have moved for an extension of the 30-day window, as is "common practice" in this District. *See, e.g., Payless Shoesource Worldwide, Inc., v. Target Corp.*, Case No. 05-4023-JAR, 2007 WL 1959194, at * 5 (D. Kan. June 29, 2007) ("It is common practice for a party who may wish to file a future motion to compel but is not prepared to do so during the 30 day window afforded by D. Kan. Rule 37.1(b) to file a simple motion for an extension of time before the deadline to file a motion to compel has expired."); *ICE Corp. v. Hamilton Sundstrand Corp.*, 05-4135-JAR, 2007 WL 4239454 (D. Kan. Nov. 30, 2007) (same).

Finally, the Plaintiffs throughout their interrogatories used the term "identify" in an attempt to force BF Labs to provide information about every document, witness, or event referred to in the interrogatory answers. "The nature of the federal discovery rules themselves suggests they are intended to facilitate reasonable discovery, not unduly burdensome, but selected by each party to fit the needs of the particular case. The discovery rules provide no absolute, unharnessed right to find out every conceivable, relevant fact that opposing litigants know. Nor do they prohibit such broad discovery, if a party can obtain it without unreasonably burdening the opposition." *Hilt v. SFC Inc.*, 170 F.R.D. 182, 187 (D. Kan. 1997); *see also Lawrence v. First Kan. Bank & Trust Co.*, 169 F.R.D. 657, 662 (D. Kan. 1996).

### B.    Discovery Ostensibly at Issue

While BF Labs is required to produce ESI and documents in its possession, custody, and control, it is not obligated to create materials that do not exist. *Didier v. Abbott Laboratories, et al.*, 2014 WL 219851 (D. Kan. Jan. 21, 2014) ("The court cannot compel a party to produce documents that do not exist or not in that party's possession, custody, or control"). The

preservation letter that Plaintiffs sent in April 2014 does not somehow change that reality. *Id.* In addition, just because Plaintiffs believe particular, specific documents "should" exist on a given issue does not mean that spoliation has occurred. *See Firestone v. Hawker Beechcraft Intern. Service Co.*, 2012 WL 899270 (D. Kan. March 16, 2012) (explaining that "Spoliation is the 'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"). BF Labs has fully answered Plaintiffs' interrogatories and produced its entire hard drive of collected ESI. There is nothing for the Court to compel.

    1.    **Interrogatory No. 5**

Interrogatory number 5 specifically asks "[f]or each product identified in No. 2, above, identify *the number* of units manufactured by month and year, *the number* of units ordered by consumers by month and year, and *the number* of units shipped to consumers by month and year." Ex. B (emphasis added).

BF Labs answered on February 20, 2015, stating that:

> BF Labs has not tracked by product the number of units it has manufactured or shipped to consumers by month and year. For the FPGA generation order dates and order status, *see* Exhibit A. For the 65 and 28 NM generations, *see* Exhibit B which will show order dates and order status."

*See* Exhibit B.

BF Labs believed this answer was sufficient. After meeting and conferring with Plaintiffs, and without wanting the Court to intervene, BF Labs supplemented this answer with additional detail:

> BF Labs has not tracked by product the number of units it has manufactured or shipped to consumers by month and year. For the FPGA generation order dates and order status, see Exhibit A. For the 65 and 28 NM generations, see Exhibit B which will show order dates and order status. Further, a spreadsheet has been identified that contains 81 different customers whose order status was excluded from Exhibit B for various reasons. See Exhibit G.

> Further, BF Labs has a manually created spreadsheet that includes a weekly breakdown of how many 65 NM products were shipped from July 14, 2013 to December 14, 2013 that was used internally for PayPal purposes. This document is not comprehensive as to all shipping. See Exhibit H.
>
> Finally, BF Labs has emails from tracking@shipstation.com that alerted customers that a product was shipped but BF Labs objects to the undue burden and expense of gathering those emails and manually creating a spreadsheet based on the number of units shipped to consumers by month and year.

*See* Exhibit C.

