IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KYLE ALEXANDER, et al., | ) |
| | ) |
|       **Plaintiffs,** | ) |
| | ) |
| v. | ) Case No. 14-CV-2159-KHV-JPO |
| | ) |
| BF LABS INC., | ) |
| | ) |
|       **Defendant.** | ) |

## DECLARATION OF DAVID MCCLAIN

I, David McClain, hereby declare and state as follows:

1. I am the Large Accounts Manager at BF Labs Inc. ("BF Labs"), and have worked in that capacity since October 2012.

2. Bitcoin came into existence in about 2009.

3. Bitcoin was initially mined with the central processing unit (CPU) in laptop or desktop computers, and subsequently with the more powerful graphics cards (GPU) in these types of computers.

4. In 2011, BF Labs was incorporated to manufacture a line of high speed encryption processors for use in Bitcoin mining, research, telecommunication, and security applications.

5. In 2012, BF Labs introduced FPGA technology that was approximately two times faster than graphics cards, which were in turn hundreds of times faster than the original CPUs.

6. In 2013, BF Labs introduced ASIC 65nm technology that was approximately 80 times faster than its FPGA technology.

7. The ASIC 28nm technology (the "Monarch") that BF Labs began shipping in August 2014 is approximately 10 times faster than the ASIC 65nm technology. At this point,

speeds are 1600 times faster than the GPUs and many thousands of times faster than the original CPUs.

8. While the majority of bitcoin miners accepted the development of new technology, they had to be willing to invest money in specialized equipment in order to compete with thousands of new entrants into "their" industry, or they risked not being able to keep pace.

9. Bitcoin miners desired faster, more powerful, more energy efficient devices as soon as they could get them in order to get a perceived "jump on the other guy." As soon as a new product is announced, some miners insisted on queuing up to be as near the front of the line as possible, and these miners were and are willing to place deposits of up to 100% to secure a delivery slot.

10. A fully pre-paid pre-order process has been standard industry practice as the market price of bitcoin fluctuates up and down, causing miners to want either to join the race or drop out of it. Some miners try to arbitrage the market fluctuation by placing, canceling, and reinstating orders as the price of bitcoin rises, falls, and rises again. This practice creates havoc for the manufacturer, who is trying to forecast product demand, buy parts with long lead times in order to meet the demand, and hire staff to assemble the orders. The financial risk thus shifts to the manufacturer, who runs the risk of getting stuck with obsolete inventory if a competitor announces a product seemingly more attractive that is promised for future delivery, and customers in the queue shift their orders to the competitor.

11. The above factors, which reflect industry standard practices and are consistent with significant competing manufacturers of similar equipment, led BF Labs to initially use a fully prepaid pre-order process whereby the funds paid by a customer are applied to pay for the

purchase of parts and labor used in the manufacturing process, making it impractical to reverse an order.

12. BF Labs' pre-order sales model, including the fact that pre-order funds may be used to complete the development, and manufacture of the products, was fully disclosed to its customers.

13. When consumers placed pre-orders for products other than the FPGA generation with BF Labs, consumers accepted terms of purchase including that the shipping range for the ordered product was "two months or longer."

14. At times, BF Labs' website instructed customers who could not tolerate a two-month or longer waiting period for the ordered product that they should "NOT preorder this product."

15. BF Labs updated its shipping projections, provided detailed production updates, and gave day-by-day shipping updates. BF Labs never promised specific shipping dates for its products, but rather estimated and projected shipping dates determined in good faith.

16. Despite clear and unequivocal warnings that consumers were entering into a pre-order arrangement for undeveloped products and that a delivery timeframe could not be assured, consumers voluntarily chose to complete their orders.

17. Like other bitcoin mining manufacturers, BF Labs experienced growing pains – particularly speed-to-market issues – in this developing market.

18. On the day this lawsuit was filed, the price of one bitcoin was $448.88.

19. On June 25, 2014, the day of the scheduling conference, the price of bitcoin was $562.13. Most of the assets held by BF Labs on that day were in bitcoin.

20. On July 17, 2014, BF Labs voluntarily ended its preorder sales model for bitcoin mining equipment.

21. BF Labs does not employ in-house counsel.

22. BF Labs' Monarch line began to ship on August 20, 2014.

23. On September 8, 2014, based on and following numerous discussions concerning BF Labs, documents, systems, policies, procedures, etc., Polsinelli sent an attorney-client privileged communication concerning discovery responses to Plaintiffs' requests to me, as I was appointed as point person for responding to Plaintiffs' discovery requests.

24. From September 9th to the 20th, 2014, I traveled to Slovenia and London for work. I discussed with counsel meeting in person to go over the discovery responses when I returned from the business trip.

25. On September 12, 2014, I sent an attorney-client privileged email to counsel regarding the discovery responses and noting the difficulty of responding to all of Plaintiffs' requests. That same day, I sent another attorney-client privileged email to counsel indicating that BF Labs will likely need an extension due to the breadth and scope of discovery, and that I would get back from a European business trip on September 22, 2014, and that we should meet then to discuss these questions with counsel in person to go over the discovery responses and finalize.

