# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:14-CV-00815-BCW |
| BF LABS INC., et al., | ) ) ) |
| Defendants. | ) ) |

## ORDER

Plaintiff contends Defendants violated Section 5(a) of the Federal Trade Commission Act ("FTC Act") by misrepresenting material facts about their Bitcoin mining machines.[1] Plaintiff moves for a preliminary injunction, asset freeze, appointment of a receiver, and other equitable relief. Defendants oppose the motion. After reviewing the premises, the record, and the applicable law, the Court denies Plaintiff's motion.

### I.  BACKGROUND

#### A. DEFENDANTS

BF Labs, Inc., d/b/a Butterfly Labs ("BFL") is a Wyoming corporation that was formed in July 2011 and has its principal place of business in Johnson County, Kansas. It manufactures and sells Bitcoin[2] mining machines including the BitForce and Monarch. BFL additionally offers a cloud mining service that utilizes its Monarch machines.

---

[1] Bitcoin is a payment system and digital currency created in 2009. Bitcoins are not issued by a government or central banking authority. Bitcoins are created by mining, which is a process where miners receive transaction fees and newly minted bitcoins in return for solving computational puzzles using their computers. The difficulty of mining increases over time.

[2] The Court uses "Bitcoin" to refer to the digital currency, and "bitcoin" to refer to an individual unit of currency.

Sonny Vleisides is a co-founder, majority owner, Innovation Officer, Vice President, and Director of BFL.  Darla Jo Drake holds multiple roles at BFL including Secretary, Treasurer, and General Manager.  Nasser Ghoseiri co-founded and co-owns BFL.  He holds several positions at the company including CEO, President, Innovation Officer, Chief Technology Officer, and Director.

### B. PRODUCTS AND SERVICES

BFL markets its mining machines and services on its website, www.butterflylabs.com.  In June 2012, BFL began selling BitForce.  BFL required customers to pay the entire cost of the machine upfront, which ranged from $149.00 to $29,899.00 depending on the machine's processing power.  The website stated that "[i]nitial product delivery is scheduled for October, 2012."  Doc. #8-1 at 81.  BFL revised the shipping date several times and did not ship any machines until April 2013.  By September 2013, more than 20,000 orders remained backlogged.

In August 2013, despite the BitForce backlog, BFL began soliciting orders for Monarch.  It again required purchasers to pay the entire cost of the machine upfront – up to $4,680.00.  The website indicated that initial shipments would occur by the end of 2013 and bulk shipping would occur in early 2014.  BFL revised the shipping date multiple times over the next several months and ultimately began shipping Monarch machines in August 2014.

In December 2013, BFL began offering 12-month mining service contracts at an average cost of $10/GH, which consumers had to pay upfront.  Under these contracts, BFL offered to use Monarch machines to mine on a consumer's behalf.  The website stated that BFL would begin generating bitcoins for consumers in the March 2014 time frame.  In June 2014, BFL told consumers that it would begin services later that month.  By September, BFL had not started providing these services.

### C. BITCOIN CALCULATOR

In addition to its website, BFL also markets its products and services on Facebook. In 2012, BFL posted a link on its Facebook page to a calculator that allowed consumers to calculate their return on investment ("ROI"). BFL's Facebook post told consumers to "measure your ROI with this cool Bitcoin mining calculator." Doc. #8-1 at 15. BFL did not create the calculator, and the calculator required consumers to input various data points including the Bitcoin exchange rate, mining difficulty, and delivery date. The calculator then determined the profitability of a Bitcoin mining machine.

### D. PROCEDURAL HISTORY

On September 15, 2014, Plaintiff filed this action under Section 13(b) and 19 of the FTC Act seeking injunctive and other equitable relief. Plaintiff alleges Defendants violated Section 5(a) of the FTC Act by falsely representing that (1) "[c]onsumers will be able to use the machines or services to generate Bitcoins, or to generate a profitable or substantial amount of Bitcoins," or (2) "Defendants will deliver Bitcoin mining machines or services to consumers in a timely fashion." Doc. #2 at 10.

