UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CASE NO. 4:14-cv-00815-BCW |
| Plaintiff, | |
| v. | |
| BF LABS, INC., *et al.*, | |
| Defendants. | |

PLAINTIFF'S REPLY SUGGESTIONS OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF

EXHIBIT 4

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Defendants Mined Bitcoins For Themselves Using Customer Equipment | 5 |
| II. | The FTC Is Likely To Succeed On The Merits | 6 |
| | A. Defendants Misrepresented The Profitability And Yield of Their Machines | 7 |
| | B. Defendants' Feeble Disclaimers Do Not Negate Their Representations Of Timely Delivery | 7 |
| | C. Defendants Claims That They Had A Reasonable Basis For Their Delivery Representations Are Irrelevant and Inaccurate | 8 |
| III. | Defendants Deliver Outdated Products to Consumers | 10 |
| IV. | Defendants Do Not Provide Refunds to Customers. | 11 |
| V. | A Preliminary Injunction Should Issue To Prevent Future Law Violations And To Preserve The Possibility For Effective Final Relief | 12 |
| | A. Defendants' Illegal Practices Continue And Are Likely To Do So | 13 |
| | B. The Changes That Defendants Have Made Are Superficial and Did Not Remedy Their Ongoing Law Violations (through entry of the TRO) | 15 |
| VI. | Conclusion | 16 |

# Table of Authorities

**Cases**

*FTC v. Affiliate Strategies, Inc.,* 849 F. Supp. 2d 1085 (D. Kan. 2011)…………………………13
*FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000)……………………….…..9, 14
*FTC v. Mallett*, 818 F. Supp. 2d 142 (D.D.C. 2011)……………………………………….….15
*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)…………………………………….….13
*FTC  v. Sage Seminars*, No. C-95-2854-SBA, 1995 U.S. Dist. LEXIS 21043 (N.D. Cal. Nov. 2, 1995)……………………………………………………………………………………………..14
*FTC v. SlimAmerica,* 77 F. Supp. 2d 1263 (S.D. Fla. 1999)……………………………………12
*FTC v. Warner Comms., Inc.,* 742 F.2d 1156 (9th Cir. 1984)…………………………………..13
*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988)…………………..9, 13
*FTC v. World Wide Factors, Ltd.*, 882 F. 2d 344 (9th Cir. 1989)……………………………….13
*FTC v. U.S. Oil & Gas*, No. 83-1702-CIV-WMH, 1987 U.S. Dist. LEXIS 16137 (S.D. Fla. July 10, 1987)……………………………………………………………………………………………14
*Int'l Assoc. of Conf. Interpreters*, 123 F.T.C. 465 (1997)……………………………………….14
*Montgomery Ward & Co. v. FTC*, 379 F.2d 666 (7th Cir. 1967)………………………………..13
*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989)………………………………….9
*SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866 (S.D. Fla. 1974)…………………………...14
*In the Matter of Zale Corp.*, 78 F.T.C. 1195 (1971)……………………………………………..14

**Statutes**
15 U.S.C. §45(a) (8)

**Rules**
16 C.F.R. § 435.2 (8)

For over two years, Defendants have been funded by payments from consumers who waited for months and even up to one year for outdated and ineffective products while Defendants held their money, ignored complaints, refused refunds, and yet took more pre-orders. Once Defendants got around to producing Bitcoin mining machines using what were essentially interest-free loans from consumers, their first actions were not to benefit their long-suffering customers, but to pad their own bottom line.  Specifically, the testimony of several former employees and Vice President of Product Development, Josh Zerlan shows that instead of fulfilling orders immediately, Defendants used their customers' machines to mine Bitcoins for themselves before shipping the now used machines to their customers.  Thus, Defendants pocketed Bitcoins that should have gone to their customers.   Further demonstrating Defendants' disregard for their customers, they used corporate funds to make and mass order red foam pitchforks mocking their own customers, emblazoned with the words, "Y U NO SHIP – BFL IS LATE!"[1]

