## EXHIBIT A

1. BFL's formation and management structure.

2. The identity of BFL's past and present organizers, board of directors, owners, and officers, and their respective capital contributions, including their training, education, experience, expertise, or lack thereof regarding business practices, sales, marketing, and advertising practices, and the pre-order business model.

3. The identity of people, excluding BFL's lawyers, with whom BFL consulted with regarding business practices, sales, marketing, and advertising practices, and the pre-order business model, including each consultant's training, education, experience, or lack thereof in such matters.

4. The identity (title, author, date, location) of any literature, publication, website, guideline, or other informational source, excluding sources drafted by BFL's lawyers, that BFL reviewed, referred to, used, or relied on in it's business practices, sales, marketing, and advertising practices, and pre-order business model.

5. The date BFL was first notified about Plaintiffs' April 4, 2014 Spoliation Letter and Notice to Preserve Documents, the actions taken in response thereto, the date such actions were taken, and whether any information/documents listed in the bullet points on pages 2-3 of the Spoliation Letter and Notice to Preserve Documents: (a) existed on or after April 4, 2014; and/or (b) was lost, destroyed, or otherwise not preserved.

6. BFL's answer, specifically (a) any paragraph that denies Plaintiffs' factual allegations, including the factual basis thereof and the identity of people having knowledge thereof; and (b) BFL's affirmative defenses, including the factual basis thereof and the identity of people having knowledge thereof.

7. BFL's June 18, 2014 initial disclosures, including the identification of witnesses, documents, tangible things, and electronically stored information referred to or described therein.

8. BFL's interrogatory answers and supplemental interrogatory answers, including the factual basis thereof, the identity of people having knowledge thereof, and the efforts taken to search for, inquire about, and/or obtain the requested information.

9. BFL's responses and supplemental responses to requests for production of documents, tangible things, and electronically stored information, including the factual basis thereof, the identity of people having knowledge thereof, and the efforts taken to search for, inquire about, and/or obtain the requested documents, tangible things, and electronically stored information.

10. Whether BFL transferred or otherwise provided any bitcoins to its owners, officers, directors, managers, employees, or agents, including the date, amount of bitcoins, and reason for doing so on each such occasion.

11. Whether BFL admits or denies the facts and/or representations asserted in Plaintiffs' interrogatory answers, Nos. 6-10, 12-13, including the factual basis thereof and the identity of any people having knowledge thereof.

12. Whether BFL admits or denies the following facts and/or representations asserted in Case No. 4:14-cv-00815-BCW, Doc. 42, including the factual basis thereof and the identity of people having knowledge thereof:

    a. "[W]hen Defendants finally manufactured products, they first used them to mine Bitcoins for themselves under the guise of testing – a process that referred to as 'burning in'."

    b. "Former employees and Mr. Zerlan, admitted that Defendants mined Bitcoins with customer equipment."

    c. "Defendants likely mined for themselves on each and every machine before they were shipped to consumers."

    d. "One former employee stated that Defendants would run up to 500 Bitcoin mining machines in three separate 'burn-in' rooms at the same time."

    e. "Another former employee testified that some machines were 'burned in' for up to two days, even though testing usually required only 10 to 30 minutes, and that Defendants generally did not ship out machines until they had manufactured machines to be burned in in their place."

    f. "Defendants not only engaged in this practice despite repeated and public denials, but kept the Bitcoins they generated for themselves."

    g. "Defendants did not need to mine with customer equipment in order to test it."

    h. "A 'test-net' exists, which enables machines to be tested without being used to mine."

    i. "[O]ne employee inquired with company management as to why they chose to test by mining rather than using the test-net and was told that the company would not make any money using a test.net."

j. "Defendants do not dispute that representations about timely delivery, profitability, and yield were material to consumers in deciding whether to purchase their products."

k. BFL "notified each and every buyer on the BF Labs online order form that the shipping date for the ordered product was 'two months or longer.'"

l. "No such qualifying language appeared on Defendants' website when they began accepting BitForce orders in June 2012."

m. "Defendants claimed to be ahead of schedule and went so far as to say, 'Honest Abe, we're scheduling shipments for October 2012.'"

n. "Qualifying language did not appear on Defendants' website until March 2013."

