## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KYLE ALEXANDER, and<br>DYLAN SYMINGTON,<br>on behalf of themselves and all those<br>similarly situated,<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>BF LABS INC., a Wyoming corporation,<br>doing business as BUTTERFLY LABS,<br><br>SONNY VLEISIDES,<br><br>NASSER GHOSEIRI,<br><br>JEFF OWNBY,<br><br>JOSHUA ZERLAN,<br><br>　　　　　　　　　　Defendants. | **FIRST AMENDED**<br>**COMPLAINT – CLASS ACTION**<br><br>Case No. 14-CV-2159-KHV-JPO<br><br>JURY TRIAL DEMANDED |

### [PROPOSED] FIRST AMENDED COMPLAINT – CLASS ACTION

COME NOW, Plaintiffs Kyle Alexander and Dylan Symington (collectively "Plaintiffs") on behalf of themselves and all those similarly situated, and for their claims against Defendants BF Labs Inc. ("BFL"), Sonny Vleisides ("Vleisides"), Nasser Ghoseiri ("Ghoseiri"), Jeff Ownby ("Ownby"), and Joshua Zerlan ("Zerlan") (collectively ("Defendants"), allege, state, and aver to the Court as follows:

### Introduction

1.　　This lawsuit challenges Defendants' deceptive and unconscionable business practices, including: collecting pre-payments for non-existent Bitcoin mining equipment, omitting and concealing material information, failing to ship Bitcoin mining equipment orders for which consumers have pre-paid, misrepresenting the date such equipment is to ship to customers, profiting from Bitcoin mining for Defendants' own

**EXHIBIT**
**1**

benefit using customers' equipment without permission or authorization from customers, and retaining both the prepayments and the equipment ordered by customers without providing a refund.

## Parties

2.    Plaintiff Kyle Alexander is a natural person and a citizen of the State of Tennessee.

3.    Plaintiff Dylan Symington is a natural person and a citizen of the State of Maryland.

4.    BFL is a Wyoming corporation with its principal place of business at 10770 El Monte St., #101, Leawood, Johnson County, Kansas.

5.    Vleisides is a natural person and a citizen of the State of Kansas.

6.    Vleisides is a founder, 44% owner, and Innovation Officer/VP of Product Development of BFL who, individually, and in concert with others, controlled the acts and practices of BFL generally and as alleged herein, had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

7.    Ghoseiri is a natural person and, upon information and belief, is not a citizen of any State in the United States and resides outside the United States.

8.    Ghoseiri is a 40% owner and President/Innovation Officer/Chief Technology Officer of BFL who, individually, and in concert with others, controlled the acts and practices of BFL generally and as alleged herein, had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

9.    Ownby is a natural person and a citizen of the State of Illinois.

10.     Ownby is a 10% owner and VP of Marketing and Ecommerce of BFL who, individually, and in concert with others, controlled the acts and practices of BFL generally and as alleged herein, had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

11.     Zerlan is a natural person and is a citizen of the State of Kansas.

12.     Zerlan is Operations Manager/Chief Operating Officer/VP of Product Development of BFL who, individually, and in concert with others, controlled the acts and practices of BFL generally and as alleged herein, had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

## Jurisdiction and Venue

13.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d) because the number of members of the proposed class is not less than 100, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the class is a citizen of a different state than Defendants.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in, are found, have an agent, or transact affairs in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## General Allegations

## Bitcoin and Bitcoin Mining

15.     BFL advertises itself to the public as a manufacturer of specialized computer equipment and processors for the task of mining bitcoins.

16.     Bitcoin is a peer-to-peer payment system and digital currency created in 2009. Unlike traditional currency, bitcoins are not issued by a government or central banking authority.[1]

17.     Bitcoin is considered a "cryptocurrency" because cryptography is used to control the creation and transfer of the currency, creating a distributed, decentralized, and secure medium of exchange.

18.     Bitcoins are regularly used to pay debts, purchase goods and services, and are exchanged for other currencies such as the U.S. dollar, U.K. pound sterling, or euro.

19.     Bitcoins are created by "mining," a process where "miners" receive transaction fees and newly minted bitcoins in return for verifying and recording payments into a public ledger.

20.     By design, mining is a computationally intensive process that becomes more difficult over time.

21.     Time is of the essence when it comes to Bitcoin mining.

22.     As the difficulty of Bitcoin mining has increased over time, the computer hardware required to profitably mine has advanced from general purpose CPUs (found in common desktop computers), high-end GPUs (often found in gaming computers), FPGAs (field-programmable gate arrays), and ultimately to ASICs (application-specific integrated circuits) purpose built for performing the calculations necessary for Bitcoin mining.

23.     The faster one is able to mine bitcoins, the more money that one may make.

---

[1]     For clarity, Plaintiff uses "Bitcoin" to refer to the digital currency, protocol, or specification; and "bitcoin" to refer to the individual denomination or unit of the currency.

