EXPERT REPORT

OF

LARRY STEVEN LONDRE

Kyle Alexander, and Dylan Symington,

on behalf of themselves and all those similarly situated,

v. BF Labs Inc., doing business as Butterfly Labs

(Case 2:14-CV-02159)

UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

(Kansas City Division)

September 4, 2015

Larry Steven Londre

***Londre Marketing Consultants, LLC***

6000 South Para Way, Third Floor

Los Angeles, CA 90094-0001

LSL@LondreMarketing.com

http://LondreMarketing.com



Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

## Table of Contents

I.     Role in the Litigation…………………………………………………Page   3

II.    Qualifications…………………………………………………………Page   4

III.   Compensation………………………………………………………..Page   8

IV.   Background…………………………………………………………..Page   8

V.    Opinions……………………………………………………………Page   22

VI.   Exhibit I (Larry Steven Londre's CV)

VII.  Exhibit II (List of Larry Steven Londre's Depositions and Trial Testimony)

VIII.  Exhibit III  (Documents and Other Materials Relied Upon and Reviewed)

Role in the Litigation

1.  In the case Kyle Alexander, and Dylan Symington, on behalf of themselves and all those similarly situated, v. BF Labs Inc., doing business as Butterfly Labs (Case 2:14-CV-02159), I have been retained by Wood Law Firm, LLC, counsel for the Plaintiffs, to offer expert opinions and testimony on issues relevant to the complaint regarding:

    • whether there are any marketing differences between an "off the shelf" sales model vs. a "pre-order" sales model and, if so, to explain the differences;

    • whether there are any unique, distinctive concerns that come into play in a "pre-order" sales model when the offered product is time sensitive or when "time is of the essence" with respect to delivery of the offered product and, if so, to explain those special concerns; and

    • the materiality to a reasonable consumer of certain facts alleged by Plaintiffs and whether a reasonable marketer offering products for pre-order sale, similarly situated, would have disclosed such alleged facts.

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

Qualifications

I, Larry Steven Londre, declare as follows:

1.  A seasoned marketing professional, I have worked for clients, marketing firms, advertising agencies and businesses since 1971. I have concurrently been a marketing, global marketing, communication, advertising and business strategies senior instructor/lecturer and adjunct professor since 1975.  At the same time, I have also worked full-time within such companies as DIRECTV, The Music Center of Los Angeles/Performing Arts Center of Los Angeles, Walt Disney Productions, Security Pacific Bank, and others.  I have worked full-time within advertising agencies including Grey Advertising-Worldwide, Grey Entertainment & Media, and Abert, Newhoff and Burr.  My accounts and clients have included Bank of America, Vons Grocery Company (now owned by Safeway), Southern California Edison, Warner Bros., ABC Network, Sheraton Hotels and Resorts, Los Angeles City Fire Department, California Special Olympics and others.

2.  I earned a Masters of Business Administration, with an emphasis in Marketing, from the University of Southern California, and a Bachelor of Science in Business Administration – Marketing, from the University of Southern California (Dean's lists).

    My additional professional development includes: Claremont Advanced Management Program; USC Advanced Management Program; USC Modern Marketing Program; USC's Strategic Marketing Online Program**;** Town Hall Executive Series, "Leaders Talking to Leaders," and others which are outlined on my CV (Londre Exhibit I).

3.  From 1975 to the present, I have been a member of the Advertising Club of Los

Angeles/thinkLA and Advertising Industry Emergency Fund/AIEF/Ad Relief. I was an active

board member of the Advertising Club from 1983 to 2006, and member, treasurer, and board

director of AIEF/Ad Relief since 1978.

4. From 1994 to 1997, and from 2001 to the present, I have been the senior managing partner of

Londre Marketing Consultants, LLC in Los Angeles, California.  In that capacity, I have acted

as an independent marketing, business, advertising and media consultant, providing expertise

in marketing campaign strategy, development and execution, new business development,

rollouts, advertising, research, collateral programs, market penetration, and effectively

identified marketing and promotional opportunities for local, national and international/global

business organizations. I have assisted on projects with senior business executives, business

leaders, creative directors, marketing and media professionals, media planners, social media

experts and professional marketing researchers. My clients have included GE Capital-

ResCom, USC Annenberg School for Communication, Alliance Environmental Group, DHX–

Dependable Hawaiian Express, DGX–Dependable Global Express, DAX-Dependable

AirCargo Express, Datastream, ICL Systems, the Getty Museum, the Herald Tribune, and

others.

In 1975, I began my concurrent role as an adjunct professor/senior lecturer/lecturer

teaching courses in marketing, advertising, branding, global marketing, business strategies,

and communication at the University of Southern California (USC)–Marshall School of

Business (both graduate and undergraduate), School of Psychology, and Annenberg School

for Communication and Journalism (both graduate and undergraduate), Loyola Marymount

University (LMU)-MBA Program, Pepperdine University (five campuses in the MBA program,

including the capstone MBA class), California State University, Northridge (CSUN) (both

graduate and undergraduate) and others.

5. My teaching has included these Business, Marketing and Advertising courses and others (79 semesters):

- MBAM 659 and MBAM 660: Business Strategies: Development, Execution and Implementation (Final, capstone classes in the MBA program at Pepperdine)

- MBFE 658: Strategic Marketing

- MKT 653: Integrated Marketing Communications (IMC)

- MBAM 619A and 619B: Business Strategies and Implementation

- COMM 599: Global Communication

- COMM 542: Business Strategies for Entertainment and Communication Companies

- COMM 541: Integrated Media and Communication Strategies

- GSBA 528:  Marketing Management

- MKT 440: Integrated Marketing Communications

- JOUR 340: Introduction to Advertising

- BUS 307: Marketing Management

- MKT 304: Marketing Management

- MKT 100: Conceptual Foundations of  American Enterprise

I am a frequent marketing and advertising presenter/guest lecturer at UCLA, Pepperdine, USC (in several schools including the entrepreneur program at USC Marshall), Cal Lutheran and others. Globally, I have presented marketing seminars/presentations in Hong Kong, Cuba, Shanghai and on the web.

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

6. In 2013, 2014 and 2015, I have given Marketing presentations at USC School of Law (with CLE credit), Southwestern School of Law, Loyola Law School and at UCLA School of Law on "What is Marketing? What is Advertising" and/or "Confusion between Marketing & Advertising: Why and What Difference Does It Make to Judges and Lawyers."

