# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KYLE ALEXANDER, et al.,      )
                                     )
                 Plaintiffs,   )
                                     )
v.                                 )     Case No. 14-2159-KHV
                                   )
BF LABS INC., et al.,         )
                                     )
               Defendants.  )

## **PRETRIAL ORDER**

A pretrial conference was conducted in this case on November 25, 2015, by U.S. Magistrate Judge James P. O'Hara. The plaintiffs, Kyle Alexander and Dylan Symington, individually and as putative class representatives, appeared through counsel, Ari N. Rodopoulos. Defendants BF Labs Inc. ("BF Labs"), Sonny Chris Vleisides, and Jeff Ownby appeared through counsel, Mark A. Olthoff and Michael S. Foster.  There was no appearance at the pretrial conference by defendants Josh Zerlan and Nasser Ghoseiri; Mr. Rodopoulos stated that plaintiffs had been unable to secure service of process on these defendants and therefore plaintiffs were abandoning claims against them.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(c).

1.     **PRELIMINARY MATTERS.**

    **a.**     **Subject Matter Jurisdiction**. Subject matter jurisdiction is invoked under 28 U.S.C. § 1332, and is not disputed.

    **b.**     **Personal Jurisdiction**. The court's personal jurisdiction over the parties is not disputed.

    **c.**     **Venue**. Venue in this court is not disputed.

    **d.**     **Governing Law**. Subject to the court's determination of the law that applies to the case, plaintiffs assert that the substantive claims in this case are governed by Kansas law. Defendants assert that plaintiffs' claims are governed by the laws of the states where any plaintiff or putative class member resides.  Defendants also assert, to the extent punitive damages issues remain, federal procedural and substantive standards apply.

2.     **STIPULATIONS.**

    **a.**     The following facts are stipulated:

        (1)     Plaintiff Kyle Alexander is a resident of Tennessee.

        (2)     Plaintiff Dylan Symington is a resident of Maryland.

        (3)     Defendant BF Labs Inc. is a Wyoming corporation with its principal place of business located in Leawood, Kansas.

        (4)     Defendant Sonny Vleisides is a resident of Missouri.

        (5)     Defendant Jeffrey Ownby is a resident of Illinois.

    **b.**     The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

None.

**3.      FACTUAL CONTENTIONS.**

  **a.      Contentions of Plaintiffs**.  Bitcoin is a peer-to-peer payment system and digital currency created in 2009. Bitcoins are created by "mining," a process where "miners" receive transaction fees and newly minted Bitcoins in return for verifying and recording payments into a public ledger. By design, mining is a computationally intensive process that becomes more difficult over time. Time is of the essence when it comes to Bitcoin mining.

  As the difficulty of Bitcoin mining has increased over time, the computer hardware required to profitably mine has advanced from general purpose central processing units ("CPUs") which are found in common desktop computers, high-end graphics processing units ("GPUs") which are often found in gaming computers, field-programmable gate arrays ("FPGAs"), and ultimately to application-specific integrated circuits ("ASICs") which are purpose built for performing the calculations necessary for Bitcoin mining. Defendants are marketers, designers, and manufacturers of ASIC computer equipment and processors specialized for the task of mining Bitcoins.

  Defendants had a scheme to obtain "pre-order" funds from the public to develop Bitcoin miners, to use the Bitcoin miners for their own enrichment, to delay and/or to avoid having to ship the miners to customers, and to delay and/or to avoid having to refund customers.

  Defendants publicly announced they had acquired "Venture Capital Funding" and they are "now backed by private venture capital," but, in reality, there was only

$8,000.00 in capital contributions and "[t]here was no significant source of outside funding," according to the Rule 30(b)(6) designated corporate representative.

Via their website, defendants advertised via "pre-order" sale the very products they hoped to design and manufacture. "Company policy" was to inform prospective customers that delivery was "two months away" and even sooner for existing customers. Defendants also advertised on their website (and elsewhere publically) that they do not and would not test customers' equipment on the live Bitcoin network prior to shipping.

Defendants willfully failed to state and/or omitted multiple material facts, including that the advertised two-month timeframe was not tied to supply chain or the engineering timeline, no final prototype for the machine existed, and defendants intended to keep both the customers' money and the products ordered.

Instead of shipping completed Bitcoin mining hardware to customers who had already paid in full, defendants used the mining hardware to earn mining income for themselves under the guise of "testing" such hardware. Defendants mined thousands of Bitcoins for their own benefit and enrichment by using customers' equipment on the live Bitcoin network for hours, days, or longer even though the equipment could have been tested on "test.net," which enables the equipment to be tested without being used.

