## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **KYLE ALEXANDER and** | ) | |
| **DYLAN SYMINGTON,** | ) | |
| **on behalf of themselves and all those** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 14-2159-KHV** |
| **BF LABS INC., d/b/a BUTTERFLY LABS,** | ) | |
| **SONNY C. VLEISIDES** | ) | |
| **and JEFF OWNBY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

### MEMORANDUM AND ORDER

Plaintiffs Kyle Alexander and Dylan Symington bring this class action on behalf of all persons who prepaid BF Labs for bitcoin mining machines between June 23, 2012 and July 17, 2014. Plaintiffs assert claims against BF Labs, Sonny C. Vleisides and Jeff Ownby under the Kansas Consumer Protection Act, K.S.A. § 50-626(b)(3) and K.S.A. § 50-627(a) ("KCPA"). Plaintiffs also bring unjust enrichment claims under Kansas common law. In addition, against BF Labs, plaintiffs assert a common law claim of conversion.[1] This matter comes before the Court on plaintiffs' unopposed Motion For Preliminary Approval Of Settlement (Doc. #150) filed April 20, 2016. Plaintiffs seek preliminary class certification, preliminary settlement approval, preliminary approval of the proposed class notice to the class and appointment of lead class counsel. For reasons set forth below, the Court overrules plaintiffs' motion.

---

[1] Plaintiffs named as defendants two additional individuals, Josh Zerlan and Nasser Ghoseiri. Zerlan was Operations Manager/Chief Operating Officer/Vice President of Product Development for BF Labs. Ghoseiri was a founder of BF Labs. Plaintiffs have been unable to secure service of process on Zerlan and Ghoseiri and therefore have abandoned the claims against them. See Pretrial Order (Doc. #140) filed December 3, 2015 at 1.

**Factual And Procedural Background**

Plaintiffs allege the following facts:

BF Labs is a Wyoming corporation with its principal place of business in Kansas.  Sonny Vleisides resides in Kansas and is Innovation Officer/Vice President of Product Development of BF Labs.  Jeff Ownby resides in Illinois and is Vice President of Marketing and Ecommerce of BF Labs.  Vleisides and Ownby, together with Nasser Ghoseiri, founded BF Labs in July of 2011. Together, these three individuals own 94 per cent of shares of BF Labs.

BF Labs manufactures specialized computer equipment and processors to mine bitcoins, a type of digital currency.  The bitcoin network is a peer to-peer payment network created in 2009. It uses digital currency known as "Bitcoin."  The bitcoin network is decentralized; no authority oversees its operation, and it uses open-source encryption software for transactions.[2]  The network uses cryptography to create and control the currency.  Bitcoins are created by "mining," a process where "miners" receive transaction fees and newly minted bitcoins in return for verifying and recording payments in a public ledger.[3]  By design, mining is a computationally intensive process

---

[2]     Unlike traditional currency, bitcoins are not issued by a government or central banking authority.

[3]     More specifically, bitcoin works as follows:

Bitcoin miners are incentivized to process payment transactions by allowing miners to create new Bitcoins for themselves based on the number of "blocks" discovered. Blocks are files containing data regarding Bitcoin transactions that have yet to be recorded in the public ledger, and are discovered by calculating a SHA256 hash, an algorithm that is very difficult to solve, over and over again until the miner finds an input that matches an expected output.  Since a miner's chances of discovering a Bitcoin relative to another miner is based on the miner's hash rate relative to the total hash rate of all Bitcoin miners on the network, miners are continuously seeking to increase their rate of processing through acquisition of the latest technology.

(continued...)

that becomes more difficult over time. Further, the faster one is able to mine bitcoins, the more money one may make.[4] As the difficulty of bitcoin mining has increased, the computer hardware required to profitably mine bitcoin has advanced from general purpose CPUs (found in common desktop computers) to high-end GPUs (often found in gaming computers), to FPGAs (field-programmable gate arrays), and ultimately to ASICs (application-specific integrated circuits) built to perform the calculations necessary for bitcoin mining.

In 2012, defendants set out to develop, market and sell ASIC hardware, which the parties refer to as bitcoin mining machines. Defendants announced that they had acquired venture capital to develop the products, but they had actually raised only $8,000. BF Labs advertised for "pre-order" of products that it hoped to design and manufacture. BF Labs willfully failed to state and/or omitted multiple material facts, including that (1) the advertised two months for delivery was not tied to the supply chain or engineering timeline, (2) it had no final prototype and (3) it intended to keep the payments and use the products which customers ordered for its own benefit before or in lieu of shipping the products.

