## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KYLE ALEXANDER, and            )
DYLAN SYMINGTON,               )
on  behalf  of  themselves  and  all  those   )
similarly situated,            )
                               )
                    Plaintiffs,   )
                               )        Case No. 14-CV-2159-KHV-JPO
v.                             )
                               )
BF LABS INC., et al.,          )
                               )
                    Defendants.   )
                               )

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' AMENDED MOTION
## FOR CLASS CERTIFICATION

Noah K. Wood              Bar #23238
noah@woodlaw.com
Ari N. Rodopoulos         Bar #26585
ari@woodlaw.com
WOOD LAW FIRM, LLC
1100 Main Street, Suite 1800
Kansas City, MO 64105-5171
T: (816) 256-3582
F: (816) 337-4243
Attorneys for Plaintiffs

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

INDEX OF EXHIBITS .................................................................................................... v

I.   NATURE OF THE MATTER BEFORE THE COURT ..................................................1

II.  STATEMENT OF THE FACTUAL ALLEGATIONS ...................................................... 3

    A.   Bitcoin generally .................................................................................... 3

    B.   Origins of BFL's scheme .......................................................................... 4

    C.   BFL's "pre-order" scheme ...................................................................... 6

III. QUESTIONS PRESENTED ..................................................................................... 18

IV.  ARGUMENT ........................................................................................................ 20

    A.   Rule 23(a) Prerequisites of Class Action Certification are Established ...............21

       (1)   The class is so numerous that joinder is impracticable .................................21

       (2)   The class shares common questions of law and fact .................................... 23

       (3)   The Representative Plaintiffs' claims are typical of the class ...................... 25

       (4)   The Representative Plaintiffs will fairly and adequately protect the interests
of the class .................................................................................... 26

    B.   Rule 23(b) Requirements are Satisfied ................................................... 27

       (1)   Questions of law or fact common to the class predominate ........................ 28

       (2)   Class action is the superior method of adjudication ................................... 29

          (a)   The interest of members of the class in individually controlling the
prosecution of separate actions is minimal ........................................... 30

          (b)   The extent and nature of litigation already commenced by members of
the class supports certification ......................................................... 31

          (c)   It is desirable to concentrate the litigation in this forum ...................... 32

          (d)   There are no unusual difficulties likely to be encountered in the
management of the case .................................................................. 32

V.   ADDITIONAL MATTERS ....................................................................................... 33

VI.  CONCLUSION ..................................................................................................... 37

CERTIFICATE OF SERVICE .......................................................................................... 38

## **TABLE OF AUTHORITIES**

**CASES**

*Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988) .................................................. 25

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 (5th Cir. 1998) ............................... 31

*Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) .............................. 25

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622–23 (1997) ...................................... 28

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ......................................... 30

*Baby Neal v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994) ........................................................ 23

*Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 .............................................................. 28

*Bevand*, 16-CV-01115-FJG (W.D. Mo.) ........................................................................... 32

*Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)* ........................................... 20

*Blair v. Transam Trucking, Inc.*, No. 09-2443-EFM-KGG, 2015 WL 5006076, at *5 (D. Kan. Aug. 20, 2015) ................................................................................................. 26

*Brady v. LAC, Inc.*, 72 F.R.D. 22, 28 (S.D.N.Y. 1976) ..................................................... 30

*CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) ........... 29

*Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015) .................................... 37

*Colorado Cross-Disability Coal. v. Taco Bell Corp.*, 184 F.R.D. 354, 357 (D. Colo. 1999) ............................................................................................................................. 37

*Cummings v. Connell*, 402 F.3d 936, 945 (9th Cir. 2005) ............................................... 20

*Dale v. DaimlerChrysler Corp.*, 204 S.W.3d 151, 181 (Mo. App. W.D. 2006 .................. 29

*DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) .............................. 25

*Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977), *cert. denied* 434 U.S. 856 (1977) ..................................................................................................................... 25

*Duke v. Double Your* Decompression, Jackson County, Mo. Case No. 14-16-CV-27569  27

Evans *& Green, LLP v. Meecorp*, Greene County, MO Case No. 0831-CV07658 ............ 27

*Evans & Green, LLP v. Mortgage Depot*, W.D. MO Case No. 6:07-CV-03275-RED ...... 27

*Federal Trade Commission v. BF Labs Inc. et al.*, Case No., 4:14-cv-00815-BCW, Doc. 377 ................................................................................................................................. 32

*Goans Acquisition, Inc. v. Moon River Enterprises, Inc.,* Greene County, MO Case No. 0831-CV13646 .............................................................................................................. 27

*Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D.Cal. 1996) ...................................... 31

*Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 (7th Cir.1974) ................... 29

*In re Bristol Bay, Alaska, Slamon Fishery Antitrust Litigation*, 78 F.R.D. 622, 628 (W.D. Wa. 1978) ................................................. 33

*In Re Folding Carton Antitrust Litigation*, 75 F.R.D. 727, 732 (N.D. Ill. 1977) .............30

*In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1127-1128, n. 33 (7th Cir.), *cert. denied* 444 U.S. 870 (1979).......................................................20

*In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 668 (D. Kan. 2013)......................................................24

*In re Northern Dist. Cal., Dalkon Shield, Etc.*, 693 F.2d 847, 856 (9th Cir. 1982) .......... 31

*K.L. by Dixon v. Valdez*, 167 F.R.D. 688, 691 (D.N.M. 1996) ...........................................25

*Linquist v. Bowen*, 633 F.Supp. 846, 859 (W.D. Mo. 1986) .............................................26

*Lolli v. BF Labs Inc.*, No. 13LA-9619 (Johnson County District Court) .........................32

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) .....................................30

*Mazur v. BF Labs Inc.*, No. GV14-7544 (Chesapeake General District Court)...............32

*Meissner v. BF Labs Inc.*, No. 13-2617-RDR-KGS (D. Kan.) ...........................................32

*Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 608 (D. Kan. 2014) ......23

*Paxton v. Union Nat. Bank*, 688 F.2d 552, 559-560 (8th Cir. 1982)................................ 21

*Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012)......................................................20

*Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D.Ill. 1992) .................23

*See In re Motor Fuel Temperature Sales Practices Litig.*, No. 07-MD-1840-KHV, 2015 WL 5010048, at *12 (D. Kan. Aug. 21, 2015)........................................................ 31

*Shen*, No. 15CV-05342 (Johnson County District Court)................................................32

*Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 612 (10th Cir. 2008) ......................................................20

*Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 444 n. 4 (N.D. Ohio 2012) ................................................. 21

*Sperry Rand Corp. v. Larson*, 554 F.2d 868, 873-4 n. 17 (8th Cir. 1977) ........................26

*Tomaszewski v. BF Labs Inc.*, No. 14SC-397 (Johnson County District Court) .............32

*Top Craft, Inc. v. Coffman Group, LLC et al.*, Greene County, MO, Case No. 104CC1179 ................................................. 27

*Top Craft, Inc. v. Int'l Collection Services*, Greene County, MO Case No. 104CC2129... 27

*Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009) ...........................................20

*Vaszlavik v. Storage Technology, Corp.*, 175 F.R.D. 672, 683 (D.Colo.1997)................. 37

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ..........................................23

*Welmaker v. W.T. Grant Co.*, 365 F.Supp. 531, 553 (N.D. Ga. 1972) .............................. 21

*West v. Capitol Federal Savings and Loan Ass'n*, 558 F.2d 977, 982 (10th Cir. 1977)... 37

**OTHER AUTHORITIES**

Newberg On Class Actions (3d Ed. 1992) .......................................................... 22

Newberg on Class Actions (5th Ed. 2012) ......................................................... 29

**RULES**

Fed. R. Civ. P. 23 .......................................................... 21, 23, 25, 26, 27, 28, 29

# <u>INDEX OF EXHIBITS</u>

1    Deposition of Bruce Bourne...........................................................4, 8, 11, 15, 16, 18, 22

2    BFL's Website, BFLABS-KA 29806............................................................................. 4

3    BFL's Response to First Interrogatories.............................................................. 4, 10

4    2012-09-20 Bitcoin Forum: "Hi, my name is Sonny Vleisides, A&S 4001........... 5, 6

