**DECLARATION OF BRANDON BONE**
**PURSUANT TO 28 U.S.C. § 1746**

  I, Brandon Bone, hereby state that I have personal knowledge of the facts set forth below and am competent to testify about them. If called as a witness, I could and would testify as follows:

  1. I am over 18 years old.  I live in Kansas City, Missouri.

  2. I am a graduate student at the University of Missouri, Kansas City, in the School of Education, and I am the owner of a language services company where I provide translation and proofreading services.

  3. I worked at BF Labs, Inc. ("Butterfly Labs") from November 2012 to January 2014 at its location at 10770 El Monte, Overland Park, Kansas.  In January 2014, Butterfly Labs asked me to leave because they were taking the customer service division in a new direction. To my knowledge, I was not terminated for cause. About five weeks prior to my departure, I was told during my performance review with Darla Drake that one of my outstanding qualities was "staying out of office politics."

  4. I had numerous job duties during my time at Butterfly Labs, but I was officially in the customer services department.  It was my job to interface with consumers over email. I also delegated refund requests from customers to another team in the customer services department.

  5. During my time in the customer services department, my job was to respond to customers' questions about the product or answer questions about missed delivery deadlines. Each time a deadline was missed, the customer services department was often not informed, but we were still required to provide revised estimated shipment dates to customers.

  6. While the extensive products delays were ongoing, Butterfly Labs continued to take more pre-orders and customers progressively grew angrier. On or around February or March 2013, I informed Butterfly Labs that I was no longer going to continue to provide consumers

1

**EXHIBIT 21**

with an estimated shipment date because I did not want to continue lying about the shipment date and compromise my integrity.

7. On or around April to May 2013, I started assisting another employee, Sam Johnston, in the "burn room." The "burn room" is a large room that is set up to handle heavy amounts of power consumption in order to support large numbers of Bitcoin mining machines operating at the same time. During my time at Butterfly Labs, there were up to three burn rooms operating at one time. Depending on the room, there could be over 500 Bitcoin mining machines hooked up and actively mining Bitcoins at one time.

8. My job was to gather Bitcoin mining machines and to plug each mining machine into the "burn room." Every single mining machine that we plugged into the burn room was intended for customers. I was told that the mining machines were placed in the "burn room" for testing purposes. But it is not necessary for the company to mine Bitcoins with the machines in order to test them. A closed system referred to as the "test net" was specifically designed as a means to test Bitcoin mining equipment without actually mining for Bitcoins. Butterfly Labs never used a "test-net" in the "burn rooms."

9. I found Butterfly Labs' decision to mine for Bitcoins with all of the consumer's mining machines to be unfair because the company explicitly told customers that they do not use the customer's equipment to mine Bitcoins.

10. On or around August or September 2013, I started assisting Sabina Marsh with invoicing. My primary duties were assisting with bank wire and Bitcoin payments. This role was especially crucial because Paypal had stopped working with Butterfly Labs due to their no-refund (and severely delayed delivery) policy. At that point, Butterfly Labs was only accepting

2

payments through bank wire and Bitcoin. I continued working with Sabina up to point of my termination.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of September, 2014, in Kansas City, Missouri.

___/s/ Brandon Bone_____

Brandon Bone

3