**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DIVISION OF KANSAS
 2
 3    KYLE ALEXANDER, and           )
      DYLAN SYMINGTON, on behalf    )
 4    of themselves and all those   )
      similarly situated,           )
 5                    Plaintiffs,   )
                                    )
 6         vs.                      )  No. 14-CV-2159-KHV-JPO
                                    )
 7    BF LABS, INC, a Wyoming       )
      Corporation, doing business   )
 8    as BUTTERFLY LABS,            )
                     Defendant.     )
 9
10                DEPOSITION OF BRUCE BOURNE,
11    produced, sworn and examined on Tuesday, August 25,
      2015, at the law offices of Polsinelli, P.C., 900
12    West 48th Place, Suite 900, in Kansas City, Missouri,
      before:
13
                 JAMES A. LEACOCK, CCR, for
14               CROSS REPORTING SERVICE, INC
15    A Certified Court Reporter for the State of Missouri.
      Taken on behalf of the Plaintiffs.
16
                      APPEARANCES:
17
      For the Plaintiffs:
18        WOOD LAW FIRM, LLC
          By:  Mr. Ari N. Rodopoulos
19        1100 Main Street, Suite 1800
          Kansas City, Missouri  64105
20
      For the Defendant:
21        POLSINELLI, P.C.
          By:  Mr. Mark A. Olthoff, and
22             Mr. Michael Foster
          900 West 48th Place, Suite 900
23        Kansas City, Missouri  64112
24    Videographer:
          Mr. David Lombardo, TBC Video
25
```

**Page 2**

```
 1                S T I P U L A T I O N S
 2
 3        It is hereby stipulated and agreed by and
 4    between the parties herein that presentment to the
 5    attorneys of record of a copy of this deposition
 6    shall be considered submission to the witness for
 7    his signature within the meaning of the Kansas
 8    Rules of Civil Procedure, but shall in no way be
 9    considered as a waiver of the witness' signature;
10    and will be filed with the court, to be signed by
11    the witness at any time before or at trial of this
12    case.
13
14                      I N D E X
15                                              Page
16    Examination by Mr. Rodopoulos.............. 3
17    Exhibit 2, Letter to BFL's counsel.........31
18    Exhibit 3, Complaint.......................34
19    Exhibit 4, BFL's Answers...................34
20    Exhibit 5, BFL Initial Disclosures.........89
21    Exhibit 6, BFL's Answers...................99
22
23
24
25
```

**Page 3**

```
 1               THE VIDEOGRAPHER:  Let the record
 2    reflect the time is 12:07 p.m.  Today is Tuesday,
 3    August 25, year 2015.  Will counsel please voice
 4    identify themselves and state whom you represent.
 5               MR. RODOPOULOS:  Ari Rodopoulos for
 6    Plaintiffs.
 7               MR. OLTHOFF:  Mark Olthoff on behalf of
 8    BFL and the witness.
 9               THE VIDEOGRAPHER:  Will the court
10    reporter now administer the oath to the witness.
11                   BRUCE BOURNE,
12    of lawful age, being produced, sworn and examined
13    on behalf of the Plaintiffs, testified as follows:
14    EXAMINATION BY MR. RODOPOULOS:
15    Q.   Sir, would you state your name for the record.
16    A.   My name is Bruce Bourne.
17    Q.   You understand that you have been designated to
18         testify on behalf of Butterfly Labs?
19    A.   I do.
20    Q.   As a corporate representative?
21    A.   Yes.
22    Q.   In front of you is something that we have marked
23         as Exhibit 1, which I will just tell you is the
24         Notice of Deposition for today.  Have you seen
25         that prior to today?
```

**Page 4**

```
 1    A.   I have.
 2    Q.   And I understand from your counsel or from BFL's
 3         counsel that you are going to be able to discuss
 4         basically all of the topics listed in Exhibit 1
 5         with me, with the exception of 15, 20, 24 and 25;
 6         is that correct?
 7    A.   That's correct.
 8    Q.   Do you understand what it means to be a corporate
 9         representative on behalf of a corporate entity?
10    A.   I do.
11    Q.   What is your understanding of that, just so we're
12         on the same page?
13    A.   That my testimony is not my own personal
14         experience, but it is the position and
15         understanding of the company.
