IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KYLE ALEXANDER, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-2159-KHV-JPO |
| | ) | |
| BF LABS INC., et al., | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF SONNY VLEISIDES

I, Sonny Vleisides, hereby declare and state as follows:

1. I am one of the founders, as well as the Innovation Officer and Vice President of Product Development, at BF Labs Inc. ("BF Labs").

2. When BF Labs was founded, the Bitcoin mining hardware industry did not yet exist.

3. BF Labs was the first company to develop a commercial, purpose-built product to perform the secured hash algorithm 256 calculations that are required for Bitcoin mining.

4. BF Labs offered products based on its own proprietary, computer chip technology; no other company had developed this type of chip before BF Labs entered the market.

5. The company's efforts were, by their nature, based on expectations, projections, and best estimates that were regularly revised as development of new products progressed. BF Labs did its best to communicate the production and delivery estimates to its customers throughout development. Due to many variables in the supply and vendor production timelines, BF Labs communications were different at different times.

*SV*

6. Over time, BF Labs hired management-level executives to handle the challenges facing the company.

7. At its peak, BF Labs had over 100 employees working to deliver advanced technology products never created before, at speeds far faster than the supply chain vendors were used to.

8. While BF Labs used a preorder model for a period of its existence, BF Labs was surprised by the extent of controversy that resulted from the preorder model combined with extremely volatile Bitcoin market price changes, vendor and supplier issues, and subsequent delivery delays. BF Labs ended the preorder model in July 2014.

9. BF Labs believes that its disclosure of the lengthy development and delivery timeframes was adequate and appropriate.

10. The audience of potential Bitcoin mining customers primarily were sophisticated and tech savvy customers.

11. BF Labs' policies and procedures relating to its preorder model and refund policies were clear, ethical, appropriate and, in many instances, the standard in the Bitcoin-mining-hardware industry.

12. Although BF Labs experienced growing pains, other than a handful (for instance, a package was returned back to BF Labs and it could not find the customer) customers who ordered from its first three generations of products were shipped equipment or received their money back, with approximately 58,000 units shipped and more than $5.5 million refunded.

13. From time to time, BF Labs' policies and practices were revised to accommodate production-chain, customer-service, and business-need realities as part of the learning curve of being the first-mover in this burgeoning technology market.

SV

14. In this sophisticated technology niche in which component manufacturers struggled to keep pace with new product generations, each batch of boards and chips was tested because each batch could potentially yield unexpected challenges. BF Labs' did not sacrifice quality for speed.

15. BF Labs' tested its products to confirm they actually worked before sending them to the consumers; its testing of miners typically occurred over a few hours, but occasionally a few days if over a weekend.

16. In order for BF Labs to confirm its products worked reliably and met the advertised performance specifications, they had to be tested using real world conditions on the live bitcoin network before they were designated for shipment.

17. BF Labs did not identify particular customers' products prior to shipment.

18. BF Labs produced products in bulk and ordinarily fulfilled orders in the order received. If a defect was found in a tested miner, then the next available successfully tested unit was shipped to that next customer. No customer "waited" for an unsuccessfully tested machine to be fixed.

19. Most (virtually all) of the 65 NM Bitforce products were delivered or valid refunds paid.

20. Some customers who ordered the 65 NM Bitforce products got the product right away, while others may have waited for a period of time.

21. Less than four-tenths of one percent of BF Labs' orders of 65 NM Bitforce products were from Kansas customers.

22. Less than three-tenths of one percent of BF Labs' orders of 28 NM products were from Kansas customers.

*SV*

23. BF Labs took orders from customers for the 65 NM product whose residences included 50 states and the District of Columbia and over 170 countries.

24. BF Labs took orders from customers for the 28 NM product whose residences included 50 states and the District of Columbia and over 110 countries.

25. As to the Monarch line (28 NM), BF Labs was in the process of making refunds or fulfilling orders when the Federal Trade Commission filed an *ex parte* motion for a temporary restraining order and receivership, which were eventually rejected by the Court. The effect of the FTC's actions were devastating and costly.

26. BF Labs had refund policies in place which changed from time to time and these policies were disclosed to customers. On numerous occasions, even though a refund request was not immediately available under the then-existing policies, BF Labs made exceptions. In total, BF Labs paid over $20 million in refunds.

27. Parallel with although separate from the FTC, the Johnson County District Attorney undertook its own investigation of BF Labs. The Johnson County District Attorney contended that BF Labs had violated the Kansas Consumer Protection Act and sought restitution for consumers who were owed refunds. A consent judgment was entered in order to save litigation costs.

28. I have reviewed the preorders that both Mr. Alexander and Mr. Symington submitted and they both sought to acquire 65 NM products.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on the 16th day of December, 2016.

_____
Sonny Vleisides