# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 14-CV-0815-W-BCW |
| | ) |
| BF LABS INC., et al., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF BRUCE BOURNE

I, Bruce Bourne, hereby declare and state as follows:

1. I am a consultant and acting Chief Financial Officer to BF Labs.

2. I am an honors graduate of Harvard Business School, MBA, General Management, and a summa cum laude graduate of Florida State University College of Business where I majored in Accounting.

3. I have served as Senior Vice President of Strategic Planning & Execution at United Behavioral Health; Chief Financial Officer at Autoland, Senior Accountant at Arthur Andersen, and Captain in the United States Army.

4. Before being raided by the FTC, Butterfly Labs did sell mining machines and services that consumers could use to generate Bitcoins.

5. BF Labs has shipped 58,391 devices since its inception in 2011, orders for all product lines prior to the Monarch line have been either fulfilled or refunded.

6. By December 31, 2013, all pre-ordered 65 NM mining machines were shipped or timely and otherwise properly requested refunds were provided.

7. BF Labs shipped 28,252 devices from October to December 2013.

49186389.4

8. The first Monarch was shipped directly to a customer on August 20, 2014. Monarchs had been shipped to a Cloud Mining facility beginning in June 2014.

9. If a BitForce machine was defective, the customer had the option to have the BitForce unit repaired or replaced, even if the person was not the original purchaser.

10. All BitForce and earlier BF Labs' customers who wanted a refund received one if the customer was qualified under the sale terms and timely and properly requested the refund. As to the Monarch line, Defendants were in the process of providing refunds to those consumers who actually sought a refund rather than requesting product delivery when the FTC brought its ex parte motion. That is, when a Monarch unit passed quality-control tests and became ready for shipment, the next customer in the pre-order queue was sent an email that offered the customer the choice of either a refund or product delivery. Whichever selection the customer made was timely fulfilled.

11. BF Labs started delivering "Nimbus Mining" – a predecessor to Cloud Mining – in conjunction with a partner in January 2014 and continued until June selling and delivering contracts. All sold contracts are still in force and are being delivered.

12. The FTC stated, in its TRO application, that "[i]n a winner-take-all approach, once one miner solves a puzzle, the Bitcoin network awards Bitcoins to that miner, and the other miners get nothing." Doc. 8, p. 9. This statement is only true if the miner does not participate in a "pool," which the majority of miners do. In a pool, miners all get a share of the bitcoins mined, proportional to the hashing power that they contributed.

13. BF Labs either shipped or refunded all BitForce orders, and was in middle of doing the same with respect to the Monarch line when the FTC raided the company.

2

49186389.4

14. BF Labs would only refuse a request for a refund if the refund was not properly and timely requested, or if it was requested before the requesting consumer became refund-eligible under BF Labs' policy, which was appropriately disclosed as a term of sale. BF Labs even voluntarily liberalized its refund policy in 2014 to include customers who had agreed to a no-refund sales term.

15. Each one of BF Labs first three generations of products were delivered within six months of projections. No hardware was ever initially shipped one year late—that is, one year after the projected date.

16. Jody Drake does not administer BF Labs' web forum. Josh Zerlan administers the web forum with a non-employee administrator.

17. Based on a shareholder meeting held in March 2014, Jody Drake is the Assistant Secretary and is not the Treasurer of BF Labs, Inc.

18. Sonny Vleisides owns 44% of the stock and is the largest shareholder but he does not own over 50% of the stock. Also, Mr. Vleisides is a co-founder of BF Labs, not the sole founder.

19. Most of the purchases referenced in the FTC's TRO Application were valid business expenses, and any non-business expenditures were properly accounted for. For instance, the massages that Jody Drake paid for were for fifteen minute chair massages to all requesting employees at their desks at BF Labs' headquarters during the peak of the shipping and manufacturing period. This is not an uncommon practice at high-tech companies in my experience.

20. The so-called "large amounts" of expenditures made from March 2013 to November 2013 as cited by the FTC totaled $14,714.26 across all corporate credit card

3

transactions referenced in the FTC's TRO application. Furthermore, of the "[l]arge amounts" of Butterfly Labs' funds that the FTC asserts "went to non-business purposes," $6,440.01 went to purchases of hardware to build out equipment, leaving approximately $8275 of allegedly personal expenses. As a point of comparison, just the shipping costs for delivery of products to customers during this period exceeded $1,000,000.

21. The FTC had access to BF Labs' BMO bank records, yet failed to disclose that $2.5 million was regularly kept in BF Labs' checking account and that amounts in excess of the $2.5 million were automatically transferred to BF Labs' savings account. This is a standard corporate finance practice, and was not dissipation of assets.

22. Of the 307 supposed consumer complaints made to the FTC's Sentinel reporting system, all but 57 of the complaints were made in 2013 (nowhere near the time that the FTC moved in secret for its supposedly urgent relief).

23. The 307 complaints related to 320 BF Labs customer orders. Of those 320 orders, 54 of the complaints were either duplicates or did not correlate with an actual BF Labs customer name.

24. Of the remaining 266 (320 minus 54) orders:

- 93% received in full either equipment, service, and/or a refund.

