# EXHIBIT K

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-0815-W-BCW |
| | ) | |
| **BF LABS INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### DECLARATION OF JOSH ZERLAN

I, Josh Zerlan, hereby declare and state as follows:

1. I am the Vice President of Product Development at BF Labs Inc. ("BF Labs"), and began working at BF Labs in August 2012.

2. I have worked in the electronics and IT industries over 25 years.

3. My jobs and duties have ranged from electronic and physical security to hardware and software end-user support to hardware design and development and maintenance.

4. Burn testing is an industry-standard practice conducted by hundreds of thousands of electronics companies since the first assembled electronics rolled off the line for consumers.

5. All electronics design and manufacturing companies, large and small, conduct burn testing in one form or another.

6. Without burn testing, devices would have a much higher failure rate and a much higher incidence of underperformance, resulting in an inferior, undesirable product.

7. With burn testing, BF Labs' failure rate in the field is less than 2%.

8. Without burn testing, BF Labs' failure or underperformance rate in the field would be closer to 40%.

9. This means 40% of BF Labs' customers would receive undesirable products, necessitating their return under RMA, costing both the consumer and the company time and money, thereby increasing prices and reducing customer satisfaction.

10. Burn testing on "testnet" is not suitable due to the nature of testnet.

11. Testnet is designed to test protocol changes and new software.

12. Testnet is designed primarily to test software. Using it to test hardware would make it unusable to those wishing to use it to test software and thus is not suitable for even regular brief testing of hardware, much less a sustained testing of new hardware.

13. Also, Testnet-in-a-box is not suitable for modern hardware because it relies on directly communicating with bitcoind, which is unable to issue work fast enough to keep new hardware busy, resulting in incomplete and inaccurate testing of new hardware.

14. A large number of our customers purchase BF Labs' hardware with the intentions of operating it on the bitcoin network.

15. BF Labs would therefore be negligent not to test the hardware on the very network that many customers wish to operate it on.

16. Not doing so risks the chance that the hardware would operate properly on a test network but fail to perform properly on a live network.

17. The live network is a complex interaction of many different parts, the majority of which BF Labs has no control over.

18. As such, our hardware absolutely MUST accommodate for the vagaries and unexpected inputs of an uncontrolled network.

19. Utilizing a testnet allows one to control all variables and eliminates the possibility of unexpected input or responses, making any testnet testing dissimilar to the livenet and as such

is not an accurate representation of what BF Labs' customers would be utilizing our hardware for in the real world.

20. BF Labs' burn testing is an insignificant portion of the network and has always been our policy to not allow BF Labs to become a risk by accumulating a large portion of the bitcoin network's hashing power.

21. Any entity accumulating a significant portion of the network hashing power puts the network at risk by offering a central point of failure and also by giving the accumulating entity the ability to perform fraudulent transactions.

22. As such, BF Labs has always intended to keep our hashing power on the network at a minimum and limited to the least amount as necessary to conduct proper testing.

23. The intent of the original policy was to prevent BF Labs from obtaining a sizable or even a majority portion of the network hashing power, and for no other reason.

24. Since that risk is no longer valid or possible, the reasons for not using the live network have been eliminated.

25. In my opinion, the BF Labs asset freeze, receivership, and injunction, and the FTC's aggressive negative media campaign, are unnecessary and improper, and have materially and irreparably harmed BF Labs.

26. In my opinion, if the asset freeze, receivership, and injunction continue, BF Labs will be materially and irreparably harmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of November, 2014.

Josh Zerlan