UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF KANSAS

| | | |
|---|---|---|
| MARTIN MEISSNER, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:13-cv-2617 |
| BF LABS INC., | ) | |
| Defendant. | ) | JURY TRIAL REQUESTED |
| | ) | |

# Complaint

## Jurisdiction and Venue

1. Plaintiff Martin Meissner is a dual German-Polish national, residing in Shenzhen, Guangdong Province, People's Republic of China.

2. On information and belief, Defendant is a Wyoming corporation, with its principal place of business at 10770 El Monte St., #101, Leawood, KS 66211.

3. On information and belief, Defendant is registered and in good standing with the Kansas Secretary of State, and is amenable to service through its registered agent, National Registered Agents, Inc. of KS, 112 SW 7th Street, Suite 3C, Topeka, KS 66603.

4. There is complete diversity of citizenship between the parties.

5. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332, and, therefore, this Court has subject matter jurisdiction.

6. Venue is proper in the District of Kansas under 28 U.S.C. § 1391 because BF Labs is subject to personal jurisdiction in Kansas, and a substantial part of the events or omissions giving rise to the claims occurred in Kansas.

EXHIBIT 2

## General Allegations

7. BF Labs holds itself out as a manufacturer of specialized technology equipment used to "mine" "Bitcoins."

8. A Bitcoin is a unit of intangible currency that exists only on the internet, without direct ties to any single nation's monetary system (though Bitcoins *are* regularly exchanged for sovereign currencies like the U.S. dollar and the British pound).

9. As of the time of this writing, one Bitcoin is worth approximately US$1,000.

10. Bitcoins are earned, or "mined," by solving a complex mathematical riddle, which requires a large amount of computer-processing power.

11. Whoever solves one of those riddles, earns ownership of a certain number of Bitcoins.

12. As more Bitcoins are "mined," the difficulty continues to increase, requiring greater and greater computing power.

13. Based on the mathematic principles underlying the Bitcoin system, there will never exist more than 21,000,000 Bitcoins.

14. Mr. Meissner has a demonstrated history of successfully mining Bitcoins.

15. BF Labs holds itself out to the public as a manufacturer of specialized computer equipment designed specifically for the task of mining Bitcoins.

16. In March 2013, Mr. Meisner corresponded by email with BF Labs' account manager, "Dave M."

2

17. On information and belief, "Dave M." is the man identified by http://www.butterflylabs.com/management/ as Dave McClain, the account manager of the corporation.

18. On March 8, Mr. Meissner asked BF Labs for an estimated delivery date for a then-contemplated new order, noting that, "[Y]our website . . . mention[s] initial shipping [is] scheduled for the last half of February 2013."

19. "Dave M." responded the same day: "If you place an order for any of our products, they may ship in a May/June timeframe."

20. Mr. Meissner wrote again on March 10: "Delivery time: How long would the shipping to this destination take by express delivery? **The delivery time is crucial for the planned investment** . . . ." (Emphasis added.)

21. Mr. Meissner's communications put BF Labs on notice that time was "of the essence."

22. Dave M. responded on March 11:

> Because we have not gotten our production team up to speed, it is impossible to know exactly when your machine will ship from our facilities. If you want that kind of assurance. You may want to wait until we have machines "in stock" to make your order. Unfortunately, it **may be this summer** before we achieve that status. **But our goal is to be able to ship an order either the same day or the next day after an order is placed.**

(Emphasis added.)

23. Based on that representation, Mr. Meissner reasonably expected shipment by mid-June, or perhaps July at the latest, for his contemplated purchase.

3

24. Two weeks later, on March 25, Mr. Meissner placed his order, requesting express shipping, for two "1,500 GH/s Bitcoin Miners."

25. BF Labs assigned his order the number 100026166.

26. BF Labs identifies its "1,500 GH/s Bitcoin Miners" with the product code "MRG015T."

27. Mr. Meissner wire-transferred payment of US$62,598 to BF Labs via the bank of his company, TradeMost Enterprises Ltd., a few weeks later.

28. The wire transfer cost an additional US$34.19, for a total debit of US$62,632.19.

29. The transferred funds belonged to Mr. Meissner, not to TradeMost.

30. Mr. Meissner placed the order, and made the payment, as a consumer, and not on behalf of TradeMost or any other business entity.