Plaintiffs argue in their Motion that BF Labs' answers "parses words and evades the heart of interrogatories." (Motion at p. 8.) Plaintiffs further argue that because a spoliation letter was sent on April 4, 2014, requesting that BF Labs "preserve" its manufacturing records that BF Labs should "have" these records. However, a spoliation letter does not impose a duty to start creating materials that a company does not maintain. *Didier v. Abbott Laboratories, et al.*, 2014 WL 219851 (D. Kan. Jan. 21, 2014) ("The court cannot compel a party to produce documents that do not exist or not in that party's possession, custody, or control"). BF Labs did not create, keep track of or maintain records regarding the number of products it *manufactured* by month and year. For instance, in BF Labs' answer to Interrogatory No. 6, BF Labs stated "[g]iven the use of the preorder sales model, the vast majority of FPGA and 65 NM products were ordered by customers prior to manufacture and the daily focus was on producing at maximum output and shipping as quickly as possible to fulfill the demand from pre-existing orders." *See* Exhibit B.

After BF Labs provided its first supplemental answer, it served its Second Supplemental Answers and Objections to Plaintiffs' First Interrogatories, answering Interrogatory No. 5 in even more detail and going beyond the specific question asked in an attempt to avoid the need for Court intervention. *See* Exhibit D. BF Labs' second supplemental answer provided a response from employee Marc Goodpasture regarding the number of boards BF Labs received per day (which were used in the assembly process). BF Labs provided more detail than what was

asked by the Plaintiffs. Because BF Labs has gone above and beyond in answering what the Plaintiffs have asked, there is nothing to for the Court to compel BF Labs to do.

2.    **Interrogatory No. 6**

Interrogatory number 6 specifically asks "[f]or each product identified in No. 2, above, identify *the number* of units manufactured by month and year that were not ordered by consumers." Exhibit B (emphasis added). BF Labs initially answered by stating that:

> BF Labs is unable to provide a specific answer as manufacturing records were not maintained on the basis requested. Given the use of the preorder sales model, the vast majority of FPGA and 65 NM products were ordered by customers prior to manufacture and the daily focus was on producing at maximum output and shipping as quickly as possible to fulfill the demand from pre-existing orders. Only at the end of the preorder queue would the company have manufactured units without a pre-existing order, and those were manufactured with the intent to sell to customers from stock. BF Labs is currently still building 28 NM units to satisfy the preorder queue. BF Labs is not able to identify units that were not ordered by consumers, nor did the company track such units by month and year.

Exhibit B.

Once again, this was not enough for the Plaintiffs. In an attempt to provide additional information, BF Labs served its second supplemental answer, getting even more detail:

> BF Labs is unable to provide a specific answer as historical manufacturing records were not maintained on the basis requested. BF Labs incorporates by reference its answer to interrogatory No. 5. BF Labs believes that all of the units it manufactured were ordered by customers until the preorder queue was exhausted. Given the use of the preorder sales model, the vast majority of FPGA and 65 NM products were ordered by customers prior to manufacture and the daily focus was on producing at maximum output and shipping as quickly as possible to fulfill the demand from pre-existing orders. At times, only at the end of the preorder queue, BF Labs manufactured units without a pre-existing order, and those were manufactured with the intent to sell to customers from stock. BF Labs does not have historical records that reflect or identify the number of units assembled for any particular month when the preorder queue may have been exhausted. In February 2015, BF Labs completed building 28 NM units to satisfy the preorder queue. BF Labs is not able to identify units that were not ordered by consumers, nor did the company track such units by month and year. In addition, BF Labs shipped units to data centers for use in providing remote mining services to customers who had preordered or ordered "off the shelf" processing capacity, but

21

did not order the physical units; however, BF Labs did not maintain records of the number of units built by month and year for these specific purposes.

*See* Ex. D.

Again, BF Labs has been complete in answering the interrogatory based upon the information it had in hand and there is nothing to compel BF Labs to do. Plaintiffs apparently want more information beyond the specific question asked. Defendant has no specific answer because such records were not kept.

3.   **Interrogatory No. 7**

Interrogatory number 7 specifically asks "[f]or each product identified in No. 2, above, identify the date(s) Defendant first requested, ordered, or initiated the manufacture of such products and the number of units Defendant requested, ordered, or initiated the manufacture of on each such date." Exhibit B.