26. On September 12, 2014, multiple attorney-client privileged emails between BF Labs and our counsel were sent that discussed the burden and scope of these interrogatories and what we were required to do. Bruce Bourne assigned additional people to work on each discovery request.

27. On September 18, 2014, I know that other BF Labs' employees sent counsel multiple attorney-client privileged emails regarding the discovery requests.

28. To my knowledge, no one at BF Labs had knowledge of the FTC investigation.

29. On the date of the *ex parte* order, the price of one bitcoin was $421.46.

30. On September 19, 2014, the FTC, along with its investigator, attorneys, federal Marshalls, and the court-appointed Temporary Receiver and his counsel raided BF Labs' building and the employees were forced to leave. Completed Monarch devices were on loading docks ready to be shipped (as they had been during the previous month).

31. At the time the FTC, without notice, raided BF Labs' headquarters, BF Labs was in process of refunding customers who wanted a refund rather than delivering a product. That is, when a Monarch unit passed quality-control tests and became ready for shipment, the next customer in the pre-order queue was sent an email that offered the customer the choice of either a refund or product delivery. Whichever selection the customer made, BF Labs timely fulfilled it.

32. On October 21, 2014, BF Labs received a bill from Modus for its data collection efforts in September 2014 for $80,256.29. The Temporary Receiver never paid this bill.

33. On December 23, 2014, the price of one bitcoin has dropped further to $334.05.

34. No BF Labs' products were shipped to consumers and no refunds were made to consumers during the interim period (September 19, 2014 through December 23, 2014). By halting BF Labs' operations for more than three months, the FTC caused BF Labs' refund liability to its customers to increase significantly. As a result of the injunctive measures entered, BF Labs suffered losses of key employees, losses of vendors due to perceived stigma of working with a company being shut down by a governmental agency's action, and the economic waste of

unique technology sitting idle while competitive windows narrow. When the company was returned, BF Labs immediately began trying to remedy some of the harm caused.

35. BF Labs incurred literally millions dollars in additional costs to pay for attorneys to defend itself, accountants to examine it, and a Temporary Receiver and his legal team to oversee it.

36. In terms of product value, with the passage of time from the delay, competitors were able to take pre-orders for newer products. BF Labs was prevented from competing to be the first to develop and release new mining equipment. BF Labs was left with the reality that once a competitors' new product is out, customers want refunds instead of the "older" BF Labs' products. Other competitors dramatically lowered their prices during the three month delay, resulting in customers electing refunds instead of taking delivery of the equipment.

37. With respect to vendor relations, BF Labs' payment accounts were frozen and the temporary receiver made disbursements as and when he deemed it appropriate. Vendors went weeks without any payments or communication. Many issued late notices, and some even issued disconnect notices. More than one supplier refused to do business with BF Labs until all past due invoices were paid and future goods or services were paid in advance. One contract software engineer refused any further work with the company due to the perceived stigma of working with a company being sued for fraud by the government.

38. On December 30, 2014, pursuant to the Western District of Missouri's Order, BF Labs began making refunds to customers in the refund queue.

39. On January 12, 2015, the price of bitcoin dropped to $267.09.

40. Following over four months of disruption, BF Labs began to work again on responses to Plaintiffs' discovery requests in January 2015.

41. On February 6, 2015, I sent Polsinelli attorney-client privileged communications concerning answers to Plaintiffs' interrogatories.

42. On February 9, 2015, I sent attorney-client privileged spreadsheets and documents relevant to Plaintiffs' interrogatories to Polsinelli.

43. On February 12, 2015, additional multiple attorney-client privileged emails were exchanged between Polsinelli and BF Labs regarding finalizing Plaintiffs' discovery requests.

44. On February 17, 2015, multiple attorney-client privileged emails were exchanged between Polsinelli and BF Labs regarding finalizing Plaintiffs' discovery requests.

45. On February 19, 2015, multiple attorney-client privileged emails were sent between Polsinelli and BF Labs regarding finalizing Plaintiffs' discovery requests.

46. On March 6, 2015, BF Labs paid Modus $78,264.45 after multiple attorney-client privileged negotiations to lower the amount of the September bill and Modus continued to work on processing data.

47. On March 12, 2015, Modus sent its February 2015 invoice for $9,389.36 to BF Labs.

48. On March 18, 2015, based on negotiated fee reductions, Modus revised its February invoice to $7,606.18.

49. On March 27, 2015, BF Labs paid Modus an additional $7,606.18 for its electronic discovery efforts.

50. I have worked on the interrogatory responses at least 50% of the time for 22 days (and on some days 100% of the time) from January to April 1, 2015. Other BF Labs' employees and consultants spent significant time (including entire days) on discovery responses as well.

51. I estimate that I have spent approximately 140 hours working on the discovery responses at issue. Five other BF Labs' employees or consultants estimated that they spent anywhere from three to 15 hours working on discovery responses to Plaintiffs' requests.

52. On April 17, 2015, the price of one bitcoin was $222.99.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 17th day of April, 2015.

_David McClain_
David McClain