Along with its complaint, Plaintiff filed a motion for ex parte temporary restraining order with asset freeze, appointment of a receiver, and other equitable relief. The Court granted the ex parte motion and scheduled a hearing. On September 29, 2014, the parties appeared for the hearing and thereafter negotiated a Stipulated Interim Order, which the Court subsequently entered. The Stipulated Interim Order provides for limited discovery and set deadlines for the exchange of additional evidence in advance of a rescheduled preliminary injunction hearing.

The Court held the preliminary injunction hearing on November 24 and 25, 2014. It heard live testimony and received evidence and argument.[3] The Court also accepted post-hearing briefs.

## II. ANALYSIS

Section 13(b) of the FTC Act authorizes Plaintiff to bring suit in district court to enjoin violations of any provision of law enforced by it upon a reasonable belief "that any person, partnership, or corporation is violating, or about to violate," such law. 15 U.S.C. § 53(b). Under this statute, the court may grant a preliminary injunction "[u]pon proper showing that, weighing the equities and considering the [FTC's] likelihood of ultimate success, such action would be in the public interest." Id. Thus, the Court must (1) determine the likelihood that Plaintiff will ultimately succeed on the merits, and (2) balance the competing equities. Id.; FTC v. Freeman Hosp., 69 F.3d 260, 267 (8th Cir. 1995). The Court must also consider, based on the express terms of the statute, whether the alleged misconduct is ongoing or is likely to continue.

### A. LIKELIHOOD OF ULTIMATE SUCCESS

To satisfy the likelihood of success element, the Eighth Circuit has adopted a stringent standard. See id. (rejecting the "fair or tenable chance" standard and declaring the proper standard is "more stringent"). Specifically, Plaintiff must demonstrate "questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by [Plaintiff] in the first instance and ultimately by the Court of Appeals." Id. (internal quotation and citation omitted).

---

[3] Before the preliminary injunction hearing, Defendants BFL, Sonny Vleisides, and Darla Drake moved to exclude the testimony and declaration of Dr. Arvind Narayanan under Federal Rules of Evidence 403, 701, and 702 (Doc. #175). The Court took the motion under advisement and allowed Dr. Narayanan to testify at the hearing. After analyzing the motion, the record and the applicable law, the Court finds Plaintiff met its burden to admit this testimony for purposes of the preliminary injunction hearing. The Court therefore admits the testimony and declaration of Dr. Narayanan. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592–94 (1993); Kumho Tire Co., Inc. v. Carmichael, 526 U.S. 137, 141 (1999). The Court finds the attacks on Dr. Narayanan's depreciation opinions (e.g., the failure to account for bitcoin exchange rate and hash rate volatility) and on his "testnet" opinions (e.g., his lack of experience in manufacturing electronics) go to the weight afforded his opinions and not admissibility.

4

Plaintiff alleges Defendants violated Section 5(a) of the FTC Act. This statute prohibits unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 45(a)(1). To establish that an act or practice is deceptive under this section, Plaintiff must show a material representation that is likely to mislead consumers acting reasonably under the circumstances. See FTC v. Real Wealth, Inc., No. 10-CV-0060-FJG, 2011 WL 1930401, at *2 (W.D. Mo. May 17, 2011) (discussing elements).

A representation is material if "it involves information likely to affect a consumer's decision to purchase a particular product or service." Id. A representation is likely to mislead consumers acting reasonably under the circumstances if the claim is false or if the defendant lacked a reasonable basis for asserting the claim at the time the claim was made. Id.

### 1. Delivery Date Representations

First, Plaintiff alleges that the stated delivery dates are material representations that are false. Plaintiff is not alleging that Defendants lacked a reasonable basis for asserting the delivery dates. Doc. #193 at 17. The Court finds Plaintiff has not shown that it is likely to succeed in establishing this claim. Although Plaintiff makes a sufficient showing that the delivery date statements are material, the principal problem with Plaintiff's evidence is an insufficient showing that these statements were false.