Moreover, while Defendants may have instituted some internal controls after the Johnson County District Attorney's Office informed them of its investigation, they have not changed their ways.  Despite scrutiny from law enforcement and two class action lawsuits, which only serve to underscore the widespread harm done by Defendants, their questionable practices have persisted.  First, Defendants appeared to be mining Bitcoins for themselves using customer equipment when the FTC executed the TRO, despite making public statements to the contrary.  Second, even up to the time that the FTC executed the TRO, Defendants were refusing to return payments to consumers who had been waiting for their orders for over six months.  Given their record of repeated law violations, Defendants cannot expect the Court simply to take their word for it that

---

[1] PX 1, ¶ 14.

4

they have abandoned their illegal conduct for good.  They misrepresented the delivery and profitability of the BitForce machine, and then  made the same misrepresentations to induce consumers to purchase the Monarch, and did so yet again to sell their cloud mining services.  They should not get a fourth chance (or a fifth chance, in the case of one of the defendants), especially when it would be funded with money that rightfully belongs to their customers.[2]  Defendants' business survives upon income obtained through misrepresentations about timely delivery and profitability that should be returned to their victims.  Defendants have failed to explain why the Court should permit them to resume operations and deplete assets available for consumer redress, especially in light of the Commission's likelihood of success on the merits.

## I. Defendants Mined Bitcoins For Themselves Using Customer Equipment

After filing this action, the FTC discovered that when Defendants finally manufactured products, they first used them to mine Bitcoins for themselves under the guise of testing – a process that referred to as "burning in."[3]  Former employees and Mr. Zerlan, admitted that Defendants mined Bitcoins with customer equipment.[4]  Defendants likely mined for themselves on each and every machine before they were shipped to consumers.[5]  One former employee stated that Defendants would run up to 500 Bitcoin mining machines in three separate "burn-in"

---

[2] The question before the Court is not, as Defendants argue, whether its decision to grant *ex parte* relief was appropriate, but whether a preliminary injunction should issue.  Oddly, Defendants' primary argument regarding why *ex parte* relief was not warranted is that another enforcement agency was investigating their conduct and that it was subject to two class actions from dissatisfied customers.  This has no bearing on the instant action, in which the FTC seeks redress for consumers nationwide.  Further, the FTC submitted voluminous evidence in support of the *ex parte* TRO, much of which Defendants do not dispute, including the diversion of corporate funds for personal use, Defendant Vleiseides' demonstrated disregard for court orders, and Defendant Ghoseiri's access to foreign bank accounts.  Finally, that Defendants' illegal practices continue despite the investigation and two lawsuits underscores the appropriateness of *ex parte* relief.
[3] PX 6, ¶ 7-8; PX 7, ¶ 5-6.
[4] PX 13 at 33: 9 – 33:5; PX 6; PX 7.
[5] PX 7, ¶ 12-13.

5

rooms at the same time.[6]  Another former employee testified that some machines were "burned in" for up to two days, even though testing usually required only 10 to 30 minutes, and that Defendants generally did not ship out machines until they had manufactured machines to be burned in in their place.[7]

Defendants not only engaged in this practice despite repeated and public denials,[8] but kept the Bitcoins they generated for themselves.[9]  Moreover, Defendants did not need to mine with customer equipment in order to test it.  A "test-net" exists, which enables machines to be tested without being used to mine.[10]  In fact, one employee inquired with company management as to why they chose to test by mining rather than using the test-net and was told that the company would not make any money using a test-net.[11]

## II. The FTC Is Likely To Succeed On The Merits

Defendants do not dispute that representations about timely delivery, profitability, and yield were material to consumers in deciding whether to purchase their products.  Significantly, nowhere do Defendants dispute that due to their shipment delays, consumers were unable to

---

[6] PX 6, ¶ 7.

[7] PX 7, ¶ 14.