o. "[T]heir qualifying language did not overcome the net impression that shipment would timely occur, which resulted from Defendants' statements to reassure consumers of timely delivery."

p. "Defendants described the timeline for the Monarch delivery as 'solid,' set forth a specific timeline to demonstrate to consumers in detail why the Monarch would timely ship, claimed that 'they [were] ready for high volume production,' and that they were 'free from the pitfalls sometimes associated with a first generation design.'"

q. "Defendants were actually aware of the potential for long delays but simply chose not to inform consumers of that fact."

r. "Defendants presented on the preorder page for the Monarch that as of September 9, 2013, that they were in the final testing phases, ' taping out' of the chip."

s. "[I]nternal chats as late as November 2013 reflect that Defendants had not come close to the 'tape out,' let alone taping out within a week."

t. In December 2013, "Defendants' preorder page continued to represent to consumers that 'tape out' occurred in August 2013 and that 'initial shipping' would occur in November/December 2013."

u. "[W]hen Defendants were expressing doubts about whether they could meet their represented shipment deadlines, they also started dispensing marketing emails that promised delivery would occur by early 2014."

      v.      "No consumer has ever received any of their products on Defendants' originally represented shipment date."

      w.     "Defendants themselves admit that when it comes to Bitcoin mining, time is of the essence."

      x.      "And still other consumers have never received a machine or a refund at all."

      y.      "Their website stated that the Monarch was shipping even though the evidence shows that most of the orders remained outstanding."

      z.      "[T[he company was encouraging consumers to accept upgrades, but failed to adequately disclose that accepting the upgrade would waive their ability to obtain a refund."

      aa.    "[T]he illegal conduct here did not occur in isolation or as a result of mere oversight, but as a result of a business model intentionally designed to extract and retain money from consumers as long as possible."

      bb.    "Defendants continued taking pre-orders despite their inability to fulfill existing orders and spent corporate funds on foam pitchforks emblazoned with the phrase, 'Y U No Ship, BFL is Late!' for conceivably no other reason than to mock their own customers."

13. Whether BFL admits or denies the facts and/or representations asserted in Case No. 4:14-cv-00815-BCW, Doc. 193, ¶¶ 5-19, 21, 27, 34-38, 45, including the factual basis thereof and the identity of people having knowledge thereof.

14. When and whether BFL disclosed to consumers that its co-founder, vice president, director, and largest shareholder:

      a.      was convicted of a felony involving obtaining money and property from victims by using material false and fraudulent pretenses, representations, and promises, and concealment of material facts.

      b.      pursuant to the terms of his release from prison, was required (but failed) to obtain the express approval of his probation officer prior to engaging in any business that involves the solicitation of funds.

and if not, why not?

15. The conceptualization, development, implementation, and terms of BFL's pre-order business model.

16. BFL's sources of funding and/or income.

17. Whether BFL admits or denies it stated or implied it can ship within a certain time, including the factual basis thereof.

18. Whether BFL admits or denies it made no shipping statement, including the factual basis thereof.

19. Whether BFL believed it could ship within 30 days, including the factual basis thereof.

20. Whether, after taking a consumer's order, BFL learned it could not ship within the time it stated or within 30 days, including the factual basis thereof.

21. Whether BFL sought or obtained any consumer's express consent to a delayed shipment, including the factual basis thereof.

22. Whether BFL, without being asked, promptly refunded all money a consumer paid BFL for unshipped merchandise, including the factual basis thereof.

23. BFL's dealings with Plaintiffs.

24. For each product identified in BFL's Answers to First Interrogatories, No. 2, an overview of the manufacturing process through shipping process, including the identification of components and vendors/suppliers and an explanation of design timeframes, specifications, and the principal and/or necessary steps in order to ship a completed product to the customer.

25. A chronology of components requested, ordered, and/or purchased by BFL, including the vendor/supplier name and the date, or approximate date, the components were requested, ordered, and/or purchased.

26. The general nature of the information and/or data contained in BFL's Exhibits A-K, including an explanation of the terms and fields used therein.

27. The facts and/or information BFL contends it was required to disclose, if any, to consumers considering whether to pre-order BFL's products and/or who pre-ordered BFL's products.