24.     For example, in November 2013, the price of one bitcoin skyrocketed above $1,000.

25.     On March 19, 2014, one bitcoin could be exchanged for an average of $613.12.

26.     On August 20, 2015, one bitcoin could be exchanged for an average of $233.48.

27.     Bitcoin experts predict that the value of one bitcoin may fall even further or may increase as high as $35,0000.

### Origins of BFL's Scheme

28.     BFL was formed in July 2011.

29.     BFL is controlled by Vleisides, Ghoseiri, and Ownby, who together own 94% of BFL's shares.

30.     Vleisides, at 44% ownership, is BFL's largest shareholder.

31.     In the late 1990's, Vleisides discovered "jurisdictional arbitration"—a concept Vleisides describes as "great"—where a person leverages technology to profit off of differences in law from one jurisdiction to another.

32.     With this concept in mind, for example, Vleisides started a software company where a Costa Rican license could be used along with satellite telecommunications to offer gaming/betting services all over the world, which Vleisides describes as a "lucrative and fun time [and] a libertarian adventure in challenging the authorities of the world while earning a good living."

33.     Vleisides states he "believe[s] very strongly in freedom, honesty and personal responsibility."

34.     On February 28, 2007, a grand jury indicted Vleisides for "knowingly and

with intent to defraud, devised, participated in, and executed a scheme to defraud victims as to a material matter, and to obtain money and property from such victims by means of material false and fraudulent pretenses, representations, and promises, and by the concealment of material facts."

35. The grand jury indictment describes Vleisides' unlawful scheme as deceiving victims into sending in payments in exchange for increased chances of winning foreign and domestic lotteries by stating (a) money sent in by participants would be pooled and used to purchase tickets in lotteries, horse races, *etc.*, (b) previous participants in the pool had already won millions of dollars through the pool, and (c) winnings would be invested in a trust or pension and would pay monthly pension checks to participants and/or their beneficiary for life.

36. The grand jury indictment states Vleisides, after receiving money from participants, wrote checks falsely represented as "lottery winnings" and sent them back to some participants in amounts less than had been originally sent in, when, in reality, the purported winnings were merely portions of payments sent in by other victims of the scheme.

37. The grand jury indictment states Vleisides solicited tens of thousands of victims to send in over $25 million and misappropriated the victims' funds in the form of checks to cash, checks to himself, or checks to the payment of personal expenses.

38. On September 15, 2010, in the United States District Court for the Central District of California, Vleisides pled guilty to violating 18 U.S.C. § 1341, Mail Fraud, Aiding and Abetting and Causing an Act to Be Done as charged in Count 1 of the indictment.

39. Vleisides, however, was not ordered to pay back his lottery scheme victims

because, among other things, "the number of identifiable victims is so large as to make restitution impracticable [and] determining . . . the cause or amount of the victim's losses would complicate or prolong the sentencing process[.]"

40.    Vleisides lottery scheme was based on partial reinforcement scheduling and half-truths, *i.e.*, instead of taking victims' money and simply keeping all of it, Vleisides reinforced and continued the scheme by sending some money under the guise of "winnings" back to a handful of victims and by publicizing such "winnings" to others, which motivated new and former victims to continue sending money to Vleisides.

41.    Vleisides refers to the lottery scheme as "a roaring success."

### BFL's "Pre-Order" Scheme

42.    Much like Vleisides' lottery scheme, where some victims were sent purported "lottery winnings" in order to entice other victims into believing they, too, could win the lottery and to send in money, BFL had a scheme based on partial reinforcement and half-truths to obtain "pre-order" funds from the public to develop bitcoin miners, to use the bitcoin miners for its own enrichment, to delay and/or to avoid having to ship the miners to customers, and to delay and/or to avoid having to refund customers.

43.    In 2011, bitcoins could be mined using CPUs, GPUs, and FGPAs because the mining difficulty rate was relatively low.

44.    Given the low difficulty rate, Vleisides, along with co-owners Ghoseiri, Ownby, and a few others, including Zerlan, set out to develop ASIC hardware that could mine bitcoins at much faster rates.

45.    The problem, however, was that BFL only had a few thousand dollars in capital, and a lot of money was needed to design, develop, and manufacture the

hardware.

46.     BFL was faced with the quandary of how to quickly raise sufficient capital to develop Bitcoin mining hardware that does not yet exist, and create the hardware before someone else does or before the mining difficulty increases to the point of mooting the hardware's utility and/or consumer appeal.