7. I have served as an expert witness in over seventy-five matters in various states throughout US, including California, Arizona, New York, Nevada, Texas, Florida, Washington, South Carolina, Michigan, Missouri, Pennsylvania, and Utah, as well as before the American Arbitration Association and JAMS (Judicial Arbitration and Mediation Services). Additionally I have served in United States District Courts in the states of California, Florida, Pennsylvania and Nevada.

8. With my education, teaching and business experience, I am qualified as an expert in the areas of marketing, advertising, sales promotion, retailing, media, and merchandizing including marketing/advertising/promotional practices.

9. A complete copy of my CV and qualifications as an expert in marketing, and related subjects is attached hereto as Londre Exhibit I, and incorporated herein.

10. A list of my depositions and trial testimony, since January 2009 is included in Londre Exhibit II.

11. A list of court documents, references, depositions, resources and information reviewed and/or relied upon is included in Londre Exhibit III.

Compensation

My services as an expert are charged at a rate of $525.00 per hour, $2,380.00 for a half day of testimony, and $4,760.00 for more than a half day of testimony for each day or portion thereof for which testimony is required. A minimum retainer was guaranteed in this matter for ten (10) hours at a rate of $5,250.00.


Background

For over two years, from June 23, 2012 and July 17, 2014,[1] Defendant BF Labs[2] presented, promoted, advertised and communicated via the Internet/web/email/telephone to potential and actual consumers the "pre-order" availability of "ASIC" miners, i.e., specialized computer and processing equipment[3] for the task of mining bitcoins. The following headline was used by BFL/BF Labs: "Butterfly Labs manufactures a line of high speed encryption processors for use in bitcoin mining, research, telecommunication and security applications."[4]


Plaintiffs allege "Bitcoin" -- created in 2009 -- is a peer-to-peer payment system and digital currency.[5]   Unlike traditional currency, bitcoins are not issued by a government or central

---

[1] BFL Interrogatory Answer No. 2; Declaration of Jeff Ownby, Doc. 155-1 page 3.

[2] Also known as Butterfly Labs, BF Labs/Butterfly Labs or BFL.

[3] In recruiting employees and staff BFL presented: "There's nothing more rewarding than working on interesting projects. Here at Butterfly labs, we bring our experience to market for specialty application in Industry, Education and Government." BFLABS-KA 031401.

[4] Examples from http://www.butterflylabs.com, BFLABS-KA 00030663, BFLABS-KA 00030643; BFLABS-KA 00030517; BFLABS-KA 00030477.

[5] Complaint at para 9.

banking authority.[6]  For clarity, Plaintiffs have been using "Bitcoin" to refer to the digital currency, protocol, or specification; and "bitcoin" to refer to the individual denomination or unit of the currency.[7]  Plaintiffs allege bitcoins are created by "mining," a process where "miners" receive transaction fees and newly minted bitcoins in return for verifying and recording payments into a public ledger.[8]

According to Dr. Sherman:

> There are two notable parameters in the Bitcoin system that change over time:  block reward and difficulty.  In addition, new hardware continues to outperform (compute faster than) older hardware.

> Every 210,000 transaction blocks (about four years), the block reward is halved.  Initially, this reward was 50 Bitcoins per block. Since November 28, 2012, it has been 25 Bitcoins.  Thus, with each such halving of the block reward, miners receive less compensation in block rewards for their work in solving block puzzles.

> Every 2016 blocks, the difficulty parameter is adjusted (up or down), according to certain formulae, based on the number of blocks added to the block chain since the last adjustment.  The intent is to maintain the invariant that solving one puzzle should take approximately ten minutes on average.   Thus, even with advances in new computer hardware and algorithms, the time to solve a puzzle should remain the same (approximately ten minutes).

> Although over short periods of time difficulty has gone up and down, over longer periods of time difficulty has a significant upward trend [blockchain.info].

> Time is of the essence when running mining hardware to mine Bitcoins.  A particular piece of mining hardware will run at a constant hashing rate.  But difficulty increases over time, meaning

---

[6] Complaint at para 9.

[7] Complaint at page 2., n. 1.

[8] Complaint at para 12.

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

that the hardware will take longer to solve puzzles and the miner will solve fewer puzzles in a given time interval.

Furthermore, as other miners introduce new and faster mining hardware, miners running older hardware will contribute a lower percent of the total computational power in the Bitcoin network. Consequently, the older slower hardware will yield, on average, fewer reward Bitcoins than a similar amount of newer faster hardware.[9]

On June 23, 2012, BF Labs began soliciting via the internet pre-order funds for "ASIC 65 NM" Bitcoin miners, which are BF Labs' first generation ASIC products.[10]  At that time, BF Labs represented "The BitForce SC chip is now in final stage development" and "Initial product delivery is scheduled for October, 2012."[11]  On September 26, 2012, BFL was still representing "The BitForce SC chip is now in final stage development" and "Initial product delivery is scheduled for October, 2012."[12]

Four days later, on September 30, 2012, BF Labs was still representing "The BitForce chip is now in final stage development" but changed its initial product delivery to November.[13] On November 15, 2012, BF Labs was still representing "The BitForce chip is now in final stage development" but changed its initial product delivery to December.[14]

On December 2, 2012, BF Labs removed its "The BitForce chip is now in final stage development" representation and also removed its "Initial product delivery is scheduled for

---

[9] Dr. Sherman Report.

[10] BFL's Interrogatory Answer No. 2; BFLABS-KA 30018.

[11] BFLABS-KA 30018.

[12] BFLABS-KA 30038.

[13] BFLABS-KA 30039.

[14] BFLABS-KA 30059.

December" representation.[15] On January 2, 2013, BFL resumed representing "The BitForce SC Chip is now in final stage development" and represented "Initial product delivery is scheduled for February, 2013."[16]

On February 15, 2013, BF Labs was still representing "The BitForce chip is now in final stage development" and "Initial product delivery is scheduled for February, 2013."[17]  On February 27, 2013, BFL represented "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and used the phrase "Order Now."[18]

As of April 11, 2013, ███████████████████████████████████.[19]  The ASIC chip is an essential component common to all BF Labs' ASIC miners.[20]

From March 8, 2013 to June 1, 2013, BF Labs was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and using the phrase "Order Now," except on April 15, 2013, BFL noted the 1,500 GH/S Bitcoin Miner was "out of stock."[21]

---

[15] BFLABS-KA 30062.