Defendants brought in over $25 million in "pre-orders" from thousands of customers. Shipment of miners to customers either never occurred or took six months or longer, rendering the equipment essentially obsolete by the time it was received. To date, thousands of customers still have not received the product ordered or a refund.

In June 2013, plaintiff Kyle Alexander ordered a Bitcoin mining machine and paid $308.00 for this equipment. In July 2013, he inquired about his order and was informed that "shipping had begun." Over the next several months, he continued to inquire about his order and was repeatedly informed that "shipping had begun." He demanded a refund on multiple occasions but, to date, he has not received a refund or the product ordered.

In April 2013, plaintiff Dylan Symington ordered a Bitcoin mining machine and paid $1,333.00 for this equipment. In September 2013, he inquired about his order and why he had not yet received any mining equipment. Nearly seven months after ordering, the mining equipment was shipped to him but it was defective and essentially obsolete due to the passage of time. He demanded a refund and the Bitcoins that defendants mined using his equipment but, to date, he has not received a refund or any Bitcoins from defendants.

Class certification under Rule 23 is appropriate as set forth in plaintiffs' pending motion for class certification (ECF doc. 137).

**b.** **Contentions of Defendants.** Defendants deny the allegations, claims, and contentions of the plaintiffs and putative class. The admissible evidence is insufficient to prove any or all of the claims of the plaintiffs and putative class. Defendants request that judgment be entered in their favor and against plaintiffs and putative plaintiff class, that they receive their costs incurred, and for such other relief as the court deems just.

BF Labs was created in 2010 by Nasser Ghoseiri and Sonny Vleisides. Mr. Vleisides incorporated the company in 2011 as a Wyoming corporation. It was originally located in Kansas City, Missouri. BF Labs moved to a location in Leawood,

Kansas in 2012. Sonny Vleisides and Jeffrey Ownby are officers and part owners of BF Labs.

BF Labs was an innovative, cutting-edge high technology design and manufacturing venture. When BF Labs was founded, the Bitcoin mining hardware industry did not yet exist. BF Labs was the very first company to produce a purpose-built product designed specifically to perform the secured hash algorithm ("SHA") 256 calculations that are required for Bitcoin mining. BF Labs offered products based on its own proprietary, custom-designed computer chip technology; no other company had created this type of chip before BF Labs did. Until then, tech-savvy individuals had repurposed gaming and graphics cards to mine Bitcoins.

As BF Labs was entering an entirely new industry and navigating many issues for the first time, it was unsure of the market, industry, or prospects for growth. The company's efforts were, by their nature unpredictable and based on expectations, projections, and best estimates that were regularly revised as development of truly new products progressed. Over time, BF Labs hired management-level executives to handle the challenges facing the company. BF Labs also retained consultants for advice on financial and marketing issues.

BF Labs did not start out with a preorder business model: its customers encouraged it because many wanted to be "first in line" to get BF Labs' new products when they were completed, and the customers offered to pay in advance to secure their spot in the queue. To accommodate this customer preference, BF Labs created a process by which preorders could be placed. However, BF Labs did not expect the extent of

6

controversy that resulted from the preorder model combined with extremely volatile Bitcoin market price changes, vendor and supplier issues, and subsequent delivery delays. The delays experienced due to the challenges in developing chips were substantial and unexpected.

Despite the issues it faced as a start-up business in a nascent industry, BF Labs believes that its disclosure of the lengthy development and delivery timeframes was adequate, particularly in light of its audience of potential Bitcoin mining customers, many of whom were sophisticated and tech savvy. BF Labs made it known to potential customers that the preordered products did not exist at the time of preorder, the products were under development, and that shipping would occur later on a projected future schedule. BF Labs relied on the contracts and timelines furnished by qualified vendor experts. It updated projections as it got new estimates and did not conceal material facts about the process. BF Labs even advised strongly and repeatedly against ordering if a buyer was not comfortable waiting to receive a Bitcoin miner. BF Labs did not use preorder funds as corporate investment capital or for the personal enrichment of its owners. Funds were used to complete development of the new ASIC-oriented miners, to acquire component parts, and to assemble and ship products.

Nevertheless, despite all of the disclosures and information made available, some customers did not accept their responsibility under the preorder arrangement. They ignored cautions in ordering; they ignored terms they had agreed to when ordering; and they had unreasonable expectations regarding the difficulty of developing new hardware technology as well as the volatility of the Bitcoin market price.

Beginning in July 2014, BF Labs stopped offering or accepting customer preorder sales for any product.