---

[3](...continued)
However, because the difficulty of Bitcoin mining is continually adjusted based on the rate at which blocks are created, a Bitcoin mining computer continually becomes less valuable over time, as it becomes relatively less efficient at processing Bitcoin blocks. Eventually, without upgrading technology, the electricity required for processing will cost a miner more than the Bitcoin computer is able to generate.

Morici v. Hashfast Techs LLC, No. 14-cv-00087-EJD, 2015 WL 906005, at *2 (N.D. Ca. Feb. 27, 2015) (internal quotations and citation omitted).

[4]        In November of 2013, one bitcoin was worth more than $1,000; in March of 2014, the value fell to $613. By August of 2015, one bitcoin could be exchanged for an average of $233.48.

Shortly after BF Labs advertised its bitcoin mining machines, customers began to order them. BF Labs required customers to pre-pay their entire orders. To entice customers to place orders, BF Labs advertised that it had begun shipping or would soon ship the products, even though it did not know whether it would receive sufficient funds to develop or manufacture the advertised products. Specifically, on June 23, 2012, BF Labs began soliciting orders for "ASIC 65 NM" bitcoin miners. On August 17, 2013, BF Labs began soliciting orders for "ASIC 28 NM" bitcoin miners. Once BF Labs manufactured the products, it operated them on the live bitcoin network for its own benefit before shipping them to customers, until it manufactured additional products.[5]

In June of 2013, Kyle Alexander paid BF Labs $308 for a bitcoin mining machine. In July of 2013, Alexander inquired about his order and BF Labs replied that "shipping has begun." Over the next several months, Alexander continued to inquire about his order and BF Labs repeatedly told him that "shipping has begun." He demanded a refund on multiple occasions but never received a refund or the product that he had ordered.

In April of 2013, Dylan Symington ordered a bitcoin mining machine for which he paid $1,333. In September of 2013, he inquired about his order and why he had not yet received the equipment. Nearly seven months after he placed the order, BF Labs shipped him a defective machine

---

[5] Instead of shipping the completed bitcoin mining hardware to customers who had pre-paid for the equipment, BF Labs utilized completed bitcoin mining hardware to earn income for itself under the guise of "testing" such hardware. BF Labs represented that it did not mine bitcoins for itself, but without authorization or permission, BF Labs mined bitcoins for itself using customer equipment on the live bitcoin network for hours, days or longer – even though the equipment only required ten to 30 minutes of testing and could have been tested on "test.net" (which enables the equipment to be tested without being used). This "testing" enriched BF Labs at the detriment of its customers by denying customers the use and benefit of equipment for which they had already paid and increasing the overall mining difficulty required to generate future bitcoins.

that was essentially obsolete due to the passage of time. Symington demanded a refund and the bitcoins that defendants had mined on his machine, but BF Labs never gave him a refund or any bitcoins.

BF Labs collected over $25 million in customer pre-payments.[6] Even after mining units became effectively obsolete due to the length of time customers had waited for the products, and even if the customers refused delivery, BF Labs would not give refunds. Many customers who pre-paid for a product have not received either the product or a refund.

On April 4, 2014, Alexander and Symington filed this class action lawsuit asserting claims under the KCPA and claims for unjust enrichment and conversion. Specifically, plaintiffs allege that before shipping the machines, defendants used bitcoin mining equipment for their own benefit, even though BF Labs publicly represented that it did not do so. Plaintiffs allege that BF Labs omitted facts material to class members' decisions to order from BF Labs or to request refunds, and that BF Labs uniformly refused or failed to provide refunds to class members who did not receive products, even after the products became effectively obsolete due to passage of time.

Defendants have vigorously contested, and continue to deny, plaintiffs' claims. After extensive litigation and discovery, the parties mediated the case. Plaintiffs and BF Labs have agreed to a proposed settlement.[7]

Plaintiffs ask the Court to preliminarily certify a settlement class, approve the settlement and

---

[6]     BF Labs ended its pre-order scheme on July 17, 2014.

[7]     The settlement agreement states that the parties have not resolved plaintiffs' claims against Vleisides and Ownby, but that plaintiffs believe that a settlement with BF Labs is in the best interest of the class because the individual defendants are unable to pay a settlement or judgment. See Doc. #150-1 at 5.

approve the proposed notice to the class.  They request certification of the following settlement class:

> All customers who prepaid BF Labs Inc. for ASIC 65 NM generation products or ASIC 28 NM generation products between June 23, 2012 and July 17, 2014. Excluded from the class shall be BF Labs Inc. and any shareholder, director, officer, or employee of BF Labs Inc. and their immediate family members; the Court and Court personnel; counsel of record for BF Labs; counsel of record for the Named Plaintiffs; and any customer who has settled with BF Labs Inc. prior to the Effective Date of this Agreement.