5    2007-02-28 Vleisides Indictment, A&S 3981-3982.................................................. 5

6    2010-09-15 Vleisides Judgment and Probation/Commitment Order, A&S
     03996...........................................................................................................................6, 17

7    http://www.prweb.com/releases/2012/6/prweb9611889.htm ............................... 7

8    Deposition of Sonny Vleisides ..................................................................................... 8

9    BFL's Website, BFLABS-KA 30018 ............................................................................ 9

10   BFL's Website, BFLABS-KA 30727 .......................................................................... 10

11   BFL's Website, BFLABS-KA 30728 ....................................................................10, 30

12   BFL's Website, BFLABS-KA 30734 .......................................................................... 11

13   Declaration of Jeff Ownby ......................................................................................... 11

14   FTC's Reply Suggestions in Support of Motion for Preliminary Injunction,
     Doc. 42-17...................................................................................................................12

15   FTC's Reply Suggestions in Support of Motion for Preliminary Injunction,
     Doc. 42-18 ..................................................................................................................12

16   A&S 00037,00041......................................................................................................12

17   FTC's Reply Suggestions in Support of Motion for Preliminary Injunction,
     Doc. 42-14...................................................................................................................13

18   FTC's Reply Suggestions in Support of Motion for Preliminary Injunction,
     Doc. 42-2 (p. 34) ........................................................................................................13

19   FTC's Reply Suggestions in Support of Motion for Preliminary Injunction,
     Doc. 42-2 (p. 37) ........................................................................................................13

20   FTC's Reply Suggestions in Support of Motion for Preliminary Injunction,
     Doc. 42-19...................................................................................................................13

21   FTC's Reply Suggestions in Support of Motion for Preliminary Injunction,
     Doc. 42-12............................................................................................................. 14, 15

22   FTC's Reply Suggestions in Support of Motion for Preliminary Injunction,
     Doc. 42-14.............................................................................................................14, 16

23   A&S 04136, 04138.....................................................................................................17

24   Redacted Expert Report of Larry Londre ............................................................... 24

25   Redacted Affidavit of Alan Sherman ....................................................................... 25

26   Redacted Affidavit of Dr. John Ward ...................................................................... 24

**COME NOW** Plaintiffs and respectfully offer to the Court the following Memorandum in Support of Plaintiffs' Amended Motion for Class Certification:

## I.      NATURE OF THE MATTER BEFORE THE COURT

This lawsuit challenges the deceptive and unconscionable practices of Defendant Butterfly Labs, Inc. ("BFL"), as directed and controlled by its owner-officers, Defendants Sonny Vleisides ("Vleisides") and Jeff Ownby ("Ownby") (collectively "Defendants"), including:

- collecting pre-payments for non-existent Bitcoin mining equipment;

- omitting and concealing material information;

- making false, vague, and misleading statements;

- failing to ship Bitcoin mining equipment orders for which consumers have pre-paid;

- misrepresenting the date such equipment would be manufactured and shipped to customers;

- profiting from Bitcoin mining for Defendants' own benefit by using customers' equipment without permission or authorization from customers; and

- retaining both the prepayments and the equipment ordered by customers without providing a refund.

Many customers never received the products for which they pre-paid in full and, to date, many customers still have not even received a refund.  Plaintiffs contend Defendants violated the Kansas Consumer Protection Act ("KCPA") (Count I), Defendants were unjustly enriched (Count II), and BFL committed conversion (Count

III).   Plaintiffs seek to recover the purchase price, the interest thereon, the unjust enrichment to Defendants, costs of suit, attorney's fees, and punitive damages.

Plaintiffs respectfully request the Court to certify Counts I-III as a class action pursuant to Rule 23 with the Plaintiff class defined as:

### Alexander Count I – KCPA

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

### Alexander Count II – Unjust Enrichment

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

### Alexander Count III – Conversion

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, (2) demanded or requested a refund, and (3) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

### Symington Count I – KCPA

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

## Symington Count II – Unjust Enrichment

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

## Symington Count III – Conversion

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

Excluded from each class shall be BF Labs Inc. and any shareholder, director, officer, or employee of BF Labs Inc.; the Court and Court personnel; counsel of record for BF Labs Inc.; and counsel of record for the Named Plaintiffs and Plaintiffs; and any customers who previously settled with Defendants.

## II.    STATEMENT OF THE FACTUAL ALLEGATIONS

### A.    Bitcoin generally

Bitcoin is a peer-to-peer payment system and digital currency created in 2009. (Doc. 123, p. 4, ¶ 16).   Unlike traditional currency, bitcoins are not issued by a government or central banking authority.[1]    (*Id.*).    Bitcoin is considered a "cryptocurrency" because cryptography is used to control the creation and transfer of the currency, creating a distributed, decentralized, and secure medium of exchange.  (*Id.* at p. 4, ¶ 17).  Bitcoins are regularly used to pay debts, purchase goods and services, and are exchanged for other currencies such as the U.S. dollar, U.K. pound sterling, or euro.

---

[1]    For clarity, Plaintiffs use "Bitcoin" to refer to the digital currency, protocol, or specification; and "bitcoin" to refer to the individual denomination or unit of the currency.

3

(*Id.* at p. 4, ¶ 18).  For example on March 19, 2014, one bitcoin could be exchanged for an average of $613.12.  (*Id.* at p. 5, ¶ 25).

Bitcoins are created by "mining," a process where "miners" receive transaction fees and newly minted bitcoins in return for verifying and recording payments into a public ledger.   (Doc. 123, p. 4, ¶ 19).  By design, mining is a computationally intensive process that becomes more difficult over time.  (*Id.* at p. 4, ¶ 20).  As the difficulty of Bitcoin mining has increased over time, the computer hardware required to profitably mine has advanced from general purpose CPUs (found in common desktop computers), high-end GPUs (often found in gaming computers), FPGAs (field-programmable gate arrays), and ultimately to ASICs (application-specific integrated circuits) purpose built for performing the calculations necessary for Bitcoin mining.  (*Id.* at p. 4, ¶ 22).  Although Defendants quibble about the definition of "admit" and "time is of the essence," Defendants admit time is of the essence when it comes to Bitcoin mining and "it was clear that consumers felt timing was important."  (*Id.* at p. 4, ¶ 21; *see also* Depo. of Bruce Bourne, 187: 23 – 189: 7, **Exhibit 1**).

### B.      **Origins of BFL's scheme**

BFL advertises itself to the public as a manufacturer of specialized computer equipment and processors for the task of mining bitcoins.  (Doc. 123, p. 3, ¶ 15; BFL's Website, BFLABS-KA 29806, **Exhibit 2**).  BFL is controlled by Vleisides and Ownby who, together, own 54% of BFL's shares.  (2015-02-20 BFL's Response to First Interrogatories, No. 13, **Exhibit 3**).  Vleisides, at 44% ownership, is BFL's largest shareholder.  (*Id.*).

In the late 1990's, Vleisides discovered "jurisdictional arbitration"—a concept Vleisides describes as "great"—where a person leverages technology to profit off of

differences in law from one jurisdiction to another.  (2012-09-20 Bitcoin Forum: "Hi, my name is Sonny Vleisides," A&S 4001, **Exhibit 4**).  With this concept in mind, Vleisides started a software company where a Costa Rican license could be used along with satellite telecommunications to offer gaming services all over the world, which Vleisides describes as a "lucrative and fun time [and] a libertarian adventure in challenging the authorities of the world while earning a good living." (*Id*.).  Vleisides states he "believe[s] very strongly in freedom, honesty and personal responsibility." (*Id*.).