16    Q.   And have you made efforts to research, learn and
17         obtain the positions of the company?
18    A.   To the extent I could, given the volume of the
19         material, yes.
20    Q.   Very good.  Are there any topics that you are
21         going to address or that you have been offered to
22         address that you feel you are not able to
23         adequately address as you sit here right now?
24    A.   Adequate is sort of a relative term.  I am
25         comfortable with nearly all of the topics.  The
```

5

1  ones that I will need to see some documentation
2  around is, you know, if you've referenced in some
3  of these, FTC document number such and such,
4  paragraphs X, Y, Z, I'm not going to be able to
5  recall those.  The other aspect that I am less
6  familiar with, I would say, is the marketing items
7  that are on the website at different points in
8  time and how they are worded.  I may ask to see
9  the, you know, the printed material.  But I have
10  at least a good familiarity with each of these.
11  Q.  Sounds fair enough.  And if that need arises, you
12     just let me know and we'll try to address it,
13     okay?
14  A.  Okay.
15  Q.  All right.  Let's start with Topic Number 1, which
16     is Butterfly Labs' formation and management
17     structure.  I have been referring to Butterfly
18     Labs as BFL in this case.  Is that okay if I do it
19     in this deposition as well?
20  A.  That's fine.
21  Q.  Just give me a general overview of BFL's formation
22     and management structure.
23  A.  Okay.  So the company was founded and incorporated
24     in August of 2011.  It is a Wyoming C.
25     corporation.  The original founders were Sonny,

6

1     his partner Nasser.  And I don't know that Jeff
2     Ownby was involved at that time, but he came in
3     soon after that.  So the company is a Wyoming
4     corporation.  It has a board of directors.  There
5     are designated corporate officers.  And then on a
6     day-to-day basis, the on-the-ground management
7     team makes the operating decisions for the
8     company.
9  Q.  Okay.  And it sounds like, at least from what I
10     have seen anyway, a lot of the owners are also
11     officers of the company?
12  A.  Half of the owners are officers of the company.
13  Q.  And those officers also control some of the daily
14     operations, some or all; is that accurate?
15  A.  Yes.
16  Q.  So in terms of just the basic structure, you have
17     kind of your entry level employees who report to
18     managers who in turn report to the officers, who
19     in turn report probably to either board of
20     directors or owners; is that a fair summary?
21  A.  That is a fair characterization.  There is
22     probably some, you know, interim level supervisory
23     people.  But that's the essential structure.
24  Q.  Okay.  And I think you said Butterfly Labs was a
25     C. corporation?

7

1  A.  Correct.
2  Q.  What do you mean by that?
3  A.  There are regular for-profit C. corporations.
4     There are closely held S. corporations.  There are
5     limited liability companies.  There are
6     partnerships.  There are not-for-profit companies.
7     So Butterfly is -- B.F. Labs, Inc. is a regular
8     for-profit C. corporation with shareholders.
9  Q.  That is a private corporation, though, in the
10     sense of it has not been made available to the
11     public?
12  A.  That's correct.
13  Q.  So if someone wanted to become a shareholder, they
14     would have to get approved by all the other
15     owners?
16  A.  At this stage, yes, that would be correct.
17  Q.  Was that the stage at the beginning as well?
18  A.  Yes, I think it has always been a C. corporation.
19  Q.  All right.  We'll just kind of start moving down
20     the line into Topic Number 2.  BFL's past and
21     present organizers, who are they?  Who are the
22     organizers?
23  A.  So -- well, the organizers of the company, as far
24     as my understanding of that terminology, is the
25     people who formed the company.  Initially the

8

1     three officers of the company would have been
2     Sonny Vleisides, Nasser Ghoseiri and Jody Drake as
3     the corporate secretary.  So I believe Sonny and
4     Nasser, and largely Sonny since he is here in the
5     U.S., were the ones who got the paperwork
6     together, made the filings or worked through
7     attorneys at the time to get the filings done.  So
8     the organizers, largely Sonny and Nasser.
9  Q.  Very good.  And then who is on the board of
10     directors?
11  A.  The board of directors at the time of formation or
12     currently?
13  Q.  Well, let's -- I guess my question kind of assumed
14     that the board had remained the same.  Let's start
15     off at initially.