- 3% pertain to Monarch orders for which customers are still waiting for their equipment or a refund (and will continue to wait, as a result of the FTC's *ex parte* actions); and

- for the 9 orders that compose the remaining 4%:
  - two orders received a partial refund,
  - one order was shipped, but was returned because the customer refused to pay customs duties,
  - one order was canceled,

4

49186389.4

- one order was settled with the customer after a demand letter, and
- four orders require additional research at this time.

25. The FTC's decision to pursue an *ex parte* TRO, compounded by its media campaign (including press releases, interviews, and a Twitter "town hall" used to interactively and publicly embarrass the company), has caused irreparable harm to BF Labs, its employees, and its customers.

26. While the FTC has professed not to be intent on shutting the company down, its actions to date are effectively bleeding BF Labs to death.

27. With respect to its reputation, BF Labs has been labeled as a bogus company, as scammers, and has been accused of defrauding customers (which is not far off from outright calling BF Labs a criminal enterprise) by a powerful Federal regulatory agency. The distribution of coverage that these comments received was international in scope. Even if the FTC published a full retraction, the reputational hit to BF Labs will never go away. Once something is on the internet, it is there forever and likely cannot be rectified.

28. In terms of cost, BF Labs has incurred literally hundreds of thousands of dollars in additional costs to pay for attorneys to defend itself, accountants to examine it, and a Receiver and his extensive team to oversee it. These are costs that the company would not have incurred and will never recoup. The company's shareholders bear that cost.

29. As a result of the asset freeze, injunction, and receivership, BF Labs has lost some of its best human capital. The lead Assembly supervisor, our lead Shipping Clerk, the only Purchasing Manager, and the lead Account Manager all sought and found other employment during the five weeks the entire company was shut down and people were thrown out of work. The company may actually have lost more people, but cannot know for sure yet because

not all staff has been recalled to work even after almost eight weeks. BF Labs cannot get these people back, nor can it hire new staff under the cloud of suspicion that the FTC has placed over it.

30. In terms of product value, with the passage of time, the future date on which some competitor will release a newer, more competitive product draws closer. BF Labs is currently prevented from competing to be the first to develop and release new mining equipment, and is at risk of seeing its entire investment in the current technology destroyed due to its current inability to ship units to customers who are waiting for them. Once a new product is out, customers will surely want refunds instead of the "older" products. There is no way to turn back the clock on this passage of time, so the damage here is truly irreparable.

31. With respect to vendor relations, BF Labs' payment accounts are frozen and the Receiver makes all disbursements as and when he deems it appropriate. Vendors went weeks without any payments or communication. Many have issued late notices, and some have even issued disconnect notices. More than one supplier has now refused to do business with BF Labs until all past due invoices are paid and future goods or services are paid in advance. One contract software engineer has refused any further work with the company due to the perceived stigma of working with a company being sued for fraud by the government. Even if BF Labs is eventually able to replace some vendors, they may not be as good as the ones the company had been using, and certainly any new vendor will not have the depth of experience in working with the company.

32. BF Labs' employees have been seriously harmed by the asset freeze, injunction, and receivership. Approximately 75% of BF Labs' workforce is paid hourly rates ranging from $12-$14 per hour. Due to being barred from the building and unable to work, a number of these

people were forced to seek public assistance. Without paychecks, it is my understanding that people had difficulty making rent and car payments, which would likely result in damage to their personal credit ratings. I am aware of at least one employee who received utility disconnect notices.

33. BF Labs' employees have also been subjected to stigma. Having one's name associated with an employer accused of criminal activity is embarrassing at best, and could lead to future employment issues for the more senior members of management.

34. Two key managers are named defendants and have had their assets substantially frozen for over two months. One of these two individuals told me they had to pull their son from preschool because he could no longer pay the tuition. Prior to a partial release, the other person had indicated they may need to sell their car to cover basic living expenses. These people and their families will not ever be able to wipe this stain from their experience.

35. One key managers was deposed by the FTC early in this action. Inexplicably, the FTC then published this person's deposition on the internet without redacting their social security number, their address, or other personal identification information. This manager has a family, including young children, and has received death threats, been subjected to ridicule on the internet, and has had to install a sophisticated home security system at their own expense. This is harm that could have far-reaching, long term, and potentially horrible personal results.

36. As a result of the asset freeze, injunction, and receivership, BF Labs' customers who had come up in the order queue and elected to receive their product instead of a refund have not been able to receive product for eight weeks now. This prevents them from mining, which is what the FTC accused BF Labs of doing. The FTC is irrefutably doing to these people the very thing BF Labs was trying not to do by shipping its product.

7

49186389.4

37. Today I have been made aware of two customers who previously wanted their products but who, due to the now eight week delay, have opted to instead receive refunds. Refunds are much more costly than shipping product; thus, the FTC's action has caused an increase in refund liability and caused irreparable harm to BF Labs.

38. Customers who had been waiting in the refund queue have continued to wait for the last eight weeks while no refunds were processed. BF Labs does not know when or if it will be able to resume paying these customers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of November, 2014.

*Bruce W. Bourne*
Bruce Bourne

8

49186389.4