31. BF Labs received the money in its name through its bank, Commerce Bank at 8901 State Line Rd., Kansas City, MO.

32. At the time of Mr. Meissner's payment, BF Labs' product-specific web page for the MRG015T reiterated the June-or-perhaps-as-late-as-July timeframe:

> Pre-order Terms: Bitforce SC (ASIC) products are in final stage development with **initial shipping scheduled for the last half of April 2013.** Products are shipped according to placement in the order queue, and **delivery may take 2 months or more after order. . . .**

(Emphasis added.)

33. Having not received confirmation of the wire transfer, Mr. Meissner contacted BF Labs on May 2, asking for the status of his order.

4

34. On May 5, "Jody" on behalf of BF Labs responded:

> We received your money but the bank tells us only "Trademost Enterprises Ltd" so we were not able to match your payment to your order until we got your email. I have received your payment and sent a copy of your invoice for your records. Your order is processing (paid).

35. On information and belief, "Jody" is the woman identified by http://www.butterflylabs.com/management/ as Jody Drake, the general manager and secretary/treasurer of the corporation.

36. That same day—May 5—BF Labs sent Mr. Meissner invoice #10002555 for his order, which confirmed receipt of $62,598 for two MRG015Ts (each priced $29,899, plus $2,800 for shipping and handling).

37. Months passed without shipment of the Bitcoin Miners.

38. At one point, BF Labs informed Mr. Meissner that it wouldn't be shipping the two MRG015Ts Bitcoin Miners (1500GH/s) at all, but that, instead, BF Labs unilaterally decided it would substitute six (6) 500 GH/s machines.

39. As Mr. Meissner grew tired of the delays and lack of communication from BF Labs, he consulted its web site for any indicia of shipping certainty; at that time, BF Labs' "FAQ" page read:

> When will you start shipping machines?
>
> A **We plan on shipping the ASIC versions of our products by the end of April.** We have orders that date back to June of 2012. Those are the orders that will be delivered first. **Orders placed now will not ship until the month of July.**

(Emphasis added.)

5

40. So it was only *indirectly* that Mr. Meissner ever learned he might have to wait till *July* for delivery.

41. But July came and went with no actual delivery, nor with any certainty of future delivery.

42. August, too, came and went with no actual delivery, nor with any certainty of future delivery.

43. And September also came and went with no actual delivery, nor with any certainty of future delivery.

44. In mid-October, Mr. Meissner, through his attorney's demand letter, advised BF Labs that any shipments at that late stage would be refused.

45. To-date, Mr. Meissner has not received the Bitcoin Miners from BF Labs (neither the model he ordered, nor a unilaterally substituted model).

46. BF Labs' repeated delays in shipping are commercially unreasonable.

47. BF Labs' conduct violates Federal Trade Commission regulations, which set forth that it is "unfair competition" and an "unfair or deceptive practice" for BF Labs to have solicited orders unless BF Labs had, at the time of solicitation, a reasonable basis to expect that it would be able to ship merchandise within a definite or otherwise reasonable time. 16 C.F.R. § 435.1.

48. BF Labs' conduct also violates Federal Trade Commission regulations because BF Labs failed to ship within a reasonably based timeframe, and then failed to offer Mr. Meissner, "clearly and conspicuously and without

6

prior demand, an option either to consent to a delay in shipping or to cancel [Mr. Meissner's] order and receive a prompt refund." 16 C.F.R. §435.1(b)(1).

49. Despite shipping of the Bitcoin Miners taking well longer than BF Labs' initial 2-month estimate, BF Labs never contacted Mr. Meissner to provide an updated shipping date, nor to discuss his entitlement to a refund.

50. In no way, shape, or form did Mr. Meissner ever agree to BF Labs' unreasonable 6-plus-month delay.

51. Mr. Meissner requested a refund from BF Labs on more than one occasion, but was told "all sales are final."

52. But there never has been a "sale," and, therefore, there is no "sale" that could be considered "final," because a "sale" requires transfer of title and possession of property from the seller to the buyer. *See, e.g.,* Black's Law Dictionary 929 (6th ed. abgd. 1991).

53. Now, more than 8 months after Mr. Meissner placed his order, and more than 7 months after his payment, BF Labs still has not transferred title and possession to the two MRG015Ts Bitcoin Miners.

54. Even if BF labs *were* to ship the Bitcoin Miners today, their value is far less than it would have been if delivered within a reasonable time because with each passing week the Bitcoin difficulties are growing more and more complex, requiring more and more computing power, and there are fewer Bitcoins remaining to be mined.