BF Labs answered, stating that "BF Labs does not maintain or possess manufacturing records that would allow an exhaustive answer to this interrogatory, but incorporates its answer to interrogatory No. 4, above." Exhibit B.

Again, to in an effort to provide more information, BF Labs supplemented stating that:

BF Labs does not maintain or possess historical manufacturing records that would allow an exhaustive answer to this interrogatory, but incorporates its answers to interrogatories Nos. 4, 5, and 6 above. BF Labs is also not aware of any witness or witnesses with knowledge of the specific information as to precise dates and numbers of units on each date. BF Labs does not purchase fully manufactured machines and rather assembles components itself for each machine. Because dozens of components go into each machine that BF Labs buys with varying lead times, the interrogatory is too vague to answer.

Exhibit D.

BF Labs has been transparent in its answer and is unaware how it can answer this interrogatory any differently than the information it has provided because there are no records to provide the precision Plaintiffs apparently seek.

4.      **Interrogatory No. 8**

Interrogatory number 8 seeks "[f]or each product identified in No. 2, above, identify the estimated shipping date (and each revised shipping date) Defendant represented publically, the date each representation was made, and Defendant's factual basis for making such representation to the public on each such date." BF Labs initially answered by stating that:

> BF Labs objects to Plaintiffs' request to the extent it seeks information that BF Labs represented publically such information is equally accessible to Plaintiffs. Regarding BF Labs' factual basis for making representations, BF Labs considered the production and assembly processes, information it received from suppliers and component manufacturers, communications with crucial vendors, contracts it had for ASIC chip delivery, among other things.

After meeting and conferring with Plaintiffs, BF Labs supplemented its answer by directing Plaintiffs to three blogs that contained the information that Plaintiffs sought. After meeting and conferring a second time with Plaintiffs, and despite believing it was under no obligation to do so, BF Labs supplemented its answer once again, providing an *eight-page* response. *See* Ex. D, pages 4 through 13. Again, there is nothing more to compel BF Labs to do and Plaintiffs' Motion is moot as to interrogatory number 8.

5.      **Interrogatory No. 9**

Interrogatory number 9 asks BF Labs "[f]or each estimated shipping date (and each revised estimated shipping date) identified in No. 8, above, identify the percentage of units of each product identified in No. 2, above, that were actually shipped within the estimated shipping date. For purposes of this interrogatory, percentage of units is defined as the number of units shipped within the applicable estimated shipping date divided by the number of orders pending for the same type of unit times 100%. Further, estimated shipping date is defined as either (a) the estimated shipping date if a fixed date was provided (e.g., "within 2 months"); or (b) the earliest

23

estimated shipping date if a range of dates was provided (e.g., "within 2 months or later" or "within 2 to 6 months")."

BF Labs initially objected to this request on the grounds that it was "overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, Defendant does not have the records to be able to provide this information to Plaintiffs." Ex. B. BF Labs then, through its supplemental answer, in an attempt to give the Plaintiffs even more information, provided the first shippable unit date and sales end date for each product. Ex. C. Still, this was not good enough for Plaintiffs. After meeting and conferring about this request, BF Labs served its second supplemental answer noting that "BF Labs has no historical record that determines any particular percentage of units shipped within any particular estimated shipping date. Plaintiffs' counsel has stated to Defendant's counsel that Plaintiffs' counsel will perform calculations to answer interrogatory request No. 9 assuming that interrogatory request No. 8 had been revised." Ex. D. Because No. 8 has been revised, then there is nothing for the Plaintiffs to compel BF Labs to do.

### 6.      **Interrogatories 12 and 13**

BF Labs has produced the coverage denial letter and has supplemented its interrogatory answers to include home addresses for the three individuals identified. Defendant believes there is no remaining issue.