Generally, a plaintiff claiming that a defendant's statement regarding his anticipated future conduct is false must show that the defendant did not intend to perform at the time the statement was made. The Court raised this issue to the parties during the hearing and reviewed the proffered case law. But the cited cases do not address this specific issue. Rather, the cases primarily establish the undisputed principle that Section 5(a) offenses do not require a showing

of intent or bad faith.  See, e.g., FTC v. Think Achievement, 144 F. Supp. 2d 993, 1009 (N.D. Ind. 2000) (noting that misrepresentations need not be made with an intent to deceive).

The Court agrees that Section 5(a) does not require scienter.  But it does require a false statement, and a statement about a defendant's intended future conduct is false when the speaker does not intend to perform at the time the statement is made.  See, e.g., THE LAW OF TORTS § 678 (2011) (noting that a promissory statement can be interpreted to be a representation about the defendant's present intent and that "[n]onperformance of a prediction or promise does not itself show the defendant lacked an intent to perform or to achieve the predicted conditions, much less that he intended not to perform").

Neither the parties nor the Court's research located a FTC Act case discussing this precise issue.  The Court did locate, however, a very recent case discussing a similar issue under Section 3729(a)(1)(A) of the False Claims Act.  See United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc., -- F.3d --, 2014 WL 6783033 (7th Cir. Dec. 3, 2014).  The elements of a claim under the False Claims Act are, undisputedly, different from a Section 5(a) offense.  But a claim under the False Claims Act does require a false statement and, in discussing this element, the Seventh Circuit explained:

> The district court ruled that this was not a false claim but merely a promise that the pharmacy failed to keep.  The ruling was incorrect.  If you say "I agree" when you don't agree, you're making a false statement, which in this case, [the plaintiff] alleges, induced the government to honor improper claims for reimbursement made by the pharmacy . . . .  Making a false promise in order to obtain something of value is fraud . . . and can easily be the basis of a claim under the False Claims Act.
>
> The problem with this part of [the plaintiff's] complaint lies elsewhere: in an insufficient showing that the "I agree" statement was false when the pharmacy made it.  It may have been an honest statement of intentions at the time, followed by a change of heart, motivated perhaps by greed, that caused the pharmacy to renege— and in that case the pharmacy would not have made any false

6

> statements, but simply have billed Medicare when it shouldn't have.

Id. at *2 (internal citations omitted).[4]  Similarly, in a securities fraud case identified by Defendants, a district court expressed similar concerns and dismissed certain securities fraud claims because the plaintiffs failed to allege facts suggesting that the defendants' statements concerning delays in testing and shipping dates were "unfounded at the time they were made . . . ." Borow v. nView Corp., F. Supp. 828, 834–35 (E.D. Va. 1993).[5]  These cases support the Court's conclusion that a defendant's statement regarding his future conduct is false when it is not an honest statement of intention when made.

Here, Plaintiff proffered evidence demonstrating that (1) the delivery dates were repeatedly extended, (2) the initial shipments of BitForce and Monarch machines were several months after the originally-stated delivery dates, (3) cloud mining services did not start when originally stated, (4) the Monarch was offered for purchase despite an extensive backlog of BitForce orders, (5) hundreds of consumers complained about BFL to Plaintiff, (6) thousands of consumers complained about BFL to PayPal, and (7) a pre-order model is problematic.  These facts are concerning and possibly create inferences of falsity.  Although inferences of falsity may demonstrate a chance of success, the Court finds they are insufficient to raise "questions going to the merits so serious, substantial, difficult, and doubtful" as to warrant preliminary injunctive relief.  Freeman Hosp., 69 F.3d at 267 (internal quotation omitted).

Plaintiff additionally offers the testimony of Anthony Fast, a former BFL customer-service employee.  Mr. Fast testified that it was "company policy" to inform customers that

---

[4] To be sure, a claim under this section of the False Claims Act requires scienter.  But the quoted portion of Grenadyor opinion discusses the falsity element of a False Claims Act claim, which is a separate element.

[5] Again, a securities fraud claim does include a scienter requirement.  But this case also discusses when a statement regarding future conduct is false.

delivery was "two months away" and that company management dismissed his suggestion to provide customers with additional information on delivery dates. Brandon Bone, another former employee, testified that he was not apprised of delays despite working in the customer service department. Plaintiff also proffers BFL's internal communications that Plaintiff suggests contradicts Defendants' representation on their website that they would complete a part of the final testing phase within one week.