[8] *See* PX 1, ¶ 10, Att. H (On Aug. 12, 2012, on the BFL web forum, BFL_Josh posted the following comment that he anticipated receiving from consumers: "You are going to have an unfair advantage when it comes to mining equipment, you'll be able to get as much as you want before anyone else!"  In response, BFL_Josh explains "I will not be expanding my mining footprint as it would be a conflict of interest.  I will continue with my current obligations and already acquired/paid for equipment but will not be purchasing or utilizing additional equipment as part of my mining operations…. I believe I can do more good for the bitcoin community as a whole working to provide that equipment to people as opposed to using it myself.");   PX 1 ¶ 10, Att. G (In introducing a new product line, BFL stated on it's website "Why don't you guys mine? This is a popular question.  The answer is pretty simple.  Hardware is the focus of our passion.  We're hardware designers.").

[9] PX 13 at 33: 9 – 33:5.

[10] Bitcoin Developer Examples (including definition of Testnet), *available at* https://bitcoin.org/en/developer-examples#testnet.

[11] PX 7, ¶ 8.

6

recoup their investments or mine a profitable or substantial number of Bitcoins. The arguments that they do raise are unsupported by law and fact, and are addressed below.

### A. *Defendants Misrepresented The Profitability And Yield of Their Machines*

Defendants cannot absolve themselves of responsibility for the profit and yield representations that came from the profitability calculator simply because they did not create it. Defendants posted the calculator on all of their social media pages, including Facebook, Twitter, and Tumblr, telling consumers to "measure your ROI [return on investment] with this cool Bitcoin mining calculator." Plaintiffs' Suggestions in Support of Ex Parte Motion for TRO, DE 8 at14 (hereinafter, "TRO Br."). It is reasonable for consumers to rely on technical representations that Defendants provide, and Defendants have cited no legal authority that excuses misrepresentations in an advertisement because the advertiser did not create that material. *See FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) (holding that it is "reasonable for consumers entering this specialized and technical market to rely on the representations of an apparently reputable firm…").

Also unpersuasive are Defendants' claims that they made accurate representations about the products' speed and capabilities. First, the accuracy of those representations is questionable. For example, a former employee's declaration asserts that the BitForce Mini-rig had less hashing power and consumed more electricity than advertised.[12] Second, Defendants do not dispute that the lengthy delivery delays rendered the calculator's output inaccurate. TRO Br. at 14 - 16.

### B. *Defendants' Feeble Disclaimers Do Not Negate Their Representations Of Timely Delivery*

---

[12] PX 7, ¶ 16, 17; *see also* PX 11, ¶ 20 (consumer received machine that did not function).

7

Defendants' claim that Butterfly Labs "notified each and every buyer on the BF Labs online order form that the shipping date for the ordered product was 'two months or longer'" is false. Def. Statement Opposing Ex Parte TRO at 11 (hereinafter, "Op."). As stated in the FTC's TRO papers, no such qualifying language appeared on Defendants' website when they began accepting BitForce orders in June 2012. TRO Br. at 17 n. 76. In fact, Defendants claimed to be ahead of schedule and went so far as to say, "Honest Abe, we're scheduling shipments for October 2012." TRO Br. at 17 n. 76. Qualifying language did not appear on Defendants' website until March 2013. TRO Br. at 17. And, as explained in the FTC's TRO papers, and unaddressed by Defendants, their qualifying language did not overcome the net impression that shipment would timely occur, which resulted from Defendants' statements to reassure consumers of timely delivery. TRO Br. at 32. As set forth in the record, Defendants described the timeline for the Monarch delivery as "solid," set forth a specific timeline to demonstrate to consumers in detail why the Monarch would timely ship, claimed that "they [were] ready for high volume production," and that they were "free from the pitfalls sometimes associated with a first generation design." TRO Br. at 32.