47.     In deciding how to raise sufficient funds, BFL had a lot of options.  For example:

> (a)     BFL could have done it the old-fashioned way, working and saving money, but this likely would have taken significant time and effort;
>
> (b)     BFL could have searched for additional private investors to raise the needed funds, but this likely would have taken significant time and effort and would have been difficult with no revenue and without a working prototype;
>
> (c)     BFL could have offered and sold BFL's shares publically, but this would have required significant disclosures to potential shareholders, likely would have taken significant time and effort, and would have been difficult with no revenue and no working prototype.
>
> (d)     BFL could have advertised its desire to raise sufficient funds via crowdfunding, *i.e.*, the practice of funding a project or venture by raising monetary contributions from a large number of people, typically via the internet, but this likely would have taken significant time and effort;
>
> (e)     BFL could have signed up for Kickstarter.com, which is a

crowdfunding website describing itself as "the world's largest funding platform for creative projects," but Kickstarter.com requires that (1) "[w]hen a project involves manufacturing and distributing something complex, like a gadget, we require projects to show a prototype of what they're making, and we prohibit photorealistic renderings"; (2) "[p]rojects that involve the development of physical products must feature explicit demos or working prototypes"; and (3) "[p]rojects can't mislead people or misrepresent facts, and creators should be candid about what they plan to accomplish"; or

(f)    BFL even could have launched its own Kickstarter-crowdfunding-type fundraiser, such as Coin, https://onlycoin.com/terms/, ("By pre-ordering a Coin Device . . . you acknowledge and agree that you are contributing (*i.e.*, making a donation) to a work in progress and not making a direct purchase."), but this likely would have taken significant time and effort.

48.    Instead, BFL chose to immediately advertise via "pre-order" sale the very products they hoped to design and manufacture—without disclosing the products did not yet exist, without disclosing there was no final working prototype, without disclosing that unless enough pre-orders were made by customers, BFL would not have sufficient funds to develop and manufacture the advertised products at all, and without disclosing BFL's intent to use the products for its own benefit and enrichment prior to shipping and/or in lieu of shipping.

49.    BFL began receiving pre-orders for nonexistent products shortly

thereafter.

50.     BFL's pre-order scheme was deceptive because it was not really a pre-order system but, rather, it was a method of raising investment capital under the guise of a pre-order.

51.     The pre-order sales industry, in general, originated when people found it hard to get popular items in stores due to their popularity.

52.     Companies then had the idea to allow customers to reserve their own personal copy, before the release.

53.     Having paid for all, part, or none the purchase price when placing the pre-order, pre-order consumers typically complete the transaction after the product's release, often on its first day in stores.

54.     Examples of the pre-order sales industry include Microsoft, http://www.microsoftstore.com/store/msusa/en_US/DisplayHelpPaymentPricingPage#price-guarantee ("[W]e won't charge your credit card until you download the product or we ship it to you."), Apple, https://support.apple.com/en-us/HT202723 ("When the item is released, we'll complete your order and bill your account."), and Tesla, https://my.teslamotors.com/own/basic, ("The Reservation Payment is fully refundable . . . . This Agreement does not constitute an agreement for the sale of a Model X and does not lock in pricing, a production slot, or an estimated delivery date.").

55.     BFL required customers to pre-pay by PayPal, bitcoins, or bank wire transfer the entire amount of an order at the time the order was placed.

56.     In order to encourage and to entice paid-in-full "pre-orders" from customers, BFL advertised its high-speed miners were shipping soon—even though BFL did not know whether it would receive sufficient pre-order funds to ever develop or

manufacture the product advertised.

57.   BFL represented that inventory of its Bitcoin mining products "was available."

58.   BFL represented its Bitcoin mining products were "in production" and "real."

59.   BFL represented its Bitcoin mining products were "expected to begin shipping soon," "shipping [had already] begun," or products would be "shipping by the end of the week."

60.   BFL represented that customers would most likely receive their equipment within "two months" after ordering, or such equipment "would be shipped in two months," or sooner.

61.   For example, on June 23, 2012, BFL began soliciting via the internet pre-order funds for "ASIC 65 NM" Bitcoin miners, which are BFL's first generation ASIC products.

62.   At that time, BFL represented "The BitForce SC chip is now in final stage development" and "Initial product delivery is scheduled for October, 2012."

63.   On September 26, 2012, BFL was still representing "The BitForce SC chip is now in final stage development" and "Initial product delivery is scheduled for October, 2012."

64.   Although BFL's pre-order scheme induced prepayments, BFL knew and had always known shipping would not begin in October.

65.   When October was approaching, in order to reinforce and to continue the pre-order scheme, BFL periodically and systematically revised its shipping date by a few days or weeks, *i.e.*, in this way, existing customers would believe shipping was just

around the corner and not cancel their orders or request refunds, and potential pre-order customers would continue sending in money.

66.     For example, on September 30, 2012, BFL was still representing "The BitForce chip is now in final stage development" but changed its initial product delivery to November.

67.     On November 15, 2012, BFL was still representing "The BitForce chip is now in final stage development" but changed its initial product delivery to December.