[16] BFLABS-KA 30414.

[17] BFLABS-KA 30438.

[18] BFLABS-KA 30715.

[19] BFL Exhibit N.

[20] Vleisides Depo. page 109-110.

[21] BFLABS-KA 30718-30726.

As of May 7, 2013, ███████████████████████████████████████.[22]

On August 7, 2013, BF Labs was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" but started using the phrase "Order" instead of "Order Now."[23]   On October 15, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" but started using the phrases "Order" and "Pre-Order" instead of "Order Now."[24]

On August 17, 2013, BF Labs began soliciting via the internet pre-order payment/funds for "ASIC 28 NM" Bitcoin miners, which are BF Labs' second generation ASIC products.[25]

On December 10, 2013, BF Labs was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and using the phrases "Order" and "Pre-Order" instead of "Order Now," but represented "65nm Products – Units in Stock.  Shipping Immediately."[26]

On January 3, 2014, BFL represented the "600 GH/s Bitcoin Mining Card" was "Now Available for Pre-Order" and represented "65nm Technology Product Line Units in Stock."[27] On February 10,

---

[22] BFL Exhibit N.

[23] BFLABS-KA 30727.

[24] BFLABS-KA 30728.

[25] BFL Interrogatory Answer No. 2.

[26] BFLABS-KA 30734.

[27] BFLABS-KA 31235.

2014, BF Labs was still representing "65nm Products – In Stock Now," and represented "28nm Products" are available as "Pre-Order."[28]

According to BF Labs, "When buyers placed pre-orders with BF Labs, BF Labs notified each and every buyer on the BF Labs online order form that the shipping date for the ordered product was "two months or longer."[29]  BF Labs claims it "never promised shipment dates, but rather estimated and projected shipping dates."[30]  BF Labs acknowledges that "two months or more" could be interpreted as technically including every possible date, but BF Labs claims that was not its intent.[31]

BF Labs stopped its business practice of taking pre-orders for consumer purchases of all products on July 17, 2014.[32]  Plaintiffs allege BF Labs took in over $25M in pre-orders and over $11M in pre-orders from PayPal alone.[33] BFL's Exhibit H shows ▮▮▮▮ first generation ASIC miners were shipped between July 14, 2013 and December 31, 2014.[34]  BF Labs' Exhibit H reflects shipping of first generation ASIC miners ordered though PayPal and is the minimum floor of the number of shipped units.[35]  The actual number of miners shipped for first and second generation ASIC miners is likely between 40,000 and 60,000 units.[36]

---

[28] BFLABS-KA 31299.

[29] FTC Doc. 14 page 11.

[30] Declaration of Jeff Ownby, FTC Doc. 155-1 page 3.

[31] Bourne Depo. page 187.

[32] Declaration of Jeff Ownby, FTC Doc. 155-1 page 3.

[33] Complaint at para 35-36.

[34] BFL Exhibit H; Bourne Depo. page 229.

[35] Bourne Depo. page 229-230.

[36] Bourne Depo. page 230.

Former employee Anthony Fast testified it was BF Labs' "company policy" to inform prospective customers that delivery was "two months away" and even sooner for existing customers, even though the two-month timeframe was not tied to supply chain or the engineering timeline and no final prototype for the machine existed.[37]  Mr. Fast recommended to company management that consumers be provided with information about delivery delays, but his recommendation was dismissed, and the reason provided was that the company did not want consumers to know that they would have to wait so long for the machines.[38]

According to former employee Sabina Marsh, even after mining units became effectively obsolete due to the length of time customers were waiting for BF Labs to ship, customers were not allowed to obtain a refund even if they refused delivery.[39] She states that, per management's instructions, BF Labs would keep both the mining units and customers' funds.[40]

BF Labs has publicly stated it does not mine Bitcoins.[41] BF Labs also publicly stated "we aren't testing any ASIC equipment on the live network either now or in the past, so it's pretty immaterial."[42]

BF Labs states it tests the hardware of each unit individually before it goes to the consumer.[43]

---

[37] FTC Doc. 193 page 7.

[38] FTC Doc. 193 page 7.

[39] FTC Doc. 42-14 page 4.

[40] FTC Doc. 42-14 page 4.

[41] FTC Doc. 42-2, page 34.

[42] FTC Doc. 42-2, page 37.

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

Former employee Brandon Bone states "Every single machine that we plugged into the burn room was intended for customers.  I was told that the mining machines were placed in the 'burn room' for testing purposes.  But it is not necessary for the company to mine Bitcoins with the machines in order to test them.  A closed system referred to as the 'test net' was specifically designed as a means to test Bitcoin mining equipment without actually mining for Bitcoins.  Butterfly Labs never used a 'test-net' in the 'burn rooms.'"[44]

Former employee Samuel Johnston states "I was in charge of overseeing testing of the bitcoin mining machines that Butterfly Labs sold to consumers.  At the time I started working at Butterfly Labs, I was aware that the company had made statements to consumers that its bitcoin mining machines were tested on the bitcoin testnet, which meant that the machines would not produce any bitcoin value while being tested.  From the time I started, I observed that the machines were not in fact tested on the testnet.  Instead, I found that they were mining with the machines on the bitcoin network."[45]

Former employee Samuel Johnston states "While I was employed, with the exception of a two-to-three week period, all tested machines were set up to mine bitcoins in the Eclipse Mining Consortium ('EMC').  I believe that EMC was owned by Josh Zerlan."[46]

---

[43] FTC Doc. 42-19, page 33-34.

[44] FTC Doc. 42-12, page 3.

[45] FTC Doc. 42-13, page 2.

[46] FTC Doc. 42-13, page 3.