In September 2014, the Federal Trade Commission ("FTC") obtained an ex parte restraining order from the United States District Court for the Western District of Missouri. That court also appointed a receiver. These actions, combined with the publicity about them, resulted in the ultimate collapse of BF Labs. The company incurred unanticipated costs, has lost millions of dollars, was unable to process and complete refund requests, and is no longer in active business.  Many vendors have been left unpaid. Many employees have lost their jobs. The court, after a two-day preliminary injunction hearing, dissolved the temporary restraining order and denied the FTC's request for a preliminary injunction that would have included an asset freeze and appointment of receiver.

At its peak, BF Labs had over 100 employees trying to deliver advanced technology products never created before, at speeds far faster than the supply chain vendors were used to. Although BF Labs experienced growing pains, all customers who ordered from its first three generations of products were shipped their equipment or have gotten their money back, with approximately 58,000 units shipped and more than $5.5 million refunded. Some customers chose to wait for BF Labs' next generation (Monarch product). Although over $11.2 million in Monarch refunds were paid, because the company can no longer conduct business, many remaining refund requests will go unanswered.

BF Labs' policies and practices were clear, ethical, appropriate and, in many instances, the standard in the Bitcoin-mining-hardware industry. From time to time, the policies and practices were revised to accommodate production-chain, customer-service, and business-need realities as part of the learning curve of being the first-mover in this burgeoning technology market. BF Labs vigorously defends those policies and practices and is confident in its ultimate vindication.

BF Labs did not make profitability representations. BF Labs never promised a return on investment or a specific number of Bitcoins to be mined from a machine. BF Labs never promised that Bitcoins would have a particular value. BF Labs never promised what it would cost any purchaser to run a miner. Customers bought machines they could use to mine Bitcoins; profitability depended upon many factors. However, many customers did earn money using BF Labs' products.

BF Labs did not project precise delivery dates but rather estimated delivery ranges, usually in terms of weeks or months. Product development and shipping projections were in large part based (and dependent) upon BF Labs' suppliers and vendors. BF Labs did not estimate projected shipping ranges recklessly or knowing that any representations may in the future turn out to be inaccurate.

BF Labs' equipment-testing practices, protocols, and policies were well within electronic industry standards. In the manufacturing process, BF Labs tested products before designating them for shipment. Reasonable consumers wanted products that had been appropriately tested and not subject to significant risk of defect. In this sophisticated technology niche in which component manufacturers struggled to keep pace with new

product generations, each batch of boards and chips was tested because each batch could potentially yield unexpected challenges. BF Labs' rigorous testing and quality-control practices are and have been expressly designed to accommodate these risks, and have resulted in a product-return rate of less than 2% of all shipped products. BF Labs' did not sacrifice quality for speed. To do otherwise would have harmed customers' user experiences, damaged BF Labs' reputation, and increased costs overall. Failing to test each piece of equipment could have led to significantly higher defect and returns. Burn-in testing was standard industry practice.

BF Labs' testing of miners typically occurred over a few hours, but occasionally a few days if over a weekend. For the moments the machines were on the live network, computations may have become more difficult; however, BF Labs did not control the network, did not control all machines on the network, and did not control computational difficulty. As machines left the network, it likely became easier to solve computational puzzles.

Live testing is by far the best option. A closed system test could not completely replicate the live environment, and therefore did not provide the quality-control assurances that BF Labs required for its products. BF Labs did not use live testing for purposes of earning Bitcoins or for profit and its costs of testing were substantial. Any amount of Bitcoins obtained during testing from a miner was not material considering the costs incurred.

BF Labs did not identify particular customers' products prior to shipment. A customer did not own an interest in a miner (or future Bitcoins earned from it) until that

equipment was identified, labeled, and a shipping order prepared. BF Labs produced products in bulk and ordinarily fulfilled orders in the order received. If a defect was found in a tested miner, then the next available successfully tested unit was shipped to that next customer. No customer "waited" for an unsuccessfully tested machine to be fixed.

BF Labs also did not control the price of Bitcoins. Conversely, the price of Bitcoins dramatically affected, among other things, the demand for miners (as the price increased, more people wanted a miner and more quickly and, conversely, as the price dropped demand waned and/or customers demanded refunds despite BF Labs' continued expenses and investment in component parts), the availability of components, the size of BF Labs' workforce, and BF Labs' costs. Nevertheless, BF Labs continued in the face of volatile markets. As above, all Bitforce products were delivered or valid refunds paid. As to the Monarch line, BF Labs was in the process of making refunds or fulfilling orders when the FTC stepped in. In all, over 58,000 devices were shipped. Fewer than 2% were ever returned.

BF Labs' refund policies were appropriately disclosed. On numerous occasions, even though a refund request was not immediately available under the then-existing policies, BF Labs made exceptions. In total, over $17 million in refunds were paid.