Doc. #151 at 1; Doc. #150-1 at 10-11.

The settlement agreement states that BF Labs has filled orders for more than 50,000 bitcoin machines and refunded over $20 million dollars to customers who requested refunds.  As of October 31, 2015, BF Labs had not filled requests from 1,541 customers seeking $7,803,863 in refunds.  BF Labs projects that customers will request additional refunds of approximately $221,101. Therefore, the current and projected future refund requests will total approximately $8,024,964. Plaintiffs' counsel has investigated the financial condition of BF Labs and determined that BF Labs currently has insufficient assets to satisfy the refund requests, any class-wide settlement or any jury verdict.

Under the settlement agreement, if BF Labs receives sufficient funds on or before May 1, 2017, it will provide a full refund to all customers who pre-paid BF Labs and have not received products or refunds, and make specified payments to class members who have received products or refunds, as follows:

> Subclass d.1, which includes customers who did not receive a product or a refund, will receive a full refund.  These customers will not be required to submit a claim form to receive settlement benefits.

> Subclass d.2, which includes customers who received a refund and who submit a valid claim form, will receive $5 each.

Subclass d.3, which includes customers who received a product and who submit a valid claim form will receive from $5 to $225 based on the type of product.

Doc. #150-1 at 12-14; 43. If BF Labs does not produce enough income to make full payment, it will make payments on a priority basis. Specifically, if as of May 1, 2017, BF labs does not have sufficient funds to pay all members of the d.1 subclass, BF labs will pay each member of the d.1 subclass a pro rata share of the amount owed after paying a prorated amount of incentive fees, expenses and attorneys' fees awarded by the Court.[8] If BF Labs is able to pay the full amount of incentive awards, expenses and attorneys' fees and a full refund to all d.1 subclass members, but has insufficient funds to completely pay the d.2 and d.3 categories, it will pay a prorated amount of the

---

[8]     As summarized below, the settlement agreement provides that BF Labs will pay incentive awards to named plaintiffs, expenses and attorneys' fees.

In recognition of services rendered for the benefit of the BF Labs settlement class, the named plaintiffs may petition the Court for an incentive award not to exceed $1,000 each. The amount of any incentive award shall be deducted from the potential settlement funds and paid before or simultaneous with any settlement payment to subclass d.1 on a pro rata basis and deducted from the d.1 settlement amount. For example, if BF Labs pays one-half of the total amount to be refunded to d.1 class members, it shall pay one-half of the approved incentive award to named plaintiffs before or simultaneous to such d.1 settlement payment.

Plaintiffs' counsel may petition the Court for an award of litigation expenses and/or court costs not to exceed $55,000. The amount of any award of litigation expenses and/or court costs approved by the Court shall be deducted from the potential settlement funds and paid before or simultaneous with any settlement payment to subclass d.1 on a pro rata basis and deducted from the d.1 settlement amount. For example, if BF Labs pays one-half of the total amount to be refunded to subclass d.1, it shall pay one-half of the approved litigation expenses and/or court costs to plaintiffs' counsel before or simultaneous with payments to subclass d.1.

The settlement agreement provides that plaintiffs' counsel may petition the Court for an award of attorneys' fees not to exceed $400,000. Any award of attorneys' fees approved by the Court shall be deducted from the potential settlement funds and paid before or simultaneous with payment to the d.1 subclass on a pro rata basis and deducted from the d.1 settlement amount. For example, if BF Labs pays one-half of the total amount to be refunded to d.1 subclass members, it shall pay one-half of the approved attorneys' fees to plaintiffs' counsel before or simultaneous with payments to subclass d.1.

settlement funds to the d.2 and d.3 class members.

If BF Labs fails to make full payment to any class members, the Court will enter judgment against BF Labs in the amounts that remain unpaid.  See Settlement Agreement § 4.e. Settlement class members who do not exclude themselves will be required to release all claims and potential claims against BF Labs. Settlement Agreement § 6.a.

## Analysis

Plaintiffs seek an order that: (1) preliminarily certifies a settlement class; (2) preliminarily approves the proposed settlement with BF Labs; (3) approves and directs notice to the settlement class; (4) appoints settlement class counsel; and (5) sets a date and time for a fairness hearing. BF Labs does not oppose the motion.