On February 28, 2007, a grand jury indicted Vleisides for "knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victims as to a material matter, and to obtain money and property from such victims by means of material false and fraudulent pretenses, representations, and promises, and by the concealment of material facts."  (2007-02-28 Vleisides Indictment, A&S 3981-3982, **Exhibit 5**).  The grand jury indictment describes Vleisides' unlawful scheme as deceiving victims into sending in payments in exchange for increased chances of winning foreign and domestic lotteries by stating (a) money sent in by participants would be pooled and used to purchase tickets in lotteries, horse races, *etc*., (b) previous participants in the pool had already won millions of dollars through the pool, and (c) winnings would be invested in a trust or pension and would pay monthly pension checks to participants and/or their beneficiary for life.  (*Id*. at A&S 3982-3983).

The grand jury indictment states Vleisides, after receiving money from participants, wrote checks falsely represented as "lottery winnings" and sent them back to participants in amounts less than had been originally sent in, when, in reality, the purported winnings were merely portions of payments sent in by other victims of the

scheme.  (*Id*. at A&S 3983-3987).  The grand jury indictment states Vleisides solicited tens of thousands of victims to send in over $25,000,000 and misappropriated the victims' funds in the form of checks to cash, checks to himself, or checks to the payment of personal expenses.  (*Id*. at A&S 3984-3985, 3987-3988).

On September 15, 2010, in the United States District Court for the Central District of California, Vleisides pled guilty to violating 18 U.S.C. § 1341, Mail Fraud, Aiding and Abetting and Causing an Act to Be Done as charged in Count 1 of the indictment.  (2010-09-15 Vleisides Judgment and Probation/Commitment Order, A&S 3996, **Exhibit 6**).  Vleisides, however, was not ordered to pay restitution to his lottery scheme victims because, among other things, "the number of identifiable victims is so large as to make restitution impracticable [and] determining . . . the cause or amount of the victim's losses would complicate or prolong the sentencing process[.]"  (*Id*. at A&S 3997).

Vleisides' lottery scheme was based on partial reinforcement scheduling and half-truths, *i.e.*, instead of taking victims' money and simply keeping all of it, Vleisides reinforced and continued the scheme by sending some money under the guise of "winnings" back to a handful of victims and by publicizing such "winnings" to others, which motivated new and former victims to continue sending money to Vleisides.  (Doc. 123, p. 7, ¶ 40).  Vleisides refers to the lottery scheme as "a roaring success."  (2012-09-20 Bitcoin Forum: "Hi, my name is Sonny Vleisides," A&S 4001, **Exhibit 4**).

### C.     **BFL's "pre-order" scheme**

Much like Vleisides' lottery scheme, where some victims were sent purported "lottery winnings" in order to entice other victims into believing they, too, could win the lottery and to send in money, Vleisides, Ownby, and BFL had a scheme based on partial

reinforcement and half-truths to obtain "pre-order" funds from the public to develop bitcoin miners, to use the bitcoin miners for their own enrichment, to delay and/or avoid having to ship miners to customers, and to delay and/or avoid having to refund customers.  (Doc. 123, p. 7, ¶ 42).

In 2011, bitcoins could be mined using CPUs, GPUs, and FGPAs because the mining difficulty rate was relatively low.  (Doc. 123, p. 7, ¶ 43).  Given the low difficulty rate, Defendants set out to develop ASIC hardware that could mine bitcoins at much faster rates.  (*Id.* at p. 7, ¶ 44).  Defendants were faced with the quandary of how to quickly raise sufficient capital to develop Bitcoin mining hardware that does not yet exist, and create the hardware before someone else does or before the mining difficulty increases to the point of mooting the hardware's utility and/or consumer appeal.  (*Id.* at p. 8, ¶ 46).  In deciding how to raise sufficient funds, Defendants chose to immediately advertise via "pre-order" sale the very products they hoped to design and manufacture—without disclosing the products did not yet exist, without disclosing there was no final working prototype, without disclosing that unless enough pre-orders were made by customers, BFL would not have sufficient funds to develop and manufacture the advertised products at all, and without disclosing BFL's intent to use the products for its own benefit and enrichment prior to shipping and/or in lieu of shipping.  (*Id.* at p. 8, ¶ 48).

On June 5, 2012, in order to create the appearance of financial strength and/or business credibility, BFL publicly announced it had acquired "Venture Capital Funding" and "is now backed by private venture capital." (*See* http://www.prweb.com/releases/2012/6/prweb9611889.htm, **Exhibit 7**).  In the press release, BFL quoted an unidentified private equity group as stating: "Having made bold

7

investments in new technology, they're [BFL] poised to redefine the landscape for SHA-256 hash verification." (*Id.*).  BFL's corporate representative, however, conceded that in reality there was only $8,000.00 in capital contributions and "[t]here was no significant source of outside funding."  (Depo. of Bruce Bourne, 212: 21 – 213: 1, **Exhibit 1**).

In discovery, BFL also produced a financial record (BFL-Alexander-Fin-001), marked as "Confidential" pursuant to the Court's protective order, showing BFL's income, profits, expenses, costs of goods sold, and costs of product development from 2011 to 2014.  At trial, Plaintiffs will introduce such confidential financial record in order to prove that BFL necessarily relied on customers' pre-order funds in order to develop the products advertised.  BFL's pre-order scheme was not really a pre-order system but, rather, it was a method of raising investment capital under the guise of a pre-order.  (Doc. 123, p. 10, ¶ 50).  Customers' pre-order funds were the largest source of BFL's funding.  (Depo. of Bruce Bource, 211: 11-24, **Exhibit 1**).

In order to encourage and to entice paid-in-full "pre-orders" from customers, BFL advertised its high-speed miners were shipping soon—even though BFL did not know whether it would receive sufficient pre-order funds to ever develop or manufacture the products advertised.  (Doc. 123, pp. 10-11, ¶ 56).  For example, the ASIC chip is an essential component common to all BFL's ASIC miners.   (Depo. of Sonny Vleisides, 108: 9 – 110: 4, **Exhibit 8**).  In discovery, BFL produced a supply record (BFL's Exhibit N, "65nm Chip Shipments from Chronicle Tech), marked as "Confidential" pursuant to the Court's protective order, showing the date and the number of ASIC chips BFL received.  At trial, Plaintiffs will introduce such confidential supply record in order to prove that BFL knew its advertisements about product delivery were false.

Specifically, on June 23, 2012, BFL began soliciting via the internet pre-order funds for "ASIC 65 NM" Bitcoin miners, which are BFL's first generation ASIC products. (2015-02-20 BFL's Response to First Interrogatories, No. 2, **Exhibit 3**; BFL's Website, BFLABS-KA 30018, **Exhibit 9**).  At that time, BFL represented "The BitForce SC chip is now in final stage development" and "Initial product delivery is scheduled for October, 2012."  (BFL's Website, BFLABS-KA 30018, **Exhibit 9**).

When October was approaching, in order to reinforce and to continue the pre-order scheme, BFL periodically and systematically revised its shipping date by a few days or weeks, *i.e.*, in this way, existing customers would believe shipping was just around the corner and not cancel their orders or request refunds, and potential pre-order customers would continue sending in money.  For example, on September 26, 2012, BFL was still representing "The BitForce SC chip is now in final stage development" and "Initial product delivery is scheduled for October, 2012."  (*Id.* at BFLABS-KA 30038).  Just four days later, on September 30, 2012, BFL was still representing "The BitForce chip is now in final stage development" but changed its initial product delivery to November.  (*Id.* at BFLABS-KA 30039).

On November 15, 2012, BFL was still representing "The BitForce chip is now in final stage development" but changed its initial product delivery to December.  (*Id.* at BFLABS-KA 30059).  On December 2, 2012, BFL removed its "The BitForce chip is now in final stage development" representation and also removed its "Initial product delivery is scheduled for December" representation.  (*Id.* at BFLABS-KA 30062).  On January 2, 2013, BFL resumed representing "The BitForce SC Chip is now in final stage development" and represented "Initial product delivery is scheduled for February, 2013."  (*Id.* at BFLABS-KA 30414).  On February 15, 2013, BFL was still representing

"The BitForce chip is now in final stage development" and "Initial product delivery is scheduled for February, 2013." (*Id.* at BFLABS-KA 30438).  On February 27, 2013, BFL represented "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and used the phrase "Order Now."  (*Id.* at BFLABS-KA 30715).