16  A.  Okay.  Initially it was Sonny Vleisides, Nasser
17     Ghoseiri and Jody Drake as the board.  To clarify,
18     I am not sure if the initial founding board -- you
19     know, usually what happens is you hire a law firm
20     and the law firm files some paperwork and the
21     lawyer is the initial organizer or board.  And
22     very quickly, as soon as the paperwork is done,
23     transitions off and other people go on to the
24     board.
25  Q.  I'm not interested in that.  Let's move from that

**21**

1 pre-order business model.
2 Q. And of any of the -- you mentioned a few sources
3 that BFL would rely on or lean on for guidance and
4 things. Did BFL ever get advice or consult with
5 anyone specifically about, hey, how do we do a
6 pre-order business model? What is the right way
7 to do it? How do we make sure we are doing it
8 right? What are some of the pitfalls to avoid?
9 A. Not to my knowledge.
10 Q. Kind of learned as they went?
11 A. Yes.
12 Q. Okay.
13 A. Reacted to demand is pretty much how it went.
14 Q. All right. Now, you said a minute ago you've had
15 business experience yourself?
16 A. Yes.
17 Q. Just real quickly, I'm not trying to challenge
18 your qualifications here, but I just want to know
19 a little bit about your background. Some things
20 off your resume'.
21 A. Okay. What would you like to know?
22 Q. Just what your business experience, what your
23 education, if you think that's relevant to that.
24 A. Sure. I have -- my undergraduate degree is in
25 accounting. I started out as a public auditor

**22**

1 with Arthur Anderson & Company. I have in the
2 past had a certified public accountant license in
3 both Georgia and Florida. That license is no
4 longer active. But I am fairly well-versed in
5 accounting. I also have a master's in business
6 administration degree. I have been financial
7 controller or chief financial officer for a number
8 of companies ranging from very small to $2 billion
9 in revenue. I have been a business consultant in
10 financial and general management areas for about
11 10 years, working with mostly smaller companies,
12 but some a little bit larger. So I have a total
13 of about 30 years of business-related work
14 experience.
15 Q. And as I am listening, it sounds like your
16 experience is primarily in the area of accounting,
17 best financial practices, things like that?
18 A. I have moved away since '88, 1988, I left the pure
19 accounting realm. I have, my MBA is from Harvard
20 Business School which is a general management
21 business school. And since then I have worked in
22 roles that were more operational and general
23 management, usually with a strong financial
24 connection.
25 Q. Okay. Well, let me ask you this then. What

**23**

1 experience or training have you had with the
2 pre-order business model?
3 A. Exposure to it in graduate school. And then I
4 worked as a controller for an airline, where you
5 presell tickets and deliver the services over a
6 period of time. I also worked as the general
7 manager of a magazine publishing company, where
8 you presell subscriptions or advertising, which is
9 then delivered over time.
10 Q. Good. I'm glad I asked. I didn't know that. All
11 right. And did BFL consult with you about, hey,
12 how are we going to do this pre-order business
13 model? What is the right way to do it, what is
14 the wrong way to do it?
15 A. No, by the time I joined the company, the company
16 was two years old and well into operations.
17 Q. The pre-order business model had already existed
18 before you got there?
19 A. Correct.
20 Q. All right. Well, since we're on the topic. Once
21 you teamed up or started working with BFL,
22 actually you weren't ever employed by BFL,
23 correct?
24 A. That's correct.
25 Q. More of an outside consultant?

**24**

1 A. Yes.
2 Q. Once you started consulting with BFL, from that
3 point on, did you give advice as to hey, here is
4 how you need to be doing this pre-order business
5 model. Here is what is working, here is what is
6 not working. Or was it always just the pre-order
7 business model is BFL's thing and you are not
8 really advising on that issue?
9     MR. OLTHOFF: Object as vague and overly
10 broad. But you can answer.
11 A. Okay. The company never came to me and said, "We
12 want you to assess the pre-order model and how
13 we're doing it specifically." But given the push
14 back that we were getting in public forum, the
15 company was getting in public forums and from
16 customers and noncustomers, and some bad press, it
17 was clearly a topic of conversation. So the
18 conversation was more around how can we improve
19 our operations to fulfill what we want to provide,
20 the company wants to provide for its customers, as
21 opposed to changing the pre-order aspect of it.