7

55. At the time Mr. Meissner ordered the Bitcoin Miners from BF Labs, there were other vendors of comparable mining equipment.

56. Because BF Labs took Mr. Meissner's money, but delivered nothing in return, he was unable to use that money for comparable mining equipment from a BF Labs competitor.

57. As recently as September, BF Labs' website seemed to acknowledge that aggrieved parties like Mr. Meissner would be able to get a refund: "If you would really like a refund . . . just ask and we'll probably be able to take care of you."

58. BF Labs' acts and failures to act, and its commercial practices generally, have been nothing short of unreasonable, wanton, and reckless.

59. If Mr. Meissner had received the Bitcoin Miners in a commercially reasonable timeframe, he would have mined approximately 5,000 to 7,500 Bitcoins with them.

60. As of this writing, the value of those mined Bitcoins (US$1,000 each) would be between US$5,000,000 and US$7,500,000.

61. Mr. Meissner has been damaged by BF Labs by the loss of his April 2013 payment of $62,632.19, the lost opportunity to mine millions of dollars' worth of Bitcoins, and by his unnecessarily incurring attorneys' fees and costs.

62. Mr. Meissner anticipates that discovery may bear out that the reason behind BF Labs' commercially unreasonable shipping practices is that BF Labs utilized the earliest Bitcoin Miners off the manufacturing line for its own

8

Bitcoin mining endeavors, to its clients' detriment, which would be unreasonable, wanton, and reckless.

### Count I: Breach of Contract

63. All other averments are incorporated herein by reference.

64. There existed a contract between Mr. Meissner and BF Labs.

65. Mr. Meissner performed his obligations under the contract.

66. Mr. Meissner put BF Labs on notice before entering into the contract that time was of the essence of the contract.

67. BF Labs breached the contract.

68. Mr. Meissner suffered damages because of BF Labs' breach.

69. BF Labs' breach is the legal cause of Mr. Meissner's damages.

**WHEREFORE**, Plaintiff Martin Meissner prays for judgment in his favor, and against Defendant BF Labs Inc., on all claims; that the Court award him the full extent of his damages, including direct damages of $62,632.19 and consequential damages in excess of $5,000,000.00; for costs and attorneys' fees; and for all such other relief as the Court deems just and equitable.

### Count II: Fraud

70. All other averments are incorporated herein by reference.

71. BF Labs repeatedly made misrepresentations of fact, opinion, and/or intent for the purpose of inducing Mr. Meissner to tender money to BF Labs, including, but not limited to:

   a. On March 11, "Dave M." represented that shipment would be forthcoming by summer 2013;

   b. At the time of Mr. Meissner's payment, BF Labs' product-specific web page for the MRG015T represented they would be shipping in the "last half of April 2013. . . . [though] delivery may take 2 months or more after order. . . ."

   c. In late-spring 2013, BF Labs' "FAQ" web-site page read:

   > When will you start shipping machines?
   >
   > A    **We plan on shipping the ASIC versions of our products by the end of April.**   We have orders that date back to June of 2012.   Those are the orders that will be delivered first.   **Orders placed now will not ship until the month of July.**

   d. As recently as September, BF Labs' web site acknowledged that aggrieved parties like Mr. Meissner would be able to get a refund:   "If you would really like a refund . . . just ask and we'll probably be able to take care of you."

   e. BF Labs unilaterally attempted to substitute a different product than the two MRG015T Bitcoin Miners for which Mr. Meissner already had ordered and paid.

10

72. On information and belief, BF Labs knew or believed that these shipping, refund, and product matters were not as BF Labs represented them to be.

73. On information and belief, BF Labs did not have confidence in the accuracy of its representations.

74. On information and belief, BF Labs knew that it did not have a basis for the representations.

75. BF Labs' misrepresentations were material.

76. Mr. Meissner reasonably relied upon those misrepresentations, to his detriment.

77. Mr. Meissner was justified in relying upon BF Labs' misrepresentations.

78. Mr. Meissner suffered damages because of BF Labs' misrepresentations.

79. BF Labs' misrepresentations are the legal cause of Mr. Meissner's damages.

**WHEREFORE**, Plaintiff Martin Meissner prays for judgment in his favor, and against Defendant BF Labs Inc., on all claims; that the Court award him the full extent of his damages, including direct damages of $62,632.19 and consequential damages in excess of $5,000,000.00; for costs and attorneys' fees; and for all such other relief as the Court deems just and equitable.