### 7.      **Interrogatories 14 and 15**

In Interrogatory No. 14, Plaintiffs requested that BF Labs "[i]dentify all bitcoin mining accounts or operations operated, owned, utilized, or otherwise controlled by Defendant or Defendant's agents or employees by stating the name and number of the account or location of the operation, the specific date(s) bitcoins were mined under that account or at that location, and the product name, version, and serial number of the each piece of mining equipment used to

mine bitcoins for each account or operation." Ex. B. Similarly, in Interrogatory No. 15, Plaintiffs' asked BF Labs to "[i]dentify all bitcoin addresses operated, owned, utilized, or otherwise controlled by Defendant or Defendant's agents or employees." *Id.*

BF Labs has fully answered these two interrogatories to the best of its ability. *See* BF Labs' answers, attached as Ex. D. Just because in Plaintiffs' imaginations they believe that BF Labs has information or should know of information does not make it so. BF Labs has gone above and beyond what was asked by Plaintiffs.

BF Labs has provided its corporate bitcoin wallet addresses to Plaintiffs and through those wallet addresses Plaintiffs are able to see all transactional activity. That means that Plaintiffs can see all transactions made through BF Labs' active and storage wallets. Plaintiffs' request for BF Labs' employees' personal bitcoin wallets, however, is overbroad and unreasonable; BF Labs objected to the interrogatory and the information was not provided in its answers. Plaintiffs' request is analogous to suing a bank and demanding its employees' personal bank account information.

Furthermore, Plaintiffs have the ability to subpoena any of BF Labs' employees for this information. To make BF Labs ask each and every employee or agent for their personal bitcoin wallet address, their transactions, the specific date(s) bitcoins were mined under that account or at that location, and the product name, version, and serial number of the each piece of mining equipment used to mine bitcoins for each account or operation is unreasonable, unduly burdensome and not discoverable through BF Labs. Plaintiffs may argue that because they seek a constructive trust over BF Labs then they are also entitled to BF Labs' employees' and agents' bitcoin wallet addresses. But Plaintiffs are overreaching to obtain personal information about employees from their current or former employer.

25

8. **Interrogatory No. 18**

Interrogatory No. 18 asks BF Labs to "*[i]dentify and itemize* all consideration (cash, bitcoins, etc.) received by Defendant from customers who pre-ordered a product or service from Defendant." Exhibit B (emphasis added). BF Labs initially produced an exhibit that included the consideration as it was kept in the ordinary course of business. BF Labs' answer stated "[f]or FPGA generation sales, *see* exhibit C. For the 28 and 65 NM generations, *see* exhibit D."

Once BF Labs realized that these exhibits did not include 81 different customers whose order status was excluded from Exhibit B (which was meant to be exhibit D) for various reasons, it supplemented and added an exhibit that included these 81 customers. After meeting and conferring once again, BF Labs supplemented the interrogatory giving more detail than what the Plaintiffs sought. BF Labs' second supplement states:

> For FPGA generation sales, see exhibit A. For the 28 and 65 NM generations, see exhibit B. BF Labs has identified a spreadsheet that contains 81 different customers whose order status was excluded from Exhibit B for various reasons. See Exhibit G. In almost all cases, customers who paid in bitcoin went through BitPay, which converted 100% of the bitcoins to dollars. BF Labs then decided how much they were to receive in bitcoin and in dollars. BF Labs then drew that over to its bank account or wallet. Therefore, any payments sent in bitcoin generally were not received fully in bitcoin after going through this exchange service. Further answering, BF Labs is unable to identify whether a payment was for preorder or for items that were purchased off the shelf. In a very few cases, customers sent bitcoins directly to BF Labs' wallet. It is estimated this happened less than ten times. In those cases, the transaction can be found in the active wallet transaction log with a keyword search of labels similar to "payment received" or "miner purchased." This was typically done in cases where no other payment method was available to either the consumer or BF Labs.

*See* Exhibit D.

BF Labs has provided its records to Plaintiffs and provided more detail than the interrogatory sought. Again, there is nothing for the Court to compel BF Labs to do.