The Court finds this evidence is still insufficient and does not establish that Plaintiff is likely to succeed in demonstrating the delivery date representations were false. This is particularly true when considered in light of Defendants' evidence. Specifically, Defendants assert that the delivery dates were based on information from BFL's vendors and suppliers and that BFL constantly updated its customers via its website on delays. They also argue that there is no evidence establishing how a customer-service employee like Mr. Fast might have sufficient information about BFL's product vendors to support his testimony, and Defendants suggest Mr. Fast is a disgruntled former employee that generally disapproves of BFL.

After considering all of the evidence, the Court finds Plaintiff has not carried its preliminary injunction burden.[6] Admittedly, the Court is troubled by some of the evidence. But Plaintiff has not established "questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and

---

[6] Plaintiff additionally argues that, despite Defendants' updates, the net impression of their representations regarding delivery dates was false. A representation may be likely to mislead consumers acting reasonably "by virtue of the net impression it creates even though [it] also contains truthful disclosures." Real Wealth, Inc., 2011 WL 1930401, at *2 (internal quotation omitted) (alteration in original). The Court reviewed the submitted website pages and again finds that Plaintiff has not demonstrated a likelihood of success under this theory for several of the reasons discussed above.

determination by [Plaintiff] in the first instance and ultimately by the Court of Appeals." Freeman Hosp., 69 F.3d at 267 (internal quotation and citation omitted).[7]

### 2. Profitability Representations

Second, Plaintiff alleges that Defendants' profitability claims are material representations that are false. The Court again finds Plaintiff has not shown a likelihood of success on these allegations. Plaintiff primarily alleges Defendants represented on their Facebook page that consumers could use a Bitcoin calculator to determine the profitability and ROI of their Bitcoin mining machines. The calculator required the consumers to input certain data points such as the mining difficulty and Bitcoin exchange rate, which are tied to the product's delivery date. Plaintiff alleges the profitability claims are false because of the significant delays in delivering the Bitcoin mining machines. Based on Plaintiff's admission that the profitability claims depend on the delivery date, the Court finds this claim is essentially a repackaged form of the delivery date allegations and fails for the reasons previously discussed.

Plaintiff additionally alleges that Defendants made specific references to profitability, including one web-forum reference to "money-making machines." Plaintiff has only identified a few instances of such comments and there is not substantial evidence that any of these references were widely disseminated or made systematically to all or even most customers. See FTC v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1316 (8th Cir. 1991) (noting that the plaintiff must show the representation was widely disseminated to satisfy the reliance requirement). Conversely, Defendants offered evidence that it has published more than 400 million ad impressions through Google that advertise hashing speeds and power efficiency of

---

[7] To be sure, Plaintiff might succeed on the merits of this claim if it presents evidence demonstrating, for example, that Defendants' suppliers expressly told them chips would not be ready for four months and despite this knowledge Defendants represented to customers that products would ship in two months.

9

BFL products but do not mention profitability. Based on all the evidence, the Court finds Plaintiff fails to establish a likelihood of success on this claim.

### B. BALANCE OF THE COMPETING EQUITIES

Even if Plaintiff had demonstrated a likelihood of success, the Court finds Plaintiff has not demonstrated the equities weigh in favor of issuing a preliminary injunction. The principal interest weighing in favor of a preliminary injunction is protecting consumers, which is obviously important. But this interest is present in every Section 5 case brought by Plaintiff and does not by itself justify an injunction. On the other hand, Defendants abandoned the pre-order model in July and have represented to this Court (on several occasions) that they do not intend to return to this business model. Defendants also note the business impact of the injunction and outline several steps BFL has taken to find solutions for customers. Plaintiff responds that, despite their statements, Defendants pose a realistic threat of recurrences in such activities based on their past pattern of conduct.

At this time, the Court finds that Plaintiff has not demonstrated that Defendants are likely to return to alleged misconduct. The pre-order business model has resulted in a class-action lawsuit, another civil lawsuit, the instant lawsuit, and an investigation by the Kansas Attorney General. As a result of these lawsuits, Defendants have lost employees, upset consumers, and suffered business delays. Based on the current evidence, there is not a clear showing at this time that Defendants intend to reactivate the pre-order business model sufficient to justify the requested relief. In addition, the Court finds Plaintiff has not sufficiently shown that Defendants will make profitability representations absent an injunction.