### C. *Defendants Claims That They Had A Reasonable Basis For Their Delivery Representations Are Irrelevant and Inaccurate*

It is irrelevant whether Defendants had a reasonable basis for their represented delivery dates. The law is well settled that the FTC need not prove that Defendants acted with intent to defraud or in bad faith to prevail under Section 5. *See, e.g.*, *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 526 (S.D.N.Y. 2000). Further, Defendants' reliance upon 16 C.F.R. § 435.2 (Mail, Internet, or Telephone Order Merchandise Rule) is misplaced. The Complaint alleges violations of Section 5, not the

8

Rule.  Additionally, the Rule *requires* merchants to have a reasonable basis for representations regarding shipment dates; it does not excuse merchants who misrepresent shipment dates. 16. C.F.R. §432.5(a)(1).

Regardless, Defendants did not have a reasonable basis for their representations regarding their projected delivery dates.  Delays ranging from six months to one year demonstrate that Defendants lacked a reasonable basis.  Contrary to Defendants' assertions that they provided "good-faith" updates about their shipment dates (Opp. at 14), Defendants were actually aware of the potential for long delays but simply choose not to inform consumers of that fact.  For example, Defendants presented on the preorder page for the Monarch that as of September 9, 2013, that they were in the final testing phases, "taping out" of the chip.[13]

However internal chats as late as November 2013 reflect that Defendants had not come close to the "tape out," let alone taping out within a week.[14]  In December 2013, one month after the Defendants' conversations about delayed shipment, Defendants' preorder page continued to represent to consumers that "tape out" <u>occurred</u> in August 2013 and that "initial shipping" would occur in November/December 2013.[15]  During this same time period when Defendants were

---

[13] The website stated:
> Our timeline to begin shipments towards the end of the year is solid.
> Here's a breakdown of the timeline.
> - We're now in at the final stage of development (Tapeout) and are sending wafers into production at the foundry in the next few weeks
> - Foundry production takes 10 weeks
> - Bumping, Slicing & BGA packaging takes approximately 2 weeks
> - Initial shipments begin and ramp up to full capacity over the following 3 weeks.

TRO Br. at 20, n. 92.
[14] PX 1 ¶ 21, Att. Y ("Honestly, if we haven't even taped out at this point, I don't see us shipping a product until the very end of January at the earliest, more like middle of February").
[15] PX 1 ¶ 6, Att. C.

9

expressing doubts about whether they could meet their represented shipment dates, they also started dispensing marketing emails that promised delivery would occur by early 2014. TRO Br. at 31.

## III. Defendants Deliver Outdated Products to Consumers

Defendants claim to have shipped products – but all of these products were delivered after significant delays. No consumer has ever received any of their products on Defendants' originally represented shipment date. Defendants themselves admit that when it comes to Bitcoin mining, time is of the essence.[16] Consumers do not want the products they ordered delivered one year late. Once consumers recognized that the product would be delivered late and would essentially be outdated or obsolete, many tried to cancel the order.[17] One consumer analogized that receiving the mining machine six months late is akin to "shipping a concert ticket half a year after the concert took place."[18] Shipping outdated products that consumers do not want does not constitute meeting your promises to the consumer.

Further, despite Defendants' assertions that they are currently shipping the Monarch, their delayed shipment has already harmed the consumer. Bitcoin mining gets more difficult over time and the Monarch is (at best) already shipping eight months after its initial represented shipment date of December 2013. Defendants fail to mention that because of the severe delay in shipment, the Monarch already cannot mine a significant or profitable amount of Bitcoins. Consumers have already complained that the severe delay renders the Monarch outdated and

---

[16] Opp. Br. at 3 - 4.
[17] PX 1, ¶ 11.
[18] PX 12, Att. F.