68.     On December 2, 2012, BFL removed its "The BitForce chip is now in final stage development" representation and also removed its "Initial product delivery is scheduled for December" representation.

69.     On January 2, 2013, BFL resumed representing "The BitForce SC Chip is now in final stage development" and represented "Initial product delivery is scheduled for February, 2013."

70.     On February 15, 2013, BFL was still representing "The BitForce chip is now in final stage development" and "Initial product delivery is scheduled for February, 2013."

71.     On February 27, 2013, BFL represented "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and used the phrase "Order Now."

72.     From March 8, 2013 to June 1, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and using the phrase "Order Now," except on April 15, 2013, BFL noted the 1,500 GH/S Bitcoin Miner was "Out of stock."

73.     On August 7, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" but started using the phrase "Order" instead of "Order Now."

74.     On October 15, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" but started using the phrases "Order" and "Pre-Order" instead of "Order Now."

75.     On August 17, 2013, BFL began soliciting via the internet pre-order funds for "ASIC 28 NM" Bitcoin miners, which are BFL's second generation ASIC products.

76.     On December 10, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and using the phrases "Order" and "Pre-Order" instead of "Order Now," but represented "65nm Products – Units in Stock.  Shipping Immediately."

77.     On January 3, 2014, BFL represented the "600 GH/s Bitcoin Mining Card" was "Now Available for Pre-Order" and represented "65nm Technology Product Line Units in Stock."

78.     On February 10, 2014, BFL was still representing "65nm Products – In Stock Now," and represented "28nm Products" are available as "Pre-Order."

79.     BFL represented orders would be "shipped according to placement in the order queue" and for particular products the "first batch of chips" would be "more than enough for all pre-orders".

80.     BFL's products did not exist at the time BFL accepted pre-payments.

81.     BFL knew or had reason to know that the products would not ship on the dates represented to customers.

82.     A former employee testified it was BFL's "company policy" to inform prospective customers that delivery was "two months away" and even sooner for existing customers, even though the two-month timeframe was not tied to supply chain or the engineering timeline and no final prototype for the machine existed.

83.     A former employee recommended to company management that customers be provided with information about delivery delays but his recommendation was dismissed, and the reason provided was BFL did not want customers to know that they would have to wait so long for the machines.

84.     To reinforce and to continue the pre-order scheme, BFL falsely advised customers that shipping had already begun; at the same time, BFL continued receiving prepayments.

85.     BFL did not ship its products within two months or within any time period represented by BFL.

86.     In or about 2012, BFL purchased from Zerlan a business known as "Eclipse Mining Consortium," which operates as a Bitcoin mining pool, an organization which permits the combination of Bitcoin mining efforts.

87.     Instead of shipping completed Bitcoin mining hardware to customers after customers have already paid for the equipment, BFL utilized completed Bitcoin mining hardware to earn mining income for itself under the guise of "testing" such hardware.

88.     BFL represented it did not mine bitcoins for itself, but, in reality, without authorization or permission, BFL mined bitcoins for itself using customer equipment on each and every unit before shipping to customers.

89.     BFL mined using customers' equipment on the live Bitcoin network for hours, days, or longer even though the equipment only required 10 to 30 minutes of testing and could have been tested on "test.net," which enables the equipment to be tested without being used.

90.     BFL used customers' equipment on the live Bitcoin network instead of on the test-net because BFL would not make any money for itself using the test-net.

91.     Instead of shipping manufactured and fully tested miners to customers, BFL kept them and operated them on the live Bitcoin network for BFL's benefit and enrichment until additional replacement miners were manufactured so that BFL could keep the same number of miners operating on the live Bitcoin network.

92.     This "testing" served to enrich BFL at the detriment of its customers by both denying customers use and benefit of equipment they have already paid for, as well as increasing the overall mining difficulty required to generate future bitcoins.

93.     Vleisides admits BFL's customers could have mined bitcoins for themselves had BFL shipped sooner.

94.     Specifically, on March 23, 2014, Vleisides, using the false pretense of "Charles Coleman," contacted Plaintiffs' counsel via the internet, specifically via Wood Law Firm, LLC's web contact form, and stated:  "I'm interested in knowing if there is any real potential for a case.  I received my miners and they work, but even though I was told during the order process that I would have to wait the unknown period of development, if I received them sooner, I would have made more profit than I did."

95.     Instead of shipping to customers, BFL also sent hundreds or thousands of miners to Netsolus to mine bitcoins for itself.

96.     BFL claims the miners sent to Netsolus were "defective," yet BFL was able

to mine substantial bitcoins for itself using such miners.

97.     BFL represented customers could receive a refund simply by asking for one, that "it's not a problem" for a customer to receive a refund, and BFL could refund all prepayments "without a problem."