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

Former employee Samuel Johnston states "When I asked Mark why the machines were not tested on the testnet, he responded that there was no point in doing so because the company would not make any money from the testing.  I understood, based on my conversations with Mark, that he received direction from Sonny to test the machines in a way that generated bitcoins. I was present in at least one brief meeting with Sonny and Mark in which it was suggested that the machines be tested on the testnet, but Sonny and Mark agreed the company would not do so. I understood that the sole reason for burning in the machines rather than using the testnet was to make money."[47]

Former employee Samuel Johnston states "The goal was to maximize the number of units that could be burned in at a time."[48]  Former employee Samuel Johnston states "Every machine sent to consumers was burned in before shipment.  Mark instructed me to always have as many machines burning in as possible.  When production of the mining machines was slow, we would keep machines mining all day rather than shipping them.  Machines were burned in for far longer than was necessary to test them.  Generally, a machine only needs to be tested for ten to 30 minutes to be tested properly."[49]

Bruce Bourne as company representative of BF Labs testified "We would admit that a testnet exists that does enable machines to be tested without being used to mine.  We would not agree that it was sufficient to test the machines we were building adequately."[50]

---

[47] FTC Doc. 42-13, page 3.

[48] FTC Doc. 42-13, page 4.

[49] FTC Doc. 42-13, page 3.

[50] Bourne Depo. page 179.

Bruce Bourne as company representative of BF Labs testified "There were units I believe in early days of the company that were tested on, test network.  In fact, I'm not entirely clear whether the FPGA's were mostly or all tested on the test network.  If we limit the discussion to the ASIC's, live network was the predominant, if not exclusive."[51]

Former employee Brandon Bone states "there were up to three burn rooms operating at one time.  Depending on the room, there could be over 500 Bitcoin mining machines hooked up and actively mining Bitcoins at one time."[52]

Former employee Samuel Johnston states "BF Labs' mining operation using equipment to be shipped to customers was powerful.  For example, in August 2013, the machines being tested were collectively hashing at a rate of 12 terrahashes per second (TH/s).  At that time, this comprised approximately 3% of the hash rate of the entire bitcoin network."[53]

Former employee Samuel Johnston states "At times, we would have machines burning in for two days before shipment, in order to generate additional bitcoins.  If we reached the end of the day without additional machines ready to replace them, we held back shipment to keep them burning in all night, and then would ship them the next day.  When production was high, the machines were burned in for shorter periods of time."[54]

---

[51] Bourne Depo. page 171.

[52] FTC Doc. 42-12, page 3.

[53] FTC Doc. 42-13, page 3-4.

[54] FTC Doc. 42-13, page 4.

Former BF labs employee Samuel Johnston states "From my work in the shipping room and the burn in rooms, I observed the pace at which the mining machines were produced and sent. When I arrived in June 2013, Butterfly Labs had produced some Jalapeno 65 nm machines, but did not have working parts to mass produce the higher powered 65 nm machines. I estimate that Butterfly Labs would ship out 30-50 units a day when I started, about 100 a day by the time I started constructing the burn-in rooms in September, and about 900 by the time I completed the burn in rooms about three weeks later."[55]

BF Labs' Exhibit S shows it mined ███ bitcoins from "testing and the development process."[56]

Most of the pre-orders were shipped after the initial shipping date.[57]  For example, customer Chalmers Greenlee did not receive his pre-ordered product for approximately eight months, and when the shipment arrived, the product did not work at all.[58]  Customer Samuel Plainfield pre-ordered a product, and after waiting eight months his refund request was denied by BF Labs.[59] He had to request a chargeback from his credit card company in order to recover the purchase price, and he never received a product from BF Labs.[60]  Plaintiff Dylan Symington received his pre-ordered product approximately seven months after ordering, and when the shipment arrived,

---

[55] FTC Doc. 42-13, page 5-6.

[56] Bourne Depo. page 241.

[57] Bourne Depo. page 187.

[58] FTC Doc 42-17.

[59] FTC Doc. 42-18 page 3-4.

[60] FTC Doc. 42-18 page 4.

it was defective.[61]  By the time Dylan Symington finally received the product he ordered, it was unable to mine one bitcoin running for 24 hours.[62]

Plaintiff Kyle Alexander, to date, has not received the product he ordered or a refund.[63] Currently, there are approximately ███ consumers who pre-paid BF Labs between 2012 and 2014 the full purchase price who have still not received the product or a refund—representing approximately ████ in unfulfilled orders and refund liability.[64]

BF Labs claims it is not in a position to pay these people back.[65]  BF Labs claims it obtained no financial benefit by holding consumers' money without providing the product or refund because there is technically a corresponding liability on its accounting books.[66]

BF Labs was founded by Sonny Vleisides, who is the largest shareholder at 44% stock ownership.[67]  At the time of BF Labs' formation in July 2011, Vleisides, I learned, was serving a three-year term of supervised release related to a lottery scheme guilty plea and felony conviction and, as a condition of release, was ordered not to "engage, as whole or partial owner, employee or otherwise, in any business involving loan programs, gambling or gaming activities, telemarketing activities, investment programs or any other business involving the solicitation of

---

[61] A&S 00037, 00041.

[62] Dr. Sherman Report.

[63] Bourne Depo. page 190.

[64] Bourne Depo. page 189-190.

[65] Bourne Depo. page 191.

[66] Bourne Depo. page 70-71.

[67] BFL Interrogatory Answer No. 13.

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

funds . . . without the express approval of the Probation Officer prior to engagement in such employment."[68]

Although Vleisides consulted with his Probation Officer about obtaining $8,000 to $10,000 from family members to start manufacturing mining hardware, Vleisides did not tell the Probation Officer he would be soliciting pre-order funds from the public in order to develop the mining hardware before manufacturing it.[69]

Specifically, the Probation Officer testified:  "I was aware of bitcoins and that his company manufactured mining equipment.  He made me aware of all of that, because I had never heard of either before.  However, I was not aware that they took preorders, used that money to develop the hardware and just kept customers waiting for months and months.  There's no determinate date."[70]

The Probation Officer testified "I was aware that he initially had a start-up, I believe, 8 to $10,000 that he told me came mostly from family members.  I was aware of that as an investment.  Not soliciting money from people to be used as an investment to develop the hardware, that I was not aware of."[71]  The Probation Officer testified "I was not fully informed as to the nature of the business, and without being fully informed I was not able to give express approval."[72]

---

[68] A&S 03996.

[69] A&S 04136, 04138.

[70] A&S 04138.

[71] A&S 04136.

[72] A&S 04134.