Although BF Labs was for all intents and purposes a start-up company in a nascent industry, it had an adequate internal bookkeeping system and an outside professional accounting firm (Marks Nelson). BF Labs implemented controls to facilitate accurate financial reporting and accounting. Accounting systems in place generally allowed

transactions to be accurately booked. BF Labs has also completed its tax returns as required. After the United States District Court for the Western District of Missouri released BF Labs from the receivership, the company continued to pay refunds, ship products, pay expenses, and maintain cloud mining for its customers as much as possible. No employees, including Vleisides and Ownby, have been paid for months. The company-owned cars and house have been sold. All valuable unsecured assets have been or are in line to be liquidated to pay expenses. As a result, any judgment will be uncollectible.

     (1)     **Claims under Kansas Consumer Protection Act ("KCPA") (Against all Defendants)**

Defendants do not contest that BF Labs is a "supplier" under K.S.A. § 50-624(1).

Individual defendants Vleisides and Ownby are not "suppliers" under K.S.A. § 50-624(1).

No defendant has engaged in deceptive acts.

No defendant has engaged in unconscionable acts.

No defendant deprived plaintiffs or putative class members of material benefits.

Individual defendants as owners of BF Labs are not liable under the KCPA.

Any incorporated entity that purchased products is not a proper class member under the KCPA.

The alleged facts omitted or misrepresented were not material.

The alleged facts omitted or misrepresented were not facts that defendants were under a duty to disclose.

Defendants did not form an intention not to disclose the alleged omitted facts or misrepresentations.

Plaintiffs and putative class members did not rely on representations or omissions.

Plaintiffs and putative class members did not rely on identical or common representations or omissions.

Plaintiffs and putative class members lack evidence of causation.

Plaintiffs' claims are not submissible, evidence is not admissible, and evidence is speculative.

Plaintiffs' expert report and anticipated testimony as to materiality and/or falsehood of alleged representations or omissions is inadmissible and speculative.

(2)   <strong>Claims for Unjust Enrichment (Against all Defendants)</strong>

Defendants were not unjustly enriched.

Plaintiffs and putative class members entered into express contracts with BF Labs, thus precluding unjust enrichment claims.

Plaintiff Symington received a product from BF Labs for the money he paid to BF Labs.

Individual defendants Vleisides and Ownby did not accept, obtain, or receive any payment or other benefit from plaintiffs or putative class members and did not mine using plaintiffs' or putative class members' machines to obtain Bitcoins for themselves.

Individual defendants Vleisides and Ownby did not acknowledge receipt of any benefit from plaintiffs or putative class members, did not accept or receive any payments

from plaintiffs or any putative class members, and did not mine for Bitcoins using machines owned by plaintiffs or any putative class members.

Individual defendants Vleisides and Ownby are not liable as owners of BF Labs. Benefits, if any, to individual defendants Vleisides and Ownby occurred if at all only by reason of their ownership in BF Labs; however, plaintiffs have asserted no claim to pierce the corporate veil.

Defendant BF Labs has not mined using equipment owned by plaintiffs or any putative class members.

Plaintiffs' claims are not submissible, evidence is not admissible, and evidence is speculative.

Plaintiffs' claims for damages are speculative, based upon inadmissible evidence, and/or based upon inadmissible expert opinion.

(3)     **Claim for Conversion (Against BF Labs)**

Defendant BF Labs did not convert any payments received.

Plaintiffs' claim for conversion of money paid is not cognizable as money is fungible and no separate deposit or account was held.

Plaintiffs did not have any ownership interest in any Bitcoin mining equipment until such time as the equipment was shipped and delivered to plaintiffs.

Plaintiffs did not have an ownership interest in any particular or unmanufactured/unassembled miner.

Defendant BF Labs did not use any plaintiff's miner for its own use, benefit, or enrichment.

Plaintiffs' claims are not submissible, evidence is not admissible, and evidence is speculative.

Plaintiffs' claims for damages are speculative, based upon inadmissible evidence, and/or based upon inadmissible expert opinion.

(4)     **Damages**

Plaintiffs and putative class members have no valid claim for damages against the individual defendants.

Plaintiffs have suffered no cognizable damages, or all or part of any claim for damages is speculative. The price of Bitcoin is volatile and subject to fluctuation. Plaintiffs' expert testimony is flawed, unreliable, and speculative. The ability of any plaintiff to earn revenues or profits is speculative and dependent on multiple factors outside the control or influence of any defendant.

Plaintiffs are not entitled to an award of attorneys' fees.

Punitive damages are unwarranted as defendants did not act with malice, ill will, or recklessness.

Plaintiffs' claims for punitive damages are limited by Kansas and federal law.

(5)     **Class Certification**

Defendants do not contest the issue of numerosity.