As noted above, plaintiffs bring claims against BF Labs under the KCPA and Kansas common law claims for unjust enrichment and conversion.

### KCPA Claims

The KCPA prohibits deceptive acts or practices in connection with a consumer transaction. K.S.A. § 50-626(a).   Deceptive acts or practices include a wide variety of knowing misrepresentations, see Section 50-626(a)(1), and willful failure to state a material fact, see Section 50-626(a)(3).  Plaintiffs allege that defendants violated K.S.A. § 50-626(b)(3) by willfully failing to state a material fact and/or willfully concealing, suppressing or omitting material fact, including that (1) the advertised delivery time was not tied to supply chain or engineering timelines, (2) it had no final prototype, (3) it intended to keep both the customers' money and the products ordered and (4) it  used the products for its own benefit and enrichment before and/or in lieu of shipping.

To prevail on their willful omission claim under Section 50-626(b)(3), plaintiffs must show

that: (1) plaintiffs and class members were consumers under the KCPA, (2) defendant was a supplier under the KCPA, (3) defendant willfully omitted a fact about a purchase or sale, and (4) the fact which defendant stated or concealed was material. Cole v. Hewlett Packard Co., No. 90,164, 2004 WL 376471, at *7 (Kan. Ct. App. Feb. 27, 2004). In the case of concealment, plaintiffs also must show that defendant had a duty to disclose the material fact. OMI Holdings, Inc. v. Howell, 260 Kan. 305, 347, 918 P.2d 1274, 1300-01 (1996). Under the KCPA, a supplier has a duty to disclose a material fact if it knows that the consumer is entering into a transaction under a mistake about the material fact, and the consumer would reasonably expect disclosure of such material fact based on the relationship between the consumer and the supplier, the customs and trade or other objective circumstances. Id.

The KCPA prohibits suppliers from engaging in any unconscionable act or practice in connection with a consumer transaction. K.S.A. § 50-627(a). Plaintiffs also allege that defendant violated K.S.A. § 50-627(a) by preventing them from receiving a material benefit from a transaction by: (1) using miners for defendant's own enrichment before shipping and retaining the bitcoins, which denied customers the use and benefit of equipment they had paid for and made it more difficult to generate future bitcoins; and (2) keeping the pre-payments, failing to ship the products ordered and failing to provide refunds. To prevail on their claim under Section 50-627(a), plaintiffs must show that (1) plaintiffs and the class members were consumers under the KCPA, (2) defendant was a supplier under the KCPA and (3) defendant committed unconscionable acts or practices.

Unjust Enrichment

Plaintiffs assert that BF Labs was unjustly enriched when it retained and used their money while retaining bitcoins it mined using their mining equipment without paying for use of the

equipment.  Plaintiffs assert that the mining equipment is now essentially worthless to them and that the money and bitcoins which defendant retained have increased in value over time.  To prevail on their claim of unjust enrichment, plaintiffs must establish that: (1) plaintiffs conferred a benefit on defendant; (2) defendant knew and received a benefit; and (3) defendant retained the benefit under circumstances that make it unjust.  Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd., 259 Kan. 166, 177, 910 P.2d 839, 847 (1996); see Spires v. Hosp. Corp. of Am., 289 Fed.Appx. 269, 270 (10th Cir. 2008).

Conversion

Plaintiffs assert that BF Labs is liable for conversion because they never authorized it to keep and use their bitcoin mining equipment to mine bitcoins for its own use, benefit and enrichment; and because BF Labs refused to return their money or to give them the bitcoins which it mined using their equipment.

Under Kansas law, "conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."  Bomhoff v. Nelnet Loan Servs., Inc., 279 Kan. 415, 421, 109 P.3d 1241, 1246 (2005). To prevail on a conversion claim, plaintiffs must prove that: (1) they possessed a right in the goods or personal chattels; and (2) defendant exercised control over the goods or chattel to the exclusion of their right.  See In re Bratt, 491 B.R. 572, 578 (Bankr. D. Kan. 2013); Bank v. Parish, 46 Kan. App.2d 422, 433, 264 P.3d 491, 498 (2011).

# I.  Preliminary Settlement Class Certification

## A.  Class Certification Standards

The class action is an exception to the usual rule that litigation is only conducted by and on

behalf of individual named parties.  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550 (2011).