From March 8, 2013 to June 1, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and using the phrase "Order Now," except on April 15, 2013, BFL noted the 1,500 GH/S Bitcoin Miner was "Out of stock." (*Id.* at BFLABS-KA 30718-30726).   Again, relying on a confidential supply record produced by BFL, (BFL's Exhibit N, "65nm Chip Shipments from Chronicle Tech), Plaintiffs will argue at trial that BFL knew such advertisements were false.

On August 7, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" but started using the phrase "Order" instead of "Order Now." (BFL's Website, BFLABS-KA 30727, **Exhibit 10**). On August 17, 2013, BFL began soliciting via the internet pre-order funds for "ASIC 28 NM" Bitcoin miners, which are BFL's second generation ASIC products. (2015-02-20 BFL's Response to First Interrogatories, No. 2, **Exhibit 3**).

On October 15, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" but started using the phrases "Order" and "Pre-Order" instead of "Order Now." (BFL's Website, BFLABS-KA 30728, **Exhibit 11**).  On

December 10, 2013, BFL was still representing "The BitForce line of ASIC Super Computer (SC) bitcoin miners are next generation bitcoin mining equipment hardware available in 4 different configurations" and using the phrases "Order" and "Pre-Order" instead of "Order Now," but represented "65nm Products – Units in Stock.  Shipping Immediately." (*Id*. at BFLABS-KA 30734, **Exhibit 12**).

On January 3, 2014, BFL represented the "600 GH/s Bitcoin Mining Card" was "Now Available for Pre-Order" and represented "65nm Technology Product Line Units in Stock." (*Id*. at BFLABS-KA 31235).  On February 10, 2014, BFL was still representing "65nm Products – In Stock Now," and represented "28nm Products" are available as "Pre-Order." (*Id*. at BFLABS-KA 31299).  According to Ownby, Vice President of Marketing and Ecommerce at BFL, BFL stopped its business practice of taking preorders for consumer purchases of all products on July 17, 2014.  (Declaration of Jeff Ownby, Case No. 4:14-cv-00815-BCW, Doc. 155-1, p. 3, ¶ 15, **Exhibit 13**).

According to BFL, "When buyers placed pre-orders with BF Labs, BF Labs notified each and every buyer on the BF Labs online order form that the shipping date for the ordered product was "two months or longer." (BFL's Statement of Reasons, Case No. 4:14-cv-00815-BCW, Doc. 14, p. 11).  BFL acknowledges that "two months or more" could be interpreted as technically including every possible date, but BFL claims that was not its intent. (Depo. of Bruce Bourne, 187: 16-22, **Exhibit 1**).

Former employee Anthony Fast testified it was BFL's "company policy" to inform prospective customers that delivery was "two months away" and even sooner for existing customers, even though the two-month timeframe was not tied to supply chain or the engineering timeline and no final prototype for the machine existed. (FTC's Proposed Findings, Case No. 4:14-cv-00815-BCW, Doc. 193, p. 7, ¶ 9).  Mr. Fast wrote an email

that the company sent to customers in April 2013 stating that it was shipping machines when it was not yet actually doing so. (*Id.* at ¶ 10).  Mr. Fast recommended to company management that consumers be provided with information about delivery delays, but his recommendation was dismissed, and the reason provided was that the company did not want consumers to know that they would have to wait so long for the machines. (*Id.* at ¶ 11).

For example, customer Chalmers Greenlee did not receive his pre-ordered product for approximately eight months, and when the shipment arrived, the product did not work at all. (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-17, p. 5, ¶ 20, **Exhibit 14**). Customer Samuel Plainfield pre-ordered a product, and after waiting eight months his refund request was denied by BFL. (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-18, p. 4, ¶¶ 9-11, **Exhibit 15**).  Mr. Plainfield had to request a chargeback from his credit card company in order to recover the purchase price, and he never received a product from BFL. (*Id.*). Similarly, Plaintiff Dylan Symington received his pre-ordered product approximately seven months after ordering, and when the shipment arrived, it was defective.  (A&S 00037, 00041, **Exhibit 16**).  At trial, Plaintiffs' expert Dr. Sherman, who was not deposed by Defendants, will testify that by the time Dylan Symington finally received the product he ordered, it was unable to mine one bitcoin running for 24 hours.

According to BFL's former employee Sabina Marsh, even after mining units became effectively obsolete due to the length of time customers were waiting for BFL to ship, customers were not allowed to obtain a refund even if they refused delivery. (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-

00815-BCW, Doc. 42-14, p. 4, ¶ 10, **Exhibit 17**).  She states that, per management's instructions, BFL would keep both the mining units and customers' funds. (*Id.*).

At all relevant times, BFL publicly stated it does not mine bitcoins. (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-2, p. 34, **Exhibit 18**) ("Q.  Why don't you guys mine?  A.  This is a popular question.  The answer is pretty simply.  Hardware is the focus of our passion.  We're hardware developers.").  BFL also publicly stated "we aren't testing any ASIC equipment on the live network either now or in the past, so it's pretty immaterial." (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-2, p. 37, **Exhibit 19**).

Not only did Defendants mine bitcoins for themselves, they did so using customers' equipment on the *live* network.  BFL claims it "tested" the hardware of each unit individually before it went to the consumer. (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-19, p. 33-34, **Exhibit 20**).  At trial, Plaintiffs' expert Dr. Sherman, who was not deposed by Defendants, will testify that "testing" the hardware of each unit individually on the live network before shipping was unnecessary—especially in situations where BFL publicly represented it did not mine at all and was not testing customers' equipment on the live network.

BFL's former employee Brandon Bone states: "Every single machine that we plugged into the burn room was intended for customers.  I was told that the mining machines were placed in the 'burn room' for testing purposes.  But it is not necessary for the company to mine Bitcoins with the machines in order to test them.  A closed system referred to as the 'test net' was specifically designed as a means to test Bitcoin mining

13

equipment without actually mining for Bitcoins.  Butterfly Labs never used a 'test-net' in the 'burn rooms.'" (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-12, p. 3, ¶ 8, **Exhibit 21**).

BFL's former employee Samuel Johnston states: "I was in charge of overseeing testing of the bitcoin mining machines that Butterfly Labs sold to consumers.  At the time I started working at Butterfly Labs, I was aware that the company had made statements to consumers that its bitcoin mining machines were tested on the bitcoin testnet, which meant that the machines would not produce any bitcoin value while being tested.  From the time I started, I observed that the machines were not in fact tested on the testnet.  Instead, I found that they were mining with the machines on the bitcoin network." (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-13, p. 2, ¶¶ 4-5, **Exhibit 22**).

Former employee Samuel Johnston states "While I was employed, with the exception of a two-to-three week period, all tested machines were set up to mine bitcoins in the Eclipse Mining Consortium ('EMC').  I believe that EMC was owned by Josh Zerlan." (*Id.* at ¶ 7).  Former employee Samuel Johnston states "When I asked Mark why the machines were not tested on the testnet, he responded that there was no point in doing so because the company would not make any money from the testing.  I understood, based on my conversations with Mark, that he received direction from Sonny to test the machines in a way that generated bitcoins. I was present in at least one brief meeting with Sonny and Mark in which it was suggested that the machines be tested on the testnet, but Sonny and Mark agreed the company would not do so. I understood that the sole reason for burning in the machines rather than using the testnet was to make money." (*Id.* at ¶ 8).

14

Former employee Samuel Johnston states "The goal was to maximize the number of units that could be burned in at a time." (*Id.* at ¶ 12).  Former employee Samuel Johnston states "Every machine sent to consumers was burned in before shipment. Mark instructed me to always have as many machines burning in as possible.  When production of the mining machines was slow, we would keep machines mining all day rather than shipping them.  Machines were burned in for far longer than was necessary to test them.  Generally, a machine only needs to be tested for ten to 30 minutes to be tested properly." (*Id.* at ¶ 13).