22 It was more about the fulfillment and the delivery
23 of the products that were being ordered to meet
24 the customer demand and what the company was
25 interested in providing to its customers.

81

1  certain amount of money to BFL.  To date, he
2  hasn't received the money or any product or
3  service.  Wouldn't BFL at least agree that he is
4  owed his money back?
5  A.  We would.
6  Q.  Okay.  And if the Plaintiff is claiming that as
7  damages, to get his money back, then we wouldn't
8  have a dispute on this anymore?  Or would we
9  still?
10          MR. OLTHOFF:  Object to the form, that
11      calls for a legal conclusion as to whether
12      that is a viable damage or not.
13 A.  He had requested a refund and was placed in the
14     refund queue.  And prior to reaching the date of
15     payment in that refund queue, he became a
16     participant, lead Plaintiff in this lawsuit.  So
17     that refund was put on hold.  Barring this action,
18     he would have received his refund.
19 Q.  (By Mr. Rodopoulos)  Are there any terms anywhere
20     on BFL's site or otherwise that says if we don't
21     provide your product or the service, we won't
22     refund your money.  And if you file a lawsuit to
23     try to get that money, you will be delayed even
24     further.  Do you have the right to do that?
25 A.  There is nothing on our website that says that.

82

1  Q.  Number 15.  Defendant says essentially that
2      "Plaintiff breached or failed to perform
3      conditions precedent or subsequent."
4          MR. OLTHOFF:  Just object to the extent
5      that that would call for a legal conclusion.
6  Q.  (By Mr. Rodopoulos)  I just want to know, what
7      evidence do you have of any breach by the
8      plaintiffs or any failure to perform a condition
9      by the plaintiffs?
10         MR. OLTHOFF:  Same objection, it calls
11      for a legal conclusion.
12 A.  In working on our affirmative defenses we rely on
13     advice of counsel.  And I would say this is
14     probably one area where this was advice of
15     counsel.
16         MR. RODOPOULOS:  I got to get it from
17     somewhere, Mark.  If there is a factual basis for
18     it, if they are saying it all came from counsel,
19     then I need to see what it is.
20         MR. OLTHOFF:  I will say this as well.
21     You have alleged a punitive class.  So it is very
22     possible that some of these affirmative defenses
23     may apply to certain members of the punitive class
24     and others not.  It's directed at -- it does say
25     "plaintiffs".  But if you have a class that is

83

1  certified, certain of these defenses certainly
2  apply to some punitive class members and not
3  others.  So beyond that I don't have a specific
4  factual basis to provide you concerning Mr.
5  Alexander or Mr. Symington.
6         MR. RODOPOULOS:  Fair enough.  That
7  helps me understand it and I can move on.
8  A.  It does.  And actually it reminds me that every --
9  as we have been reading plaintiffs, I keep
10 thinking of these two lead plaintiffs.  But, you
11 know, I had lost sight of the fact that the
12 plaintiffs is actually a proposed class.  All
13 right.  I may want to rethink some of my answers
14 to see if there would be anything different if I
15 were to address.  I would just say generally I
16 agree with that, that there are a lot of
17 different -- there's, you know, thousands of
18 customers and they are all unique.  And so when
19 some of these people -- for instance, what was
20 disclosed on the website when the plaintiffs
21 placed their orders.  It would have been different
22 for Symington and Alexander, versus lots of the
23 other people.  So that actually is probably why a
24 lot of the denials came in.  Not specifically for
25 these two guys, but --

84

1  Q.  Could have been broader?
2  A.  -- because for the class, it would not -- whatever
3      the assertion was, it wouldn't have been true.
4  Q.  Well, let's do this then.  Maybe, Mark, you can
5      help shortcut some of this.  I was at what, 13 or
6      15?  I was at like 15.  For the rest of those I
7      have on my topics, if these are just kind of
8      asserted to raise defensive potentially for the
9      rest of the class and there's not specific
10     evidence for the plaintiffs, then if you guys just
11     state that, I will just move on.
12         MR. OLTHOFF:  That's the case.
13         MR. RODOPOULOS:  Very good.  Why don't
14 we take a break then and come back.
15         THE VIDEOGRAPHER:  Stand by, please.
16 Going off record at 2:08 p.m.
17     (Lunch recess.)