### Count III:  Negligent Misrepresentation

80. All other averments are incorporated herein by reference.

81. On information and belief, BF Labs supplied false information in order to lure Mr. Meissner into the sale transaction.

82. On information and belief, BF Labs continued to supply false information in order to prevent Mr. Meissner from: seeking a refund of money; seeking a redress of the wrong; purchasing comparable equipment from BF Labs' competitor(s).

83. On information and belief, BF Labs failed to exercise reasonable care or competence in obtaining and communicating material information to Mr. Meissner.

84. Mr. Meissner reasonably relied on the false information from BF Labs.

85. On information and belief, BF Labs knew at the time of its supply of false information that Mr. Meissner's reasonable reliance thereon would hinder his ability to mine Bitcoins before the increasing difficulties rendered the contemplated equipment obsolete.

86. BF Labs' supply of false information to Mr. Meissner caused him damage.

87. BF Labs' supply of false information is the legal cause of Mr. Meissner's damages.

**WHEREFORE**, Plaintiff Martin Meissner prays for judgment in his favor, and against Defendant BF Labs Inc., on all claims; that the Court award him the full extent of his damages, including direct damages of $62,632.19 and consequential damages in excess of $5,000,000.00; for costs and attorneys' fees; and for all such other relief as the Court deems just and equitable.

### Count IV: Kansas Consumer Protection Act (Deceptive Acts)

12

88. All other averments are incorporated herein by reference.

89. BF Labs willfully used exaggeration, falsehood, innuendo, and/or ambiguity as to material facts in its written representations.

90. BF labs willfully failed to state material facts, and/or willfully concealed, suppressed, or omitted such material facts.

91. BF labs' conduct constituted several instances of "deceptive acts and practices" within the meaning of the Kansas Consumer Protection Act, K.S.A. 50-623, *et seq*.

92. Pursuant to K.S.A. 60-634 and -636, Mr. Meissner is entitled to recover from BF Labs civil penalties, costs, and attorneys' fees.

**WHEREFORE**, Plaintiff Martin Meissner prays for judgment in his favor, and against Defendant BF Labs Inc., on all claims; that the Court award him the full extent of his damages, including direct damages of $62,632.19 and consequential damages in excess of $5,000,000.00; for penalties, costs, and attorneys' fees under the Kansas Consumer Protection Act; and for all such other relief as the Court deems just and equitable.

### Count V: Kansas Consumer Protection Act (Unconscionable Acts)

93. All other averments are incorporated herein by reference.

94. BF Labs engaged in unconscionable acts and practices in connection to its consumer transaction with Mr. Meissner.

13

95. BF Labs' conduct was unconscionable because, *inter alia*:

    a. BF Labs knew or had to reason to know it was taking advantage of Mr. Meissner's inability to protect reasonably his interests because of great geographic distance, and because of differences in nationality, language, and custom; and

    b. BF Labs knew or had to reason to know Mr. Meissner was unable to receive a material benefit from the subject of the transaction because of the unreasonable delays.

96. BF labs' conduct constituted several instances of "unconscionable acts and practices" within the meaning of the Kansas Consumer Protection Act, K.S.A. 50-623, *et seq.*

97. Pursuant to K.S.A. 60-634 and -636, Mr. Meissner is entitled to recover from BF Labs civil penalties, costs, and attorneys' fees.

**WHEREFORE**, Plaintiff Martin Meissner prays for judgment in his favor, and against Defendant BF Labs Inc., on all claims; that the Court award him the full extent of his damages, including direct damages of $62,632.19 and consequential damages in excess of $5,000,000.00; for penalties, costs, and attorneys' fees under the Kansas Consumer Protection Act; and for all such other relief as the Court deems just and equitable.

                                        Respectfully Submitted,
                                        THE FLYNN LAW FIRM, P.C.

By: /s/ Robert F. Flynn
ROBERT F. FLYNN # 22649
1150 Grand Blvd., Ste. 300
Kansas City, MO 64106-2303
(816) 283-3400 (913) 782-1383/Fax
Robert@TheFlynnLawFirm.com
*Attorneys for Plaintiff Martin Meissner*

**Plaintiff respectfully requests a trial by jury.**

15