9.      **Interrogatory No. 19**

Interrogatory Number 19 seeks to "identify all customers who requested a refund from Defendant, denoting which customers received refunds, the date of such refunds, and the type and amount of such refunds (cash, bitcoins, etc.)." Exhibit B. BF Labs initially responded by providing "Exhibit E, which may be supplemented as it may not be completely comprehensive." BF Labs then supplemented, stating "*See* Exhibit E which is comprehensive as of February 20, 2015." After meeting and conferring once again, BF Labs supplemented once again (as it would have done under the Federal Rules) by producing additional exhibits and stating:

> See Exhibit E which is comprehensive as of February 20, 2015. See also Exhibit J which is comprehensive as of March 31, 2015. Both Exhibit E and Exhibit J list the date of such refunds, the amount of refunds, and the type of refunds (see the section titled "Notes"). Both Exhibits E and J are maintained by BF Labs' accounting staff. Further answering, Exhibit K is also attached that BF Labs' customer service group maintains, that also contains refund data that includes the date a valid refund request was received. Exhibit K, however, may not cover earlier historical data.

Exhibit D.

Therefore, there is nothing for the Court to Compel BF Labs to do as to interrogatory number 19.

10.      **Interrogatory No. 20**

Plaintiffs requested that BF Labs "[i]dentify all IPs and account names that Defendant's employees or agents have utilized to post information on the internet relating or referring to bitcoin mining by the dates the posts were made, the contents, and the location of those posts."

BF Labs objected to this Interrogatory as overbroad and unduly burdensome to compile, but gave the Plaintiffs its employees' user names used by those employees to post information in BF Labs' forums. BF Labs has no obligation to independently investigate and obtain personal IPs and account names for all Defendant's employees or agents. BF Labs has provided account

names that BF Labs employees and agents used in BF Labs' forums. BF Labs has stated to Plaintiffs that it is willing to supplement its answer if employees made representations in other forums in their capacity as employees. But BF Labs is the Defendant, not these employees in their individual capacity, and forcing the company to gather all posts that employees may have made in their individual capacity is unduly burdensome and overbroad. Furthermore, Plaintiffs sent a subpoena to Michael Marquardt, d/b/a bitcointalk.org asking for all forum posts made by BF Labs' employees. BF Labs has not objected to the Plaintiffs' subpoena. On April 14, 2015, Michael Marquardt, d/b/a bitcointalk.org responded to Plaintiffs' subpoena by providing forum posts and private messages made by BF Labs' employees. *See*, *e.g.*, Doc. 68; Ex. F, ¶ 50. BF Labs has also provided a hard drive of all collected ESI to Plaintiffs. Therefore, Plaintiffs' Motion should be denied as to this Interrogatory.

11.     **Interrogatory No. 23**

Interrogatory No. 23 specifically asked BF Labs "*[h]ow many* bitcoins has Defendant mined (either by itself or by someone else on Defendant's behalf) for Defendant's own benefit from the testing of mining equipment pre-ordered by customers before shipping such equipment to customers?" Exhibit B (emphasis added).

BF Labs initially responded by stating the following:

BF Labs does not maintain records that would allow it to answer the question posed by this interrogatory. BF Labs is otherwise unable to determine precisely the number of bitcoins mined through the testing of mining equipment. BF Labs further states in an effort to address this interrogatory that there are various activities that result in "by-product" mining, such as product research and development, quality assurance testing, returned item testing and diagnosis, and substandard unit testing and repair/retest. The bitcoin resulting from this "by-product" mining has historically been directed to a single wallet address. While the number of bitcoins generated by testing cannot be determined, it is substantially less than the 8124.58 total bitcoins mined and identified in the answer to Interrogatory No. 22 above (a figure which includes bitcoins that were mined as part of the Nimbus Mining partnership, as well as bitcoins that BF Labs has yet to receive from cloud mining).

Exhibit B.

While this answer fully responded to the Plaintiffs' interrogatory, Plaintiffs suggest it is insufficient. BF Labs has supplemented twice. In BF Labs' first supplement, it provided the single wallet address used. In its second supplemental answers, BF Labs added a sentence stating "BF Labs believes that approximately 7240 bitcoins were mined by BF Labs through product research and development, quality assurance testing, returned item testing and diagnosis, substandard units, and repair/retesting." BF Labs has fully answered this interrogatory.