Moreover, the proposed injunction is very onerous and affects activities that appear unconnected to the allegedly deceptive conduct. Specifically, Plaintiff's allegations regard

delivery date and profitability representations. But the proposed injunction extends to areas of the company such as shipping products and interacting with consumers. The Court therefore finds, at this point in time, that the balance of equities does not favor Plaintiff.

### C. EXPRESS LANGUAGE OF STATUTE

Regardless of the above analysis, a preliminary injunction cannot issue on the current record. Section 13(b) of the FTC Act allows Plaintiff to bring suit in district court to enjoin a party that "is violating, or about to violate" any provision of law enforced by Plaintiff. 15 U.S.C. § 53(b). Plaintiff fails to show any continuing violation of the alleged misconduct. Indeed, it is undisputed that Defendants abandoned the pre-order model. Plaintiff also fails to establish that Defendants are violating, or about to violate, any law that Plaintiff enforces regarding profitability representations. Plaintiff argues Defendants' past conduct suggests they are likely to return to this business model and related representations in the future. But, as previously discussed, the Court disagrees. On the instant record, the Court is unable to find that there is a cognizable danger of recurrent violations. Accordingly, preliminary injunctive relief under Section 13(b) is currently precluded.

### III. DEFENDANTS' VOLUNTARY PROPOSAL

Although the Court finds Plaintiff is not entitled to the remedy of a preliminary injunction, the Court, consistent with Defendants' voluntary proposal contained in BFL's business plan, orders Defendants to submit a written report on a monthly basis that will document progress made on the commitments contained in the business plan as well as operational and financial results. The report will address:

    (1) Status of manufacturing and shipping to the current order queue, number of customers requesting shipment/service activation, number of customers delivered, projected number of customers still requiring shipment and anticipated shipment timeframes;

11

(2) Assessment of remaining pre-order refund liability, including status of refund requests and status of reserve or progress toward generating assets to pay out all requested refunds in a timely manner;

(3) Corporate governance progress;

(4) Reaffirm that the no pre-order policy remains in effect and that only consumer sales of in-stock items are occurring;

(5) Status of burn testing and report on segregated proceeds; and

(6) Key communications made and/or planned with customers.

The Court will discuss the filing procedure with the parties during a status conference, but it is the Court's current intent that these reports shall be filed under seal and not be distributed to anyone other than the parties and counsel of record absent leave of Court.

### IV. REMAINING ISSUES

Based on this ruling, there are several outstanding issues the Court needs to address with the parties such as the most efficient procedure for winding down the temporary receivership and setting a schedule for this case. The Court therefore sets a telephonic status conference on **December 22, 2014**, at **9:30 A.M.** to address these issues. Before this conference, the parties shall meet and confer on a potential schedule for this case. The parties should prepare an aggressive but realistic schedule and submit it to the Court on or before **December 18, 2014**. Accordingly, it is hereby

ORDERED Defendants BF Labs Inc., Sonny Vleisides, and Darla Drake's Motion to Strike Declaration and Exclude All Testimony From Arvind Narayanan, Ph.D (Doc. #175) is DENIED.  It is further

ORDERED Plaintiff's motion for a preliminary injunction (Doc. #7) is DENIED.  It is further

ORDERED Defendants shall submit a written report to the Court on a monthly basis consistent with the above rulings. The first report shall be submitted on or before **January 30, 2015**. It is further

ORDERED the parties shall appear for telephonic status conference on **December 22, 2014**, at **9:30 A.M.** The Courtroom Deputy, Joella Baldwin, will arrange participation. It is further

ORDERED the parties shall submit a proposed schedule for this lawsuit on or before **December 18, 2014**.

IT IS SO ORDERED.

Dated: December 12, 2014           /s/ Brian C. Wimes
                                   JUDGE BRIAN C. WIMES
                                   UNITED STATES DISTRICT COURT