10

many are seeking refunds for exactly that reason.[19] Costs in running such outdated technology are usually higher than the revenue generated.[20]

## IV. Defendants Do Not Provide Refunds to Customers.

Defendants claim that they have provided a "full product shipment or refund" for "every single order between August 9 and November 9, 2013." Def. Opp. at 15. They provide no supporting documentation establishing this fact. Directly contrary to Defendants' statement, one consumer stated in his declaration that after placing an order with Butterfly Labs in both September and October of 2013 for over $7,500, he received neither a refund nor a product after numerous requests.[21] And, even in situations where consumers were able to get a refund, they often had to resort to other methods such as their credit card's dispute resolution process or civil lawsuits before they were able to get a refund. For example, one consumer had to lodge a complaint with his credit card company before he was able to obtain a refund.[22] Another consumer had to sue the Defendant through an attorney before he was able to get their attention and have his money refunded.[23] And still other consumers have never received a machine or a refund at all.[24] Defendants may try to argue that these are isolated incidents, but there are entire threads on the blogosphere where consumers teach each other tips on ways to force Butterfly Labs to provide refunds to the consumer.[25] These threads generate hundreds of comments with consumers all explaining their difficulty in getting a refund from Defendants.

---

[19] PX 1, ¶ 11; PX 9, ¶ 13; PX 10, ¶ 3, 6, 10, 11.
[20] *See, e.g.,* PX 11, ¶ 20.
[21] PX 14, ¶ 8.
[22] PX 12, ¶ 9.
[23] PX 11, ¶ 22, 24.
[24] PX 8, ¶ 10.
[25] *See* PX 1, ¶ 9, Att. E (On the website bitcointalk.org, one consumer posted a list of the more than twelve steps that the consumer had to take to finally get a refund from BFL. These steps

11

Even if Butterfly Labs were providing refunds, this would not negate their law violations. Even "the existence of a money-back guarantee . . . is neither a cure for deception nor a remedy for consumer injury." *FTC v. SlimAmerica,* 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) (*citing FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994). Otherwise, "anything might then be advertised as long as unsatisfied consumers were returned their money." *Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 671 (7th Cir. 1967); *see also FTC v. Affiliate Strategies, Inc.,* 849 F. Supp. 2d 1085, 1119-20 (D. Kan. 2011) (injunctive relief entered despite company's argument that it should not be enjoined because it, among other things, refunded over $1 million).

## V. A Preliminary Injunction Should Issue To Prevent Future Law Violations And To Preserve The Possibility For Effective Final Relief

As established in the FTC's TRO papers and undisputed by Defendants, public equities, especially in the context of consumer protection, "receive far greater weight" in the determination of whether injunctive relief should issue. *World Travel Vacation Brokers*, 861 F.2d at 1030; *see also FTC v. Warner Comms., Inc.,* 742 F.2d 1156, 1165 (9th Cir. 1984); *FTC v. World Wide Factors, Ltd.*, 882 F. 2d 344, 347 (9th Cir. 1989); *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011) ("The public interest in ensuring the enforcement of federal consumer protection is strong."). The FTC demonstrates below that the equities put forth by Defendants

---

included emailing BFL and after being denied by BFL, filing a dispute with Paypal, calling Paypal's customer service, emailing Paypal multiple times, escalating the dispute within Paypal, and speaking to Bruce at BFL. In response to that post, another consumer explained "This is almost exactly how my refund went. Took me a month and quite the run around of contacting Paypal multiple times." Another consumer posted that "I sent 5 emails to BFL requesting refunds, spent a good deal of time talking to several Paypal representatives on numerous occasions, and Bank of America several times as well. Paypal actually had me do a charge back via my Bank to initiate the full refund from BFL. Don't expect BFL to be of any help in your quest for a refund." Another consumer described "I received a refund through Paypal after the 45 days, just by being persistent. However, they wouldn't refund the extra shipping charge, which was a different transaction…. I then filed a charge back with my credit card for the extra shipping transaction, as of today, it looks like that will be refunded as well."; PX 1, ¶ 9, Att. F.

12

cannot overcome the public interest in preserving assets to redress consumers and ensuring that Defendants cannot victimize additional consumers.