98.     Even after mining units became effectively obsolete due to the length of time customers were waiting for BFL to ship, customers were not allowed to obtain a refund even if they refused delivery.

99.     A former employee testified that, per management's instructions, BFL would keep both the mining units and customers' funds.

100.    BFL used customers' funds for the individual benefit of BFL's officers and shareholders.

101.    For example, BFL purchased a home and a $66,171.27 car for Vleisides.

102.    BFL made hundreds of thousands of dollars in loans to shareholders.

103.    BFL ordered red foam torches mocking their own customers, stating "Y U NO SHIP – BFL IS LATE!"

104.    This class action lawsuit challenging BFL's pre-order scheme was originally filed on April 4, 2014.

105.    BFL ended its pre-order scheme on July 17, 2014.

106.    BFL solicited and received millions of dollars in pre-order funds.

107.    Prior to discontinuing BFL's ability to accept payments through the service, Paypal alone had processed over $11 million in prepayments.

108.    BFL's representatives admit BFL collected over $25 million in customer prepayments.

109.    At the time of BFL's formation in July 2011, Vleisides was serving a three-

year term of supervised release related to the lottery scheme guilty plea and felony conviction and, as a condition of release, was ordered not to "engage, as whole or partial owner, employee or otherwise, in any business involving loan programs, gambling or gaming activities, telemarketing activities, investment programs or any other business involving the solicitation of funds . . . without the express approval of the Probation Officer prior to engagement in such employment."

110.    Although Vleisides informed his probation officer that BFL manufactured and sold hardware, Vleisides did not disclose to his probation officer that BFL solicited customer funds through pre-orders by advertising non-existent products in order to develop the hardware.

111.    Vleisides' probation officer testified "I was aware that he initially had a start-up, I believe, 8 to $10,000 that he told me came mostly from family members. I was aware of that as an investment. Not soliciting money from people to be used as an investment to develop the hardware, that I was not aware of."

112.    Vleisides' probation officer testified "I was not fully informed as to the nature of the business, and without being fully informed I was not able to give express approval."

113.    To date, many customers have not received the products for which they pre-paid in full or a refund.

### The Representative Plaintiffs' Orders

#### *Kyle Alexander*

114.    In June of 2013, Plaintiff Kyle Alexander ordered a Bitcoin mining machine from BFL.

115.    Plaintiff Kyle Alexander paid $308.00 to BFL via PayPal for this

equipment.

116.    At the time Plaintiff Kyle Alexander ordered and paid for mining equipment, BFL represented to Plaintiff Kyle Alexander and other potential customers that its inventory "was available," "in production," available for "shipping soon," and/or that "shipping [had already] begun," and that customers would most likely receive their equipment within "two months" after ordering.

117.    In July of 2013, Plaintiff Kyle Alexander contacted BFL to inquire about his order and was informed by BFL that "shipping had begun."

118.    Over the next several months, Plaintiff Kyle Alexander continued to inquire about his order and was repeatedly informed by BFL that "shipping had begun."

119.    In March of 2014, Plaintiff Kyle Alexander again inquired about his order and BFL advised him of the "good news" that his order had been changed to BFL's "Mining by the GH" product, which is described on BFL's website as a "product which is not yet live," which BFL "expect[s] to launch in April, 2014."[2]

120.    Plaintiff Kyle Alexander never changed or modified his order and never gave BFL permission to use the equipment he ordered to mine bitcoins for itself or for anyone else.

121.    In June of 2013, Plaintiff Kyle Alexander demanded BFL return the money he paid but to no avail.

122.    To date, Plaintiff Kyle Alexander has not received any mining equipment from BFL or a refund.

123.    Since Plaintiff Kyle Alexander pre-paid for his order of mining equipment

---

[2]    *See* Bitcoin Mining Hardware Bitcoin Mining by the GH (https://products.butterflylabs.com/homepage-new-products/1-gh-cloud-hosted-bitcoin-hashing-power.html) retrieved March 31, 2014.

from BFL in June of 2013, numerous bitcoins have been mined by BFL and others, and the difficulty of mining new bitcoins has substantially increased over such time.

### *Dylan Symington*

124.    On April 3, 2013, Plaintiff Dylan Symington ordered a Bitcoin mining machine from BFL.

125.    Plaintiff Dylan Symington paid $1,333.00 to BFL via PayPal for this equipment.

126.    At the time Plaintiff Dylan Symington ordered and paid for mining equipment, BFL represented to Plaintiff Dylan Symington and other potential customers that its inventory "was available," "in production," available for "shipping soon," and/or that "shipping [had already] begun," and that customers would most likely receive their equipment within "two months" after ordering.

127.    In September of 2013, Plaintiff Dylan Symington contacted BFL to inquire about his order and why he had not yet received any mining equipment from BFL.

128.    Nearly seven months after receiving payment, on November 1, 2013, BFL shipped mining equipment to Plaintiff Dylan Symington.