On June 5, 2012, BF Labs publicly announced it had acquired "Venture Capital Funding" and "is now backed by private venture capital."[73]  The press release by BF Labs quoted an unidentified private equity group as stating: "Having made bold investments in new technology, they're [BF Labs] poised to redefine the landscape for SHA-256 hash verification."[74]  Bruce Bourne, however, testified there was only $8,000.00 in capital contributions and "[t]here was no significant source of outside funding."[75]  BF Labs' income statement for 2011 to 2014 shows that ███████ was required to develop BF Labs' products, but BF Labs had ████████████████████████████████ ██████████████ ████.[76]  Pre-order funds were the largest source of BF Labs' funding and revenue.[77]

Opinions

1.  Plaintiffs have asked me to opine on whether there are any marketing differences between an "off the shelf" sales model vs. a "pre-order" sales model and, if so, to explain the differences.

In my opinion, there are significant differences. When a seller offers products for sale "off the shelf," the product has already been assembled and is available for immediate purchase and physical delivery. Often the consumer is able to see, hold, review and/or "test out" a sample product in the store before deciding whether to purchase a unit.  For example, with regard to

---

[73] http://www.prweb.com/releases/2012/6/prweb9611889.htm.

[74] http://www.prweb.com/releases/2012/6/prweb9611889.htm.

[75] Bourne Depo. page 212-213.

[76] BFL-Alexander-Fin-001.

[77] Bourne Depo. page 211.

electronics such as TVs or computers, a consumer is often able to view the clarity of a TV in store, such as at Best Buy, before deciding to purchase a unit and take it home.  In the example, the consumer is able to verify for himself/herself whether the clarity is sufficient or as represented by the seller before making a purchase.  In deciding whether to purchase a product "off the shelf," the consumer is usually not concerned by whether the seller will be able to produce the product, whether the product will be timely delivered, or whether there are any substantial risks the seller will be delayed or impaired in producing and delivering the product.  The seller does not possess superior knowledge regarding its ability to produce and deliver the product as offered and the consumer is able to verify whether the product has been produced and is available for immediate delivery before deciding whether to purchase the product.  This is because the product is already on the shelf, or in a stockroom/storeroom and the only step needed to obtain possession of the product is for the consumer to purchase the product.

However, when a seller offers and sells products on a "pre-order" basis, the dynamics of the relationship between seller and consumer are markedly different.  A "pre-order" is the pre-sale of a product that has not yet been released.  In other words, the product is not available for purchase "off the shelf."  By placing a "pre-order," the consumer seeks a guarantee he/she will receive the product upon its release without having to race or compete with other consumers, which avoids the risk of limited inventory, stock outs or sell outs. An example of product sell out is where a mother goes to Target to purchase a newly released video game "off the shelf" for her son or daughter only to find out the product already sold out several days earlier and is not on the shelf.

In the "pre-order" sales model, the consumer is in a disadvantaged position in that the consumer is less able to verify the seller's presentation, statements or representations about the product

and the seller has superior knowledge about its ability to produce and to deliver the product as offered to the consumer.  In a "pre-order" sale, the consumer is unable to physically examine the product before deciding whether to purchase the product.  In a "pre-order" sale, the consumer is unable to determine whether the promoted product is fully functional, nearly functional, or anywhere close to functional.  In a "pre-order" sale, the consumer is unable to verify whether the seller possesses the components needed to assemble and to deliver the product as offered.  If the "pre-order" product is purchased, the consumer does not obtain physical possession of the product until a later time. [78] As such, unlike in an "off the shelf" sale, the consumer is unable to verify prior to placing the pre-order whether the product will be produced or will be delivered as offered by the seller.

Examples of sellers using the pre-order sales model include:

- Amazon.com:

---

[78] FTC Regulations: The FTC's Mail, Internet, or Telephone Order Merchandise Rule applies to most goods a customer orders from the seller by mail, telephone, fax, or on the Internet. It does not matter how the merchandise is advertised, how the customer pays, or who initiates the contact.  The FTC "Mail Order" rule requires that when a company promotes and advertises merchandise, a █████y must have a reasonable basis for stating or implying that they can ship within a certain time. If the company makes no shipment statement, the company must have a reasonable basis for believing that you can ship within 30 days.  In this case, it was rolling shipping statements that were neither clear nor certain combined with a lack of disclosures by BFL.

Further, if, after taking the customer's order, a company learns it cannot ship within the time stated or within 30 days, the company must seek the customer's consent to the delayed shipment. If the company cannot obtain the customer's consent to the delay, the company is generally required to, without being asked, promptly refund all the money the customer paid for the unshipped merchandise. (http://www.ecfr.gov/cgi-bin/retrieveECFR?gp=1&SID=76d9746d492a9d4b75f0216e214f5dc8&ty=HTML&h=L&n=16y1.0.1.4.54&r=PART).

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

- o For the preordering games and software on Amazon.com: Amazon states that their "pre-order can be done on selected unreleased games and software and automatically delivered to you on release day. To pre-order games and software: Go to the product detail page for the game or software you want to pre-order; (Click) Pre-order PC Download or Pre-order Mac Download. (Click) Place your pre-order. We (Amazon) won't charge you for the pre-order until release day, and will send you an e-mail to confirm when the item is available in Your Games & Software Library. If you'd like to cancel your pre-order before release day, go to Your Games & Software Library and click Cancel pre-order." (http://www.amazon.com/gp/help/customer/display.html?nodeId=201380120)


- Best Buy.com:
  - o For the preordering of phones at Best Buy, it states "Be one of the first to get the latest smartphone. You can pre-order your phone at BestBuy.com before its release date or go to a Best Buy store or Best Buy Mobile™ specialty store and reserve your new phone right after it's announced by the carrier or manufacturer. Go to a Best Buy store; When the new phone you want is announced, go to your nearest Best Buy or Best Buy Mobile™ specialty store and see a Mobile Phone Specialist.
  - o Provide info and purchase a $50 gift card
    - ▪ After you provide phone choice and contact information, you'll need to purchase a $50 Best Buy gift card to reserve your phone. You'll be able to apply the gift card toward your new phone when it arrives or toward any Best Buy purchase.