Issues of law and fact are not common to all putative class members. Among other things, putative class members purport to have relied on statements or omissions at different times, communicated with BF Labs at different times, purport to have relied on statements made by BF Labs that were different at different times, made decisions to

purchase for different reasons at different times, and placed orders for different products at different times.

Plaintiffs' claims are not typical.

Plaintiffs are not adequate representatives.

Defendants do not contest the adequacy of counsel.

The proposed class definitions are overly broad, improper, and unworkable. Among other things, the proposed class definitions include persons who have no claim for relief or too broadly demarcate the claims for relief. The class definitions improperly include persons without standing. The class definitions improperly include persons who made decisions unrelated to the claims asserted.

Common issues of law and fact do not predominate.

A class action is not the appropriate, superior, or most efficient manner to resolve disputes. A class judgment likely will be uncollectible as to any defendant.

## 4.   LEGAL CLAIMS AND DEFENSES.

a.     **Legal Claims of Plaintiffs**.   Plaintiffs assert that they are entitled to recover upon the following theories:

<u>Count I: Violation of the KCPA (against all Defendants)</u>

Defendants violated K.S.A. § 50-626(b)(3) by willfully failing to state a material fact and/or willfully concealing, suppressing, or omitting a material fact, including:

i.      Vleisides was required, but did not obtain, the express approval of his probation officer prior to soliciting pre-order funds from customers;

16

ii.      the lack of sufficient capital to design, develop, and manufacture the advertised products;

iii.      the inability to design, develop, and manufacture the advertised products unless and until a certain number of pre-orders were received;

iv.      the advertised products were not in the final stage of development;

v.      the advertised products were not functional;

vi.      no final working prototype existed;

vii.      the lack of chips necessary to produce the advertised products;

viii.      shipping would not occur as represented, anywhere close to as represented, or ever;

ix.      shipping representations were not tied to the supply chain or engineering timeline;

x.      intent to design, develop, and manufacture miners for defendants' benefit;

xi.      intent to delay and/or avoid shipment of miners;

xii.      intent to delay and/or avoid providing refunds;

xiii.      the intent to keep the customers' prepayments and the products ordered;

xiv.      each miner is used on the live Bitcoin network for defendants' benefit prior to shipping;

xv.      even after sufficient testing had occurred, miners are used on the live Bitcoin network for defendants' benefit until replacement miners are manufactured;

xvi.     numerous miners were to be sent to Netsolus for self-mining instead of shipping to customers; and

xvii.    the general scheme as described in plaintiffs' contentions.

Defendants also violated K.S.A. § 50-627(a) by:

i.       denying customers' ability to receive a material benefit from the transaction, specifically by using miners for defendants' own enrichment prior to shipping and retaining the Bitcoins, which denied customers the use and benefit of equipment they already paid for, as well as increased the overall mining difficulty required to generate future Bitcoins; and

ii.      denying customers' ability to receive a material benefit from the transaction, specifically by keeping the prepayments, failing to ship the products ordered, and failing to provide a refund.

### Count II: Unjust Enrichment (against all defendants)

Defendants were unjustly enriched in that:

i.       Defendants have retained and used plaintiffs' money without paying for its value or increased value over time;

ii.      Defendants have retained the Bitcoins they mined using plaintiffs' mining equipment without paying for the use of plaintiffs' mining

equipment or the value or increased value of Bitcoins mined over time;

iii.    Defendants' acceptance and retention of the money and/or Bitcoins, and use of plaintiffs' mining equipment and retention of Bitcoins mined therefrom, without paying for its value, is inequitable because:

    i.    defendants have either not provided the mining equipment it promised to ship to plaintiffs in exchange for the money paid by plaintiffs or have used the equipment for defendants' own enrichment, to plaintiffs' detriment, before providing the equipment;

    ii.    even if defendants immediately provided the mining equipment to plaintiffs, the equipment is now essentially worthless to plaintiffs;

    iii.    the money and Bitcoins retained by defendants have increased in value over time;

    iv.    Plaintiffs never gave defendants permission to use their mining equipment to mine Bitcoins for themselves or for anyone else;

    v.    Defendants have benefitted from the increase in value in money and Bitcoins over time and have used this money and Bitcoins to purchase houses and cars, to make loans, to

exchange into dollars, to pay expenses, and/or to develop and manufacture mining equipment for their own use and benefit; and

vi.    Defendants' retention of the money and/or Bitcoins over time has resulted in additional profits from mining that could have been earned by plaintiffs had defendants timely shipped the mining equipment to plaintiffs.