Whether to certify a class is left to the broad discretion of the trial court.  See Shook v. El Paso Cty.,

386 F.3d 963, 967 (10th Cir. 2004).  The Court must conduct a rigorous analysis to determine

whether the parties seeking certification have shown that the putative class satisfies the prerequisites

of Rule 23.  Dukes, 131 S. Ct. at 2551.  While Rule 23 does not give the Court license to conduct

free-ranging merits inquiries at the certification stage,  the Court may consider the merits of a suit

"to the extent – but only to the extent – that they are relevant to determining whether the Rule 23

prerequisites are satisfied."  Amgen, 133 S. Ct. at 1194-95.

As the party seeking class certification, plaintiffs have the burden to prove that the

requirements of Rule 23 are met.  D. Kan. Rule 23.1(d); Shook, 386 F.3d at 968; see Dukes, 133

S. Ct. at 2553 (citing Gen. Tel. Co. v. Falcon, 457 U.S. 147, 159 (1982)).  Under a strict burden of

proof, plaintiffs must affirmatively demonstrate that the requirements of Rule 23 are clearly satisfied.

Dukes, 131 S. Ct. at 2551; Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  Plaintiffs must

first satisfy the prerequisites of Rule 23(a), that is, they must demonstrate that: (1) the  class is so

numerous that joinder of all members is impracticable, (2) questions of law or fact are common to

the class, (3) the claims of the representative parties are typical of the claims of the class and (4) the

representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ.

P. 23(a).  After meeting these requirements, plaintiffs must demonstrate that the proposed class

action fits within one of the categories described in Rule 23(b), Fed. R. Civ. P.

Plaintiffs seek to proceed under Rule 23(b)(3), which requires that "questions of law or fact

common to class members predominate over any questions affecting only individual members and

that a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3).  In determining predominance and superiority under Rule

23(b)(3), the Court considers the following factors:

> (A)   the class members' interests in individually controlling the prosecution or
> defense of separate actions;
> (B)   the extent and nature of any litigation concerning the controversy already
> begun by or against class members;
> (C)   the desirability or undesirability of concentrating the litigation of claims in
> the particular forum; and
> (D)   the likely difficulties in managing the action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).  In deciding whether to certify a settlement class, the Court need

not inquire whether the case, if tried, would present difficult management problems under

Rule 23(b)(3)(D).  See Amchem Prods. v. Windsor, 521 U.S. 591, 620 (1997).  All of the other

requirements apply, however, and demand heightened attention in the settlement context.  Id.  Such

attention is vital because in the settlement context, the Court generally lacks an opportunity to adjust

the class as it becomes informed by the proceedings as they unfold.  See id.

## B.     Rule 23(a) Requirements

Plaintiffs seek conditional certification of the following settlement class:

**All customers who prepaid BF Labs Inc. for ASIC 65 NM generation products
or ASIC 28 NM generation products between June 23, 2012 and July 17, 2014.**

Excluded from the class shall be BF Labs Inc. and any shareholder, director, officer,
or employee of BF Labs Inc. and their immediate family members; the Court and
Court personnel; counsel of record for BF Labs; counsel of record for the Named
Plaintiffs; and any customer who has settled with BF Labs Inc. prior to the Effective
Date of this Agreement.

Class Action Settlement And Release Agreement (Doc. #150-1) filed April 20, 2016, at 10-11; see

Memorandum In Support Of The Motion For Preliminary Approval Of Settlement (Doc. #151) filed

April 20, 2016 at 1.

1.     Numerosity

Rule 23(a)(1) requires plaintiffs to show that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); see Trevizo, 455 F.3d at 1162.  They must therefore produce some evidence or otherwise establish by reasonable estimate the number of class members that may be involved.  See Rex v. Owens ex rel. State of Okla., 585 F.2d 432, 436 (10th Cir. 1978).  This is a fact-specific inquiry and the Court has no set formula for determining whether plaintiffs meet this requirement.  Trevizo, 455 F.3d at 1162; Rex, 585 F.2d at 436.

Plaintiffs state that the putative settlement class includes approximately 21,590 members. Memorandum In Support (Doc. #151) at 14-15.  Based on this representation, plaintiffs have satisfied the numerosity requirement.  See Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. 312, 379, 436 (D.N.M. 2014) (although no strict numerical test, "per se numerosity threshold seems to exist somewhere south of 150 proposed class members") (citing Mullen v. Treasure Chest Casino, LCC, 186 F.3d 620, 624 (5th Cir. 1999) (class of 100 to 150 members within range that generally satisfies numerosity requirement)).