Bruce Bourne, as company representative of BFL, testified "We would admit that a testnet exists that does enable machines to be tested without being used to mine.  We would not agree that it was sufficient to test the machines we were building adequately." (Depo. of Bruce Bourne, 179: 1-8, **Exhibit 1**).  Bruce Bourne also testified "There were units I believe in early days of the company that were tested on, test network.  In fact, I'm not entirely clear whether the FPGA's were mostly or all tested on the test network. If we limit the discussion to the ASIC's, live network was the predominant, if not exclusive." (*Id.* at 171: 9-23).

Former employee Brandon Bone states "there were up to three burn rooms operating at one time.  Depending on the room, there could be over 500 Bitcoin mining machines hooked up and actively mining Bitcoins at one time." (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-12, p. 3, ¶ 7, **Exhibit 21**).  Former employee Samuel Johnston states "Butterfly Labs' mining operation using equipment to be shipped to customers was powerful.  For example, in August 2013, the machines being tested were collectively hashing at a rate of 12 terrahashes per second (TH/s).  At that time, this comprised

approximately 3% of the hash rate of the entire bitcoin network." (FTC's Reply Suggestions in Support of Motion for Preliminary Injunction, Case No. 4:14-cv-00815-BCW, Doc. 42-13, pp. 3-4, ¶ 10, **Exhibit 22**).  Former employee Samuel Johnston states "At times, we would have machines burning in for two days before shipment, in order to generate additional bitcoins.  If we reached the end of the day without additional machines ready to replace them, we held back shipment to keep them burning in all night, and then would ship them the next day.  When production was high, the machines were burned in for shorter periods of time." (*Id.* at ¶ 14).

Former BFL employee Samuel Johnston states "From my work in the shipping room and the burn in rooms, I observed the pace at which the mining machines were produced and sent. When I arrived in June 2013, Butterfly Labs had produced some Jalapeno 65 nm machines, but did not have working parts to mass produce the higher powered 65 nm machines. I estimate that Butterfly Labs would ship out 30-50 units a day when I started, about 100 a day by the time I started constructing the burn-in rooms in September, and about 900 by the time I completed the burn in rooms about three weeks later." (*Id.* at ¶ 15).

BFL's Interrogatory Exhibit H, which was marked "Confidential" pursuant to the Court's protective order, shows the number of first generation ASIC miners that were shipped between July 2013 and December 2014.  (Depo. of Bruce Bourne, 229: 12-21, **Exhibit 1**).  BFL's Interrogatory Exhibit H reflects shipping of first generation ASIC miners ordered though PayPal and is the minimum floor of the number of shipped units; the actual number of miners shipped for first *and* second generation ASIC miners is "probably close to 60,000" units.  (*Id.* at 101: 25 – 102: 17; 229: 22 – 230: 17).

BFL's Interrogatory Exhibit S, which was marked "Confidential" pursuant to the

Court's protective order, shows the number of bitcoins BFL likely mined during the testing process. (*Id.* at 241: 2-21).   At trial, Plaintiffs will rely on BFL's Interrogatory Exhibit S and the deposition of Bruce Bourne to argue that Defendants mined millions of dollars worth of bitcoins using customers' equipment prior to (and/or in lieu of) shipping such equipment to customers who had pre-paid in full.

Ultimately, Defendants pre-order scheme was successful in that Defendants solicited via the internet and received millions of dollars in pre-order funds. (Doc. 123, p. 16, ¶ 106).   At the time of BFL's formation in July 2011, however, Vleisides was serving a three-year term of supervised release related to a lottery scheme guilty plea and felony conviction and, as a condition of release, was ordered not to "engage, as whole or partial owner, employee or otherwise, in any business involving loan programs, gambling or gaming activities, telemarketing activities, investment programs or any other business involving the solicitation of funds . . . without the express approval of the Probation Officer prior to engagement in such employment." (A&S 03996, **Exhibit 6**). Although Vleisides consulted with his Probation Officer about obtaining $8,000 to $10,000 from family members to start manufacturing mining hardware, Vleisides did not tell the Probation Officer he would be soliciting pre-order funds from the public in order to develop the mining hardware before manufacturing it.   (A&S 04136, 04138, **Exhibit 23**).

Specifically, Vleisides' Probation Officer testified: "I was aware of bitcoins and that his company manufactured mining equipment.   He made me aware of all of that, because I had never heard of either before.   However, I was not aware that they took preorders, used that money to develop the hardware and just kept customers waiting for months and months.   There's no determinate date." (*Id.* at A&S 04138).   Vleisides

Probation Officer testified "I was aware that he initially had a start-up, I believe, 8 to $10,000 that he told me came mostly from family members. I was aware of that as an investment. Not soliciting money from people to be used as an investment to develop the hardware, that I was not aware of." (*Id.* at A&S 04136). Vleisides' Probation Officer testified "I was not fully informed as to the nature of the business, and without being fully informed I was not able to give express approval." (*Id.* at A&S 04134).

Plaintiff Kyle Alexander, to date, has not received the product he ordered or a refund. (Depo. of Bruce Bourne, 190: 12-17, **Exhibit 1**). Currently, there are approximately 1,600 consumers who pre-paid BFL between 2012 and 2014 the full purchase price who have still not received the product ordered or a refund—representing approximately $7.5M in unfulfilled orders and refund liability. (*Id.* at 189: 8 – 190: 11). Much like Vleisides' lottery scheme, BFL claims it is not in a position to pay these people back. (*Id.* at 191: 10-18).

## III.   QUESTIONS PRESENTED

1.   Whether Counts I-III of Plaintiffs' Amended Complaint should be certified as a class action pursuant to Rule 23, with the Plaintiff class defined as:

### Alexander Count I – KCPA

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

### Alexander Count II – Unjust Enrichment

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between

September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

## Alexander Count III – Conversion

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, (2) demanded or requested a refund, and (3) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

## Symington Count I – KCPA

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

## Symington Count II – Unjust Enrichment

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

## Symington Count III – Conversion

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

Excluded from each class shall be BF Labs Inc. and any shareholder, director, officer, or employee of BF Labs Inc.; the Court and Court personnel; counsel of record for BF Labs Inc.; and counsel of record for the Named Plaintiffs and Plaintiffs; and any customers who previously settled with Defendants.

2.      Whether Plaintiffs Kyle Alexander and Dylan Symington should be appointed as class representatives.

3.      Whether Noah K. Wood and Ari N. Rodopoulos of the Wood Law Firm, LLC should be appointed as lead class counsel.

## IV.   ARGUMENT

Certification of a class is within the sound discretion of the district court. *Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009); *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012). In deciding a motion for class certification, the district court may look into the merits of the case "only so far as to determine whether, given the factual setting of the case, if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005); *see also Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 612 (10th Cir. 2008).

The purpose of a class action is to facilitate litigation when the number of persons having interest in the lawsuit is so great that it is impractical to join them all as parties. *Cummings v. Connell*, 402 F.3d 936, 945 (9th Cir. 2005).  Class action certification is appropriate to enforce legislative policies especially where numerous individuals hold only relatively small claims that would otherwise not be pursued.  *See In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1127-1128, n. 33 (7th Cir.), *cert. denied* 444 U.S. 870 (1979) (class action is primarily a device to vindicate the rights

of individual class members and is also a vehicle for furthering the substantive policies behind legislation); *see also Welmaker v. W.T. Grant Co.*, 365 F.Supp. 531, 553 (N.D. Ga. 1972) ("The traditional purpose of a class action is to generate incentive to litigate claims that would otherwise not be litigated because they are [monetarily] so small as to make it impractical to bring individual suits.").