18         THE VIDEOGRAPHER:  Resuming record after
19 a lunch recess at 2:41 p.m.
20         MR. RODOPOULOS:  Mark, you mentioned
21 that you wanted to go on the record and -- go
22 ahead.
23         MR. OLTHOFF:  Sure.  Mr. Bourne during
24 the break had recognized that there were some
25 additional testimony he would like to provide that

21 (Pages 81 to 84)

125

1        argumentative.
2   Q.   (By Mr. Rodopoulos)  Do you agree with that or no?
3   A.   No, I don't.  I think it is because this is -- the
4        P.C. industry is well established.  And the
5        bitcoin industry is more like the wild west, where
6        everything is clean sheet and newly developing, so
7        that manufacturers who move first are able to get
8        market share.
9   Q.   As part of that effort to move first, rather than
10       do the two or three years of testing and spending
11       tens of millions of dollars before releasing, in
12       this situation, BFL advertised first and then
13       tested later; is that fair in a sense?
14            MR. OLTHOFF:  Object to the form, it is
15       overly broad, vague, ambiguous and argumentative.
16  Q.   (By Mr. Rodopoulos)  I will make it much simpler.
17       In this case BFL advertised the products before
18       they were tested?
19            MR. OLTHOFF:  Object to the form, overly
20       broad.
21  A.   Advertised before they were tested?
22  Q.   (By Mr. Rodopoulos)  If the answer is different by
23       product -- let me change it.  I understand Mark's
24       objection now.  I think -- here is what I am
25       asking.  Was there any product that was listed in

126

1        Interrogatory Number 2 there that was tested
2        before it was advertised?
3   A.   Go back to Number 2 for a moment.  I can't answer
4        it -- well, if you want to limit it to the ASICs.
5   Q.   Limit it to the ASICs.
6   A.   Limit it to the ASICs.
7   Q.   And let me add that when I say advertised, I mean
8        offered for preorder sale.
9   A.   By tested, you know, again, I think Sonny talked
10       about how you hire someone to do theoretical
11       design work and project what the outcome would be.
12       In that regard, testing and projection in a bench
13       test or a software simulation, tested probably in
14       software simulation, not tested in physical
15       existence.
16  Q.   Fair enough.
17  A.   I will agree, not tested in physical existence.
18  Q.   On Interrogatory Number 9, Plaintiffs are trying
19       to figure out how often did you give a shipping
20       representation, and then how often did you
21       actually satisfy your own representation.  Do you
22       understand that's the basic import of this
23       question?
24  A.   I didn't, but if you are telling me that, I will
25       accept that.

127

1   Q.   With that in mind, without getting into details,
2        would you agree that, by and large, BFL wholly
3        failed to meet its own shipping estimates?
4            MR. OLTHOFF:  Object to the form, it's
5        argumentative.
6   Q.   (By Mr. Rodopoulos)  I don't mean it to be
7        argumentative.  If that's not true, just say so.
8        I'm just asking the question.
9   A.   Well, you know, the word "wholly" is, even to me,
10       sounds a little bit argumentative.
11  Q.   Fair enough.  Let me rephrase it.  Would you agree
12       that BFL largely failed to meet its own shipping
13       representations?
14            MR. OLTHOFF:  Object to the form, it's
15       vague and ambiguous with respect to the term
16       "largely".
17  Q.   (By Mr. Rodopoulos)  More often than not?
18  A.   Let me talk about representations first.  BFL
19       anticipated, estimated, scheduled, projected, but
20       did not promise delivery on a specific timetable.
21       So in this process, which people in the company
22       knew and believed that the customers understood
23       was new technology, rapidly developing, very
24       innovative, stuff that had not been done before,
25       applications of science that hadn't been applied

128

1        before in the development of products, that we did
2        the best.  The company was doing its best, given
3        the information it had at any particular point in
4        time to project when it would be able to produce
5        and ship products.  As new information became
6        available, there wasn't a precise company policy
7        of every 30 days or every two weeks we will
8        announce a new update to shipping.  The updates
9        were periodic, somewhat reactive to the latest
10       developments or information that we got from
11       outside parties.  And to some extent reactive to
12       customer inquiries.  The more customer service was
13       having to answer the same question over and over
14       again, the more incentive there was to put out
15       kind of a general update.  So we tried to keep --
16       the company tried to keep customers and the
17       general public up-to-date as it became aware of
18       new information that affected the estimates.