## 12.   Requests for Production of Documents in General

BF Labs has produced to Plaintiffs its entire hard drive of data collected, in a searchable format and by agreement with Plaintiffs, so that BF Labs would save the significant expense of reviewing and marking "confidential" or "attorney-eyes only" the hundreds of thousands of documents collected. A current dispute exists about the way BF Labs and Modus ran the privilege filters before producing the ESI hard drive to the Plaintiffs. After BF Labs agreed to provide the ESI hard drive, Plaintiffs' counsel sent an e-mail to BF Labs' counsel stating that they would not agree to the search terms proposed by BF Labs and suggested, instead, Plaintiffs' own way for BF Labs to search for and catalogue its potential privileged documents. While the privilege filter was not done the way Plaintiffs wanted (limiting a search to fields of "to," "from," "cc," or "bcc" but not the body or text) this was not intentional, and there is no harm to Plaintiffs other than not being able to review a relative few privileged e-mails that would have been clawed back anyway under the terms of the ESI agreement. *See* Ex. F, ¶ 49. Further, Plaintiffs' suggestion to filter BF Labs' e-mails by their method is nothing more than a ploy to fish for privileged materials.

BF Labs' production of its hard drive is satisfactory and far from unusual. First, BF Labs produced all requested documents except for those subject to attorney-client privilege. For those

documents, BF Labs will be providing a privilege log. BF Labs will also produce any non-privileged documents after concluding its privilege review if any non-privileged documents were inadvertently picked up by the search terms. The process is necessary because, for example, if there were e-mails shared between BF Labs' employees after a Polsinelli e-mail was sent, those Polsinelli e-mails would be in the body but not picked up in a to:, from:, cc:, bcc: field.

Besides this privilege issue, there are a few requests for production that still need to be discussed.

### 13.   **RFPD No. 11**

Regarding RFPD No. 11, Plaintiffs are asking BF Labs to provide "[a]ll documents and/or communications relating or referring to any mining of bitcoin by Defendant or *Defendant's employees or agents*." (emphasis added). BF Labs refuses to produce documents and/or communications relating to the mining of bitcoin by any of BF Labs' employees or agents in their individual capacity for the same reasons mentioned above in Section II.B.7.

### 14.   **RFPD No. 14**

In RFPD No. 14, Plaintiffs seek "[a]n electronic copy of the Defendant's websites including any previous versions." BF Labs is willing to provide this to Plaintiffs but there is an expense involved in collecting and providing this to Plaintiffs. If Plaintiffs are willing to pay for this collection, BF Labs will provide this to the Plaintiffs.

### 15.   **RFPD No. 20**

BF Labs is currently identifying and producing documents (including its entire hard drive) to Plaintiffs. All of BF Labs' documents designated in its initial disclosures will be produced through the production of the ESI hard drive to Plaintiffs.

**III.      CONCLUSION**

Plaintiffs' complaints about BF Labs' interrogatory answers lack merit and appear to be an attempt to place substantial undue burden and prejudice on BF Labs. In contending that virtually all of BF Labs' answers and responses are deficient, Plaintiffs ignore the substance of BF Labs' answers, which in each case provide a complete narrative response to the interrogatory at issue. BF Labs' answers to Plaintiffs' interrogatories are responsive, complete and satisfy the Federal Rules of Civil Procedure. BF Labs also has complied with Plaintiffs' First Request for Production of Documents and Electronically Stored Information. BF Labs is providing its entire ESI collection (other than documents culled for privilege). BF Labs' counsel is conducting a privilege review and will then produce any additional non-privileged documents and a privilege log to the Plaintiffs. Plaintiffs are merely fishing for privileged documents to which they are not entitled.

For the reasons detailed above, Plaintiffs' Motion to Compel should be denied.

Respectfully submitted,

/s/ Mark A. Olthoff
MARK A. OLTHOFF                          KS Fed. #70339
MICHAEL S. FOSTER                        KS #24011
POLSINELLI PC
900 W. 48th Place
Suite 900
Kansas City, Missouri  64112-1895
(816) 753-1000
(816) 753-1536 (FAX)
molthoff@polsinelli.com
mfoster@polsinelli.com

Attorneys for Defendant BF Labs Inc.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 17th day of April, 2015, a true and correct copy of the foregoing was filed electronically with the United States District Court for the District of Kansas using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

/s/ Mark A. Olthoff
Attorney for Defendant BF Labs Inc.