### A.     *Defendants' Illegal Practices Continue And Are Likely To Do So*

Defendants' current cessation of the pre-order business model does not demonstrate that illegal conduct has ceased.  Defendants have still not fulfilled the majority of Monarch orders.  Nonetheless, they still continued to deny consumers refunds, and do not dispute that the company's current policy is to deny refunds for consumers who ordered the product less than six months ago.  Further, as noted above, Defendants' representation to this Court that "full product shipment or a refund has been given for *every single order* made between August 17 and November 9, 2013" is inaccurate.  Consumer Eric LeFebvre ordered a Monarch in October 2013, and has yet to receive the machine, and Butterfly Labs denied his two requests for a refund.[26]  Defendants cannot hold on to consumer money for months on end while giving them nothing in return, while claiming to comply with the law.  Moreover, up until the time of filing, they were engaging in deceptive practices.  Their website stated that the Monarch was shipping even though the evidence shows that most of the orders remained outstanding.  Further, the company was encouraging consumers to accept upgrades, but failed to adequately disclose that accepting the upgrade would waive their ability to obtain a refund.  Additionally, they were mining for Bitcoins for themselves by using consumers' products.

The continuance of illegal conduct obviates the need for the Commission to demonstrate a likelihood of future violations. [27]  Nonetheless, the Commission can demonstrate this

---

[26] PX 14, ¶ 8.
[27] Even if they had ceased their wrongful conduct, cessation of conduct after commencement of an investigation is given less credibility.  *FTC v. Sage Seminars*, No. C-95-2854-SBA, 1995 U.S.

13

likelihood with ease.  Courts recognize that "past illegal conduct is *highly suggestive* of the likelihood of future violations."  *Five-Star Auto Club*, 97 F. Supp. 2d at 536 (emphasis added); *see also, e.g., SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974) (past misconduct suggests likelihood of future violation."  *See also FTC v. U.S. Oil & Gas*, No. 83-1702-CIV-WMH, 1987 U.S. Dist. LEXIS 16137, at *51 (S.D. Fla. July 10, 1987).  Defendants have exhibited a repeated pattern of advertising new and allegedly innovative equipment, while failing to deliver on their promises to ship older equipment.  As previously mentioned, Defendants have take pre-orders induced by misrepresentations on timely delivery and profitability for three different products or services.

     Moreover, Defendants' corporate culture further undermines the credibility of their claims that they have reformed and will operate lawfully in the future.  Up until the time the FTC executed the TRO, Defendants were using customer equipment to line their own pockets despite public representations to the contrary.  Further, the illegal conduct here did not occur in isolation or as a result of mere oversight, but as a result of a business model intentionally designed to extract and retain money from consumers as long as possible. Defendants have already done this once – they started taking consumers' money for their second generation machine, the Monarch, when their first generation customers were still angrily waiting for their delivery. TRO Br. at 18-20.  Also telling,rather than exhibiting contrition about their failure to fulfill promises to consumers, Defendants continued taking pre-orders despite their inability to fulfill existing

---

Dist. LEXIS 21043, at *16-17 (N.D. Cal. Nov. 2, 1995).  In fact, "[a] claim of abandonment is rarely sustainable as a defense to a Commission complaint where, as here, the alleged discontinuance occurred 'only after the Commission's hand was on the respondent's shoulder.'" *Int'l Assoc. of Conf. Interpreters*, 123 F.T.C. 465, 658 (1997), *quoting In the Matter of Zale Corp.*, 78 F.T.C. 1195, 1240 (1971).  Here, Defendants only ceased taking pre-order sales after the Johnson County District Attorney's Office began its investigation, and after it became subject to numerous private actions by disgruntled customers.

orders and spent corporate funds on foam pitchforks emblazoned with the phrase, "Y U No Ship, BFL Is Late!" for conceivably no other reason than to mock their own customers.[28]

### B. *The Changes That Defendants Have Made Are Superficial and Did Not Remedy Their Ongoing Law Violations (through entry of the TRO)*

Defendants should not be able to continue to operate on the consumers' dime because they have taken superficial steps after two years of illegal operations to remedy their flawed business model. It is irrelevant whether Butterfly Labs has a "limitless" future or a viable business plan. What is relevant is whether or not this court should permit Defendants to use their ill-gotten gains to fund this so-called future. As demonstrated below, the efforts that Defendants have made to improve their business operations are too little, too late, particularly given that they were engaged in ongoing law violations until they were served with this Court's TRO.