129.    When Plaintiff Dylan Symington received the mining equipment, it was defective.

130.    Plaintiff Dylan Symington never gave BFL permission to use the equipment he ordered to mine bitcoins for itself or for anyone else.

131.    In April of 2014, Plaintiff Dylan Symington demanded BFL return the money he paid and the bitcoins mined by BFL using his equipment, but to no avail.

132.    Between the time Plaintiff Dylan Symington pre-paid for his order of mining equipment from BFL in April of 2013 and the time he received mining

equipment from BFL in November of 2013, numerous bitcoins had been mined by BFL and others, and the difficulty of mining new bitcoins had substantially increased over such time.

## Class Action Allegations

133.    Plaintiffs bring this action on their own behalf and on behalf of a class of all persons similarly situated, pursuant to Rule 23(a) and Rule 23(b)(3).  The Plaintiff Class consists of all persons who pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between [three years prior to filing of First Amended Complaint] and July 17, 2014.  Plaintiffs anticipate having subclasses as set forth in Plaintiffs' Second Supplemental Interrogatory Answers, but Plaintiffs are unable to confirm the subclasses until after taking BFL's deposition on August 25, 2015 and having time to obtain and review the deposition transcript.

134.    The Plaintiff Class satisfies all of the prerequisites stated in Rule 23(a):

(a)    The class is so numerous that joinder of all members would be impractical.  Upon information and belief, members of the class number in the thousands. The number of class members can be identified from BFL records.

(b)    There are questions of law or fact common to the class, such as:

(i)    whether or not Defendants accepted pre-paid orders for Bitcoin mining equipment;

(ii)    whether or not such equipment existed at the time Defendants solicited prepayments for Bitcoin mining equipment;

(iii)    whether or not Defendants made representations regarding

the time Bitcoin mining equipment would ship to customers;

(iv)    whether or not Defendants represented consumers could receive a refund of their prepayments;

(v)    whether Defendants' representations were truthful or misleading;

(vi)    whether or not Defendants shipped Bitcoin mining equipment to customers;

(vii)    whether or not Defendants shipped Bitcoin mining equipment to customers within the time promised;

(viii)    whether or not Defendants profited or benefited from using customer's Bitcoin mining equipment after such equipment had been paid for by customers;

(ix)    whether or not Defendants willfully omitted, concealed, suppressed or failed to disclose material facts;

(x)    whether or not Defendants committed conversion;

(xi)    whether or not Defendants were unjustly enriched;

(xii)    whether Defendants owe money to customers who have not received the product ordered or a refund;

(xiii)    whether or not the actions of Defendants violated the Kansas Consumer Protection Act;

(xiv)    whether or not Defendants engaged in the scheme as alleged herein;

(xv)    whether or not Defendants engaged in unconscionable acts or practices;

(xvi)   whether Vleisides, Ghoseiri, Ownby, and Zerlan had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

(c)   The claims of the representative plaintiffs are typical of the claims of the Plaintiff Class.

(d)   The representative plaintiffs and their counsel will fairly and adequately protect the interests of the class.  The representative plaintiffs and their counsel have no conflicts of interest with other class members and have no interests antagonistic to the class.  The representative plaintiffs and their counsel will prosecute the action vigorously on behalf of the class.  The representative plaintiffs' counsel is experienced in litigating consumer class action cases.

135.   Further, the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the party opposing the class.

136.   The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that:

(a)   Defendants' computer, personal, financial, and business records enable Plaintiffs to readily identify class members and establish liability and damages;

(b)     Liability and damages can be established for Plaintiffs and the class with the same or similar common proofs;

(c)     Damages for each class member can be calculated in the same or similar manner;

(d)     A class action will result in an orderly and expeditious administration of claims and will foster economies of time, effort, and expense;

(e)     A class action will contribute to uniformity of decisions concerning Defendants' practices; and

(f)     As a practical matter, the claims of the class are likely to go unaddressed absent class certification.

### Count I: Violation of the Kansas Consumer Protection Act, K.S.A. §§ 50-626, 50-627, and 50-634 (against all Defendants)

137.    Plaintiffs re-allege and incorporate by reference all other Paragraphs of this Complaint as if fully set forth herein.

138.    In pertinent part, the Kansas Consumer Protection Act, K.S.A. § 50-626 provides:

> No supplier shall engage in any deceptive act or practice in connection with a consumer transaction[.]

139.    In pertinent part, the Kansas Consumer Protection Act, K.S.A. § 50-627 provides:

> No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction.

140.    BFL is a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business solicits, engages in or enforces consumer

transactions, and is therefore a "supplier" as defined in K.S.A. § 50-624(l).

141.    Plaintiffs, and the proposed class, are individuals, husbands and wives, sole proprietors, or family partnerships who seek or acquire property or services for personal, family, household, or business purposes, and are therefore "consumers" as defined in K.S.A. §50-624(b).