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

- ▪ Pick up phone within three days of arrival. We'll contact you via e-mail when your new phone arrives at your selected store. Bring in the receipt within three days to pick up your new phone. We'll activate it and set it up for you with our free Walk Out Working™ program. You can even trade in your old phone and save." (http://www.bestbuy.com/site/phones-communication-promotions/smartphone-pre-order/pcmcat255200050006.c?id=pcmcat255200050006)

- GameAgent.com
  - ○ Order information at https://cart.gameagent.com/:
  - ○ For purchases of physical products, you won't be billed until your product is shipped. ..." (https://www.gameagent.com/)

- "Microsoft.com:
  - ○ Microsoft states "We won't charge your credit card until you download the product or we ship it to you." (http://www.microsoftstore.com/store/msusa/en_US/DisplayHelpPaymentPricingPage#price-guarantee)

- Kaspersky Lab eStore - Order Information - Digital River, Inc. (https://store.digitalriver.com/DRHM/store?Action.)
  - ○ ". ...using a credit card, you won't be billed until your product is shipped." (https://store.digitalriver.com/DRHM/store?Action=DisplayOrderInformationPage&SiteID=kaspersk&Locale=en_IE&ThemeID=30242800)

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

- Apple.com:
  - o   When the item is released, we'll complete your order and bill your account.")

    (https://support.apple.com/en-us/HT202723)


- Tesla.com:
  - o    "The Reservation Payment is fully refundable. This Agreement does not

    constitute an agreement for the sale of a Model X and does not lock in pricing, a

    production slot, or an estimated delivery date."

    (https://my.teslamotors.com/own/basic);

    http://my.teslamotors.com/de_DE/forum/forums/model-iii-preorder-timeline-

    preference-existing-owners


2. Plaintiffs have asked me to opine on whether there are any unique concerns that come into

   play in a "pre-order" sales model when the offered product is time sensitive or when "time is of

   the essence" with respect to delivery of the offered product and, if so, to explain those special

   concerns.


In my opinion, there are unique concerns that arise when a "pre-order" sales model is used to

offer products that are susceptible to obsolescence[79] due to the passage of time.  Some products

are time sensitive -- susceptible to obsolescence due to the passage of time -- and some are not.

For example, if a musician were to offer her upcoming album on CD for "pre-order" sale, the CD's

---

[79] "Infrequently purchased products such as automobiles, microwaves and industrial equipment, exhibit replacement

cycles dictated by physical wear or obsolescence associated with styles, features and performance." (Marketing

Management, Kotler and Keller, Page 449).

ability to produce the recorded sounds remains the same regardless of whether the product is delivered in two months or six months after the pre-order was made.  Although the length of the waiting period would still be material to a consumer in deciding whether to pre-order the CD, the CD's ability to produce the recorded sounds is unaffected by delivery date.

Alternatively, if a musician were to offer concert tickets for "pre-order" sale for a show in September 2015, the delivery date takes on extra significance to the consumer in deciding whether to pre-order the concert tickets.  For example, if the concert tickets were not to be delivered until October 2015, the tickets would effectively be rendered obsolete. The expired concert tickets may still have some value to an obsessed fan, but the tickets would no longer have any value towards admittance to the September 2015 show.  Any substantial risk that the concert tickets might not be delivered prior to the show would be highly material to a consumer's decision whether or not to pre-order the tickets, and a reasonable marketer, similarly situated, would know that such information is highly material to the consumer, and a reasonable marketer would disclose such information.  In sum, although delivery date is a significant factor in any "pre-order" consumer decision, the delivery date becomes especially significant when a time sensitive product is offered for "pre-order" sale.[80]

3.  Plaintiffs have asked me to opine on whether the following alleged facts[81] would be material to a reasonable consumer in deciding whether to pre-order an offered product from BF Labs,

---

[80] The lowest price for the BFL products was from a few hundred dollars to $25K. Mr. Alexander paid $308.00 for his BFL product which he has never received.

[81] My understanding is these alleged facts are disputed by BFL.  I am not opining on which side is factually correct; rather, my opinions are limited to whether such alleged facts would be material to a reasonable consumer in deciding

and whether a reasonable marketer offering products for pre-order sale, similarly situated, would have disclosed such alleged facts.

Before addressing the facts alleged by Plaintiffs, there are several established best practices and ethical standards in the marketing industry that are implicated and relevant to the analysis. "Marketing" is defined as "the activity, set of institutions, and processes for creating, communicating, delivering, and exchanging offerings that have value for customers, clients, partners, and society at large."[82]   Under this definition, BF Labs is a marketer who communicated, promised to deliver, and offered for "pre-order" sale Bitcoin miners that had value or appeared to have value to consumers, as demonstrated by the 40,000 to 60,000 pre-orders placed by BF Labs' customers.

The American Marketing Association has published "Ethical Norms" and "Ethical Values" that I believe, based on my experience, knowledge, education, and training, accurately state the marketing standards by which the propriety of a marketer's conduct must be evaluated.  Those standards, in pertinent part, are as follows:

> **Ethical Norms**
>
> As Marketers, we must:
>
> Do no harm. This means consciously avoiding harmful actions or omissions by embodying high ethical standards and adhering to all applicable laws and regulations in the choices we make.
>
> Foster trust in the marketing system. This means striving for good faith and fair dealing so as to contribute toward the efficacy of the exchange

---

to pre-order an offered product, and whether a reasonable marketer offering products for pre-order sale, similarly situated, would have disclosed such alleged facts.

[82] https://www.ama.org/AboutAMA/Pages/Definition-of-Marketing.aspx.

process as well as avoiding deception in product design, pricing, communication, and delivery of distribution.

Embrace ethical values. This means building relationships and enhancing consumer confidence in the integrity of marketing by affirming these core values: honesty, responsibility, fairness, respect, transparency and citizenship.

**Ethical Values**

Honesty – to be forthright in dealings with customers and stakeholders. To this end, we will:

Strive to be truthful in all situations and at all times.

Offer products of value that do what we claim in our communications.

Stand behind our products if they fail to deliver their claimed benefits.

Honor our explicit and implicit commitments and promises.

Responsibility – to accept the consequences of our marketing decisions and strategies.  To this end, we will:

Strive to serve the needs of customers.

Avoid using coercion with all stakeholders (e.g., customers, employees, investors, peers, channel members, regulators and the host community).