Count III: Conversion (against BF Labs)

Defendant is liable for conversion in that:

i.    Plaintiffs never authorized defendant to keep and use their Bitcoin mining equipment to mine Bitcoins for defendant's own use, benefit, and enrichment; and

ii.    Plaintiffs demanded defendant to return their money and the Bitcoins mined by defendant using their miners, but to no avail.

**b.**    **Defenses of Defendants**.  Defendants assert the following defenses:

(1)    Plaintiffs' and/or one or more alleged alleged putative class members' claims are barred as plaintiffs or the alleged alleged putative class members accepted the terms of their pre-order and understood that all sales were final and that there was a backlog of orders and production and delivery of any order may take two months or longer.

(2)    Plaintiffs' and/or one or more alleged alleged putative class members' claims are barred because BF Labs "FAQ" website states it reserves "the right

to handle refund requests on a case by case basis" and pre-ordered products are non-refundable as is clearly stated at the time of purchase.

(3)     Plaintiffs' and/or one or more alleged putative class members' claims are barred because plaintiffs and/or one or more alleged putative class members understood that deliveries may take two months or more after order.

(4)     Plaintiffs' and/or one or more alleged putative class members' claims are barred because plaintiffs and/or one or more alleged putative class members expressly agreed to a pre-order arrangement, knowing delay would be two months or longer and BF Labs was unable to make any representation regarding the length of delay.

(5)     Plaintiffs' and/or one or more alleged putative class members' claims are barred as the products in question are designed and manufactured in accordance with the standards in the industry.

(6)     Plaintiffs' and/or one or more alleged putative class members' claims are barred because the products in question underwent burn testing for a minimal amount of time and had not be assigned to a customer order at the time of the burn testing.

(7)     Plaintiffs' and/or one or more alleged putative class members' claims are barred because untested products are not finished goods and could not be customers' equipment.

(8)     Plaintiffs' and/or one or more alleged putative class members' claims are barred pursuant to K.S.A. 84-2-501, in that the products in question were not identified in any contract at the time of the pre-order.

(9)     Plaintiffs' and/or one or more alleged putative class members' claims are barred because burn testing was done to warrant the product as fit and suitable for the purposes for which it is sold.

(10)     Plaintiffs' and/or one or more alleged putative class members' claims are barred because defendants exercised reasonable care to prevent and promptly correct any delays that plaintiffs and/or one or more alleged putative class members complain of.

(11)     Plaintiffs' and/or one or more alleged putative class members' alleged damages request cannot be sustained as unconscionable.

(12)     Each and every claim contained in plaintiffs' complaint fails to state a claim upon which relief can be granted.

(13)     Plaintiffs' and/or one or more alleged putative class members' claims for damages are barred in whole or in part because plaintiffs or alleged putative class members have suffered no damages.

(14)     Plaintiffs' and/or one or more alleged putative class members' claims are barred in whole or in part based on the doctrine of election of remedies.

(15)     Plaintiffs' and/or one or more alleged putative class members' claims are barred by reason of plaintiffs' breaches or failures to perform conditions precedent or subsequent.

(16)     Plaintiffs' and/or one or more alleged putative class members' claims are barred by reason of plaintiffs' and/or one or more alleged putative class members' unclean hands.

(17)    Plaintiffs' and/or one or more alleged putative class members' alleged damages, which are denied, were caused by intervening and superseding acts over which defendants had no control or right of control, thereby barring or diminishing plaintiffs' and/or one or more alleged putative class members' alleged right of recovery.

(18)    The damages claimed by plaintiffs and/or one or more alleged putative class members are not recoverable, in whole or in part, under Kansas or federal law.

(19)    Plaintiffs' and/or one or more alleged putative class members' claims are barred by a prior settlement and/or release of those claims or are barred to the extent plaintiffs and/or one or more alleged putative class members have entered into an accord and satisfaction or otherwise compromised their claims.

(20)    Defendant BF Labs is entitled to the benefit of all defenses and presumptions contained in, or arising from the Kansas Uniform Commercial Code.

(21)    Defendants' actions were neither the cause in fact nor the proximate cause of plaintiffs' and/or one or more alleged putative class members' injuries, if any.

(22)    Plaintiffs' and/or one or more alleged putative class members' claims are barred, in whole or in part, by the equitable doctrines of waiver and estoppel.

(23)    Plaintiffs' and/or one or more alleged putative class members' claims are barred by the doctrine of justification.

(24)    Plaintiffs' and/or one or more alleged putative class members' claims are barred, in whole or in part, by the doctrine of ratification.

(25)    Plaintiffs' and/or one or more alleged putative class members' claims are barred by all applicable statutes of limitation.

(26)    Plaintiffs' and/or one or more alleged putative class members' claims are barred to the extent plaintiffs or alleged putative class members entered into an accord and satisfaction or otherwise compromised their claims.