2.     Commonality

Rule 23(a)(2) requires plaintiffs to show that "questions of law or fact are common to the class." Fed. R. Civ. P. 23(a)(2).  Merely raising common questions, however, does not automatically satisfy the commonality requirement.  See Dukes, 131 S. Ct. at 2551.  Plaintiffs must demonstrate that they have suffered the same injury, and their claims must rely on a common contention that is capable of classwide resolution.  Id.  A question is "common" if its truth or falsity will resolve an issue that is central to the validity of every claim in one stroke.  Id.  To satisfy Rule 23(a)(2), a single common question will do.  Id.  The commonality requirement of Rule 23(a) is satisfied "when the

13

legal question linking the class members is substantially related to the resolution of the litigation." DeBoer v. Mellon Mortg. Co., 64 F.3d 1171, 1174 (8th Cir. 1995)).

Here, common questions are clear.  Plaintiffs allege that BF Labs misrepresented its capabilities to deliver products and the timing of deliveries.  Plaintiffs contend that before shipping, BF Labs uniformly used bitcoin mining equipment on the live network for its benefit – even though it represented that it would not do so.  Plaintiffs also assert that BF Labs uniformly omitted facts material to class members' decisions to order from BF Labs and/or to request refunds and that it refused to provide refunds to class members who never received products.  Plaintiffs allege numerous common issues of law and fact including whether: (1) BF Labs violated the KCPA; (2) BF Labs committed conversion; (3) BF Labs was unjustly enriched; (4) BF Labs' alleged omissions of fact were material to reasonable consumers; (4) a reasonable marketer in the pre-order sales industry would have disclosed such facts; and (5) customers who ordered from BF Labs had contractual, property or other rights in the mining equipment which BF Labs used before shipping. The Court finds that a class action will generate common answers to questions that are central to every claim.

### 3.    Typicality And Adequacy Of Representation

The typicality and adequacy of representation requirements of Rule 23(a) tend to merge, "although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest."   Dukes, 131 S.Ct. at 2551 n. 5 (citing Falcon, 457 U.S. at 157-58). Rule 23(a)(3) requires plaintiffs to show that "the claims of the representative parties are typical of the claims of the class." Fed. R. Civ. P. 23(a)(3).  This element requires that representative plaintiffs possess the same interests and suffer the same injuries as the proposed class members.  Falcon, 457

14

U.S. at 156.  The claims of the representative plaintiffs need not be identical, however, to those of the other class members.  DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010). As long as the claims of named plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality.  Id.

Rule 23(a)(4) requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To meet this requirement, the representative plaintiffs must show that (1) their interests do not conflict with the interests of other class members and (2) they will prosecute the action vigorously through qualified counsel.  See E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977); Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).  To defeat class certification a conflict must be "fundamental" and speak to specific issues in controversy.  Minor conflicts are not enough. Eatinger v. BP Am. Prod. Co., No. 07-1266-EMF, 2010 WL 3023957, at *4 (D. Kan. Aug. 2, 2010). A fundamental conflict exists where some class members claim to have been harmed by conduct that benefitted other class members.  See id.  In such situations, the named representative cannot adequately represent the interests of the class because the interests of the named representative are actually or potentially antagonistic to or in conflict with the interests and objectives of other class members.  See id.

Plaintiffs assert that they satisfy the typicality requirement because lead plaintiffs' claims and absent class members' claims arise out of the same alleged course of conduct, are based on the same legal theories and require the same evidence to prove.  Plaintiffs contend that they will adequately represent absent class members because they have no interests which are antagonistic to the class or subclasses and "have demonstrated their allegiance to this litigation through their patience and

participation in the settlement process on behalf of all putative class members." Memorandum In Support (Doc. #151) at 17 (citing Amchem Prods., 521 U.S. at 625; Carpe v. Aquila, Inc., 224 F.R.D. 454, 458 (W.D. Mo. 2004)).

Alexander purports to represent the subclasses of persons who pre-paid BF Labs for ASIC 65 NM generation products or ASIC 28 NM generation products between June 23, 2012 and July 17, 2014 and who have not received products or refunds.   He appears to be an adequate representative of the subclass labeled as d.1.  Symington purports to represent the subclass of persons who pre-paid BF Labs for ASIC 65 NM generation products or ASIC 28 NM generation products between June 23, 2012 and July 17, 2014 and as of this filing, have received products.  He appears to be an adequate representative of the subclass labeled as d.3.

Although plaintiffs assert that their interests and those of absent class members are aligned, they ignore an aspect of the settlement which appears to be inconsistent with typicality and adequacy of representation.  Specifically, no named plaintiff holds a claim which falls in the category of customers who have received refunds – the subclass labeled d.2.  Because the proposed settlement provides differing relief to different groups within the settlement class, it appears that the interests of the named representatives are not aligned with every member of the settlement class.  Amchem Prods., 521 U.S. at 625-26 (where members of settlement class have divergent interests and receive diverse benefits, structure of settlement must assure fair and adequate representation for diverse groups and individuals affected).