### (A)   Rule 23(a) Prerequisites of Class Action Certification are Established

Rule 23 governs class certification and requires an action meet the four prerequisites in Rule 23(a) and the requirements of at least one of the three subsections of Rule 23(b).  Rule 23(a) states:

> (a)   Prerequisites.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1)   the class is so numerous that joinder of all members is impracticable,
> (2)   there are questions of law or fact common to the class,
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

### (1)   The class is so numerous that joinder is impracticable.

"The numerosity requirement of Rule 23(a)(1) requires an inquiry into whether the class is 'so numerous that joinder of all members is impracticable.'" *Paxton v. Union Nat. Bank*, 688 F.2d 552, 559-560 (8th Cir. 1982) (quoting Rule 23(a)(1)).  "A motion for class certification does not require the exact number or identity of class members." *Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 444 n. 4 (N.D. Ohio 2012).  Rather, "[t]he inquiry focuses on impracticability of joinder, not

precise identity." *Id.* "Where the exact size of the class is unknown, but it is general knowledge or common sense that it is large, the court will take judicial notice of this fact and assume joinder is impracticable." 2 NEWBERG ON CLASS ACTIONS (3D ED. 1992), § 7.22.A.

Here, the numerosity requirement is easily satisfied.  Defendants' Interrogatory Exhibit B, which was produced as "Confidential" pursuant to the Court's protective order, identifies everyone who pre-ordered an ASIC product from BFL.  (Depo. of Bruce Bourne, 225: 18-25, **Exhibit 1**).   Defendants' Interrogatory Exhibit B shows the customer's name, address, the amount paid (valued in dollars), order status, whether a product shipped, and whether a refund was given.  (*Id.* at 226: 1-25).   Defendants' Interrogatory Exhibit E, which was produced as "Confidential" pursuant to the Court's protective order, identifies everyone who received a refund and the amount.  (Depo. of Bruce Bourne, 228: 4-11, **Exhibit 1**).  Defendants' Interrogatory Exhibit G, which was produced as "Confidential" pursuant to the Court's protective order, supplements Exhibit B.  (Depo. of Bruce Bourne, 228: 22 – 229: 11, **Exhibit 1**).  Defendants' Interrogatory Exhibit J, which was produced as "Confidential" pursuant to the Court's protective order, shows who was refunded, the amount of the refund, and the date of the refund.  (Depo. of Bruce Bourne, 231: 19-25, **Exhibit 1**).  Defendants' Interrogatory Exhibit K, which was produced as "Confidential" pursuant to the Court's protective order, also shows the date a refund was requested.  (Depo. of Bruce Bourne, 233: 1 – 234: 16, **Exhibit 1**).

Such exhibits reveal thousands of putative class members, with the smallest proposed class (*i.e.*, those who received no product and no refund) consisting of approximately 1,600 customers.  Joinder of all these putative class members is clearly

not practical.  *See Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 608 (D. Kan. 2014) ("A class of at least 233 people is sufficiently large that joinder of all members is impracticable.").  According to the parties' joint proposed pre-trial order submitted to Judge O'Hara on November 9, 2015, Defendants do not contest the issue of numerosity.

### (2)     The class shares common questions of law and fact.

The commonality requirement of Rule 23(a)(2) is satisfied where there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality requires the plaintiff to show the class members have suffered the same injury.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  There need only be a single issue of law or fact common to the members of the class.  *See Baby Neal v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994).  "[T]he commonality requirement has been characterized as a 'low hurdle' easily surmounted."  *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D.Ill. 1992).

This case involves Defendants' uniform method of using Bitcoin mining equipment on the live network for their own benefit prior to shipping even though Defendants publicly represented they did not and would not engage in such practices. This case involves Defendants' uniform omission of facts material to class members' decision to pre-order from Defendants and/or to request a refund.  This case also involves Defendants' uniform refusal and/or failure to provide refunds to class members who never received a product—even after the products became effectively obsolete due to the passage of time even after demands for refunds were made.

In this case, there are numerous common issues of law and fact, including, but not limited to, the following:

- Whether Defendants violated the KCPA;

- Whether Defendants committed conversion;

- Whether Defendants were unjustly enriched;

- Whether the omissions of fact as alleged in Plaintiffs' Amended Complaint were material to a reasonable consumer;

- Whether a reasonable marketer in the pre-order sales industry would have disclosed such facts;

- Whether pre-order customers have a contractual, property, or other right in the mining equipment used by Defendants prior to shipping.

At trial, Plaintiffs' expert Larry Steven Londre (who was not deposed by Defendants) will testify that all of the omissions alleged in Plaintiffs' Amended Complaint were (1) material to a reasonable consumer, and (2) a reasonable marketer using a pre-order model would have disclosed such facts.  (*See* Redacted Expert Report of Larry Londre, **Exhibit 24**).

The liability elements of Plaintiffs' claims are common to all members within each proposed class definition.  Thus, there is no question the commonality prerequisite is met.  *See In re Motor Fuel Temperature Sales Practices Litig*., 292 F.R.D. 652, 668 (D. Kan. 2013) (commonality established because the liability elements of plaintiffs' claims bear out that the class allegedly suffered the same injury).

Further, the damages of each class member (*i.e.*, either purchase price plus interest, interest only, and/or the number of bitcoins mined using customer equipment) may be calculated using the same formula or method. Plaintiffs' expert Dr. John Ward (who was not deposed in discovery) has concluded each class member's damages (purchase price plus interest or interest only) may be calculated by using the formulas he has provided.  (Redacted Affidavit of Dr. John Ward, ¶¶ 5-7, 13-14, **Exhibit 26**).

Plaintiffs' expert Dr. Alan Sherman has concluded each class member's damages (the number of bitcoins mined using customer equipment) may be calculated by using the calculations and charts he has provided.  (Redacted Affidavit of Dr. Alan Sherman, ¶¶ 111, 116, 146-147, **Exhibit 25**).

### (3)   The Representative Plaintiffs' claims are typical of the class.

Rule 23(a)(3) requires "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Typicality under Rule 23(a)(3) means that there are 'other members of the class who have the same or similar grievances as the plaintiff.'"  *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) (*quoting Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977), *cert. denied* 434 U.S. 856 (1977)).  The typicality element is "fairly easily met so long as other class members have claims similar to the named plaintiff."  *Id.* (*quoting DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)).  "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory."  *Id.*; *see also K.L. by Dixon v. Valdez*, 167 F.R.D. 688, 691 (D.N.M. 1996), *citing Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

Here, Plaintiffs' claims arise out of the very same conduct as the claims of each member of each proposed class:  the omissions of material fact, the unauthorized use of customers' miners prior to shipping, the retention of bitcoins mined using customers' equipment, and the failure to provide refunds.  Additionally, the claims of Plaintiffs are based upon the same very same legal theories as could be asserted by each member of each proposed class:   that Defendants' conduct violated the KCPA, constituted

conversion, and Defendants' were unjustly enriched.   Accordingly, the typicality requirement is satisfied.

### (4)   The Representative Plaintiffs will fairly and adequately protect the interests of the class.

Rule 23(a)(4) requires "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The adequacy requirement "is satisfied if: (1) there is no antagonistic interests between the named plaintiff and the class members, and (2) the plaintiff's counsel are competent to conduct the litigation." *Linquist v. Bowen*, 633 F.Supp. 846, 859 (W.D. Mo. 1986), *citing Sperry Rand Corp. v. Larson*, 554 F.2d 868, 873-4 n. 17 (8th Cir. 1977)); *see also Blair v. Transam Trucking, Inc.*, No. 09-2443-EFM-KGG, 2015 WL 5006076, at *5 (D. Kan. Aug. 20, 2015).

Here, Plaintiffs are members of the proposed classes they seek to represent. Further, there are no antagonistic interests between the named Plaintiffs and the class members.  The named Plaintiffs' claims are identical to those of each proposed class they seek to represent. In fact, in pursuing this litigation, the named Plaintiffs have put the interests of the class above their own interests by pursuing the case on behalf of the class, instead of quickly recovering their own damages.