19            Did the company meet its estimates in
20       whole or in part?  I would say, you know, given
21       the number of revisions of the date of initial
22       shipments, the company was not able to project
23       with any degree of accuracy at the beginning when
24       it was going to be able to start shipments.  Once
25       shipments started, again, the company was using

181

1 scheduling shipments for October 2012" is
2 accurate.
3 Q. In 12-O, the second part there. FTC basically
4 alleges that "Defendants made statements to
5 reassure consumers of timely delivery." Do you
6 see that?
7 A. I see it. I am going to read the whole -- "did
8 not overcome the net impression" -- okay, so
9 what's the question?
10     MR. OLTHOFF: I am going to -- go ahead
11 and ask your question first.
12 Q. (By Mr. Rodopoulos) My question is, did BFL use
13 language to reassure consumers that timely
14 delivery would occur?
15     MR. OLTHOFF: Object to the form of the
16 question to the extent it calls for speculation.
17 A. I'm not sure exactly what timely delivery, how
18 that would be defined. Reassure them of timely
19 delivery. You know, the company made the
20 assertions, projections, scheduling, estimates
21 that it made. I don't know that it was to
22 reassure people of timely delivery. We were
23 trying to accurately, to the best of the company's
24 ability, say when we thought we would be able to
25 deliver. Or ship at least.

182

1 Q. (By Mr. Rodopoulos) On 12-Q, "FTC alleges that
2 Defendants were actually aware of the potential
3 for long delays, but simply chose not to inform
4 consumers of that fact." Is that true?
5 A. I don't think that's true.
6 Q. Let's start with, let's break it down, because it
7 is kind of two different things. Were
8 Defendants -- was BFL aware of the potential for
9 long delays?
10 A. I think that BFL was aware in the design stage of
11 it, of the products, that if you ran into a
12 problem, there could be a long delay. Based on
13 interactions with the experts that we hired to
14 help design and then manufacture, we were not --
15 there wasn't indications from them that there were
16 likely to be long delays. At the points at which
17 we got notified that there was a problem, it was
18 generally not painted as a long delay. It was
19 "we've run into a problem, we're working on fixing
20 it. We're doing best efforts," et cetera. So
21 there was not a case where the company was told,
22 you know, look, there's a risk of a six-month
23 delay and the company chose not to disclose that
24 to people, or to call it a two-month delay or a
25 one-month delay, as opposed to what it was being

183

1 advertised to us by the suppliers.
2 Q. Did BFL ever disclose on the website that, just
3 these words, "there is a potential for long
4 delay"?
5 A. I don't think that we used those words.
6 Q. Did you use any words that BFL contends is
7 similar?
8     MR. OLTHOFF: Object to the form of the
9 question, vague.
10 A. There was at least, in one instance, a posting
11 that said this is -- it is a preorder product
12 still in development. And I don't remember the
13 exact language, but essentially it said that if
14 you are not comfortable waiting, and I don't
15 remember whether it said for a specific period or
16 for at least this much time, do not order this
17 product.
18 Q. (By Mr. Rodopoulos) Any others? Any other
19 examples that you can think of?
20 A. That is the prime example that I can think of.
21 There may be others that I am not able to call to
22 mind.
23 Q. "FTC alleges that Defendants presented on the
24 preorder page for the Monarch, that as of
25 September 9th, 2013, that they were in the final

184

1 testing phases, taping out of the chip." Is that
2 true?
3 A. I think that is a -- I think that is actually a
4 condensation. I don't think that is a direct
5 quote from the website. That we were in the final
6 testing phase, quote, taping out of the chip. But
7 easy enough to go back and look and see if we did
8 make that comment. The taping out part doesn't
9 seem like it jibes with this. But outside of the
10 taping out being in the final testing phases, that
11 does sound right.
12 Q. So BFL did state that they were in the final
13 testing phases?
14 A. September. Final testing phases of the chip. Not
15 the finished product.
16 Q. Okay. And then what is taping out of the chip?
17 What does that mean?
18 A. That -- I am not qualified to answer that. I will
19 tell you, it is part of the process of chip design
20 and development. And I know that it is a
21 milestone in that development process. But that's
22 more of an engineering question than I can answer.