Defendants' hiring of outside consultant Bruce Bourne provides little comfort. He began working with Butterfly Labs in September 2013.[29] However, despite his presence, Defendants continued to take Monarch pre-orders and to misrepresent shipment and delivery dates and used consumers' equipment to mine Bitcoins for themselves. Also despite Mr. Bourne's presence, Defendant Vleisides lives in a home renovated, owned, and paid for by Butterfly Labs, and therefore consumers. This home is not corporate housing that all Butterfly Labs' employees can use, the only persons who reside in this house are Defendant Vleisides, his son, his domestic partner, and his partner's daughter.[30] And despite Mr. Bourne's presence, Defendants continued to hold funds belonging to consumers who never received machines.

---

[28] PX 1, ¶ 14.
[29] PX 2
[30] PX 2

Similarly, Defendants' claims that they hired a consultant to improve the efficiency of their business processes has no bearing on the necessity for injunctive relief.  This is not a case in which consumer harm resulted from simple flaws in Defendant's operations.  The consumer harm here resulted from misrepresentations that Defendants made to induce consumers to purchase the BitForce, then the Monarch, and then their cloud mining services.  It also bears mentioning that Defendants, in inducing consumers to purchase the Monarch, claimed that they had improved numerous of their processes and had overcome past pitfalls.  Despite those purported improvements, Defendants were not able to fulfill their promises to consumers.

Finally, Defendants cite their refund policy and free cloud mining services as more proof that they can be trusted to operate lawfully.  However, as discussed in Section IV, Defendants are not providing refunds as represented, and, neither providing refunds nor mollifying customers with giveaways cures deception.  Defendants specifically stated in August 2013 that their shipment date of December 2013 was solid.  They made statement after statement following December 2013 that reflected shipment within a month.  In March 2014, Defendants announced that shipments would begin within five weeks (April 2014).  Today, Defendants now state that a consumer who ordered a Monarch in November 2013 would receive the product in August 2014.  As discussed *supra*, the Monarch is now outdated and unwanted by many consumers.  Where it matters, Defendants still have not solved any of their problems.

## VI.    Conclusion

For the foregoing reasons, the FTC respectfully requests that the Court enter the proposed preliminary injunction.


Respectfully submitted,

                                      JONATHAN E. NEUCHTERLEIN
                                      General Counsel

Dated:  September 26, 2014

                                        /s/ Helen Wong
                                      Helen P. Wong, DC Bar # 997800
                                      Teresa Kosmidis, NY Bar # 4533824
                                      Leah Frazier, DC Bar # 492540
                                      Federal Trade Commission
                                      600 Pennsylvania Ave., N.W.
                                      Mail Stop CC-10232
                                      Washington, D.C. 20580
                                      202-326-3779 (Wong)
                                      202-326-3216 (Kosmidis)
                                      202-326-2187 (Frazier)
                                      202-326-3768 (facsimile)
                                      E-mail:  hwong@ftc.gov
                                      E-mail:  tkosmidis@ftc.gov
                                      E-mail:  lfrazier@ftc.gov

                                      TAMMY DICKINSON
                                      United States Attorney

Dated: September 26, 2014        /s/ Charles M. Thomas
                                      Charles M. Thomas, MO Bar #28522
                                      Assistant United States Attorney
                                      Charles Evans Whittaker Courthouse
                                      400 East Ninth Street, Room 5510
                                      Kansas City, MO  64106
                                      Telephone:  (816) 426-3130
                                      Facsimile:   (816) 426-3165
                                      E-mail:        charles.thomas@usdoj.gov

                                      Attorneys for Plaintiff
                                      FEDERAL TRADE COMMISSION