142.    The purchase of Bitcoin mining equipment from BFL constitutes a "consumer transaction" pursuant to the definition provided in K.S.A. § 50-624(c).

143.    The Kansas Consumer Protection Act, K.S.A. § 50-634 provides for a private right of action for "a consumer who is aggrieved by a violation of this act."

144.    Defendants violated K.S.A. § 50-626(b)(3) by willfully failing to state a material fact and/or willfully concealing, suppressing, or omitting a material fact, including:

(a)    Vleisides was required, but did not obtain, the express approval of his probation officer prior to soliciting pre-order funds from customers;

(b)    the lack of sufficient capital to design, develop, and manufacture the advertised products;

(c)    the inability to design, develop, and manufacture the advertised products unless and until a certain number of pre-orders were received;

(d)    the advertised products were not in the final stage of development;

(e)    the advertised products were not functional;

(f)    no final working prototype existed;

(g)    the lack of chips necessary to produce the advertised products;

(h)   shipping would not occur as represented, anywhere close to as represented, or ever;

(i)   shipping representations were not tied to the supply chain or engineering timeline;

(j)   intent to design, develop, and manufacture miners for Defendants' benefit;

(k)   intent to delay and/or avoid shipment of miners;

(l)   intent to delay and/or avoid providing refunds;

(m)   the intent to keep the customers' prepayments and the products ordered;

(n)   each miner is used on the live Bitcoin network for Defendants' benefit prior to shipping;

(o)   even after sufficient testing had occurred, miners are used on the live Bitcoin network for Defendants' benefit until replacement miners are manufactured;

(p)   numerous miners were to be sent to Netsolus for self-mining instead of shipping to customers; and

(q)   the general scheme as alleged herein.

70.   The above facts are those to which a reasonable person would attach importance in determining his or her choice of action in the transaction involved.

71.   Defendants also violated K.S.A. § 50-627(a) by:

(a)   denying customers' ability to receive a material benefit from the transaction, specifically by using miners for Defendants' own enrichment prior to shipping and retaining the bitcoins, which

denied customers the use and benefit of equipment they already paid for, as well as increased the overall mining difficulty required to generate future bitcoins; and

(b)     denying customers' ability to receive a material benefit from the transaction, specifically by keeping the prepayments, failing to ship the products ordered, and failing to provide a refund.

72.     As a direct and proximate result of Defendants' deceptive and unconscionable acts and practices, Plaintiffs were aggrieved and have suffered an ascertainable loss, including, but not limited to: the purchase price and interest thereon, the loss of use of equipment ordered, the loss of bitcoins which were mined by Defendants prior to shipping, costs of suit, and attorney's fees.

73.     Plaintiffs are entitled to an award of punitive damages because Defendants willfully and intentionally violated K.S.A. §§ 50-626 and 50-627.

74.     Plaintiffs are entitled to an award of attorney's fees pursuant to K.S.A. § 50-634.

## Count II: Unjust Enrichment
## (against all Defendants)

75.     Plaintiffs re-allege and incorporate by reference all other Paragraphs of this Complaint as if fully set forth herein.

76.     A benefit was conferred on Defendants in that Plaintiffs paid money to Defendants.

77.     A benefit was conferred on Defendants in that Defendants used Plaintiffs' mining equipment to mine bitcoins for itself.

78.     Defendants accepted and appreciated the money from Plaintiffs and had knowledge of such facts.

79.     Defendants accepted and appreciated the use of Plaintiffs' mining equipment and the bitcoins it mined for itself using Plaintiffs' mining equipment and had knowledge of such facts.

80.     To date, Defendants have retained such benefits in that Defendants have retained and used Plaintiffs' money without paying for its value or increased value over time.

81.     To date, Defendants have retained such benefits in that Defendants have retained the bitcoins it mined for itself using Plaintiffs' mining equipment without paying for the use of Plaintiffs' mining equipment or the value or increased value of bitcoins mined over time.

82.     Under the circumstances, Defendants' acceptance and retention of the money and/or bitcoins, and use of Plaintiffs' mining equipment and retention of bitcoins mined therefrom, without paying for its value, is inequitable because:

(a)     Defendants have either not provided the mining equipment it promised to ship to Plaintiffs in exchange for the money paid by Plaintiffs or have used the equipment for Defendants' own enrichment, to Plaintiffs' detriment, before providing the equipment;

(b)     even if Defendants immediately provided the mining equipment to Plaintiffs, the equipment is now essentially worthless to Plaintiffs;

(c)     the money and bitcoins retained by Defendants have increased in value over time;

(d)     Plaintiffs never gave Defendants permission to use their mining equipment to mine bitcoins for itself or for anyone else;

(e)     Defendants have benefitted from the increase in value in money and

bitcoins over time and have used this money and bitcoins to purchase houses and cars, to make loans, to exchange into dollars, to pay expenses, and/or to develop and manufacture mining equipment for its own use and benefit; and

(f)    Defendants' retention of the money and/or bitcoins over time has resulted in additional profits from mining that could have been earned by Plaintiffs had Defendants timely shipped the mining equipment to Plaintiffs.