Acknowledge the social obligations to stakeholders that come with increased marketing and economic power.

Recognize our special commitments to vulnerable market segments such as children, seniors, the economically impoverished, market illiterates and others who may be substantially disadvantaged.

Fairness – to balance justly the needs of the buyer with the interests of the seller.  To this end, we will:

Represent products in a clear way in selling, advertising and other forms of communication; this includes the avoidance of false, misleading and deceptive promotion.

Reject manipulations and sales tactics that harm customer trust.

Refuse to engage in price fixing, predatory pricing, price gouging or "bait-and-switch" tactics.

Avoid knowing participation in conflicts of interest.

> Transparency – to create a spirit of openness in marketing operations. To this end, we will:
>
> Strive to communicate clearly with all constituencies.
>
> Accept constructive criticism from customers and other stakeholders.
>
> Explain and take appropriate action regarding significant product or service risks, component substitutions or other foreseeable eventualities that could affect customers or their perception of the purchase decision.[83]

With these standards in mind, I now address whether the following alleged facts would be material to a reasonable consumer in deciding whether to pre-order an offered product from BF Labs, and whether a reasonable marketer offering products for pre-order sale, similarly situated, would have disclosed such alleged facts.

a. *BFL's founder, board member, officer, and largest shareholder, pursuant to the terms of his release from prison, was required, but did not obtain, the express approval of his probation officer prior to soliciting pre-order funds from customers.*

It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs. BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  The unauthorized or unlawful solicitation of pre-order funds presents a substantial risk BF Labs would be delayed or impaired in delivering the product, and a reasonable consumer would think twice before sending pre-order funds to BF Labs in these circumstances.

---

[83] https://www.ama.org/AboutAMA/Pages/Statement-of-Ethics.aspx; Marketing Management, Kotler and Keller (2016).

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, responsibility, and transparency, specifically by failing to adhere to applicable law (soliciting pre-order funds without obtaining express permission of the probation officer), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know express approval had not been granted by the probation officer), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to legal issues).

b.   *BFL's lack of sufficient capital to design, develop, test, and manufacture the advertised products.*

It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use).  Because the lack of sufficient capital to design, develop, test, and manufacture the products offered presents a substantial risk of impairment or delay in delivering the products offered, this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, responsibility, fairness, and transparency, specifically by not being truthful, using coercion, and using false and misleading promotion (publicizing the acquisition of venture capital funds from a private equity group and bold investments into the development of the technology when, in reality, there was only $8,000 in startup capital and no significant source of outside funding), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know there was only $8,000 in startup capital and no significant source of outside funding), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to insufficient capital).

> c.   *BFL's inability to design, develop, test, and manufacture the advertised products unless and until a certain number of pre-orders were received.*

It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use).  The inability to design, develop, test, and manufacture the products unless and until a certain number of pre-orders were received

means that a consumer's pre-order delivery date is dependent upon events occurring after the pre-order was placed.  A reasonable consumer would want to know this information before placing a pre-order with BF Labs because it presents a substantial risk of impairment or delay in delivering the products offered.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, responsibility, fairness, and transparency, specifically by not being truthful, using coercion, and using false and misleading promotion (publicizing the acquisition of venture capital funds from a private equity group and bold investments into the development of the technology when, in reality, there was only $8,000 in startup capital, no significant source of outside funding, and pre-order funds were necessary to design, develop, test, and manufacture the products offered), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know there was only $8,000 in startup capital, no significant source of outside funding, and pre-order funds were necessary to design, develop, test, and manufacture the products offered), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to insufficient capital).

> d.      *The advertised products were not in the final stage of development.*

It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any

substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use).  BF Labs consistently represented the products were "now in final stage development."[84]  The stage at which the product was in development provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of the delivery date.  A reasonable consumer would want to know this information before placing a pre-order with BF Labs because it presents a substantial risk of impairment or delay in delivering the products offered.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, responsibility, fairness, and transparency, specifically by not being truthful, using coercion, and using false and misleading promotion (repeatedly representing the products were in the final stage of development even though no final prototype for the machine existed), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know the stage of development and that no final prototype for the machine existed), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to development delay).

        e.      *The presented, promoted and advertised products were not functional.*

---

[84] BFLABS-KA 30438.

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

      *f.*     *No final working prototype existed.*

Subparagraphs 3.e. and 3.f. are addressed concurrently.  It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use).  Whether or not the products offered are functional yet, and whether there is yet a final working prototype in existence, provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of the delivery date.  A reasonable consumer would want to know this information before placing a pre-order with BF Labs because it presents a substantial risk of impairment or delay in delivering the products offered.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, responsibility, fairness, and transparency, specifically by not being truthful, using coercion, and using false and misleading promotion (repeatedly representing the products were in the final stage of development even though no final prototype for the machine existed), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know the stage of development and that no final prototype for the machine existed), and failing to explain significant risks or other foreseeable eventualities

that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to development timeline).

> g.   *BFL lacked the chips necessary to produce the presented, promoted and advertised*
> *products.*

It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use).  The ASIC chip is an essential component common to all BF Labs' ASIC miners.[85]  The lack of an essential component provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of the delivery date.  A reasonable consumer would want to know this information before placing a pre-order with BF Labs because it presents a substantial risk of impairment or delay in delivering the products offered.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information.  The failure to disclose this information violates the marketing standards of honesty, responsibility, fairness, and transparency, specifically by not being truthful, using coercion, and using false and

---

[85] Vleisides Depo. page 109-110.

misleading promotion (repeatedly representing the products were in the final stage of development when BF Labs had ████ and representing the products are available in four different configurations when BF Labs only had ██████ in possession, and the ██████ were slotted for the first handful of thousands of pre-order consumers), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know the status of chip development, the quantity of chips possessed, the supply timeline, or the number of backlogged pre-orders), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to the lack of essential components and the number of backlogged pre-orders).