(27)    Plaintiffs' and/or one or more alleged putative class members' claims are barred by the doctrines of repudiation and anticipatory breach.

(28)    Plaintiffs' and/or one or more alleged putative class members' claims are barred to the extent plaintiffs prevented BF Labs or Individual Defendants from performing.

(29)    Plaintiffs' and/or one or more alleged putative class members' claims are barred to the extent that any such person received, accepted, and/or benefited from his, her, or its transactions with defendants. Any claim to hold defendants liable or responsible to such persons who received the benefits of their transactions including but not limited to the bitcoin miners of which such persons had possession and opportunity to use is unjust, inequitable, and supportable in fact, law, or equity.

(30)    Plaintiffs' and/or one or more alleged putative class members' claims are barred based on plaintiffs' or alleged putative class members' rejection of goods, as well as plaintiffs' or alleged putative class members' revocation of acceptance of goods.

(31)    Plaintiffs and/or one or more alleged putative class members have failed to mitigate their damages, if any, or otherwise take reasonable steps to minimize or

prevent the damages Plaintiffs and/or one or more alleged putative class members claim to have suffered. Plaintiffs and/or one or more alleged putative class members also, once they realized a claim existed, were under an obligation to minimize their alleged loss, if any. As a result, any recovery against defendants should be barred, reduced, or offset accordingly.

(32)    Plaintiffs' and/or one or more alleged putative class members' damages should be reduced as an offset by any amount received by any other payment to mitigate damages.

(33)    To the extent any alleged putative class member has settled or does settle claims, then defendants are entitled to a set-off of amounts paid.

(34)    Plaintiffs' and/or one or more alleged putative class members' punitive damage claims are barred by applicable provisions of the Kansas and/or United States Constitutions.

(35)    Plaintiffs' and/or one or more alleged putative class members' claims for punitive damages are barred and must be dismissed on the following grounds:

i.      The standard by which defendant's conduct is to be determined as alleged by plaintiffs and/or one or more alleged putative class members for claimed "punitive damages" is vague and wholly arbitrary and as such denies due process in violation of the Kansas Constitution, the Fifth and Fourteenth Amendments of the United States Constitution, and the state constitutions of the states in which one or more alleged putative class members reside.

ii.      The standards for determining the amount of "punitive damages" are vague, supplying no notice to defendants of the potential repercussions of any conduct, and are subject to the unbridled discretion of the jury thereby denying due process under the Kansas Constitution, the United States Constitution, and the state constitutions of the states in which any one or more alleged putative class members reside.

iii.      Plaintiffs' and/or one or more alleged putative class members' request for "punitive damages" constitutes a request for and/or imposition of an excessive fine in violation of the Kansas Constitution, the Eighth Amendment of the United States Constitution, and the state constitutions of the states in which one or more alleged putative class members reside.

iv.      Plaintiffs' and/or one or more alleged putative class members' request for "punitive damages" against defendants constitutes a denial of equal protection under the law in violation of the Kansas Constitution and the Fifth and Fourteenth Amendments of the United States Constitution, and the state constitutions of the states in which one or more alleged putative class members reside, in that defendants' wealth or net worth may be considered by the jury in determining the amount of punitive damage award.

v.      Plaintiffs' and/or one or more alleged putative class members' request for punitive damages against defendant subjects defendant to multiple punishments for the same alleged wrong, thereby denying due process under the Kansas Constitution, the Fifth and Fourteenth Amendment to the United States Constitution, and

the state constitutions of the states in which one or more alleged putative class members reside.

vi.     Plaintiffs' and/or one or more alleged putative class members' punitive damage claims are barred and fail in that they require strict proof and must be established by clear and convincing evidence, which is absent from the case as a matter of law.

vii.    There can be no punitive damages assessed in an action in a Kansas court based upon conduct, even if found to be unlawful, outside the state of Kansas.

viii.   As a matter of law, there can be no punishment for legal conduct.

(36)    Plaintiffs' and/or one or more alleged putative class members' claims for class certification fail as a matter of law as the prerequisite elements under Fed. R. Civ. P. 23 are missing and plaintiffs and/or one or more alleged putative class members cannot prove the elements required.

## 5.     DAMAGES AND NON-MONETARY RELIEF REQUESTED.

### Count I:  Violation of the Kansas Consumer Protection Act (against all Defendants)

Plaintiff Kyle Alexander seeks actual damages of $415.99, and punitive damages in whatever amount the jury deems appropriate. If plaintiff Kyle Alexander is successful at trial, he anticipates seeking an award of attorneys' fees pursuant to K.S.A. § 50-634.