Further, the proposed settlement calls into question named plaintiffs' purported typicality and adequacy of representation; depending on the value of defendant's assets as of May 1, 2017, subclasses d.2 and d.3 are more likely than members of subclass d.1 to get nothing more than

uncollectible judgments.  See Mirfaishi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir. 2004) (reversing approval of settlement that without explanation gave certain class members nothing in return for surrendering claims); see also Mirfaishi v. Fleet Mortg. Corp., 450 F.3d 745 (2006) (reversing approval of second settlement in same case for same reason).  The record contains no information regarding the probable value of defendant's assets on May 1, 2017, the operative date.[9] Plaintiffs have not addressed these issues, much less affirmatively demonstrated under a strict burden of proof that named plaintiffs satisfy the typicality and adequacy of representation requirements of Rule 23(a).  See In re Motor Fuel Temp. Sales Practices Litig., 271 F.R.D. 263, 283 (D. Kan. 2010).

### C.    Rule 23(b) Requirements

Plaintiffs ask the Court to certify a settlement class under Rule 23(b)(3).  Under that provision, plaintiffs must show that "questions of law or fact common to members of the class predominate over any questions affecting individual members" and that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The predominance requirement tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation.  Amchem, 521 U.S. at 623.  The superiority requirement insures that no other available method of handling the claims has greater practical advantages.  See In re Universal Serv. Fund Tele. Billing Practices Litig., 219 F.R.D. 661, 679 (D. Kan. 2004.) In determining predominance and superiority under Rule 23(b)(3), the Court considers the following factors:

> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)    the extent and nature of any litigation concerning the controversy already

---

[9]     The parties have not explained why May 1, 2017 is a relevant date.

begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of claims in the particular forum; and

(D)    the likely difficulties in managing the action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

### 1.    Predominance

Determining whether "questions of law or fact common to class members predominate" begins with the elements of the underlying cause of action, listed above. Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184 (2011). Plaintiffs point out that all of the claims of the members of the BF Labs Settlement Class arise out of BF Labs' alleged unfair, deceptive or unconscionable acts and practices related to the marketing and sale of bitcoin mining devices. BF Labs' denial of this allegation presents a common question of law as to whether its practices complied with applicable laws. The Court finds that the claims arise out of events which occurred uniformly to class members and that common questions predominate over individual questions.

### 2.    Superiority

Plaintiffs state that a class action is superior to other available methods because class members would have little incentive to proceed with individual cases, each of which concerns a relatively small amount of money compared to costs and uncertainty of litigation. The Court agrees that a class action would be superior to individual actions. Nevertheless, for the reasons stated above, the Court denies plaintiffs' request for class certification.

## II.    Preliminary Approval Of Proposed Settlement

Because the Court denies plaintiffs' request to certify a settlement class, it need not address plaintiffs' request for preliminary approval of the proposed settlement. The Court's review of the proposed settlement, however, suggests several infirmities:

Under Rule 23(e), Fed. R. Civ. P., once a class is certified, the action may not be settled, dismissed or compromised without Court approval.  Preliminary approval of a proposed settlement is the first of two steps required before a class action may be settled.  In re Motor Fuel Temp. Sales Practices Litig., 258 F.R.D. 671, 675 (D. Kan. 2009).  If the Court grants preliminary approval, it directs notice to class members and sets a hearing to determine the fairness of the class settlement. Id.

At the preliminary approval stage, the Court makes a preliminary evaluation of the fairness of the proposed settlement and determines whether the proposed settlement is within the range of possible approval, i.e. whether there is any reason not to notify class members of the proposed settlement and proceed with a fairness hearing.  See Gautreaux v. Pierce, 690 F.2d 616, 621 n.3 (7th Cir. 1982); Freebird, Inc. v. Merit Energy Co., No. 10-1154-KHV, 2012 WL 6085135 (D. Kan. Dec. 6, 2012); In re Motor Fuel Temp. Sales Practices Litig., 258 F.R.D. at 675-76; 4 Robert Newberg, Newberg on Class Actions § 11:25 at 38 (4th ed. 2002).  The Court will ordinarily grant preliminary approval where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; has no obvious deficiencies; does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval.  The standards for preliminary approval of a class settlement are not as stringent as the requirements for final approval.  Freebird, 2012 WL 6085135, at *5.  The Court is mindful, however, that a higher degree of scrutiny applies when determining the fairness of a settlement negotiated before class certification.  In re Motor Fuel Temp. Sales Practices Litig., 258 F.R.D. at 676.

In deciding whether to approve a proposed settlement, the Court assesses the reasonableness of the compromise, taking into account the context in which the parties reached the settlement.  See

id. (citing Nat'l Treasury Emp. Union v. United States, 54 Fed. Cl. 791, 797 (2002)).  Although the Court must assess the strength of plaintiffs' claims, it should "not decide the merits of the case or resolve unsettled legal questions."  Id. (citing Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14 (1981)).

Plaintiffs ask the Court to preliminarily approve the proposed settlement.  In determining whether a proposed settlement is fair, reasonable and adequate, the Court considers the following factors:

> (1)   whether the proposed settlement was fairly and honestly negotiated;
> (2)   whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
> (3)   whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
> (4)   the judgment of the parties that the settlement is fair and reasonable.

Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1188 (10th Cir. 2002).  While the Court will consider these factors in greater depth at the final approval hearing, they are a useful guide at the preliminary approval stage as well.  See In re Motor Fuel Temp. Sales Practices Litig., 258 F.R.D. at 675; Lucas v. Kmart Corp., 234 F.R.D. 688, 693 (D. Colo. 2006); Am. Med. Ass'n v. United Healthcare Corp., No. 00-2800(LMM), 2009 WL 1437819, at *3 (S.D.N.Y. May 19, 2009).

Here, the first and second factors weigh in favor of preliminary approval.  As to the first factor, it appears the parties negotiated the settlement fairly and honestly.  The parties are represented by counsel with experience in class action litigation.  They engaged in extensive arms-length negotiations which produced this settlement agreement.  As to the second factor, serious questions of law and fact remain.

The third and fourth factors, however, weigh against preliminary approval.  As to the fourth factor, counsel have signed the settlement agreement, indicating that they think the agreement is fair

and reasonable.  As noted, however, no named plaintiff holds a claim in subclass d.2; thus no member of that subclass has passed on the question whether the agreement is fair and reasonable.

Regarding the third factor, the Court weighs the value of immediate recovery under the settlement against the possibility of future recovery after further proceedings and a trial.  Plaintiffs assert that the settlement provides class members with the potential of substantial monetary benefits.  See Vigil v. Finesod, 779 F. Supp. 522, 526 (D.N.M. 1990) ("If the proposed settlement is not approved, the result will be a much more complicated and expensive course of litigation and there is no assurance that the final result will in any way be superior.  The time and expense for additional litigation is not warranted under the circumstances."); In re AT & T, 270 F.R.D. at 349 (plaintiffs' claims will likely require great deal of time and money to pursue if not resolved through settlement; proposed settlement agreement provides relief at least comparable to result that plaintiffs could achieve through continued litigation).  But class members will receive monetary benefits only to the extent that defendant has assets to make payments on May 1, 2017.  The record contains no information regarding the probable value of the settlement on that date, or why May 1, 2017 is a relevant deadline.  Plaintiffs are not guaranteed *any* recovery under the settlement agreement; if BF Labs does not have sufficient funds to pay the proposed settlement amounts, some or all of the class members will receive only a judgment.  Thus, under the worst case scenario, the settlement agreement only provides each class member an uncollectible judgment.  Plaintiffs cite no authority for the proposition that an uncollectible judgment would be a reasonable settlement.  Moreover, the settlement provides uneven treatment of the subclasses, leading the Court to ponder why plaintiffs have included subclasses d.2 and d.3 in this class action and why some subclasses (but not others) are required to submit claim forms.

Plaintiffs point out that without the settlement, plaintiffs would have to go through trial to get a possible judgment.  They thus argue that the settlement has some value to all members of the class, who will either receive a payment or a judgment. Without any information concerning the likely financial status of defendant on May 1, 2017, it is impossible for the Court to determine whether the proposed settlement is fair, reasonable and adequate.  Furthermore, the Court cannot begin to consider whether plaintiffs' request for attorneys' fees and litigation expenses is reasonable, relative to the results achieved in this case.  The fact that fees and litigation expenses are subject to pro rata reduction does not mean that the amount of the baseline request (up to $455,000) is appropriate in light of the recovery to plaintiffs.

**IT IS THEREFORE ORDERED** that plaintiffs' unopposed Motion For Preliminary Approval Of Settlement ("Motion For Preliminary Approval") (Doc. #150) filed April 20, 2016 be and hereby is **OVERRULED**.

Dated this 22nd day of September, 2016 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

22