Additionally, Plaintiffs' counsel is competent to conduct this litigation.  Plaintiffs have selected counsel that has experience in litigating complex tort cases, as well as experience in the area of telecommunications law, including appearing before the Federal Communications Commission.  Other Federal courts and Missouri courts have recognized the ability of Plaintiffs' counsel by appointing the firm as lead counsel in other class actions.[2]  Counsel for Plaintiffs has also done extensive work in identifying

---

[2]  *See, e.g., Duke v. Double Your* Decompression, Jackson County, Mo. Case No. 14-16-

and investigating the potential claims of this action during the time this action has been pending and committed significant time, out-of-pocket expenses, and other resources to representing the class.   Further, Plaintiffs' counsel has received phone calls from numerous putative class members and is knowledgeable about the concerns, frustrations, desires, and interests of the putative class.   According to the parties' joint proposed pre-trial order submitted to Judge O'Hara on November 9, 2015, Defendants do not contest the adequacy of Plaintiffs' counsel.

Because there are no antagonistic interests between the named Plaintiffs and the class and because Plaintiffs' counsel is competent to conduct the litigation, the requirements of Rule 23(a)(4) are satisfied.

### (B)   Rule 23(b) Requirements are Satisfied

In addition to the prerequisites of Rule 23(a), an action must also satisfy at least one of the three sub-parts of Rule 23(b) to be maintained as a class action.   Fed. R. Civ. P. 23(b).   This action satisfies Rule 23(b)(3), which states:

---

CV-27569, Order Granting Class Certification, July 31, 2015 ("Noah K. Wood and Ari N. Rodopoulos of the Wood Law Firm, LLC are appointed as counsel for the above Class"; *Evans & Green, LLP v. Meecorp*, Greene County, MO Case No. 0831-CV07658, Order Granting Class Certification, August 27, 2014 ("Noah Wood and Ari Rodopoulos of Wood Law Firm, LLC are appointed as class counsel"; *Goans Acquisition, Inc. v. Moon River Enterprises, Inc.,* Greene County, MO Case No. 0831-CV13646, Order Approving Class Settlement, December 28, 2010 ("Lead Counsel and Lead Plaintiffs have fully and adequately represented the Class for purposes of entering into and implementing the settlement and have satisfied the requirements of Rule 52.08"); *Top Craft, Inc. v. Int'l Collection Services*, Greene County, MO Case No. 104CC2129, Class Certification Order, November 8, 2007 (counsel "experienced in litigation of class actions" and "competent to conduct this litigation"); *Evans & Green, LLP v. Mortgage Depot*, W.D. MO Case No. 6:07-CV-03275-RED, Order Approving Class Action Settlement, March 12, 2009 ("Lead Counsel has conducted the litigation and achieved the Settlement Agreement with skill, perseverance and diligent advocacy"); *Top Craft, Inc. v. Coffman Group, LLC et al.*, Greene County, MO, Case No. 104CC1179, Preliminary Approval Order, July 10, 2007.

(b)   A class action may be maintained if Rule 23(a) is satisfied and if:

***

(3)   the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.   The matters pertinent to these findings include:

(A) the class members' interest in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

### (1)   Questions of law or fact common to the class predominate.

"To satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (internal citations and quotations omitted). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622–23 (1997).  "It is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be

dispositive." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).   "Put differently, the predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.*, *quoting* 2 William B. Rubenstein et al., Newberg on Class Actions § 4:49, at 195–96 (5th ed. 2012).

Here, the predominating issues are whether: (1) the Defendants violated KCPA by omitting material facts, by using customers' equipment prior to shipping after representing they would not do so, or depriving customers of a material benefit; (2) whether the Defendants were unjustly enriched by obtaining an interest free loan (disguised as a "pre-order") from customers or using customers' equipment prior to shipping; and (3) whether Defendants committed conversion by using customers' equipment without permission or failing to provide refunds when demanded by customers.  The common operative facts are the significant aspect of the case, which can be established with common evidence, and can be best resolved in a single adjudication. Thus, the first requirement of Rule 23(b)(3) is satisfied.

### (2)    Class action is the superior method of adjudication.

Rule 23(b)(3) further requires a class action be superior to other available methods for the fair and efficient adjudication of the controversy.   Fed. R. Civ. P. 23(b)(3). "In balancing the relative merits of a class action versus alternative available methods of adjudicating the controversy, the trial court may consider: 'the inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually.'" *Dale v. DaimlerChrysler Corp.*, 204 S.W.3d 151, 181 (Mo. App. W.D. 2006) (*quoting  Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 (7th Cir.1974)).  As explained by the

United States Supreme Court:

> The policy at the very core of a class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (*citing Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).  "[O]ne of the primary functions of the class suit is to provide a device for vindicating claims which, taken individually, are too small to justify legal action but which are of significant size if taken as a group." *Brady v. LAC, Inc.*, 72 F.R.D. 22, 28 (S.D.N.Y. 1976).  The class action is especially preferred when a large number of small or medium sized claimants may be involved because "[i]n light of the awesome costs of discovery and trial, many of them would not be able to secure relief if class certification were denied."  *In Re Folding Carton Antitrust Litigation*, 75 F.R.D. 727, 732 (N.D. Ill. 1977).

> (a)   The interest of members of the class in individually controlling the prosecution of separate actions is minimal.

In this case, the individual class members paid anywhere from a few hundred dollars to approximately $22,000 per miner.  (*See e.g.*, BFL's Website, BFLABS-KA 30728, **Exhibit 11**).  Defendants' Interrogatory Exhibit B, which was produced as "Confidential" pursuant to the Court's protective order, shows that most pre-orders were for a few hundred dollars to a few thousand dollars.  Given the technical issues involved in this case and the costs of expert testimony, litigation costs for an individual class member would exceed the maximum possible recovery, making litigation of individual cases uneconomical for most if not all class members. *See In re Motor Fuel*

*Temperature Sales Practices Litig.*, No. 07-MD-1840-KHV, 2015 WL 5010048, at *12 (D. Kan. Aug. 21, 2015) ("[I]n light of the limited size of any potential financial recovery for any particular class member and the possibility of inconsistent results, a class action is a far superior method of resolving the claims compared to individual suits.").

The "most compelling rationale for finding superiority in a class action" is the case of a "negative value suit" where the stakes to each member are too slight to repay the cost of the suit. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 (5th Cir. 1998). "This factor is most relevant where each class member has suffered sizeable damages or has an emotional stake in the litigation . . . where the damages each plaintiff suffered are not that great, this factor weighs in favor of certifying a class action." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D.Cal. 1996) (*citing In re Northern Dist. Cal., Dalkon Shield, Etc.*, 693 F.2d 847, 856 (9th Cir. 1982)).

This case does not present a situation where each class member has suffered sizeable damages or has an emotional stake in the litigation, such as in a personal injury case. Accordingly, the interest of class members in individually controlling their own litigation is minimal.

(b)     The extent and nature of litigation already commenced by members of the class supports certification.

As to the extent and nature of litigation concerning the controversy already commenced by members of the class, Plaintiff has inquired through discovery about other similar lawsuits filed against Defendants. The FTC has filed a statutory enforcement action seeking injunctive and equitable relief against BFL and Vleisides. (*See* Case No. 4:14-cv-00815-BCW). The FTC action resulted in a settlement with BFL and Vleisides that resulted in a $38 million dollar suspended judgment with BFL and

Vleisides paying a total of $19,000.00 to the FTC and with little to no money being returned to the victims of the scam. (*See Federal Trade Commission v. BF Labs Inc. et al.*, Case No., 4:14-cv-00815-BCW, Doc. 377).

As for suits seeking damages from Defendants, Defendants disclosed six individual cases:  *Meissner v. BF Labs Inc.*, No. 13-2617-RDR-KGS (D. Kan.); *Lolli v. BF Labs Inc.*, No. 13LA-9619 (Johnson County District Court); *Mazur v. BF Labs Inc.*, No. GV14-7544 (Chesapeake General District Court); *Tomaszewski v. BF Labs Inc.*, No. 14SC-397 (Johnson County District Court); *Shen*, No. 15CV-05342 (Johnson County District Court), and *Bevand*, 16-CV-01115-FJG (W.D. Mo.).  Plaintiffs' understanding is that none of these cases involved class action allegations.  Accordingly, there is not significant litigation already commenced by members of the class against Defendants and this factor weighs in favor of certification as a class action.

(c)    It is desirable to concentrate the litigation in this forum.

Concentrating the claims of the class in this forum is desirable because there are no pending actions in other forums pursuing a class action and there are adequate Plaintiffs and competent counsel willing to pursue the claims of the class within this forum.

(d)    There are no unusual difficulties likely to be encountered in the management of the case.

There are no unusual difficulties likely to be encountered in the management of this case as a class action.  Courts have managed scores of class actions with no unusual difficulty. "[D]ismissals [of class actions] for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule."  *In re Bristol Bay, Alaska, Slamon Fishery Antitrust Litigation*, 78 F.R.D. 622, 628 (W.D. Wa.

1978) (internal citations and quotations omitted).

Any difficulty encountered in the management of this action as a class action is far outweighed by the difficulties that would be encountered by the joinder of thousands of separate suits.  This case presents no more difficulties to manage than other class action suits, including securities litigation and consumer fraud cases.  Accordingly, this factor weighs in favor of class certification.

Thus, because the common questions of law and fact predominate the action and a class action is the superior method of adjudicating the claims alleged in this case, the Rule 23(b)(3) requirements are satisfied.

## V.   ADDITIONAL MATTERS

In Doc. 163, this Court ordered Plaintiffs to address "the obvious disconnect between the class which the amended complaint seeks to certify and the class which plaintiffs' motion to certify seeks to establish."  (Doc. 163, p. 3).  Below is a side-by-side comparison of the proposed class definition in the amended complaint and the proposed class definition in the amended motion for class certification:

| **First Amended Complaint** | **Amended Motion for Class Certification** |
| --- | --- |
| The Plaintiff Class consists of all persons who pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, with the following subclasses by representative plaintiff and by claim: | Plaintiffs and, pursuant to Rule 23, respectfully move the Court for an Order: |
| | (a)  Determining that this action shall be maintained as a class action with the Plaintiff class defined as: |
| (a) Kyle Alexander – KCPA –subclasses defined as "All persons or who pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, | **Alexander Count I – KCPA**<br><br>All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July |

2014" and "All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014 and (2) as of this filing, have not received the product(s) ordered or a refund";

17, 2014, and (2) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

(b) Kyle Alexander – Unjust Enrichment – subclasses defined as "All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, (2) as of this filing, have not received the product(s) ordered, and (3) either (a) received a refund, or (b) have not yet received a refund" and "All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014 and (2) as of this filing, have not received the product(s) ordered or a refund";

### **Alexander Count II – Unjust Enrichment**

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

(c) Kyle Alexander – Conversion – subclasses defined as "All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, (2) demanded or requested a refund, (3) as of this filing, have not received the product(s) ordered, and (4) either (a) received a refund, or (b) have not yet received a refund" and "All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between

### **Alexander Count III – Conversion**

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, (2) demanded or requested a refund, and (3) as of November 18, 2016, have not received the product(s) ordered and have not received a refund.

September 3, 2012 and July 17, 2014, (2) demanded or requested a refund, and (3) as of this filing, have not received the product(s) ordered or a refund";

(d) Dylan Symington – KCPA – subclass defined as "All persons who pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014";

(e) Dylan Symington – Unjust Enrichment – subclass defined as "All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014 and (2) as of this filing, have received the product(s) ordered"; and

(f) Dylan Symington – Conversion – subclass defined as "All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014 and (2) as of this filing, have received the product(s) ordered."

(First Amended Complaint, Doc. 123, ¶ 133).

### Symington Count I – KCPA

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

### Symington Count II – Unjust Enrichment

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

### Symington Count III – Conversion

All persons who (1) pre-paid BFL for ASIC 65 NM generation products or ASIC 28 NM generation products between September 3, 2012 and July 17, 2014, and (2) as of November 18, 2016, have received the product(s) ordered and have not received a refund.

Excluded from each class shall be BF Labs Inc. and any shareholder, director, officer, or employee of BF Labs Inc.; the Court and Court

> personnel; counsel of record for BF
> Labs Inc.; and counsel of record for the
> Named Plaintiffs and Plaintiffs; and
> any customers who previously settled
> with Defendants.
>
> (Amended Motion for Class
> Certification, pp. 1-2).

In the First Amended Complaint, Plaintiffs proposed alternative class definitions because discovery was ongoing and Plaintiffs' counsel was still analyzing class certification. The change in dates from "as of this filing" to "as of November 18, 2016" was made to reflect any refunds or product deliveries made by BFL since the amended complaint was filed.  The changes in language stating that (a) Plaintiff Alexander only seeks to represent putative class members who have not received the product ordered and have not received a refund, and (b) that Plaintiff Symington only seeks to represent putative class members who received the product ordered and have not received a refund were made pursuant to Plaintiffs' request for leave to file an amended motion for class certification, which was granted.  (Doc. 159, p. 5; Doc. 163, p. 3).

Regardless, the class allegations in the amended complaint are not relevant to class certification under Rule 23.  Class certification analysis is governed by Rule 23(a)-(b), which does not require a class definition that matches the class alleged in the complaint.  In fact, Rule 23(a)-(b) does not even require that any class allegations be made in the complaint.  In *Chapman*, the Seventh Circuit Court of Appeals recently addressed the issue and explained:

> The parties and the district judge have proceeded as if
> Chapman's proposal to certify a class defined with reference
> to the opt-out notice requires an amendment to the
> complaint, to which the standards of Fed.R.Civ.P. 15(a)(2)

> apply. They don't say why, and we can't see why. A complaint must contain three things: a statement of subject-matter jurisdiction, a claim for relief, and a demand for a remedy. Fed.R.Civ.P. 8(a). Class definitions are not on that list. Instead the obligation to define the class falls on the judge's shoulders under Fed.R.Civ.P. 23(c)(1)(B). *See Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011). The judge may ask for the parties' help, but motions practice and a decision under Rule 23 do not require the plaintiff to amend the complaint.

*Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015).

The district court has authority to modify a class definition, and the court is not limited to the class definition contained in the complaint. *See Colorado Cross-Disability Coal. v. Taco Bell Corp.*, 184 F.R.D. 354, 357 (D. Colo. 1999) ("Taco Bell argues that the class definition contained in the Third Amended Class Action Complaint, rather than the modified class definition, is binding on plaintiffs. I disagree. I have discretion to alter, expand, subdivide or modify the class definition."); *see also Vaszlavik v. Storage Technology, Corp.*, 175 F.R.D. 672, 683 (D.Colo.1997) ("Class action certification is discretionary with the trial court judge . . . and may be altered, expanded, subdivided or abandoned as the case develops.") (internal citation omitted); *West v. Capitol Federal Savings and Loan Ass'n*, 558 F.2d 977, 982 (10th Cir. 1977) (class certification is interlocutory and subject to change).

## VI.    CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs request this Court to grant their Amended Motion for Class Certification, to appoint Kyle Alexander and Dylan Symington as class representatives and Plaintiffs' counsel Noah K. Wood and Ari N. Rodopoulos of the Wood Law Firm, LLC as lead class counsel, and any other relief the Court deems just and proper.

Respectfully submitted,

WOOD LAW FIRM, LLC


By   /s/ Ari N. Rodopoulos
      Noah K. Wood           #23238
      noah@woodlaw.com
      Ari N. Rodopoulos      #26585
      ari@woodlaw.com
      1100 Main Street, Suite 1800
      Kansas City, MO 64105-5171
      T: (816) 256-3582
      F: (816) 337-4243
      Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2016, the foregoing document was filed with the clerk of the court using the court's CM/ECF system, which will serve notice on all parties of record.


By   /s/  Ari N. Rodopoulos
     *Attorneys for Plaintiffs*