23 Q. Whatever that actually means, from an engineering
24 perspective, fair to say that taping out is in the
25 final testing phase?

46 (Pages 181 to 184)

201

1 ended.
2 Q. Fair to say, then, that the supply chain also was
3 open ended?
4 A. The supply chain to the extent that it really is
5 not only heavily dependent but critically
6 dependent on the supply of the chips. So yes, the
7 supply chain, until you get the design of the
8 chips done and then the boards that the chips are
9 going to sit on, the supply chain is dependent on
10 the engineering timeline.
11 Q. Is it true that -- Well, I am going to skip that
12 part. I am going to skip that part. I am going
13 to move on. Okay. "FTC alleges that BFL sent an
14 e-mail to customers in April of 2013 stating it
15 was shipping machines when it was not yet actually
16 doing so." Is that true?
17 A. I don't -- they are claiming we sent an e-mail to
18 all customers? It is not clear from that, what
19 you just read. I don't know -- I don't recall or
20 I'm not aware that the company sent an e-mail to
21 its customers saying that the company was
22 shipping. Although it is my understanding that
23 the first machines did ship in April of 2013. The
24 first machines of the first generation ASIC
25 product.

202

1 Q. "FTC alleges that an employee recommended to
2 company management, including Sonny, that
3 consumers be provided information about delivery
4 delays and that his recommendation was dismissed
5 because BFL did not want customers to know they
6 would have to wait so long for the machines." Is
7 that true?
8      MR. OLTHOFF: I just continue my
9 continuing objection.
10 A. I don't know what the motivation, I don't know
11 what the conversation was. And I don't know that
12 that would have been the motivation for telling
13 him not to tell customers that. I think we would
14 dispute that.
15 Q. (By Mr. Rodopoulos) Is it true, though, that the
16 company did not want consumers to know that they
17 would have to wait so long for the machines?
18 A. So long. So long is a vague term. I think what
19 would have been true is that the company expected
20 there would not be a long delay. I don't even
21 know what the time frame of this is. But if the
22 company believed it was going to be able to
23 rectify whatever was causing the delay in a short
24 period of time, the company wouldn't have believed
25 that there was going to be a long delay. And

203

1 that's my understanding, is there was a series of
2 short delays that cumulatively added up to a long
3 delay.
4 Q. "FTC also alleges that with respect to the
5 Monarch, BFL represented shipment would occur by
6 the end of 2013. And that based on its experience
7 with the BitForce line, that the Monarch promised
8 delivery date was solid." Is that true?
9 A. I think that's a misinterpretation. It refers to
10 promised delivery date. My recollection is that
11 we expected or estimated or projected delivery by
12 the end of the year. And it would have been
13 couched in terms of, you know, this is again, it
14 is a not yet in production, not final design. It
15 is still in development, but based on our best
16 knowledge and expectations at this point, here is
17 what we project. So I would say we would say
18 that's not accurate.
19 Q. Did BFL use the term "solid" with respect to that
20 year end 2013 shipment date or projection?
21 A. That would be easy enough to confirm. I don't
22 know if that specific word was used.
23 Q. Can't admit or deny?
24 A. Can't admit or deny.
25 Q. Fair enough. "FTC alleges that with respect to

204

1 the Monarch, Defendants were months behind on
2 their timeline for the development, production and
3 shipping, yet did not revise the promised shipping
4 date and even misrepresented the development
5 status." Is that true?
6 A. Months behind on the design, development,
7 production and shipment? No, I don't think
8 that's -- I don't think that's true. We were --
9 with the Monarch, we were right where we expected
10 to be, all the way up to November or whatever the
11 date was that we ran into the metal layer problem
12 in the production of the wafers. That was the
13 first significant issue that arose in the
14 production. But then the design and the
15 development of the Monarch. So I think that
16 statement is overbroad and inaccurate.
17 Q. "In September of 2013, FTC alleges that BFL
18 represented it would complete a part of the
19 testing phase known as taping out within one
20 week." We kind of talked about this earlier?
21 A. That came up earlier.
22 Q. But did BFL state it would complete taping out
23 within one week at some point in December of 2013?
24 A. I don't have a basis for admitting or denying.
25 Let me ask you a question. When it says "the