83.    As a direct and proximate result of Defendants' deceptive and unconscionable acts and practices, Plaintiffs were aggrieved and have suffered an ascertainable loss, including, but not limited to: the purchase price and interest thereon, the loss of use of equipment ordered, the loss of bitcoins which were mined by Defendants prior to shipping, costs of suit, and attorney's fees.

84.    The imposition of a constructive trust on the money and bitcoins paid to Defendants and the bitcoins mined by Defendants prior to shipping is warranted given Defendants' unlawful conduct described above.

## Count III: Conversion
## (against BFL)

85.    Plaintiffs re-allege and incorporate by reference all other Paragraphs of this Complaint as if fully set forth herein.

86.    Plaintiffs paid money to Defendants for the purposes of purchasing Bitcoin mining equipment consonant with the representations made by Defendants.

87.    Plaintiffs have an ownership interest in such money until a condition is satisfied, *i.e.*, until Defendants provides the Bitcoin mining equipment.

88.    Plaintiffs never authorized Defendants to keep and use their money without providing Bitcoin mining equipment or for any purpose other than to timely

manufacture and ship the Bitcoin mining equipment to Plaintiffs.

89.     Without authorization, Defendants assumed or exercised the right of ownership and possession over Plaintiffs' money by using such money for purposes other than timely manufacturing and shipping the Bitcoin mining equipment to Plaintiffs.

90.     During Defendants' exercise of unauthorized ownership and possession over Plaintiffs' money, Plaintiffs were excluded from exercising their ownership and possession rights over the money.

91.     Further, by paying for and purchasing Bitcoin mining equipment from Defendants, Plaintiffs had an ownership interest in such Bitcoin mining equipment.

92.     After Plaintiffs' Bitcoin mining equipment was manufactured, but before shipping such Bitcoin mining equipment to Plaintiffs, Defendants used Plaintiffs' Bitcoin mining equipment to mine bitcoins for Defendants' own use, benefit, and enrichment.

93.     Plaintiffs never authorized Defendants to keep and use their Bitcoin mining equipment to mine bitcoins for Defendants' own use, benefit, and enrichment.

94.     Without authorization, Defendants assumed or exercised the right of ownership and possession over Plaintiffs' Bitcoin mining equipment by keeping and using Plaintiffs' Bitcoin mining equipment to mine bitcoins for Defendants' own use, benefit, and enrichment before shipping such equipment to Plaintiffs.

95.     During Defendants' exercise of unauthorized ownership and possession over Plaintiffs' Bitcoin mining equipment, Plaintiffs were excluded from exercising their ownership and possession rights over the Bitcoin mining equipment.

96.     In June 2013 and April 2014, Plaintiffs Kyle Alexander and Dylan

Symington, respectively, demanded BFL return the money they paid and the bitcoins mined by BFL using their equipment, but to no avail.

97.     As a direct and proximate result of Defendants' conversion of Plaintiffs' money, bitcoins, and Bitcoin mining equipment, Plaintiffs were aggrieved and have suffered an ascertainable loss, including, but not limited to: the purchase price and interest thereon, the loss of use of equipment ordered, the loss of bitcoins which were mined by Defendants prior to shipping, costs of suit, and attorney's fees.

**WHEREFORE** Plaintiffs, on behalf of themselves and all those similarly situated, pray this Court:

(a)     Enter an order pursuant to Rule 23(c)(1) that this action is to be maintained as a class action;

(b)     Enter an order pursuant to Rule 23(g) appointing and denominating the undersigned as class counsel;

(c)     Enter an order of restitution and disgorgement, and imposing a constructive trust as authorized by law and equity;

(d)     Enter judgment in favor of Plaintiffs and Plaintiff Class against Defendants awarding damages, interest, costs of suit, attorney's fees, punitive damages; and all other relief this Court deems just and proper.

## Demand For Trial By Jury

Plaintiffs hereby demand a trial by jury on all issues so triable.

## Designation of Place of Trial

Plaintiffs request Kansas City, Kansas as the place of trial.

Respectfully submitted,

WOOD LAW FIRM, LLC


By_____

Noah K. Wood                                    Bar #23238
noah@woodlaw.com
Ari N. Rodopoulos                               Bar #26585
ari@woodlaw.com
1100 Main Street, Suite 1800
Kansas City, MO 64105-5171
T: (816) 256-3582
F: (816) 337-4243
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the ____ day of August, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

_/s/_____
Attorney for Plaintiff