> h.    *Shipping would not occur as represented, anywhere close to as represented, or ever.*
>
> i.    *Shipping representations were not tied to the supply chain or engineering timeline.*

Subparagraphs 3.h. and 3.i. are addressed concurrently.  It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use).  Whether or not the products offered would ship as represented, i.e., in a specific month of the year 2012 as initially represented by BF Labs, provides significant information to the consumer in deciding whether to pre-order the product, specifically the

consumer's informed analysis of the delivery date.  Whether or not the products offered would ship as represented, i.e., in "two months or more"[86] as later represented by BF Labs, provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of the delivery date.  Whether or not BF Labs' shipping representations were tied to the supply line or the engineering timeline also provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of the delivery date. A reasonable consumer would want to know this information before placing a pre-order with BF Labs because it presents a substantial risk of impairment or delay in delivering the products offered.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, responsibility, fairness, and transparency, specifically by not being truthful, using coercion, and using false and misleading promotion (repeatedly representing the products were in the final stage of development even though no final prototype for the machine existed, representing the products would ship in specific months in 2012 when BF Labs did not even possess ███████████

---

[86] A shipping representation of "two months or more" or "in two months or more" is vague and ambiguous because it implies shipping *could* occur (1) within two months (day 1 through day 60 or later), (2) in the second calendar month after the order was placed (day 31 through day 60 or later), or (3) after two full months had passed (day 61 or later). A reasonable marketer, similarly situated, would know that using such language is confusing and implies multiple different time periods, but does not state any clear or conspicuous time period.  In fact, BF Labs' corporate representative admits that "two months or more" technically includes every possible date.  According to the FTC "Mail Order" Rule, if a shipping time is not clearly and conspicuously stated, the seller is generally required to believe it can ship within 30 days after receipt of a completed order from a buyer—otherwise, it is a deceptive practice for the seller to solicit the order through the mail, via the Internet, or by telephone.

██████████████████████████████████, and implying shipping would occur within two months regardless of the supply chain or the engineering timeline), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know the stage of development, the supply chain, the engineering timeline, the quantity of chips possessed, and that no final prototype for the machine existed), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to development timeline, supply chain, and lack of essential components).

       j.      *BFL's intent to design, develop, and manufacture miners for BFL's own use and benefit.*

       k.      *BFL's intent to delay and/or avoid shipment of miners.*

Subparagraphs 3.j. and 3.k. are addressed concurrently.  It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use). BF Labs' products were offered as new, i.e., unused.  The fact that BF Labs intended to use the products for its own benefit prior to shipping to consumers provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of the condition of the product and of the delivery date.  The fact that BF Labs intended to keep the products for its own benefit without shipping to consumers

provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of obtaining any material benefit from the transaction. A reasonable consumer would want to know this information before placing a pre-order with BF Labs because it presents a substantial risk of impairment or delay in delivering the products offered and/or a substantial risk of being ripped off.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, responsibility, fairness, and transparency, specifically by not being truthful, using coercion, and using false and misleading promotion (offering the products as new, representing to consumers BF Labs did not use the products to mine and did not test products on the live Bitcoin network prior to shipping, and then nevertheless using the products to earn thousands of bitcoins for itself), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know BF Labs' intent to use the products prior to shipping for its own benefit), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to BF Labs' intent to use or keep the products for its own benefit; risk of being ripped off).

> l.    *BFL's intent to delay and/or avoid providing refunds.*
>
> m.    *BFL's intent to keep the customers' prepayments and the products ordered.*

Subparagraphs 3.l. and 3.m. are addressed concurrently.  It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF

Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use).  The fact that BF Labs intended to keep the products ordered and not provide refunds provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of obtaining any material benefit from the transaction.  A reasonable consumer would want to know this information before placing a pre-order with BF Labs because it presents a substantial risk of impairment or delay in delivering the products offered and/or a substantial risk of being ripped off.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, fairness, and transparency, specifically by not being truthful (deceiving the consumer by offering the products for sale with the intent to keep them and without providing refunds), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know BF Labs' intent to keep the products and not provide refunds), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to BF Labs' intent to keep the products without providing refunds; risk of being ripped off).

n.      *Each miner is used on the live Bitcoin network for BFL's benefit prior to shipping.*

Alexander, et al. v. BF Labs Inc. (Case 2:14-CV-02159)

o.     *Even after sufficient testing had occurred, miners are used on the live Bitcoin*

*network for BFL's benefit until replacement miners are manufactured.*

Subparagraphs 3.n. and 3.o. are addressed concurrently.  It is my opinion this information would be material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs was offering, presenting and promoting a highly "time" sensitive product that was susceptible to rapid obsolescence.  With this in mind, any substantial risk of impairment or delay in delivering the miner would be highly material to a reasonable consumer in deciding whether to pre-order a miner from BF Labs.  BF Labs' products were also highly complex, i.e., advanced computing hardware as opposed to widgets (such as common nails or common items for personal/business use). The fact that BF Labs uses the products on the live Bitcoin network for its own benefit prior to shipping provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of the condition of the product and of the delivery date.  The fact that BF Labs kept using the products on the live Bitcoin network for its own benefit prior to shipping—even after sufficient testing had occurred—also provides significant information to the consumer in deciding whether to pre-order the product, specifically the consumer's informed analysis of the condition of the product and of the delivery date. A reasonable consumer would want to know this information before placing a pre-order with BF Labs because it presents a substantial risk of impairment or delay in delivering the products offered and/or a risk of receiving a used product.

It is my opinion a reasonable marketer, similarly situated, would have known such information was material to the consumer's decision to pre-order and would have disclosed such information. The failure to disclose this information violates the marketing standards of honesty, responsibility, fairness, and transparency, specifically by not being truthful, using coercion, and using false and

misleading promotion (offering the products as new, representing to consumers BF Labs did not use the products to mine and did not test products on the live Bitcoin network prior to shipping, and then nevertheless using the products to earn thousands of bitcoins for itself), failing to be forthright in dealings with consumers (lack of disclosure), failing to recognize consumers' substantial disadvantage (consumers' inability to know BF Labs' intent to use the products prior to shipping for its own benefit), and failing to explain significant risks or other foreseeable eventualities that could affect consumers or their perception of the purchase decision (lack of disclosure; risk of impaired or delayed delivery due to BF Labs' intent to use or keep the products for its own benefit; risk of being ripped off).

All opinions are stated with a reasonable degree of certainty and likelihood based on my experience, knowledge, training, and education.

I reserve the right to review, modify, and amend this declaration upon the receipt of any new or additional information.

This declaration is dated and signed this 4th day of September, 2015, and was executed in Los Angeles, California.

Larry Steven Londre