Plaintiff Dylan Symington seeks actual damages of $1,834.53, and punitive damages in whatever amount the jury deems appropriate. If plaintiff Kyle Alexander is successful at trial, he anticipates seeking an award of attorneys' fees pursuant to K.S.A. § 50-634.

Plaintiffs' expert Dr. Ward has provided an equation by which each class member's actual damages may be reasonably calculated.

### Count II: Unjust Enrichment (against all Defendants)

Plaintiff Kyle Alexander seeks actual damages of $107.99.

Plaintiff Dylan Symington seeks actual damages of $501.53, plus a minimum of .0772 Bitcoins multiplied by the market value of 1 Bitcoin (valued at $391.00 as of Nov. 4, 2015).

Plaintiffs' expert Dr. Ward has provided an equation by which each class member's actual damages (money losses) may be reasonably calculated. Plaintiffs' expert Dr. Sherman has provided a chart by which each class member's actual damages (Bitcoin losses) may be reasonably calculated.

### Count III: Conversion (against BF Labs)

Plaintiff Kyle Alexander seeks actual damages of $74.74.

Plaintiff Dylan Symington seeks actual damages of $320.00 plus a minimum of .0772 Bitcoins multiplied by the market value of 1 Bitcoin (valued at $391.00 as of Nov. 4, 2015).

Plaintiffs' expert Dr. Ward has provided an equation by which each class member's actual damages (money losses) may be reasonably calculated. Plaintiffs' expert

Dr. Sherman has provided a chart by which each class member's actual damages (Bitcoin losses) may be reasonably calculated.

**6.      AMENDMENTS TO PLEADINGS.**

None.

**7.      DISCOVERY.**

Discovery is complete. However, if plaintiffs' motion for class certification is granted by the court, then plaintiffs intend to file a motion for leave to modify the scheduling order so that their experts, Dr. Ward and Dr. Sherman, would be given 45 days to supplement their reports to include a calculation for damages of the certified class based on the certified class definition; defendants plan to object to any such motion.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.   Although discovery may be conducted beyond the deadline for completion of discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.      MOTIONS.**

**a.        Pending Motions**.

i.        Defendants Vleisides and Ownby's motion to dismiss (**ECF doc. 129**), which was filed on September 25, 2015, and which has been fully briefed (*see* ECF docs. 130, 132, and 133).

      ii.      Plaintiffs' motion for class certification **(ECF doc. 137)**, which was filed on November 23, 2015.

**b.**    **Additional Pretrial Motions**. After the pretrial conference, the parties intend to file the following motions:

      i.      Plaintiffs intend to file a motion to approve proposed class notices and method of notice should class certification be granted.  Plaintiffs intend to file a motion challenging the admissibility of expert testimony by witnesses designated by defendants. Plaintiffs also intend to file motions *in limine* should the matter proceed to trial.

      ii.      Defendants intend to file at least a dispositive motion and motions *in limine*, including to challenge the admissibility of testimony of plaintiffs' experts, should the matter proceed to trial.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **December 30, 2015**.

The parties should follow the summary-judgment guidelines available on the court's website:

http://www.ksd.uscourts.gov/summary-judgment/

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

c. **Motions Regarding Expert Testimony**. All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed by **December 30, 2015**.

9. **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **August 8, 2016, in Kansas City, Kansas**. This case will be tried by jury. Trial is expected to take approximately 5-10 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge will convene another pretrial conference to discuss, among other things, the setting of deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, and proposed jury instructions.

IT IS SO ORDERED.

Dated December 3, 2015, at Kansas City, Kansas.


 s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge

## CERTIFICATE OF SERVICE

Counsel are hereby notified that, unless the undersigned Magistrate Judge receives objections, corrections, or revisions to the foregoing proposed pretrial order by the **7th day of December, 2015,** it will be signed and filed.  If revisions are requested, counsel shall state in writing on a separate document in letter form the requested revision, identifying the paragraph number and the reason for such revision, and serve on opposing counsel and to the Magistrate Judge.  Counsel shall confer about all such revisions before communicating them to the Magistrate Judge.  Counsel are encouraged (but not required) to submit jointly any requests for revisions.  At a minimum, written requests for revisions shall state whether opposing counsel consents or objects, and summarize the bases of all objections.  All such requests for revisions shall be submitted via e-mail to:

*ksd_ohara_chambers@ksd.uscourts.gov*

This proposed pretrial order was served on November 25, 2015, on the following:

| | |
|---|---|
| Aristotle N. Rodopoulos | ari@woodlaw.com |
| Mark A. Olthoff | molthoff@polsinelli.com |
| Michael S. Foster | mfoster@polsinelli.com |

 s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge